1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF MICHIGAN
2                  SOUTHERN DIVISION

3

     UNITED STATES OF AMERICA,
4
                         Plaintiff,
5
          -v-                    Case No. 10-20123
6
     D-1 DAVID BRIAN STONE, a.k.a. "RD,"
7        a.k.a. "Joe Stonewall," a.k.a.
         "Captain Hutaree,"
8    D-2 DAVID BRIAN STONE, JR., a.k.a.
         "Junior,"
9    D-3 JOSHUA MATTHEW STONE, a.k.a. "Josh,"
     D-4 TINA MAE STONE,
10   D-5 JOSHUA JOHN CLOUGH, a.k.a. "Azzurlin,"
         a.k.a. "Az," a.k.a. "Mouse," a.k.a.
11       "Jason Z. Charles,"
     D-6 MICHAEL DAVID MEEKS, a.k.a. "Mikey,"
12   D-7 THOMAS WILLIAM PIATEK,
     D-8 KRISTOPHER T. SICKLES, a.k.a.
13       "Pale Horse,"
     D-9 JACOB J. WARD, a.k.a. "Jake,"
14       a.k.a. "Nate," a.k.a. "Guhighllo,"

15   _____ Defendants./

16              **DETENTION HEARINGS**
       **BEFORE HON. MAGISTRATE JUDGE DONALD A. SCHEER**
17            United States Magistrate Judge
              Theodore Levin U.S. Courthouse
18                 231 West Lafayette
               Detroit, Michigan 48226
19
               **(Wednesday, March 31, 2010)**
20

21   APPEARANCES:        RONALD W. WATERSTREET, ESQUIRE
                         Appearing on behalf of the
                         Government.
22
                         WILLIAM W. SWOR, ESQUIRE
23                       Appearing on behalf of Defendant
                         David Brian Stone.
24
                         RICHARD M. HELFRICK, ESQUIRE
25                       Appearing on behalf of Defendant
                         David Brian Stone, Jr.

1          JAMES C. THOMAS, ESQUIRE
            Appearing on behalf of Defendant
2          Joshua Matthew Stone.

3          MICHAEL A. RATAJ, ESQUIRE
            Appearing on behalf of Defendant Tina
4          Mae Stone.

5          RANDALL C. ROBERTS, ESQUIRE
            Appearing on behalf of Defendant
6          Joshua John Clough.

7          HENRY M. SCHARG, ESQUIRE
            Appearing on behalf of Defendant
8          Kristopher T. Sickles.

9          CHRISTOPHER N. SEIKALY, ESQUIRE
            Appearing on behalf of Defendant
10         Jacob J. Ward.

11         MARK A. SATAWA, ESQUIRE
            LISA B. KIRSCH SATAWA, ESQUIRE
12         Appearing on behalf of Defendant
            David Meeks.
13
      COURT RECORDER:    LOLITA GRANGER
14
      TRANSCRIBED BY:    MARIE J. METCALF, CVR, CM
15                       Federal Official Court Reporter
                         257 U.S. Courthouse
16                       231 W. Lafayette
                         Detroit, Michigan 48226
17

18
              *(TRANSCRIPT PRODUCED FROM DIGITAL VOICE RECORDING;*
19                *TRANSCRIBER NOT PRESENT AT PROCEEDINGS)*

20

21

22

23

24

25

**TABLE OF CONTENTS**                                **PAGE:**

**Proceedings - Wednesday, March 31, 2010**

Arraignment of Defendant David Brian Stone..........4

Proffer by the government...........................5

**DETENTION HEARINGS**

**DEFENDANTS:**

David Brian Stone..................................48

David Brian Stone, Jr..............................59

Joshua Matthew Stone...............................66

Tina Mae Stone.....................................73

Joshua John Clough.................................79

Kristopher T. Sickles..............................91

**EXHIBITS:**                                       **RECEIVED:**

Government Exhibit No. 5...........................38

*U.S.A. v. Stone, et al.*

1           Detroit, Michigan

2           Wednesday, March 31, 2010

3           At about 1:54 p.m.

4                *   *   *

5           DEPUTY COURT CLERK:  -- the Honorable

6    Donald A. Scheer presiding.  You may be seated.

7           The Court calls case number 10-20123,

8    United States of America versus David Brian Stone.

9           MR. WATERSTREET:  Good afternoon, again,

10   Your Honor.  Ronald Waterstreet appearing on behalf of

11   the United States.

12          THE COURT:  Thank you.

13          MR. SWOR:  Your Honor, William Swor on

14   behalf of and with Mr. David Brian Stone.

15          THE COURT:  Thank you.

16          MR. SWOR:  Your Honor, we have received

17   the indictment.  We have reviewed the indictment with Mr.

18   Stone.  We waive the reading of the indictment in open

19   court and stand mute to the charges contained in the

20   indictment.

21          We've executed the written acknowledgment

22   of indictment and filed it with the Court.

23          THE COURT:  Thank you.

24          The Court has received the defendant's

25   signed acknowledgment of indictment.  And the defendant

*U.S.A. v. Stone, et al.*

1    having waived the formal reading of the charges and

2    standing mute, a plea of not guilty is entered in his

3    behalf.

4                    And, Mr. Swor, Mr. Stone is prepared to

5    address the issue of bond today?

6                    MR. SWOR:  We are prepared to go forward

7    with the -- I have a funny feeling that the government's

8    not going to agree to unsecured release, so we're ready

9    to go forward.

10                   THE COURT:  Very well, sir.

11                   Are all other counsel prepared to proceed?

12                   UNIDENTIFIED SPEAKER:  Yes.

13                   UNIDENTIFIED SPEAKER:  Yes.

14                   UNIDENTIFIED SPEAKER:  Yes, Judge.

15                   UNIDENTIFIED SPEAKER:  Yes, Your Honor.

16                   UNIDENTIFIED SPEAKER:  Yes, Your Honor.

17                   UNIDENTIFIED SPEAKER:  Yes, Your Honor.

18                   THE COURT:  Mr. Waterstreet, you may

19    proceed.

20                   MR. WATERSTREET:  Thank you, Your Honor.

21    May we be seated?

22                   THE COURT:  Yes, please.

23                   MR. WATERSTREET:  Your Honor, what I would

24    first like to do is draw the Court's attention to the

25    actual charges that each of the defendants have facing

*U.S.A. v. Stone, et al.*

1    against them at this point as a result of a return of a

2    grand jury indictment.

3                    Every one of the defendants in court today

4    is charged with seditious conspiracy and attempted use of

5    a weapon of mass destruction.

6                    David Stone, Sr., and David Stone, Jr.,

7    are charged with teaching, demonstrating use of explosive

8    materials.

9                    And all the defendants are charged with at

10   least one count of carrying, using or possession of a

11   firearm in relation to a crime of violence.

12                   As a result of those charges, the United

13   States will be seeking their detention based upon risk of

14   flight and a danger to the community.

15                   Under 3142(e)(3), and due to the nature of

16   the charges that are pending against all the defendants,

17   there is a presumption that arises that there are no

18   conditions nor combination of conditions which will

19   assure their appearance or to ensure the safety of the

20   community.

21                   The Court need only find that there is

22   probable cause to believe the listed crimes were

23   committed.  And I submit to the Court that by a return of

24   a grand jury indictment, which must be based upon

25   probable cause, that has been met.

*U.S.A. v. Stone, et al.*

```
 1                    And the second thing is they have been
 2        charged with one of the listed offenses.  One of the
 3        listed offenses under sub-section (b) is a 924(c) count
 4        which all the defendants are facing, as well as under
 5        sub-section (c), one of the listed offenses under
 6        2232(b)(g)(5)(B) refers to 18 U.S.C. 2332(a), which is
 7        relating to the use of a weapon of mass destruction,
 8        which applies to all defendants.
 9                    So under two separate charges, each of the
10        defendants is presumed to have no conditions or
11        combination of conditions that would ensure their
12        appearance and ensure the safety of the community.
13                    Your Honor, as I mentioned earlier, what
14        the government intends to do is to provide general
15        information about the overall conspiracy, general
16        information concerning the various roles that people
17        played in that conspiracy.
18                    And then, as the Court is aware, we then
19        intend to go through each defendant separately as to
20        different reasons why they pose a danger to the community
21        and are a risk of flight.
22                    THE COURT:  Very well.
23                    MR. WATERSTREET:  Your Honor, first of
24        all, I would like to start off and say what this case is
25        not about.  It's not about a religious group and it's not
```

*U.S.A. v. Stone, et al.*

1      about the militia.

2                  But it's about a group of like-minded

3      people who decided to oppose by force the authority of

4      the United States by using violence and weapons.

5                  And I just want to digress a moment here,

6      Your Honor, and kind of explain that this case does not

7      appear in a vacuum but comes about as a result of some

8      beliefs that the members of this conspiracy share.

9                  And one of the beliefs they share is that

10     the New World Order, who they refer to as the "elitist in

11     charge," which is a powerful and secretive elitist group

12     with a globalist agenda that seek to have one government

13     and to supplant the government of the United States, is

14     working with the U.S. government.

15                 And the foot soldiers in that regard are

16     people that they refer to as the "Brotherhood," their

17     enemy.  And the Brotherhood has been defined as any

18     federal, state, or local law enforcement officer.

19                 The hierarchy of this group is that a

20     David Stone, Sr., whose nickname is "RD," which comes

21     from the rank structure that he has created by the

22     Hutaree as Radock, his initials being RD, is the leader

23     of this organization.

24                 His son, Josh Stone, is one of the squad

25     leaders of this organization.

*U.S.A. v. Stone, et al.*

```
 1                    His son, David, Jr., is a person who
 2       during training is oftentimes the op force or the
 3       opposition force when they go for training.  And he's
 4       responsible for the detonation of various explosives that
 5       are used in their training.
 6                    Tina Stone, Dave Stone's wife, is in
 7       charge of communications between the various members of
 8       Hutaree and other groups that they believe are affiliated
 9       with them.
10                    Kristopher Sickles is the self-identified
11       leader of the Ohio Militia who would travel from Ohio to
12       train with the Hutaree and would oftentimes help suggest
13       and critique the training techniques that the Hutaree
14       would engage in.
15                    Joshua Clough --
16                    MR. ROBERTS:  Your Honor, if counsel --
17       excuse me.  If I may interrupt?
18                    At this point in time I'm objecting.
19       Unless I understood incorrectly, if the government
20       counsel is proceeding by way of proffer --
21                    THE COURT:  You should --
22                    MR. ROBERTS:  Sorry.  This is Randall
23       Roberts on behalf of Mr. Clough.
24                    If government counsel, as I understand it,
25       is proceeding by way of proffer, I'm objecting to the
```

*U.S.A. v. Stone, et al.*

1    proffer.

2                        I'm objecting -- I understand what the

3    rules allow.  But formally, I'm objecting to the proffer

4    and I'm objecting to any hearsay references of double,

5    triple hearsay that may be coming in based upon review of

6    whatever materials counsel may have reviewed, without the

7    benefit of us being able to test in the crucible of this

8    arena the verification of the various witnesses and the

9    sundry information that they're providing in this forum.

10                       THE COURT:  Mr. Waterstreet?

11                       MR. SCHARG:  I concur with -- on behalf of

12   Mr. Sickles.  I concur that we should have more than a

13   proffer.  We should have a case agent or someone testify

14   because there's no other way to dispute some of the

15   allegations that are starting to develop, especially

16   regarding my client.  There is no way to challenge his

17   proffer.

18                       UNIDENTIFIED SPEAKER:  And I join that

19   objection, Your Honor.

20                       MR. SEIKALY:  I would join that objection

21   on behalf of Mr. Ward.

22                       MR. RATAJ:  On behalf of Mrs. Stone, same

23   objection, Your Honor.

24                       And all I've heard today is that my

25   client's in charge of communications.  Well, we know that

*U.S.A. v. Stone, et al.*

1    from even reading the papers that they have a Facebook

2    page.  So what?

3               So -- I mean, I object to this whole

4    proceeding.  There's nothing I've heard that would

5    suggest that my client is a danger to the community.

6               THE COURT:  Anyone who does not object?

7               MR. THOMAS:  Well, I would acknowledge,

8    Judge, that we spoke about what was going to happen in

9    chambers, but I think that in light of the uniformity,

10   everybody is objecting, you've got a consensus here.

11              THE COURT:  I will accept the statements

12   as made thus far as in the nature of an opening

13   statement.

14              Should specific information be presented

15   to the Court, at least some basis for that information

16   should be acknowledged in the presentation.

17              MR. WATERSTREET:  I will, Your Honor.

18              THE COURT:  The objections are overruled

19   at this time.

20              MR. WATERSTREET:  I believe I was talking

21   about Mr. Clough at the time, Your Honor.

22              He -- his job is an information officer.

23   He is an individual who is responsible for maintaining

24   the web site of -- the Hutaree web site, creating the

25   training videos, in charge of the recruitment videos, as

*U.S.A. v. Stone, et al.*

1        well as responsible for explosives.

2                       One defendant who is not here today is Mr.

3        Piatek.  He has had his appearance in the Northern

4        District of Indiana.  He, as -- along with Mr. Meeks,

5        we'll refer to as the heavy gunners of this organization

6        who were responsible for laying down heavy fire when --

7        when they incurred the -- the enemy.

8                       And Jacob Ward is an active member of the

9        Hutaree.  He is a committed member and follower of this

10       group.  He is also a member of the Ohio militia, and

11       travels oftentimes with Kris Sickles for training up here

12       in Michigan with the Hutaree.

13                      Your Honor, what I intended to do is go

14       through chronologically to give this Court a little idea

15       what this group has been involved in over a period of

16       time.  And I want to start back in December of 2008.

17                      In December of 2008, during an ATF

18       investigation of a local federal firearms licensee in the

19       Southeast Michigan area, Joshua Clough posted on a web

20       site an indication that the Hutaree members were ready to

21       go to war over the fact that the ATF was asking for

22       paperwork from a local federal firearms dealer.

23                      The -- which was posted on AWRM, which

24       stands for a "A Well-Regulated Militia," on December 8th,

25       2008, Josh Clough using the Hutaree given name of

*U.S.A. v. Stone, et al.*

1    Azzurlin, A-z-z-u-r-l-i-n, posted the following:

2                         "ATF agents are at our local FFL

3                         today looking for all the paperwork

4                         specifically relating to our

5                         commander located in SE Michigan,"

6    which I assume is Southeast Michigan,

7                         "We have and will return fire.  The

8                         question is, will you?"

9    And then signs it,

10                         "Hutaree.com."

11   Additionally, on that same day, David Stone sent an

12   e-mail out to various members of the Hutaree, and under

13   the name of Joe Stonewall on the -- from an e-mail at

14   Hutaree@yahoo.com, and the e-mail was titled "Flash flash

15   ATF enforcers."  The content of the e-mail read,

16                         "Okay.  Here we go.  Looks like ATF

17                         enforcers are looking for a reason to

18                         start a fire fight and we will answer

19                         the call.  All Hutaree members

20                         contact me immediately."

21   Approximately one month later, the son of this federal

22   firearms licensee was arrested.  And at that time David

23   Stone, "RD" and his son, Josh, went and volunteered the

24   services of the Hutaree to attempt to break that person

25   out of prison.  Those offers were rebuffed.

*U.S.A. v. Stone, et al.*

 1              And I want to move to now June, early June

 2      of 2009, in which there was a planned training to fight

 3      the U.S. government.  And during that planned training,

 4      RD indicated that the police would -- the law enforcement

 5      would be the first to appear, and that the blue helmets,

 6      which he referred to -- which as a side note, blue

 7      helmets are typically UN forces peacekeepers around the

 8      world, who he claims to be part of the New World Order,

 9      will come in.

10              And if I might just stop for a moment

11      here, on You-Tube there's a publicly-available video

12      which was created by the Hutaree and which depicts an

13      individual up in a tree stand who spots somebody walking

14      along in the forest.

15              And if you look closely you'll notice that

16      one of the people who are being spotted in the forest is

17      wearing a blue helmet.  The person on the tree stand

18      jumps down and is met with other members purportedly of

19      the Hutaree.

20              Next, the video focuses in on some type of

21      trip-wire device.  And I want to finish this story first

22      before I digress a little more about the trip-wire

23      device.

24              In that video, it's a close-up of a

25      clothes pin with orange wires connected to it, which has

U.S.A. v. Stone, et al.

1    a trip-wire connected -- that's holding the two ends of

2    the clothes pin apart.  The idea is that when the item

3    that is holding those two pieces of the clothes pin apart

4    are allowed to touch each other and complete the

5    electrical circuit, an explosive will detonate.

6              The video goes on to show an individual

7    who is purportedly a member of the New World Order,

8    walking down the path and tripping the trip-wire,

9    followed quickly by an explosion and showing a body prone

10   on the ground apparently to indicate that the person has

11   been killed.

12             Later then, the video flashes to two

13   individuals walking through a field.  Again, it's -- if

14   you look closely, one of the individuals is wearing a

15   blue helmet.  And as they're walking across the field,

16   the video pans back and you see two people hiding in the

17   brush who purportedly fire upon these two people walking

18   across the field.

19             And then shortly thereafter, there's a cut

20   to the UN flag flying atop a flagpole which is then set

21   ablaze.  And then the members of the Hutaree who are

22   identified by the patches that they wear on their left

23   shoulder, come running in, circle around the flagpole,

24   and rather than raising the U.S. flag, they raise the

25   Hutaree flag.

*U.S.A. v. Stone, et al.*

1           And the reason I said I didn't want to

2     digress too far when I was talking about the improvised

3     trip-wire device, is that on November 15th, 2008, Josh

4     Clough and David Stone, who was then being identified by

5     the name of Captain Hutaree, were on the Liberty Tree

6     Radio webcast and Josh Clough was providing a detailed

7     explanation of what he referred to as a way for a -- I

8     want to make sure I use the right term here -- he -- I'm

9     not finding my place right now, Your Honor.

10          But what -- he described it as a defensive

11    system by which he would be able to identify whether the

12    perimeter had been breached and suggested putting

13    together a trip-wire system, and then went on to explain

14    in great detail the precise type of trip-wire system

15    that's depicted in the video with using the clothes pin,

16    using the wires, the wires coming together closing the

17    circuit, and then, therefore, indicating that somebody

18    has breached the perimeter.

19          I now want to move to June 13th, 2009,

20    which was a training day of the Hutaree out at 6021 Tomer

21    Road in Clayton, Michigan, which is the residence of

22    David Stone, Tina Stone and Josh Stone.

23          Present during that time were David Stone,

24    David Stone, Jr., Josh Stone, Josh Clough, Michael Meeks,

25    Thomas Piatek, Jacob Ward, and others.  And part of the

*U.S.A. v. Stone, et al.*

1    training that day was for the two different squads -- and

2    I have to digress a moment here.

3                    There were two different squads which

4    David Stone wanted to have available to him.  And he

5    referred to the two different squads by a made-up name

6    that he created as part of his language of the Hutaree.

7    And he was going to be the leader of one of those squads,

8    and his son, Josh Stone, was the leader of the other

9    squad.

10                    And that day, David Stone, Jr., would be

11   the opposition force as part of the training.  And the

12   job of the squad's training that day was for them to

13   avoid trip-wires and also to find the opposition force.

14                    It was during that training that various

15   explosives were demonstrated and explained.  For example,

16   one of the explosives that was set off, an IED, which is

17   improvised explosive device, was what David Stone

18   referred to as a Bouncing Betty.  And he went on to

19   explain what a Bouncing Betty was and how it would be

20   built and how it was built.

21                    And unlike an anti-personnel mine in which

22   one individual would step on it and suffer the

23   consequences of that, a Bouncing Betty is something that

24   was first introduced in World War II as -- by the

25   Germans.  It was called an S mine.

*U.S.A. v. Stone, et al.*

1                  And rather than taking out one individual,

2     the way this bomb was built is that if a trip-wire was

3     used or was command detonated, that means somebody set it

4     off watching somebody go by, the Bouncing Betty would

5     first -- have a first explosion, and in this case, David

6     Stone's, the first explosion was used in a shotgun shell,

7     which would cause the projectile and all the materials,

8     the shrapnel in the projectile, to come up about waist

9     high.

10                  And then at that time a second explosion

11    would detonate, causing shrapnel to be sent out 360

12    degrees, that way increasing the effectiveness and the

13    lethality of the weapon to not only seek to harm the

14    person that tripped it, but also the rest of the people

15    that were with him.

16                  During this training, they set off several

17    non-fragmentary explosives and explained that all we need

18    to do is either add shrapnel or ball bearings to these

19    things and we could have improvised hand grenades or

20    improvised explosives.

21                  Also during that day he was able to

22    display an assembled pipe bomb which lacked the explosive

23    materials.

24                  And it was also during this meeting that

25    Michael Meeks was part of a discussion concerning the

*U.S.A. v. Stone, et al.*

1     government.  And during that discussion of the

2     government, he indicated that it was his belief that we

3     should get rid of the entire judicial system and that

4     everybody who was involved needed to die.

5              He also went on to opine that people like

6     Senator Kennedy, the former Senator Edward Kennedy,

7     thought that they were different from everybody else.

8     But all he had to do was just wait and he would find out

9     he would be able to bleed like everybody else.

10              And he also talked about a common

11     reoccurring theme about taking on the Brotherhood by

12     planning to cap a member of law enforcement and take

13     their weapon.

14              I want to move ahead to July 25th, 2009 in

15     which David Stone had a barbecue at the Tomer Road

16     address.

17              Before I go on, there's one other thing I

18     wanted to mention about some of the items that were

19     observed in David Stone's home.  In David Stone's home,

20     in addition to the pipe bomb, he had a large roll of

21     green hobby fuse, a large pile of electric matches.  An

22     electric match is a device that an external electrical

23     current can be placed through it.  It will cause -- it

24     would ignite and then it would cause a combustion of any

25     explosive material.

*U.S.A. v. Stone, et al.*

 1              A large box full of orange electrical

 2      wires, and I submit to the Court that if it does take a

 3      look at the You-Tube video which I discussed earlier, the

 4      type of wires that were used to build the trip-wire

 5      device were orange wires.

 6              And approximately 20 cardboard tubes that

 7      would be used for IED construction, as well as

 8      approximately five or six large green ammo cans.  And it

 9      was this type of cardboard tubes that were being used as

10      part of the detonation explanation, as well as the ones

11      that would simply just have to add the shrapnel to become

12      hand grenades.

13              On July 25th, 2009 at a barbecue at Tomer

14      in which David Stone, David Stone, Jr., Joshua Stone,

15      Josh Clough, Michael Meeks, Thomas Piatek, Jacob Ward and

16      others were present, David Stone began to explain that he

17      believed that the war was approaching and therefore they

18      needed to train harder.

19              And what he wanted to have was two

20      nine-man squads and four rally points from which they

21      could go to, one of those rally points being the Tomer

22      Road address.  And he also indicated that he wanted to be

23      able to own his own country.

24              On August 13th, 2009, there was a

25      situation in which an undercover law enforcement officer

*U.S.A. v. Stone, et al.*

1    was present.  And this undercover law enforcement officer

2    had been involved in a number of the trainings that had

3    taken place up to that date with the Hutaree.  And he had

4    been present during the demonstration of the various

5    explosive devices by David Stone and David Stone, Jr.

6                And during the August 13th training, David

7    Stone defined the enemy as all federal, state and local

8    law enforcement officers, who he referred to as the

9    Brotherhood.  And he believed that -- well, he -- and I'm

10   sorry.  During this meeting, he discussed the goals and

11   the tactics that the Hutaree would use in their combined

12   effort against the brotherhood.

13               One of the goals was to reduce the numbers

14   of the Brotherhood, which he estimated at 650,000.  And

15   he believed that by bringing on -- by engaging in various

16   tactics, which he went into later, he thought that quite

17   quickly he would be able to reduce that number from 650

18   to 150,000 law enforcement officers, because they would

19   have to -- law enforcement officers would have to weigh

20   in their mind whether "I want a paycheck or do I want to

21   go home to my family?"

22               He also -- one of the goals was to make

23   the law enforcement cower or retreat to the cities so

24   that he would be free in the country to run and do what

25   he wished.

*U.S.A. v. Stone, et al.*

 1               And his third goal was to diminish the

 2      numbers of the Brotherhood.  Some of the tactics he

 3      explained on that day was, one, to burn the law

 4      enforcement or the Brotherhood out of their homes.  And

 5      as they fled their homes that were on fire, to then lob

 6      bullets at all of those who exited.

 7               He indicated that the women and children,

 8      the wives of law enforcement, the wives of the

 9      Brotherhood and the children of the Brotherhood were

10      equal targets, because in his mind they were no better

11      than the law enforcement officers.

12               One of the tactics -- one of the other

13      tactics as pointed out in the indictment, was to kill one

14      law enforcement officer, which he knew would bring law

15      enforcement from all over the nation to attend the

16      funeral, wait three days after the initial killing, and

17      then begin to attack the funeral procession.

18               And even he talked about -- even after law

19      enforcement had, in his term, cowered and retreated to

20      the cities, there was a plan to make false 911 calls to

21      have the police officers come out and be subjected to

22      being ambushed.

23               Now, after the Hutaree had shown their

24      capability with explosives, as I indicated before with

25      the bouncing Betties and the trip-wires, the undercover

*U.S.A. v. Stone, et al.*

1    officer wanted to demonstrate his familiarity with

2    explosives as well -- and frankly, Your Honor, the

3    purpose of doing this was to convince David Stone that

4    the undercover agent had the capability of making

5    whatever explosives David Stone wanted.

6              And for one reason, one reason alone.

7    This way the United States would know what explosives

8    were being made and to ensure the safety of the community

9    that David Stone wasn't going off making his own

10   explosives.

11             And as a result of that he demonstrated an

12   explosive.  After the demonstration, RD, David Stone,

13   instructed various modifications to be made to the

14   explosive in order to increase its damage capability.

15   And he indicated that he wanted a particular type of

16   explosive to be made, a shape charge, which is a --

17   referred to as an EFP, explosively formed projectile.

18             And he wanted a type of explosive that

19   would be able to penetrate armor.  And he discussed at

20   that time using street signs or road signs to be cut into

21   disks to be put together with different explosive

22   materials, which would then -- that disk would cause a

23   explosively formed projectile to be created, which would

24   be able to penetrate armor.  And this was in August of

25   2009.

1           On August 22nd, of 2009, there was another

2       training at the Tomer Road address, which were present

3       were David Brian Stone, David Stone, Jr., Joshua Stone,

4       Tina Stone, Josh Clough, Michael Meeks, Thomas Piatek,

5       Kristopher Sickles and Jacob Ward.  Let me make sure I've

6       got that right.  Yes.

7           And during this training a group

8       photograph was taken of all the various members of the

9       Hutaree who were part of the training for in patrols and

10      trip-wire detection.  And that photograph was eventually

11      posted on the Hutaree web site, and I believe that is

12      Government's Proposed Exhibit Number One that I have

13      provided to counsel.

14          I want to present the original to the

15      Court.  I gave the Court a copy already, but for the

16      benefit of the Court, the various people involved in that

17      training that day were identified.

18          Starting on the left-hand side, the second

19      person in is Michael Meeks, next to him is Josh Clough,

20      David Stone, and then there's another individual, and

21      then the shorter individual, Tina Stone, and then there's

22      another individual.  Then there's David Stone, Jr.,

23      another individual, then there's Jacob Ward.  And then in

24      the front row is Thomas Piatek, Joshua Stone, another

25      individual, and Kristopher Sickles.

*U.S.A. v. Stone, et al.*

1          During this meeting, after the meeting of

2      the 15th in which David Stone believed the undercover

3      agent had the capability of making explosives, and now

4      that he had his two nine-man squads, he gave a motivation

5      speech and called upon the group, collective group, to

6      communicate better.  And then began training on trip-wire

7      use against the enemy.

8          During this training, the undercover

9      indicated that following the directions of David Stone,

10     he would be able to build the bomb, the EFP, that David

11     Stone wanted to build.  And based upon his understanding

12     of the amount of the explosive they wanted to be used, it

13     would be able to go through a three-quarter inch plate of

14     steel.

15         And Stone acknowledged that this would be

16     able to easily go through a police car, because that's

17     who we would face first.

18         On August 27th, 2009, that shape charge

19     was demonstrated, in which a one-inch hole was placed in

20     a three-quarter inch plate of steel.  David Stone,

21     apparently pleased with the result, indicated that they

22     could use this on a convoy and wanted as many as he could

23     get at that time.

24         On September 13th, 2009, David Stone

25     indicated that it was his belief at this point that all

*U.S.A. v. Stone, et al.*

1        his Hutaree members could kill.

2                          And he also began to outline his plan to

3        take over four or five counties in the State of Michigan,

4        and which, after taking over the counties, he would then

5        have the enemy come to him.  And he wanted to link

6        Washtenaw, Hillsdale and Lenawee Counties as to an area

7        that he would control.

8                          On November 7th, 2009, the Hutaree went to

9        a new training location, which was to be a rally, another

10       rally point for the Hutaree.  Present during that

11       training were Defendant Number One, David Stone;

12       Defendant Number Three, Joshua Stone; Defendant Number

13       Five, Joshua Clough; Defendant Number Six, Michael Meeks;

14       Defendant Number Seven, Thomas Piatek; Defendant Number

15       Eight, Kristopher Sickles; and Defendant Number Nine,

16       Jacob Ward.

17                         At this particular rally point, various

18       holes had been dug for fighting positions and to bury

19       supplies.  David Stone indicated that he wanted to be

20       able to bury food, weapons and medical supplies so that

21       in the event they were attacked, this would be one of the

22       rally points that they would be able to go to.

23                         And it was during also this training that

24       Kristopher Sickles showed up wearing his ghillie suit.

25       And it's a type of camouflage clothes designed to

*U.S.A. v. Stone, et al.*

1   resemble heavy foliage.  And typically it's like a net or

2   a cloth garment that's covered with loose strips of cloth

3   or twine and sometimes even made to look like trees or

4   leaves to help them blend into the background.

5               The reason why this rally point became

6   important is -- and I'm going to jump forward a little

7   bit in time, and I'll come back to it a little bit later,

8   this was the rally point that Josh Stone, when he knew he

9   was wanted by federal authorities, went to, and where he

10  kept law enforcement at bay since the day he knew he was

11  wanted until just the other day where he had that

12  standoff with law enforcement.

13              On December 12th, 2009, David Stone

14  married Tina Stone, wearing full camo, wearing their

15  Hutaree uniforms and bringing their weapons with them.

16              Present at that were Defendant Number One;

17  Defendant Number Two, David Stone, Jr.; Defendant Number

18  Three, Josh Stone; Defendant Number Four, Tina Stone;

19  Defendant Number Five, Josh Clough; and Defendant Number

20  Six, Michael Meeks.

21              It was at this particular event that

22  Michael Meeks handed over a document which listed various

23  federal judges, elected officials, business leaders and

24  educational leaders.

25              And at that point, Josh Clough indicated

*U.S.A. v. Stone, et al.*

```
1      that it looked like a ready-made hit list for the
2      Hutaree.
3                    The following day, on December 13th, a
4      series of calls were placed from the Hutaree, the various
5      members of the Hutaree, placing them on high alert and to
6      be mobilized and go hot to rescue fellow militia members.
7                    Apparently, some militia members from
8      another organization in Indiana had gone missing.  And
9      David Stone felt it was important that all the members of
10     the Hutaree be ready for armed conflict.
11                   THE COURT:  What was the date, please?
12                   MR. WATERSTREET:  Eventually --
13                   THE COURT:  What was that date, please?
14                   MR. WATERSTREET:  I'm sorry.  That was
15     December 13th, one day after the wedding, Your Honor.
16                   THE COURT:  Thank you.
17                   MR. WATERSTREET:  Later on that day, Josh
18     Stone contacted the undercover agent as well as other
19     members of the Hutaree to report that the issue has been
20     resolved and for the membership to stand down.
21                   I want to move ahead to January 9th, 2010,
22     which was another training at the Tomer road address.
23     Present were David Stone, David Stone, Jr., Josh Stone,
24     Josh Clough, Michael Meeks, Kristopher Sickles and Jacob
25     Ward.
```

*U.S.A. v. Stone, et al.*

1          As a result of this call-out that had been

2     made the prior month, David Stone felt that the Hutaree

3     needed to be ready and have better communication, and

4     then ended up placing Tina Stone in charge of the

5     communications of the Hutaree, to list -- to make up a

6     list, to make sure they had a current list of the members

7     of the Hutaree and to be able to alert members of

8     necessary information such as red alerts.

9          At this training, David Stone indicated

10    that in the next few months they had to gear up for a

11    real operation in April.  And then he began to outline

12    the April plan.  David Stone told the Hutaree members

13    present that in the next months of training that they

14    were going to engage in, they were going to gear up for a

15    live training in April.

16          In April it was Stone's plan to insert a

17    team into a hostile area using a van.  And he referred to

18    this as mobility training.  The goal of the Hutaree team

19    was to be mobile and undetected.  And David Stone went on

20    to say how he wanted anybody who happened to come upon

21    them to be dealt with.

22          He explained that he wanted every member

23    of the Hutaree to handle this as a hostile situation.

24    And he said that if anybody happened upon them and they

25    did not submit to the demands of the Hutaree, they would

*U.S.A. v. Stone, et al.*

1    be put on the ground either by bullet or by knife.

2                        He even went as far as instructing the

3    Hutaree members to make sure they wipe down all the

4    bullets and casings before they went into the field to

5    make sure that no fingerprints were left behind and that

6    in the event there was a killing, they would -- they need

7    not hang around, to simply make the communication call

8    and they would be picked up.

9                        Later, as part of the training for this

10   event, the groups were broken up into their two different

11   squads; Josh Stone in charge of one squad, David Stone in

12   charge of the other.  During the conversations with Josh

13   Stone, during his -- with his patrol group, he repeated

14   his father's instructions.

15                       And then, when asked who the intended

16   victim would be, Josh Stone stated he didn't know who the

17   targets were and he didn't care.  He told the group that

18   they could kill people with guns or knives and he didn't

19   care about either.  He just said that they all had jobs

20   to do and "welcome to the business of killing."  Two of

21   the members that were part of that group were Kristopher

22   Sickles and Jacob Ward.

23                       Later that day, Josh Stone took the

24   undercover agent into his bedroom at the Tomer Road

25   address, and to display his AR-15 that he had mounted a

1    .22 rifle to the bottom of it, and he indicated that he

2    also showed the agent two AR-15s that had -- he had

3    installed a three-position selector switch, indicating

4    that it was his intent -- and he indicated that his

5    intent was to try to make the weapons fully automatic.

6          Also during this discussion, Kristopher

7    Sickles spoke to Josh Stone about his understanding of

8    how to make C4 explosives.  And he went on to explain,

9    albeit incorrectly, how to make C4.  He did go on to

10   explain how to make a very volatile explosive.

11         Kristopher Sickles also indicated that he

12   would like to have an explosive detonated outside the

13   Huron Police Department in Ohio.  And then he went on to

14   explain that he had recently been involved in an incident

15   where he used his .357 caliber handgun to kill his cat to

16   get some practice for killing, and stating, "I did it to

17   see if I could do it, to see if I could kill something

18   that I had a feeling for."

19         On January 14th, 2010, David Stone and

20   Tina Stone met the undercover agent, and during this

21   meeting, Stone told the undercover agent that he wanted

22   the undercover agent to build several IEDs with EFPs, the

23   explosively formed projectiles.

24         And if I may just -- and that he said he

25   would e-mail the undercover the schematics for exactly

*U.S.A. v. Stone, et al.*

1  how he wanted them built, at which time the undercover

2  showed David Stone and Tina Stone some inert pipe bombs

3  which he led them to believe were fully functional.

4            On January 17th, 2010, another alert went

5  out.  And shortly after this alert was canceled, David

6  Stone indicated that he needed to have a summit meeting

7  from the various militias around the United States in

8  order to clarify the procedure for allied militia groups

9  to be called out for the assistance of one another.  And

10  he understood that some of the trusted members of his

11  group would be part of that summit.

12            On January 20th, 2010, the undercover

13  agent received an e-mail from David Stone with two files

14  attached.  The first file was a schematic of an EFP that

15  was captioned under it "schematic entitled figure one

16  formation of an EFP warhead," and number two, the second

17  attachment was a color picture of a concave copper disk

18  laid atop a can.

19            And I submit those, Government's Proposed

20  Exhibits Number Two and Three, Your Honor.  And if the

21  Court wishes, this is available on Wikipedia under EFP.

22  Apparently Mr. Stone went on line to provide these

23  diagrams to the undercover agent.

24            On January 25th, 2010, in preparation for

25  this upcoming summit, a reply was made to the

*U.S.A. v. Stone, et al.*

1    undercover's request about the devices that Stone wanted

2    for the Kentucky trip, because now having been told that

3    he wanted EFPs, the undercover agent wanted to make sure

4    that he made the right kind of explosives after

5    previously showing the pipe bombs to David Stone.

6              David Stone indicated that -- that he

7    wanted the explosives to be anti-personnel, and figured

8    that, "If we have to do anything, we'll be on the run

9    anyway," so, in essence, they would not be able to plant

10   the EFPs, explosives, but needed anti-personnel

11   explosives for this trip to Kentucky.

12             On February 6th, 2010 -- let me back up a

13   little, Your Honor.

14             On January 14th, 2010, when Tina Stone and

15   David Stone met with the undercover agent and they talked

16   about the shape charges and that David Stone would send

17   the schematics on how he wanted it built, during part of

18   that discussion, Tina Stone complained about Josh Stone

19   not getting a job, and complaining that Josh Stone

20   indicated that he couldn't have a job because he was

21   getting ready for war, at which time she said she was

22   getting ready for war, but she still had a job.

23             On the -- February 6th, 2010, which I'll

24   refer to as the Kentucky trip, present were David Stone,

25   Josh Stone, Tina Stone, Josh Clough, Michael Meeks and

*U.S.A. v. Stone, et al.*

1    Thomas Piatek.  It was decided that Tina Stone would stay

2    behind and monitor the communications during this trip of

3    the Hutaree down to Kentucky to meet with the other

4    militia.

5                    And it was decided that the -- continual

6    check-in approximately every hour to make sure that

7    things were going as planned, and that instructions were

8    given to Tina Stone that if there was a red alert, Tina

9    Stone was to clear out the entire front room of the home

10   and flee.

11                   During the execution of the search

12   warrant, Your Honor -- I'm going to move ahead in time.

13                   On March 29th, 2010, more than 300 pieces

14   of evidence were seized from that location.  And in the

15   front room were various firearms, explosive materials,

16   bomb components and shrapnel.

17                   THE COURT:  What was the date?

18                   MR. WATERSTREET:  The date of the search,

19   Your Honor?

20                   THE COURT:  Yes.

21                   MR. WATERSTREET:  That was March 29th --

22   excuse me, 27th?  Twenty-seventh and twenty-eighth.  I'm

23   sorry, Your Honor.

24                   Prior to leaving for this trip to

25   Kentucky, many of the members met at the Stone residence

*U.S.A. v. Stone, et al.*

1    on Tomer Road, and there were various discussions taking

2    place among Tina Stone and the other members discussing

3    obtaining the various parts for the IEDs that the

4    undercover agent was going to build.  All the members who

5    were taking this trip brought their various firearms,

6    handguns and long rifles.  I don't know if the Court

7    recalls, but on February 6th, 2010 it was a rather bad

8    winter day and the parties made it all the way down near

9    Indianapolis, Indiana before they had to turn around and

10   come back.

11                One of the plans of David Stone was to

12   read a speech he had written with the help of Josh Stone

13   to the members of the other militia.  And on the trip

14   back, David Stone read that speech to the people who were

15   traveling on this trip to Kentucky.  And I have an

16   audio-clip which I would like to play.  I have also

17   handed out copies of the transcript for the parties to

18   follow.

19                Does the Court have a copy of that, by

20   chance?

21                THE COURT:  I do not.

22                This recording would be Exhibit 5?

23                MR. WATERSTREET:  Yes, Your Honor.  And

24   you will start on page four.

25                And I need to set the stage a little bit.

*U.S.A. v. Stone, et al.*

 1      These various people were riding in the van, with David

 2      Stone being in the front passenger seat.  And the clip

 3      will start off with David Stone talking about his belief

 4      that as -- when the New World Order comes, they would

 5      start a police state, and that his belief that police

 6      officers, the Brotherhood, would fight right along some

 7      Chinese trooper -- some Chinese trooper who happened to

 8      come in to oppose the United States.

 9                  And just give me a moment, Your Honor.  I

10      want to make sure I can get this thing to work.

11                  (Brief pause in proceedings)

12                  THE COURT:  You're offering Five at this

13      time?

14                  MR. WATERSTREET:  Yes, Your Honor.

15                  THE COURT:  Are there objections?

16                  MR. SWOR:  Yes, Your Honor.

17                  I mean, this is just some -- so far we've

18      heard this free-flowing narrative with no reference to

19      any testimony that we can cross.

20                  We're seeing him go from point (a) to

21      point (c) to point (b) to point (f).  And it's just

22      become a narrative.  This is not a hearing or this is not

23      being conducted as a hearing.  There is nothing being

24      offered to the Court.

25                  We were told that this was in the nature

*U.S.A. v. Stone, et al.*

1      of an opening statement in response to Mr. Roberts'

2      objection.  Now we're going to have an opening statement.

3      If it is an opening statement, then this is the wrong

4      time for evidence.  And if it's not an opening statement,

5      then where's the beef?

6                    THE COURT:  Mr. Waterstreet?

7                    MR. WATERSTREET:  Your Honor, as I

8      indicated earlier, that the government intended to

9      proceed by way of proffer and for the Court to give the

10     evidence whatever weight it feels is appropriate.

11                   And I don't think I've suggested anything

12     other than that.

13                   THE COURT:  Can you at least indicate what

14     the source of the tape is, or what it is?

15                   MR. WATERSTREET:  I can do that, Your

16     Honor.

17                   Present during that trip was the

18     undercover agent.  And he was able to record this

19     statement of David Stone and some of the other members

20     that were in the vehicle.

21                   MR. SWOR:  The point is, Your Honor, this

22     is evidence of what?  There's no foundation.

23                   Assuming for the sake of argument that it

24     is what it appears to be or what the government says it

25     is, all they're saying is my client has an opinion and

*U.S.A. v. Stone, et al.*

1        knows how to use his mouth.  It doesn't direct this

2        towards any crime charged or any question of

3        dangerousness or risk of flight.

4                    It's just a grandiose talking.

5                    THE COURT:  Well, absent hearing the tape,

6        I would not be able to make a determination, but a

7        relevant consideration for a bond decision are questions

8        of history and characteristics of a defendant.  To the

9        extent that his speech reflects his characteristics, I

10       believe that it is relevant.

11                   And I will overrule the objection and

12       receive the exhibit.

13                   MR. WATERSTREET:  Thank you, Your Honor.

14                   MR. THOMAS:  Judge?

15                   THE COURT:  Sure.

16                   MR. THOMAS:  This procedure and the way

17       that we're proceeding, I've only seen it done once before

18       in this district.  And it may have been done before that

19       I have not seen, but it's a highly unusual procedure.

20                   And that is, that the prosecution is

21       moving by way of a proffer, where even though the rules

22       of evidence are relaxed, we would at least have the

23       ability to have, you know, written documentation upon

24       which an agent is relying, the ability to cross-examine

25       the agent as it relates to the issues that are before

*U.S.A. v. Stone, et al.*

1    you, which is risk of flight and danger to the community.

2              I knew that at one time this was done.

3    But I think that the way that we're proceeding and the

4    length of the proceeding may be for nothing if it is

5    decided that you're not going to allow them to proceed by

6    way of proffer.

7              And since we have the objections and

8    they've been overruled, and I know that -- I don't want

9    to belay it any longer, but, Judge, I think that this is

10   a critical phase for us and that we should be able to

11   proceed other than by way of proffer.

12             And I'm wondering if you will let us brief

13   the issue relating to proffer, since it looks like we

14   might not get done today, and it looks like if we don't

15   get done, there's not going to be any bonds that are

16   going to be consented to by the government.

17             I think we should move carefully, because

18   this looks like it is going to be an extended case.

19   We're talking about issues of free speech versus evidence

20   of somebody's characteristics.

21             We don't have anybody to cross-examine

22   them, and we don't have the written material that would

23   support what it is that Mr. Waterstreet is essentially,

24   and with all due respect, testifying.

25             So I think that this is not an issue that

U.S.A. v. Stone, et al.

1    we should take lightly and I think we should brief it.

2    And I think that we should not proceed any further.

3                    THE COURT:  It is unlikely that I would

4    make a determination on all, if any, of the defendants

5    today.

6                    I will receive the exhibit and we will

7    proceed today.  If we suspend prior to the conclusion of

8    all the presentations, I will afford counsel an

9    opportunity to brief the issue and to attack the proffer.

10                    You may proceed.

11                    MR. WATERSTREET:  Thank you, Your Honor.

12                         (Whereupon Government's Exhibit

13                         Number One was played for the Court)

14                    MR. WATERSTREET:  Your Honor, if I just

15    may direct the Court to page five, when he's talking

16    about the elitist New World Order,

17                         "They are few in number, we are many.

18                         Every day we watch ever so close for

19                         the evil blue helmets to appear on

20                         our streets.  But as long as there

21                         are Interpol law enforcement

22                         mercenaries called the Brotherhood

23                         working for the New World Order and

24                         is doing such a great job, we don't

25                         need to watch for these new foreign

*U.S.A. v. Stone, et al.*

```
 1                            armies to come to our shores.  They

 2                            are already here."

 3      A little bit later he refers to as,

 4                            "A foreign army controlling the

 5                            streets and highways.  I submit to

 6                            you it's law enforcement that patrols

 7                            the streets and highways."

 8      A little bit later in their trip back from Indiana, when

 9      they were nearing Hudson, Michigan, David Stone noticed a

10      vehicle on the side of the road with a police car.  And

11      he indicated on page six,

12                            "Oh, look, are we making sure that --

13                            oh, my God, you better check their

14                            IDs.  This Hudson cop is such a dick.

15                            Every time somebody is out there

16                            changing their tire or whatever, he

17                            pulls up and he's got to have your

18                            ID.  He's got to run you through."

19      Thomas Piatek,

20                            "Really?"

21                            "Yeah.  Just because you have a flat,

22                            yeah.  Nice guy.  He's a jerk.  He's

23                            a --"

24      David Stone indicates,

25                            "He's a prick."
```

*U.S.A. v. Stone, et al.*

1      And then Josh Stone,

2                              "That's Hudson police for you,

3                              though."

4      Then David Stone turns and says,

5                              "We're gonna -- we're gonna pop him.

6                              Guaranteed."

7      Then it was asked,

8                              "Well, do you know this -- "

9      basically,

10                             "Do you know his name?  Do you know

11                             this police officer's name?"

12                             "It's not hard.  There's only like

13                             three cops in Hudson."

14                             "Oh, yeah?"

15     David Stone then says,

16                             "We're gonna pop every one of them."

17                             "There you go."

18                             "Hey, you think you got him?"

19                             "Yeah, why?"

20                             "They're all dead."

21     After this speech of planning potentially to kill the

22     Hudson Police Officers, after the speech of planning to

23     go to an operation in April in which an opposing force

24     may wander upon them, they had more training.

25                      And who returned for that training?  David

*U.S.A. v. Stone, et al.*

1    Stone, David Stone, Jr., Josh Stone, Josh Clough, Michael

2    Meeks, Kris Sickles, Jacob Ward and others.

3                    They engaged in their live fire training

4    and patrol training.  And then there came a point in time

5    that they started discussing the fact that the militia

6    member down in Oklahoma had recently committed suicide.

7                    And David Stone opined that, "If you're

8    going to commit suicide, you might as well try to take

9    some cops with you."

10                    At which time, both Michael Meeks and

11   Kristopher Sickles indicated that they wanted to die

12   suicide by cop.  Michael Meeks wanted to die by what

13   he -- the term he used was "copicide."

14                    Move ahead to March 13th, 2010, which was

15   the wedding of Josh Stone to his fiancee.  During this

16   meeting, the undercover agent attended and they talked

17   about -- "they" being David Stone -- let me see.

18                    The people who were present were David

19   Stone, David Stone, Jr., Tina Stone, Josh Clough, Michael

20   Meeks and others.  And the undercover engaged in several

21   conversations with the members of the Hutaree.  And David

22   Stone was concerned about the EFPs that Stone wanted to

23   have built.

24                    Apparently there had been some

25   miscommunication between Josh Stone and David Stone about

1    getting the anticipated materials for the EFP.  However,

2    David Stone provided the undercover agent a document

3    which included a step-by-step direction concerning the

4    manufacturing of the EFP, as well as what materials were

5    needed and the anticipated performance capabilities of

6    that EFP.

7                   And during that conversation David Stone

8    tasked Michael Meeks to obtain some metal that would be

9    used to create the EFP.  And David Stone ordered two EFPs

10   as soon as possible and have some others available in the

11   future.

12                  On March 18th, 2010, David Stone, Josh

13   Stone, and Tina Stone and others met at David Stone's

14   residence on Tomer with the undercover agent.  David

15   Stone indicated that they had been able to, in fact,

16   obtain materials for the explosive devices.

17                  Josh Stone and another Hutaree member had

18   been able to get those materials and that they indicated

19   that they would continue to get those materials.

20                  And at that point in time, one of the

21   materials that were handed over was a street sign.  And

22   if the Court will recall, sometime back in August of

23   2009, David Stone said that he would obtain street signs

24   or road signs that could be cut into disks for EFPs.

25                  At this point in time they handed the

*U.S.A. v. Stone, et al.*

1       agent a road sign that Josh Stone and another member of

2       the Hutaree had been able to obtain.  And at this point

3       in time, the undercover agent stopped David Stone and

4       explained to him, "You understand what's going to happen

5       if a vehicle goes over this EFP and it's detonated, it's

6       going to kill every occupant inside that vehicle."

7                       David Stone indicated he understood that

8       and he was okay with that.  He even indicated that they

9       needed to test one of the devices against a car with a

10      blue and white -- a blue and red light on top.

11                      David Stone even went as far as suggesting

12      that perhaps the undercover agent could make him some

13      beer can mortars.  And if the Court recalls, back on

14      August 13th, 2009, when they were talking about the

15      funeral for the police officer and the funeral

16      procession, there was a comment made by David Stone

17      about,

18                              "For the funeral they'll be all

19                              flocked together.  They're going to

20                              be boo-hooing and crying, they'll be

21                              there from all over the nation.

22                              That's when we'll need our mortars

23                              and we will just lob our shells on

24                              top."

25      So now he understands he's got the EFPs and he now is

45

*U.S.A. v. Stone, et al.*

1     waiting for the mortars to be built.

2                     During this meeting, also it was confirmed

3     that Tina Stone was now fully responsible for all the

4     Hutaree communications, including the e-mails, phone

5     calls, and she would surf the web or the internet for

6     items of interest to the Hutaree members.

7                     Josh Stone, again, also indicated he was

8     in the process of making a weapon fully capable of being

9     fired on automatic mode.

10                     Your Honor, the United States executed

11    several search warrants on December (sic) 27th, 2010.

12    They were able to successfully arrest every member of the

13    Hutaree who were indicted, except for one person, and

14    that was Josh Stone.

15                     As part of the arrest, agents were able to

16    find items inside some of the vehicles that the members

17    drove in, including a vehicle driven by David Stone in

18    which they found some more road signs and some firearms.

19                     As I indicated before, the only person

20    that was not arrested was Josh Stone.  And based upon the

21    events that took place from the 27th through the 29th,

22    Josh Stone, fulfilled the Hutaree plan.

23                     When he found out that members of the

24    Hutaree were arrested, he sent out an alert to all the

25    other Hutaree members.  He sent out a request for help

*U.S.A. v. Stone, et al.*

```
1     from other militias.  He sought to be armed and sought
2     weapons from various militias and other people that he
3     knew.  He headed to the rally point over in Hillsdale,
4     where eventually he armed himself.  And he, and five
5     other people, and an infant, hid out at that rally point
6     until March 29th when he faced the presence of an
7     overwhelming police force and finally surrendered.
8                      Now, those are the facts that the
9     government would proffer to show that these people are a
10    risk of -- the group as a whole is a risk of flight and a
11    danger to the community.
12                     I do have -- I'm prepared to go through
13    each individual, one-by-one, concerning what -- the
14    various factors the Court should consider; their
15    character, their physical condition, mental condition,
16    family ties, things of that nature, one by one.
17                     If the Court wishes me to start on that
18    now, I can do that.
19                     THE COURT:  Does counsel wish a recess
20    before we go on?
21                     MR. SWOR:  Yes, Your Honor.
22                     THE COURT:  We will take a ten-minute
23    recess.
24                     (Court in recess at 3:13 p.m.)
25                           *   *   *
```

*U.S.A. v. Stone, et al.*

1          (Court in session at 3:44 p.m.)

2          DEPUTY COURT CLERK:  The Court recalls

3     case number 10-20123, United States versus David Stone,

4     among others.

5          MR. WATERSTREET:  Good afternoon, again,

6     Your Honor.  Ronald Waterstreet appearing on behalf of

7     the United States.

8          Your Honor, one other thing.  As part of

9     that packet that I gave the Court, Government's Proposed

10    Exhibit Number Four, I was going to just identify what

11    that was.

12         During the execution of the search warrant

13    in Mr. Piatek's home, those were the items that were

14    seized from his home, the weapons, the ammunition, things

15    of that nature.

16         THE COURT:  Thank you.

17         MR. WATERSTREET:  Your Honor, I believe

18    the Court wanted us to go in order based upon defendants,

19    starting with Mr. David Stone?

20         THE COURT:  Yes.

21         MR. WATERSTREET:  Your Honor, I'm looking

22    at the pretrial services report.  The address in which

23    the defendant claims to live is the Tomer Street address,

24    where all of the significant training of the Hutaree took

25    place, where weapons, explosive materials were seized

*U.S.A. v. Stone, et al.*

1          during the execution of the search warrant, was where --

2          the rally point by which the various members of the

3          Hutaree were supposed to come together.

4                    My understanding is that the information

5          that the defendant supplied to pretrial services was

6          confirmed by co-defendants and any attempts to contact

7          any additional family members have been unsuccessful.  So

8          it appears as if a co-defendant is verifying what a

9          co-defendant said.

10                   It appears that he has employment, but

11         it's only since November of 2008.  He indicates that he

12         previous worked for Performance Engineering in Adrian

13         from July 2007 to July 2008.

14                   Your Honor, the -- he indicates that he

15         has a trailer on the home -- a trailer home with an

16         approximate value of $500.  It's my understanding that

17         while he may own the trailer, he does not own the

18         property on which it sits.

19                   It appears that he filed bankruptcy not

20         that long ago.  It doesn't appear as if he has a home

21         like most people would typically have which would impede

22         their flight.

23                   And I suggest if the Court considers his

24         character, his mental condition, his family ties and the

25         fact that it was the members of his family that he were

*U.S.A. v. Stone, et al.*

1      -- is involved in this criminal activity with, his

2      financial resources, his ties to this community, that

3      along with the presumption that arises in the charges

4      that he faces, that no condition or combination of

5      conditions can assure his appearance or the safety of the

6      community, that he should be detained pending the

7      resolution of this matter.

8                  THE COURT:  Did you intend to summarize

9      the evidence against Mr. Stone?

10                 MR. WATERSTREET:  Well --

11                 THE COURT:  I realize that you addressed a

12     number of matters in your proffer.  Do you have anything

13     additional?

14                 MR. WATERSTREET:  Not at this time.  Your

15     Honor, the proffer -- I believe there may have been only

16     one or two times on a date that I mentioned that did not

17     involve David Stone, either directing, training, the --

18     directing plans, directing the manufacturing of

19     explosives, the demonstration of explosives.

20                 I venture to say if I were to summarize

21     his involvement, I would be here yet another hour or so

22     going over the fact materials that I mentioned before.

23                 THE COURT:  And the source of your

24     proffer?

25                 MR. WATERSTREET:  The source of my proffer

*U.S.A. v. Stone, et al.*

1    is based upon items seized, observations of the

2    undercover agent, recordings of the undercover agent,

3    statements of co-conspirators, items that are open source

4    items open to the public, such as Hutaree videos,

5    recorded conversations he had with Josh Clough, and those

6    type of items, Your Honor.

7                    THE COURT:  Anything further?

8                    Mr. Swor?

9                    MR. SWOR:  Your Honor -- and this cuts

10   right to the heart of our objection and the problem that

11   we currently face.

12                   My concern is that what you've heard,

13   everything you have heard, has been a summary as refined

14   through the lens of the government's opinion.  We have

15   seen no facts and no evidence.  We've asked the Court for

16   an opportunity to argue the legal issue.  And I think

17   that the facts as they have been presented to the Court

18   clarify the importance of this dispute.

19                   I mean, when you asked what the source of

20   the government's proffer was, what you were told was it's

21   a summary.  Well, we've now heard a summary of a summary

22   through the vision of the government's advocate.  There

23   have been no facts presented to this Court.  Only a

24   summary.

25                   We have had no opportunity to confront the

*U.S.A. v. Stone, et al.*

1    undercover agent, to challenge the items seized, to

2    challenge the description of the few exhibits that are

3    here.  I dare say that the government has not -- even

4    with the presumption, that the government has not met its

5    burden of proof factually.

6                    But to sit here and go back and forth -- I

7    would like to reserve, until we present our written

8    argument to the Court about this procedure, and at that

9    point if the Court wants, I can address -- I mean, I

10   could address it now, but it will be kind of willy-nilly,

11   and I think that the Court deserves and Mr. Stone

12   deserves an organized, coherent defense and presentation.

13                   So I would renew our objection to the

14   procedure --

15                   THE COURT:  There's no need to renew the

16   objection.  The objection is made.  It is a matter of

17   record.

18                   MR. SWOR:  Okay.  And I would ask the

19   Court to defer our response, allow us to present our

20   written argument and then proceed from there.

21                   THE COURT:  Do you have evidence or

22   proffer?

23                   MR. SWOR:  No, sir.

24                   THE COURT:  You have nothing --

25                   MR. SWOR:  At this point I do not.  I

*U.S.A. v. Stone, et al.*

1     mean, the -- because to some extent what we're going to

2     do is -- we can't even challenge what the government has

3     claimed.

4                     I may have a proffer at future -- but I

5     think that --

6                     THE COURT:  Well, it was represented

7     earlier that you were prepared to proceed on behalf of

8     Mr. Stone on the issue of bail.

9                     MR. SWOR:  I am.

10                    THE COURT:  If you have information,

11    evidence or proffer to support his request for bail, you

12    should present it.  I understand the objection and I

13    understand that you will brief the issue.

14                    MR. SWOR:  Then I will proceed.  I will

15    proceed.  Okay.

16                    First of all, pretrial services has found

17    without any question that Mr. Stone is not a risk of

18    flight.  The government claims that because of the

19    presumption that he is a risk of flight.

20                    Well, the presumption does not shift the

21    burden of proof.  The government has the burden of proof.

22    And the evidence -- or at least the summary of the facts

23    put before the Court by pretrial services clearly

24    establish that Mr. Stone is not a risk of flight.

25                    He has no capital, he has no resources, he

U.S.A. v. Stone, et al.

1       has no connection with any family or friends outside of

2       the Eastern District of Michigan.

3                   And the irony I heard a minute ago was

4       that the government arrested both Mr. Stone and his wife.

5       This has been such a widely publicized thing that

6       everybody down in that area is intimidated.  Nobody is

7       answering their phones.

8                   And so the government is saying, "Well,

9       okay, because we've scared everybody into not answering

10      their phones, you should somehow interpret that as

11      evidence against Mr. Stone, and at the same time even

12      though evidence has been given by Mrs. Stone that

13      verifies his information, you shouldn't regard that

14      because she's a co-defendant.  Not because it's not

15      trustworthy, not because it's not logical, not because

16      it's not truthful, but simply because she's a

17      co-defendant and no one else could be contacted."

18                  So I think the Court should reject out of

19      hand the government's claim that he is a risk of flight.

20      As far as the danger issue, I think it is interesting to

21      note that pretrial services does not suggest that Mr.

22      Stone may pose or does pose a danger to the community.

23      They say he may pose it.  And it's based solely upon the

24      allegations.

25                  It is not based upon any fact.  Mr. Stone

*U.S.A. v. Stone, et al.*

1       has no criminal history.  He has no assaultive history.

2       What we heard today was that Mr. Stone talks a lot and

3       that Mr. Stone is very angry, and that Mr. Stone thinks

4       that there are a lot of things politically wrong.

5                    The tape that they've played, Mr. Stone

6       was talking about defending the United States against

7       foreigners or defending our home against foreigners.

8       There's nothing in that tape that says he was looking to

9       make war on the United States government.

10                   We're told about all of these supplies and

11      equipment that were somehow seized from the Tomer house,

12      but nothing was offered to the Court; only the

13      government's interpretation.

14                   The two exhibits that were presented to

15      the Court -- I think it's Exhibit Two and Exhibit Three,

16      are not diagrams or photographs taken by Mr. Stone, but

17      rather pages printed out of the internet.

18                   There was nothing done of any violent or

19      dangerous nature by Mr. Stone other than he talks.  And

20      as Mr. Thomas alluded to, there is still a First

21      Amendment and a right of free speech.

22                   You know, Mr. Stone didn't go around

23      throwing bricks through congressmen's houses or

24      policemen's houses or anyone else.  He talked.  He

25      trained.  Okay, he trained.  He got involved and trained.

*U.S.A. v. Stone, et al.*

1    So what?  He didn't do anything with that training.

2                    The recitation that the Court heard was

3    that over months, over a series of months when the

4    government had an undercover agent in this group of

5    people, they regularly met and talked.  And that is it.

6                    I would proffer to the Court that where

7    the issue -- were evidence presented where the issue of

8    explosives, and IEDs and devices are -- occurred, if the

9    Court heard the actual statements, the actual testimony,

10   the Court would hear that most of that came from the

11   government agent, not from the defendants.

12                   The defendants did not create any

13   explosive, did not create any devices, that those devices

14   were created by the government undercover agent.  That's

15   our proffer.

16                   So that there are a combination of

17   circumstances.  First of all, I think that the likelihood

18   of flight has clearly been rebutted and that the pretrial

19   services suggestion that he is not a risk of flight

20   should be adopted.

21                   And second of all, I think that the

22   evidence presented here or the proffer summarized here,

23   does not establish any personal danger from Mr. Stone

24   being free.  There is no risk to the public, in general,

25   and there is no risk to any person.

*U.S.A. v. Stone, et al.*

1            Certainly, suggesting that something

2   should happen to a police officer that he clearly didn't

3   like is not evidence of any immediate risk.  I mean, what

4   we've heard is that he talks a lot.  End of story.

5            THE COURT:  Thank you.

6            MR. SWOR:  He should be released on some

7   kind of conditional bond.

8            THE COURT:  Do you have rebuttal, Mr.

9   Waterstreet?

10            MR. WATERSTREET:  Your Honor, if I may,

11   there's just two areas that I would like to -- three

12   areas that I would like to touch upon.

13            It's my understanding according to

14   pretrial services, he is suggesting moving back to the

15   Tomer Road address.  It's the government's understanding

16   that some fellow members of the Hutaree have since moved

17   into that location.  These were the same people who were

18   helping Josh Stone, Jr. while he was avoiding arrest by

19   the FBI.

20            It's clear through the government's

21   recitation that Mr. Stone believes in the survivalist

22   mentality by the fact of hoarding food, medical supplies,

23   ammunition, things of that nature.  It's that type of

24   lifestyle that does not lend to somebody who is

25   willingly -- willing to turn themselves in.

*U.S.A. v. Stone, et al.*

1                 And as for the indication that the

2       government has scared off anybody from saying any good

3       words about Mr. Stone, I have no indication that that has

4       been done or that was the intent of the government, but

5       just remind the Court that the whole reason the Kentucky

6       trip was taking place was that Mr. Stone was headed down

7       to have a summit of like-minded individuals so that he

8       could give them his speech on his belief of the world and

9       how law enforcement were the -- basically the foot

10      soldiers of the New World Order.  So obviously there may

11      be other like-minded people who are willing to harbor him

12      in the event he does get released.

13                 Thank you, Your Honor.

14                 THE COURT:  Thank you.

15                 MR. SWOR:  So we're told that other people

16      are a problem.  We're told that Josh is a problem.  But

17      we're not told anything about Mr. David Stone.

18                 He was employed.  He went to work

19      regularly.  Yeah, he didn't make -- he didn't make a

20      great deal of money and I think that works in his favor,

21      because he certainly didn't make enough money to go

22      running away.

23                 The van -- remember, this Kentucky trip

24      was a field trip of sorts.  His car couldn't reach

25      Kentucky and they went in a van as a group.  That's still

1          legal as far as I know.  Having opinions and traveling as

2          a group is still legal.

3                          And when the weather was bad, they came

4          home.  It wasn't like they were somehow motivated by some

5          overarching commitment that no matter what the weather

6          is, we're going to cross the Delaware and take the

7          British at Monmouth.

8                          His character has not been successfully

9          attacked.  The government made a comment about his mental

10         condition.  There's no suggestion that there's anything

11         wrong with his mental condition.  And if the Court wants

12         to order him to reside some other place than Tomer Road

13         -- by the way, that place is empty.  There is nobody

14         there.  We can do that.

15                         THE COURT:  Thank you.

16                         Moving on to defendant number two, David

17         Brian Stone, Jr.

18                         Mr. Waterstreet.

19                         MR. WATERSTREET:  Your Honor, I've handed

20         out -- there's bullet points, to counsel, as to why the

21         government believes, in addition to the presumption, that

22         there's a risk of flight and there's a danger to the

23         community.

24                         It's the government's understanding, and I

25         believe it is borne out by the pretrial services report,

1    that while Mr. David Stone is recently employed, he has

2    just recently moved to his address on South Main in

3    Adrian, as a matter of fact, just moved there within the

4    last week or two.  And he moved into rental property.

5              Therefore, again, he doesn't have those

6    financial binds that keep most people to stay home.  He

7    owns no real property.  His prior addresses were living

8    with David Stone at the Tomer address and his

9    girlfriend's parents.

10             It's our understanding he's close with a

11   brother who lives out of state who has severed his ties

12   to this community.  He was present for virtually all

13   Hutaree training events.  He served as the opposition

14   forces for the training.  He provided explosives training

15   and demonstration.  He showed his --

16             THE COURT:  Are you reading from the

17   bullet points?

18             MR. WATERSTREET:  Yes, Your Honor.

19             THE COURT:  Do you have a copy?

20             MR. WATERSTREET:  Yes, I do.

21             THE COURT:  Thank you.

22             MR. WATERSTREET:  He set ambushes and

23   demonstrated his proficiency and ability to set those

24   ambushes, demonstrated explosives and firearms

25   proficiency.  And stored his firearms at the primary

*U.S.A. v. Stone, et al.*

1          Hutaree rally point at the Tomer Street address.

2                    He has no residential information prior to

3          the fall of 2009.  And these are some additional bullet

4          points from reading the pretrial services report.  He has

5          a minimal employment history.  And it's my understanding

6          he declined to take a drug test.

7                    Based upon the presumption and those

8          additional factors, Your Honor, the government again

9          relies upon the presumption and the specific information

10         that it has provided the Court.

11                   THE COURT:  Thank you.

12                   Mr. Helfrick?

13                   MR. HELFRICK:  Yes, Your Honor.  I would,

14         by way of proffer, proffer the pretrial services report.

15         Although I would indicate that Mr. Stone, Jr. did proffer

16         other employment to pretrial services, pretrial services

17         declined to make the calls to those other employers.

18                   Mr. Stone, Jr. is 19 years old.  The only

19         place he has ever lived is in the State of Michigan, and

20         for the most part in the Adrian area.  He has no prior

21         arrests, no prior convictions, no prior contact with the

22         police or the criminal justice system whatsoever.

23                   He has been living with his fiancee.  They

24         have a recently-born son that is six months old.  There

25         was nothing presented during the proffer to indicate that

*U.S.A. v. Stone, et al.*

1    he owns any firearms.

2                    I do recall the government indicating that

3    this investigation started when the ATF was looking into

4    a FFL owner in -- I guess, in the Adrian, Michigan area.

5                    I haven't heard any indication from those

6    records that Mr. David Stone, Jr. ever purchased any

7    firearms or owns any firearms.  And he does -- you know,

8    in proffering, he has never purchased any firearms, does

9    not own any firearms.

10                   And just to back up a minute, and I know

11   the Court knows the objection is part of the record, but

12   what's been alluded to by Mr. Thomas and Mr. Swor's

13   proceeding in this fashion, the last time that I've been

14   involved in a case of this magnitude where it was

15   conducted this way, was of course, the *Koubriti* case in

16   2001, where the Assistant U.S. Attorney got up and

17   proffered to the magistrate and to the judge, you know,

18   this chronology of what supposedly had happened.  And our

19   concern was that our clients spent three or four years in

20   jail before they were exonerated.

21                   And that's part of the reason that we have

22   such a strong feeling and objection to this sort of a

23   proceeding, because of the abuse of this sort of

24   procedure that's taken place in the past.

25                   At any rate, David Stone, Jr. was

*U.S.A. v. Stone, et al.*

1    employed.  He has been working the last five weeks.  And

2    prior to that, or actually concurrent with that, I talked

3    with an individual down in that part of the state who, I

4    quite frankly don't want to name at this point, because I

5    don't want the media to descend upon his farm.  But David

6    Stone, Jr. has worked for this person off and on for the

7    last five years, mowing lawns, baling hay, taking care of

8    the animals and various things.

9             And this person and his wife both have

10    nothing but good things to say about David Stone, Jr.,

11    about what a good person he was, about how reliable he

12    was, and as I say, nothing but good things.

13             Throughout this -- and they say he was

14    present at most, if not all of these training events.

15    And my recollection as Mr. Waterstreet went through the

16    proffer when he named individuals who were present, at

17    least half the time he was not present.

18             Moreover, during this proffer, nothing was

19    ever proffered to this Court by anyone, the undercover

20    officer or anyone else, that indicated that David Stone,

21    Jr. ever held any of these beliefs, assented to any of

22    these beliefs, agreed with them.  There's no indication

23    that he held these beliefs, agreed with them or that he

24    was prepared to act on any of these beliefs.

25             Mr. David Stone, Jr. was arrested the

*U.S.A. v. Stone, et al.*

1   other day, and along with all -- four, five, six of these

2   individuals, they were all arrested.  They were at a

3   memorial service in Ann Arbor at the time of their

4   arrest.

5                    And there was no altercation with Mr.

6   David Stone, Jr.  There was no attempt to flee, there

7   were no threats made, there were no possession of any

8   type of firearms, guns, knives or any other type of

9   weapons.

10                   When they went to his apartment and

11  conducted a search, it's my understanding -- or I'm sure

12  we would have heard about it.  No firearms, no

13  explosives, none of these other things that the

14  government is talking about that they found at various

15  other locations.

16                   So there's no indication that he had

17  possession of these items or any other type of items, not

18  that it would be illegal for him to possess firearms

19  since he's not a convicted felon, but the fact of the

20  matter is, he didn't.  He wasn't in possession of any of

21  these things.

22                   And it's my understanding that at the time

23  of the arrest, not only Mr. David Stone, Jr. but everyone

24  was cooperative with the authorities and didn't attempt

25  to flee or do anything else.

*U.S.A. v. Stone, et al.*

1              So, you know, given this defendant's

2      history and characteristics and everything else, I think

3      that it would be a draconian sanction to order him

4      detained without bond or some sort of conditions.

5              He only has ties to this area.  All of his

6      ties are to this area.  His mother is present in court,

7      his fiancee is present in court, his fiancee's mother is

8      present in court.  He has strong family support.

9              He isn't going to go anywhere.  And I'm

10     certain that the Court can fashion some sort of

11     conditions of release for him that will assure not only

12     his appearance, but the safety of the community.

13             But as I say, there's nothing that's been

14     proffered to this Court that indicates that he advocates

15     any of these views that the government has set forth.

16     And we would ask the Court to set some sort of bond that

17     would allow him to remain free, pay his rent, and support

18     his family while this case is pending.

19             Thank you.

20             THE COURT:  Thank you.

21             Mr. Waterstreet, rebuttal.

22             MR. WATERSTREET:  Your Honor, if I didn't

23     clear -- wasn't very clear, my apologies.

24             Hopefully, I can clear it up at this

25     point.  When the agents executed a search warrant at Mr.

*U.S.A. v. Stone, et al.*

1       David Stone, Jr.'s home there were not found any weapons

2       because it was the government's understanding, and the

3       government was told, the undercover agent was told that

4       Junior stored his weapons at the Tomer Street address,

5       the Hutaree rally point.

6                   And from there, 37 weapons -- 37 guns,

7       including long guns and pistols were taken.  The items

8       that were found that showed his assent and his agreement

9       to train with the Hutaree was the fact that they found

10      his Hutaree uniform at his apartment during the execution

11      of the search warrant.

12                  And I hope that clears up any

13      misunderstanding there may have been, Judge.

14                  THE COURT:  Thank you.

15                  Moving forward to Defendant Three, Joshua

16      Matthew Stone.

17                  MR. WATERSTREET:  Your Honor, here are

18      those bullet points.

19                  THE COURT:  Thank you.

20                  MR. WATERSTREET:  I've also given a copy

21      of those to defense counsel as well.

22                  It's the government's understanding, and

23      from reading the pretrial services report, Joshua Matthew

24      Stone is unemployed.  His address is the Tomer Street

25      address in Clayton, Michigan.  He has just recently been

*U.S.A. v. Stone, et al.*

1       married on March 13th, 2010.

2                       He owns no real property.  He resides with

3       David Stone, Tina Stone at the Tomer property which is

4       the primary Hutaree rally point.

5                       He is the second in command with the

6       Hutaree.  He leads one of the operational squads.  He

7       has, in comments concerning upcoming training in April,

8       expressed a callous disregard for human life, basically

9       not caring who he faced.  He didn't care who it was or

10      who he faced.

11                      He fled on March 27th, 2010 when he was

12      known he was wanted from law enforcement.  He attempted

13      to implement the plan that Hutaree -- the red alert plan,

14      which was to contact Hutaree members, contact other

15      militias.

16                      He sought weapons, sought cash, sought

17      vehicles, sought to arm himself and other Hutaree members

18      who rallied around him, demanded the release of the

19      Hutaree and threatened war if they were not released.

20                      He traveled to one of the predetermined

21      Hutaree rally points.  He distributed weapons in

22      concealed locations throughout the rally point, so that

23      if he had to withdraw he could withdraw and obtain

24      weapons on the way.

25                      He engaged in an armed standoff until

*U.S.A. v. Stone, et al.*

1    after eight p.m. on March 29th, 2010, when faced with

2    overwhelming forces and an armored vehicle, he and his

3    group finally surrendered.

4              As for employment, it's my understanding

5    he has minimal employment and at most he was a

6    pyrotechnic -- pyrotechnician with Colonial Fireworks in

7    Clayton, Michigan.

8              I believe with the -- that there are no

9    conditions or combination of conditions which will assure

10   his appearance.  He has already indicated his willingness

11   to attempt to flee, to arm himself, and put others at

12   danger and at risk when known -- when he knows that law

13   enforcement is, in fact, seeking his arrest.

14             And frankly, Your Honor, I believe he's a

15   risk of flight and a danger to the community.

16             Thank you.

17             THE COURT:  Mr. Thomas.

18             MR. THOMAS:  Judge, I've got a copy of the

19   report and recommendation from pretrial services, and

20   they have made the determination that -- that this

21   defendant is not a risk of flight.

22             He is 21 years old.  He got married just

23   recently to his wife, Shannon, who is here in Court

24   today.  They were married on March the 13th of the --

25   what did I say, March the 13th of 2010.

*U.S.A. v. Stone, et al.*

1           She is on an annuity, and is certainly

2      capable of getting her own place, and suggests that if

3      the Court were willing to allow him to be released, that

4      he would not go back to the subject residence where he

5      lived with his father and his brother.

6           He is -- he has been employed, although

7      one of the bullets that the government has is that he's

8      unemployed at that time.  His employment was seasonal.

9           And like with Mr. Helfrick, it is now

10     coming into the season where he would be employed, and we

11     believe that he could obtain meaningful employment if he

12     was allowed to be released.

13          The allegations against him are very

14     serious and I want you to know that we take them very

15     seriously.  But they are nothing more than just that, in

16     that they are allegations.

17          And while the Bail Control Act or the --

18     18 U.S.C. Section 3142 has now made it -- in my view, a

19     constitutional right has been made conditional.  I think

20     that the presumption of innocence still applies.

21          And the last time that we were here, as

22     Mr. Helfrick and Mr. Swor have reflected, we were here on

23     a case that the same mood and the same tenor and the same

24     process was employed against at that time, five -- four

25     to be tried, defendants who ultimately were exonerated.

*U.S.A. v. Stone, et al.*

1          And so the presumption in my view is still

2    alive and well in this country and I think that the Court

3    should look at that very, very carefully.  This is a

4    21-year-old kid who has no prior criminal history.  And

5    he has a place to go, and we'll make sure that he has a

6    place to go if the Court sees fit to have him have bond.

7          There are two people here in court who I

8    will proffer are here in court who have given me their

9    name and address and who are willing to stand up and say

10   that they would take this man with his wife until they

11   are able to get a place to rent.

12         He has prior employment that Mr.

13   Waterstreet has referred to, and that relates to a

14   pyrotechnics firm.  We would agree that he would not go

15   to work, not be near any weapons or firearms or bullets

16   as is required by statute in any event since he's under

17   indictment, and that he would not go to work at this

18   place of employment even though he is licensed to do so.

19         Serious charges.  But I think that there

20   are conditions that you can release him, upon which we

21   can assure that he is not a risk of flight.  And there

22   are reporting requirements which could assure that he's

23   not going to be a danger to the community.  And there are

24   also conditions upon which he cannot be a danger to the

25   community.

*U.S.A. v. Stone, et al.*

1              Regular reporting, in my view, the

2      sociological studies regarding a tether or regular

3      reporting requirements show that even though there is

4      nothing other than the fact that the person is at a

5      location that can be determined, deters any further

6      criminal conduct.

7              It seems to me that the government's got a

8      pretty good handle on who's involved in this case and

9      what they want to do with this case.  I say let them do

10     that, but let this young man at least go free pending

11     what appears to be another mega-trial which is going to

12     take a couple of years to unfold.

13             To have this gentleman in detention at

14     this point, when not one shot was fired, when not -- when

15     he was arrested, and I think I have to address this, his

16     whole family and his support structure was arrested, he

17     fled.  Not because of the fact that he was a risk of

18     flight; because he was in fear.

19             Imagine the full force of the United

20     States government coming down on a particular location.

21     Once it was determined where he was, he sat there, and in

22     a -- a period of time it took to work him out of where it

23     was that he was.  The government would term that a

24     standoff.

25             And I would say that there was no weapon

U.S.A. v. Stone, et al.

1    flashed, even though there were weapons there.  There was

2    no weapon shown or alluded to, even though there was

3    weapons there, which by the way were not semi-automatic

4    weapons.  There were shotguns and a handgun.

5              It seems to me that if you take a look at

6    it from the perspective of the person who was being

7    sought, their fear, their subjective fear is what we

8    should be looking at as opposed to the government's point

9    of view, and that is, "Oh, yes.  Well, you know, he is a

10   person who has gone out and he has secreted himself

11   because of the fact that he wanted to rally the troops."

12             Yes, he was with other people who were

13   alleged to be involved with the Hutaree.  But nobody

14   showed any violence.  When his wife and his step-mom

15   assisted the government by making a video, and they saw

16   that they were safe and that everyone else was safe, my

17   client then surrendered himself.

18             Not by bringing guns out, or dropping guns

19   all over the place or showing force in any way, raised

20   his hands and walked out voluntarily on his own.

21             So I suggest to the Court that a bond

22   could be issued in this case.  And that he would comply

23   with the terms of those bond -- whatever the conditions

24   of the bond is and the standards that are set forth in

25   the bond statute, 18 U.S.C. Section 3142, can be met.

*U.S.A. v. Stone, et al.*

1          THE COURT:  Thank you.

2          Mr. Waterstreet, rebuttal.

3          MR. WATERSTREET:  Your Honor, I'm not

4     going to say -- I don't want to get into a "he said, she

5     said" kind of a situation, but it's my understanding, and

6     Mr. Thomas can correct me if I'm wrong, that the

7     defendant's wife was with him in the trailer with the

8     weapons and that there's no way that she made a taped

9     statement to ask him to come out.

10         MR. THOMAS:  Yeah, I did misspeak, Judge.

11    It was his --

12         MR. WATERSTREET:  Okay.  All right.

13         MR. THOMAS:  It was the step-mom.

14         THE COURT:  I understand.  Thank you.

15         MR. WATERSTREET:  Thank you, Your Honor.

16         MR. THOMAS:  So you're right.

17         MR. WATERSTREET:  Thank you.

18         THE COURT:  Moving forward to Defendant

19    Number Four, Tina Mae Stone.

20         MR. WATERSTREET:  Your Honor, I've handed

21    up various bullet points that I would like to go over.  I

22    have provided this to counsel.

23         Ms. Stone was one of the more recent

24    members to the Stone family, moved into the Tomer Street

25    address and that is her home address, and that she was

*U.S.A. v. Stone, et al.*

1    present and involved in the training and the meetings on

2    August 22nd, 2009, September 14th, 2009, December 12th,

3    2009, January 9th, 2010, January 14th, 2010, January

4    17th, 2010, January 28th, 2010, February 6th, 2010,

5    before the departure, when she was left with the

6    instructions to remove the items from the home which were

7    later found to be the weapons and the explosive devices

8    if she got a red alert, and then for herself to flee.

9    And also she was present during the February 20th, 2010

10   training.

11             She just recently married David Stone in

12   December of 2009.  She is currently unemployed, claims to

13   be proficient with firearms.  She has increasingly taken

14   on the role of communications for the Hutaree and has

15   contacted the undercover as well as other members of the

16   Hutaree on occasion at Stone's request to pass on

17   information or alerts.

18             She has been responsible for issuing

19   alerts for the Hutaree members and other militia.  As I

20   mentioned before, she was tasked with removing and

21   destroying evidence of criminal activity upon notice from

22   David Stone and then to flee; collected and directed the

23   collection of component parts for the IEDs; acknowledged

24   her preparation for the war despite the fact she said, "I

25   was working at the time.  I'm still prepared for war."

*U.S.A. v. Stone, et al.*

1           The pretrial services -- again, it's one

2    of these situations where the co-defendant is

3    corroborating the information for pretrial services.

4    It's the government's understanding -- I believe it's in

5    the pretrial services report that she does not own any

6    real property and that she has -- she does have prior

7    criminal contact, with contempt of court and obstructing

8    and assaulting a police officer in 2006.

9           I believe with the charges which she

10   faces, her role in the offense, that -- with the

11   presumption that there is no conditions or combination of

12   conditions which will assure her appearance or the safety

13   of the community.

14                THE COURT:  Thank you.

15                Mr. Rataj.

16                MR. RATAJ:  Thank you, Your Honor.

17           Well, Your Honor, as -- I'll start off my

18   comments by pointing out that I have reviewed the

19   presentence report and I will state for the record that

20   according to pretrial services Ms. Stone is not a risk of

21   not -- she is not a risk of not appearing for court.

22           The problem that pretrial services has, as

23   they do with the other defendants from what I can gather,

24   is that given the serious nature of the alleged offense,

25   that she may pose a danger to community, a total

*U.S.A. v. Stone, et al.*

1    conclusory statement that's based on absolutely nothing,

2    Your Honor.

3                      Before we get into that -- but let me just

4    point out that, you know, pretrial services did interview

5    her parents.  Her parents do live in the area.  She is a

6    lifelong resident of the State of Michigan.  She has

7    nowhere to go, Judge.

8                      And the parents, Mr. and Mrs. Kelly, have

9    advised pretrial services that they would be willing to

10   act as third-party custodians.

11                     We'll also point out that she has three

12   children from prior marriages; a daughter who's 25, a

13   daughter who's 23, and a son who's 18 years old.  They

14   all live in the Adrian area.

15                     Now, in terms of these -- this conclusory

16   statement that she is somehow a danger, Judge, I haven't

17   heard one shred of evidence here this morning -- or this

18   afternoon, excuse me, that would suggest that my client

19   is somehow a danger to the community.

20                     This is more of a situation akin to being

21   guilt by association.  She's married to this Mr. Stone,

22   who has -- according to the government, is this monster,

23   and because she's married to him, she is somehow a

24   monster too.  I would suggest there's no evidence on

25   either score.

*U.S.A. v. Stone, et al.*

 1                    These meetings, Judge, that Mr. Waterstone

 2     (sic) has pointed out, unfortunately because -- and the

 3     big problem that we pointed out to you is, we're not able

 4     to cross-examine this undercover officer.

 5                    I mean, she's at these meetings in what

 6     capacity?  I'm not able to test this undercover officer's

 7     testimony, other than to say, "Oh, she was there."  Okay.

 8                    Well, how long was she there?  Did she

 9     participate in the conversations or was she out making

10     coffee and serving doughnuts?  We don't know any of that.

11                    They got one date down, December 12th,

12     2009.  Well, that's their wedding date.  Yeah, she was at

13     her wedding, you know, so that must make her a danger to

14     the community because other people involved in Hutaree

15     that were there at her wedding, that makes her a danger

16     to the community.  I think not, Judge.

17                    Her proficiency in firearms use, I mean,

18     it's almost comical, Judge.  And meeting with her for the

19     first time this morning, she told me that yeah, she knows

20     how -- I asked her, "Do you know how to use a gun?"

21                    She said, "Sure, I know how to use a gun.

22     I've been hunting squirrels and rabbits since I was a

23     little girl.  My father taught me."

24                    Does that make her a danger to the

25     community because she knows how to shoot squirrels and

*U.S.A. v. Stone, et al.*

1    rabbits?  I think not.

2                    This notion that she's a -- she's taken on

3    the communications role for the Hutaree, what

4    communications has she sent out, Judge?  There's been no

5    evidence that she sent out these red alerts, "Be

6    prepared, we're going to kill a police officer.  Be

7    prepared, we're going to start the war."  There's nothing

8    like that.

9                    As a matter of fact, I was able to go on

10   the web site.  And she admits that she's responsible for

11   the web site, and there's basically nothing on there.

12   There's nothing that would even be close to being

13   considered seditious behavior or seditious messages or

14   messages that "We're going to kill police officers.

15   We're going to kill people involved in the Brotherhood."

16   There is absolutely nothing of the sort.

17                    So having said all that, Judge, it's

18   basically -- again, there's nothing to even suggest that

19   Mr. Stone should not be awarded a bond with conditions.

20   The argument is even stronger for my client.  This is

21   simply a matter of guilt by association.

22                    And as Mr. Waterstreet accurately pointed

23   out, they were just recently married in December of 2009.

24   She didn't even meet Mr. Stone until May or June of 2009.

25   So she is new to this.  That does not make her a danger.

*U.S.A. v. Stone, et al.*

1  Her background suggests that she's not a danger.

2  I know he pointed out there's an

3  obstruction of justice or assaulting a police officer,

4  but that didn't result in a conviction. It was simply

5  taken under advisement.

6  And it had to do with a situation with her

7  daughter dating somebody that she didn't want to be

8  dating. So no evidence that she espouses a violent

9  overthrow of the government.

10  I'm sure that, Your Honor, in your

11  infinite wisdom, can fashion a bond that will protect the

12  public. I believe, Judge, that she should be awarded an

13  unsecured bond in this case and that -- that there should

14  be strict reporting requirements and that should satisfy

15  the government's need to protect the public.

16  Thank you.

17  THE COURT: Thank you.

18  Mr. Waterstreet, rebuttal?

19  MR. WATERSTREET: No, Your Honor.

20  THE COURT: Moving forward to Defendant

21  Number Five, Joshua John Clough.

22  MR. WATERSTREET: Again, I've handed up

23  the bullet points, your Honor. The government again will

24  rely upon the -- the presumption that there is no

25  conditions or combination of conditions which will assure

*U.S.A. v. Stone, et al.*

1        the defendant's appearance and the safety of the

2        community.

3                    We should point out in a quick summary

4        fashion here, Mr. Clough was present during a vast

5        majority of these meetings; September 28th, 2008, October

6        18th, 2008, November 8, 2008, November 15th, 2008,

7        December 20th, 2008, February 28th, 2009, March 27th

8        through the 28th of 2009, June 12th, 2009, June 13th,

9        2009, July 25th, 2009, August 22nd, 2009, August 27th,

10       2009, November 7th, 2009, December 12th, 2009, January

11       9th, 2010, February 6th, 2010, which was the Kentucky

12       trip, and February 20th, 2010.

13                   It's my understanding from looking through

14       the pretrial services report and it's our understanding

15       as well that he owns no real property.  He is apparently

16       recently employed as a security guard, and more than

17       likely as a result of these charges will become

18       unemployed due to the nature of the charges.

19                   He acknowledges a proficiency with

20       explosives and firearms.  He was a former member of

21       another militia group.  He devised the trip-wire

22       detonation system.

23                   He's the -- was the videographer and web

24       site manager for the Hutaree.  He created the training

25       and recruitment videos.  He is one of the trusted inner

*U.S.A. v. Stone, et al.*

1    circle of the Hutaree.  He was one of the trusted

2    individuals who appeared for the EFP demonstration by the

3    undercover agent.  He was the one who posted on the web

4    site that ATF agents were at the local FFL, "And we have

5    and will return fire.  The question is, will you?"

6              He -- during the training on December

7    20th, 2008, after discussions with killing police

8    officers, he indicated "This would not be a pretty day

9    for any officers to come down here."

10             He was the one who also referred to the

11   list of elected officials, federal judges and other

12   leaders, that it is a ready-made hit list of government

13   officials.

14             He was traveling down to the Kentucky

15   summit and was responsible for his -- with his computer,

16   to look for evasive routes in the event they had to

17   escape or avoid law enforcement.

18             In some of his postings and comments on

19   Liberty Tree Radio web blog, he has indicated that he has

20   used mobile GPS to mark fighting positions.  He has

21   indicated that he -- through statements, that he has his

22   own explosives or used explosives.

23             And I believe pretrial services has

24   indicated he is a risk of flight because he has created

25   various You-Tube videos on how to survive if you were to

*U.S.A. v. Stone, et al.*

1    lay low to avoid the enemy.  Although there is a

2    disclaimer on the video that notes it's a -- the scenario

3    is fictitious, it shows he possesses the skills to

4    survive on the run if the situation should arise.

5                   And I believe those are the bullet points,

6    Your Honor, as to Mr. Josh Clough.

7                   THE COURT:  Mr. Roberts.

8                   MR. ROBERTS:  Thank you very much, Your

9    Honor.

10                   First of all, I would -- in terms of your

11   consideration of this last series of remarks, I would

12   caution Your Honor most respectfully that these bullet

13   points that have been referred to here, a lot of these

14   are conclusions with what I would suggest at this point

15   no demonstrated evidential underpinning.  This summary is

16   exactly like an opening statement and I suggest Your

17   Honor should treat it and consider it as such.

18                   With regard to the -- my part of a

19   proffer, I would suggest the strongest items are items

20   that, unfortunately, in my situation, I usually don't

21   encounter clients like this.  When we get into federal

22   courts, most of my clients seem to have built up at least

23   a limited history of contact with law enforcement.

24                   And in this case, we have an individual

25   who is 28 years old, and I would proffer the pretrial

*U.S.A. v. Stone, et al.*

1     services report to Your Honor for your consideration.

2     I'm reviewing this as they were talking.

3                     He's 28 years old.  He has been a lifelong

4     resident of this state.  He has no prior arrests even

5     reported.  No convictions as a youth, a juvenile or an

6     adult.  He's lived with his parents and was living with

7     his parents -- and his parents, by the way, are not, as I

8     understand it -- have not been suggested to have been

9     involved in any way, shape or form.

10                    So this is a 28-year-old man who is living

11    at home with mom and dad.  And I don't want to put out

12    that address.  It's not necessary for the recitation.

13    But it's not associated with the other addresses that we

14    have heard all this representation about today.

15                    This individual then is the kind of person

16    who would normally present as one worthy of consideration

17    of a combination of conditions, not confinement.  He has

18    no history of bench warrants or bond forfeitures,

19    obviously, if he's never been charged with any.  No

20    capiases is the fancy term that's used in the City of

21    Detroit courts.

22                    He therefore, has no history of prior

23    failure to appear for any court appearances or any court

24    date.  There would be no -- there's no suggestion in that

25    kind of background that would call for a conclusion that

*U.S.A. v. Stone, et al.*

1   he is a risk of flight.

2                    It's true he has no major sources of

3   capital.  He had a very limited amount of bank account.

4   He has no money to flee with.  While he obviously -- it's

5   reported that he did possess -- still possesses --

6   doesn't have it in his possession, a passport.  That's

7   generally the kind of condition that a judge would impose

8   in terms of a condition of bond, that that be

9   surrendered.

10                    There is not at least -- I was paying

11   close attention, Your Honor, and I didn't hear any

12   representation of a violent act committed by my client

13   toward another human being.

14                    He had a job.  He had had the job one

15   week.  Obviously, probably will not -- will no longer

16   have that job due to the fact that he's been arrested by

17   the government.  He's lost that job.

18                    But persons in situations where --

19   especially in our economy, where they don't have a job, a

20   lot of people don't have jobs that want them.  A lot of

21   people don't have places to reside.  The fact that he

22   doesn't own property is a factor for you to consider, but

23   I would suggest that it shouldn't hold much moment.

24                    The beliefs that were espoused or have

25   been attributed to one of the defendants have not been

*U.S.A. v. Stone, et al.*

1    shown to have been held or accepted or promulgated by my

2    client, Mr. Clough.

3              There's been no manifesto that bears his

4    signature, no alternative document suggesting another

5    government that he aligns himself with.  There is nothing

6    that's been signed by him, no ritualistic initiation or a

7    violent act toward another human being.

8              I would suggest that while the nature of

9    the charges sound most heinous, considering when you --

10   when you will, that the weapon here, that the second

11   count or the major counts dealing with possessions, or

12   use of, or intended use of weapons of mass destruction,

13   we launched a war over mass destructive weapons that were

14   never found.

15             And in this case, as I understand, and a

16   careful reading of the documents at issue would reflect

17   the weapon involved and labeled, I understand how the

18   statute works, and refers you back to 921, the weapon

19   could be, and in this case was, explosives.

20             Not biological, not chemical, not nuclear,

21   nothing that we would normally envision when we consider

22   weapons of mass destruction.

23             I would adopt other defense counsels'

24   earlier remarks about the presumptions at issue here.

25   And I would strongly suggest to Your Honor that this

*U.S.A. v. Stone, et al.*

1    individual, unblemished by a convicted record of any

2    nature, would be easily monitored, would be willing to

3    report as regularly as Your Honor would require, can

4    certainly -- his ankle monitoring or ankle tethering,

5    electronic tethering could certainly dissuade any

6    suggestion that as soon as he's out, he's going to flee.

7    Because there's nothing else that would suggest that.

8              And in the bullet points that the

9    prosecution has submitted, we would suggest the following

10   for your consideration.

11             With regard to all these bullet points,

12   they are again, to the point that they're not theories,

13   we would suggest you consider, and you can look yourself

14   on the Hutaree website, the specific emboldened phrase on

15   one of these bullet points,

16                    "We have and will return fire.  The

17                    question is, will you?  Hutaree.com."

18   That is at the bottom of their web page.  It's at the

19   bottom of every transmission that is put on that web

20   page.

21             And I haven't heard anything that suggests

22   how it is that the government is making a conclusion that

23   my client is the one who put that particular entry on

24   there.  And that particular entry, because it's on all of

25   their web references, does not specifically refer to the

*U.S.A. v. Stone, et al.*

1    December 8th, 2008 event.

2                    The other remarks that are attributed

3    directly to Mr. Clough,

4                    "This would not be a pretty day for

5                    any officers coming down here,"

6    again, Your Honor, that's just talking.  That's all we've

7    heard about; talking and role playing.

8                    There was never even any demonstrative

9    thing at the end of a statement like that, like "This is

10   what I would do if they were standing right here" and

11   launch of a bunch of rounds.

12                   We don't have any references at all to my

13   client doing anything other than making remarks.  There's

14   a bullet point having to do with this list of elected

15   officials.

16                   I think if Your Honor were able to examine

17   that, there's probably names on there that this group

18   would have no way of getting anywhere near, people in

19   other countries, people that are -- that don't even live

20   in the United States.  And again, a reference of the kind

21   that was made with regard to that particular list is

22   nothing but a remark.

23                   All of these -- and again, the last one

24   that Clough and another defendant both claim that Clough

25   has his own explosives, I didn't hear anything presented

*U.S.A. v. Stone, et al.*

1     by the prosecuting attorney yet that indicated they had

2     seen Mr. Clough in possession of any -- any kind of

3     explosives or detonating any explosives.

4                   So I could say, "I know all about bombs."

5     That doesn't mean it's true.  And I am suggesting that

6     these are the kinds of problems that we run into when a

7     case at a detention hearing proceeds by proffer.

8                   Again, this is -- I know that this is a

9     process that is invoked occasionally.  It's invoked more

10    seriously than in other situations.

11                  We haven't had one witness testify, not

12    even a federal agent saying, "I was there and this is

13    what I saw," let alone, "I interviewed this person and

14    this is what they told me" or anything like that.

15                  We've had an Assistant United States

16    Attorney carefully go through his notes from all the

17    review that he's made of whatever information has been

18    parlayed to him second and third-hand and that is the

19    danger of locking up Joshua Clough based upon that

20    modicum of proof.

21                  I ask Your Honor to seriously consider all

22    of my remarks in line with the other defense attorneys'

23    and to conclude that there is a combination of conditions

24    that would ensure not only the safety of the public, but

25    my client's return.

U.S.A. v. Stone, et al.

1                    THE COURT:  Thank you.

2                    Mr. Waterstreet, rebuttal?

3                    MR. WATERSTREET:  Yes.  Just two areas,

4     Your Honor.

5                    To the extent, if any, defense is

6     suggesting, and I don't know if he was doing it directly,

7     that the parents should be third-party custodians, I just

8     believe there's something that should be brought to the

9     Court's attention.  I didn't bring it up, because I did

10    not know that he would mention the parents.

11                   But apparently during the execution of the

12    search warrant, they barricaded themselves in the house

13    on themselves and eventually the FBI were able to

14    negotiate a peaceful resolution of that.  While

15    understanding that, of course, people, if they did not

16    hear the initial knock, knowing that it was law

17    enforcement, it would have been very clear that they

18    would have been defending their home.

19                   However, it did become clear shortly

20    thereafter that it was still -- that it was, in fact, law

21    enforcement and the barricade standoff lasted for a

22    period of time.

23                   As to the other indication that counsel

24    alluded to was the Hutaree.com, "We have and will return

25    fire.  The question is, will you?"

1              Perhaps I didn't do a very good job of

2       explaining this.  But there were two different postings,

3       Your Honor.  One was from Josh Clough, signed "Azzurlin,"

4       which is his Hutaree nickname, A-z-z-u-r-l-i-n, and that

5       was posted on AWRM.org.  It stands for a well-regulated

6       militia.

7              And that's when he made that comment that,

8       "The ATF were at our local FFL today and looking at

9       paperwork specifically related to our commander."  And

10      that was on December 8th, 2008.

11             Then on a separate e-mail that was sent

12      out from David Stone from Hutaree@yahoo.com, it was an

13      e-mail that was entitled "Flash, flash, flash, ATF

14      Enforcers."

15             So if there was any confusion, Your Honor,

16      I apologize, but it is a situation where Josh Clough did,

17      in fact, go on line, sign his Hutaree name, and indicated

18      that people should react to this checking of paperwork at

19      a federal firearm licensee.

20                   THE COURT:  Thank you.

21                   Ms. Satawa has requested an adjournment.

22                   Mr. Scharg, I understand you have a trial

23      tomorrow; is that correct?

24                   MR. SCHARG:  I would ask the Court to

25      proceed with Mr. Sickles today, please?

*U.S.A. v. Stone, et al.*

1              THE COURT:  We'll start with Mr. -- we'll

2    go on with Mr. Sickles.

3              MR. SCHARG:  Okay.  Thank you very much,

4    Your Honor.

5              MR. WATERSTREET:  As for Kristopher

6    Sickles, Your Honor, again the presumption exists in this

7    situation.  We have a little bit different situation for

8    Mr. Sickles.  And you will also hear from Mr. Ward.

9              These individuals do not live in the

10   Eastern District of Michigan.  They live in another

11   district.  They have no ties to this district, other than

12   for them to come for training with the Hutaree and to

13   engage in the conduct in which they are charged.  He was

14   present for training on September 27th, 2008, August

15   22nd, 2009, November 7th, 2009, January 9th, 2010 and

16   February 20th, 2010.

17             He is the self-proclaimed leader of the

18   Ohio Militia.  He is a person who called for the

19   million-man armed march on Washington.  He has been

20   discharged from the Army under other than honorable

21   conditions, owns and possesses body armor, bullet-proof

22   vests, a ghillie suit to blend in with the wooded

23   environments, night-vision goggles.  He has, in fact,

24   even posted those items on his Facebook.

25             He is a CCW permit holder in Ohio.  He is

*U.S.A. v. Stone, et al.*

1 an individual who is willing to travel several hours just

2 to train with the Hutaree, rather than a more local

3 militia.

4    During the January 9th, 2010 training when

5 he heard Stone's plan for the April training, that's when

6 Sickles indicated his desire to detonate an IED outside

7 the Huron, Ohio Police Department.

8    He discussed the killing of his cat with

9 two .357 handgun rounds, to get some practice in killing,

10 to see what it was like.  He also described how he

11 thought C-4 explosives could be made.

12    During the February 20th, 2010 training

13 event where they discussed murdering law enforcement

14 officers, the Brotherhood, specifically, Sickles

15 mentioned his desire to martyr himself by suicide by cop.

16    And during this conversation, he made it

17 very clear that he would try to take as many police

18 officers with him before he would die.

19    He does, in fact, have a criminal record.

20 He was arrested on February 23, 2004 by the Huron, Ohio

21 Police Department for a charge of disseminating matter

22 harmful to minors.  He received a misdemeanor conviction,

23 and therefore he was still able to keep his concealed

24 weapons permit.

25    He has a lengthy record with the Huron

*U.S.A. v. Stone, et al.*

1       Police Department involving allegations involving no less

2       than 17 police reports.

3                       And he had previously been training with

4       another militia group, and left that militia group to

5       join the Hutaree, because in his opinion, that other

6       group was not doing enough.

7                       I believe, Your Honor, for the reasons

8       I've stated before, with the presumption, as well as the

9       fact he does not have ties to this community, and it's my

10      understanding through the pretrial services report, the

11      defendant is unemployed.

12                      The government has serious reservations

13      whether, if released, he would show up, or if released,

14      he would not pose a threat to the community.

15                      And so, therefore, it's the government's

16      opinion that he should be ordered detained pending the

17      resolution of this matter.

18                      THE COURT:  Thank you.

19                      Mr. Scharg.

20                      MR. SCHARG:  Thank you, Your Honor.

21                      As I listened to Mr. Waterstreet earlier

22      today talk about all the street signs, one comes to mind,

23      is to "proceed with caution."

24                      And I ask the Court to proceed with

25      caution, based upon the fact that Mr. Waterstreet's

*U.S.A. v. Stone, et al.*

1    presentation to the Court was merely argument and not

2    based upon fact.

3              And since my argument is going to be based

4    upon argument and not fact, I think it should have the

5    same and equal weight as Mr. Waterstreet's, since neither

6    one of us have any type of witnesses or facts in evidence

7    to back up the arguments.

8              I would like to say also that I concur

9    with the arguments of Mr. Thomas and Mr. Swor regarding

10   the format the Court is using in terms of the fact that

11   it is extremely unusual and objectionable to use this

12   format where we can not cross-examine and challenge any

13   of the arguments made by Mr. Waterstreet.

14             I should say that I have reviewed the

15   pretrial services report and like other -- like other

16   counsel, first of all, I would like to argue the fact

17   that pretrial services has opined that Mr. Sickles is not

18   a flight risk in this case.

19             The arguments of Mr. Waterstreet to me are

20   somewhat disingenuous in terms of the fact that he's from

21   out of state.

22             Mr. Sickles was born and raised in

23   Sandusky, Ohio, which I think they have that big

24   amusement park there.  And some of the argument of Mr.

25   Waterstreet seems to blend in with that amusement park

*U.S.A. v. Stone, et al.*

1    mentality, in terms of the fact that Sandusky, Ohio, from

2    the last time I took my kids there, was about two hours

3    away.

4              And Sandusky, Ohio is closer than a lot of

5    the cities and areas in the Eastern District of Michigan.

6    And to say that -- in fact, that he lives outside the

7    State of Michigan, without explaining the fact that his

8    home is closer than many areas of -- in the Eastern

9    District of Michigan, really is -- portrays something of

10   fiction.

11             Mr. Sickles is 27 years told.  The

12   extensive criminal record that Mr. Waterstreet alludes to

13   is one misdemeanor conviction, one misdemeanor conviction

14   where he got a suspended sentence.

15             And the other part of this extensive

16   criminal record that he has is the 17 police reports.

17   And I have -- really, I've heard a lot here today, but

18   arguing that 17 police reports over a person's life is an

19   extensive criminal history, again, I think is

20   disingenuous, ludicrous and fictitious.

21             Mr. Sickles lives with this wife who's

22   here today and his two small children, a four-year-old

23   and a seven-month-old, in Sandusky, in a trailer home

24   that he owns, where he has lived his entire life, with a

25   support system of parents and family members in that

*U.S.A. v. Stone, et al.*

1    far-distant area of Sandusky, Ohio.

2                    Although he is unemployed, he is -- he was

3    collecting unemployment benefits because, in fact, his

4    job was terminated.  And, in fact, if he was allowed to

5    return to home -- return home in lieu of collecting the

6    unemployment benefits if that is terminated, he could

7    work part time if -- for his father-in-law who owns a

8    local nursery; as in forestry, rather than children.

9                    In terms of the arguments and allegations

10   by the government and in terms of their talking points,

11   and I want to stress talking, rather than evidentiary

12   points, in terms of the number of meetings, I believe it

13   is clear that Mr. Sickles did not attend more meetings

14   than he did attend during this period of time.

15                   He did not attend this Kentucky summit.

16   He was not present at the explosive demonstration.  And

17   he was present at some of these trainings or training

18   sessions.

19                   And I'll address the content and substance

20   of what was done at the training sessions in terms of the

21   fact that there is very little and no evidentiary

22   evidence that in fact that he did anything more than act

23   in these training exercises that these militias all over

24   do and which are not illegal.

25                   He is the self-proclaimed leader of the

1    Ohio militia.  That means that that proclamation and a

2    dollar and-a-half can probably get him a cup of coffee

3    somewhere in Sandusky.

4              Calling for a million-man march, I am not

5    aware of any million-man march that occurred in

6    Washington, and probably there was a one-man march.  And

7    when we talk about "armed march," it's not armed

8    resurrection, but it's -- I believe has something to do

9    with Second Amendment rights.

10             In terms of the discharge from the

11   military, he was -- he was discharged under less than

12   honorable conditions, but in fact, after he went AWOL, he

13   did self-surrender.  He owns and possesses body armor and

14   this ghillie suit and night goggles.  And I have no

15   information that that's illegal.

16             CCW permit, I mean, that in itself is no

17   reason to deny bond and that he's a danger to the

18   community if he went out and got a permit so he could

19   carry and possess weapons.

20             The fact that he travels -- that he

21   travels several hours to go to Hutaree exercises, rather

22   than more local militia, my argument is just as valid as

23   Mr. Waterstreet's argument here, and in being out of

24   state, is that this local militia was closer to him, less

25   than two hours -- or several hours, was closer than other

*U.S.A. v. Stone, et al.*

1    militias in the State of Ohio.

2                The information regarding this martyrdom,

3    suicide by cop, how -- you know, how do we confront this

4    information without having a witness?  It is -- I think

5    the best way is, action speaks louder than words, is that

6    when police or government agents arrived at his home to

7    arrest him, contrary to the government's argument on

8    other defendants, he surrendered without incident.

9                There were weapons in the house.  There

10    were people in the house.  And there was a surrender or

11    without incident, and he was cooperative.  Contrary to

12    someone seeking martyrdom or a martyr status or suicide

13    by cop, the situation occurred that when the police came

14    out to raid the house and to arrest him, he surrendered.

15                We're asking the Court to set conditions

16    for release.  His wife or family members from Sandusky

17    can act as third-party custodians.  He can be ordered

18    under house arrest, doesn't have to leave the house, with

19    a GPS and/or tether, to assist his wife, who works, in

20    the care of his two young children.

21                Again, and finally, pretrial services says

22    there is no flight risk.  Agreed.  We believe that

23    there's a number of conditions that can be set by this

24    court to assure that there's no danger to the community,

25    to the fact that he would, during the pendency of this

*U.S.A. v. Stone, et al.*

1        case, and it could be long and protracted, that he could

2        tend for his two minor children at the home and be there

3        at all times and not be a danger to anyone.

4                        Thank you.

5                        THE COURT:  Thank you.

6                        Mr. Waterstreet, rebuttal as to Mr.

7        Sickles?

8                        MR. WATERSTREET:  Yes, Your Honor.  I will

9        quickly.

10                       Mr. Scharg is correct.  Thankfully, Mr.

11       Sickles did not follow through with his copicide plan,

12       seeing that he was the only adult home caring for his one

13       and four-year-old child, that he thought better of giving

14       in to a shootout with law enforcement, despite the fact

15       he had the wherewithal and the equipment to do so, having

16       been arrested with 13 firearms, more than 8,000 rounds of

17       ammunition, having a Kevlar helmet, the bullet-proof

18       vest, camouflage clothing, various knives, tactical vest

19       and night vision equipment.

20                       I am happy that it came to a safe

21       resolution, rather than what his plan was.  That, in and

22       of itself, because it became a safe resolution, does not

23       mitigate the fact that he was engaged in serious criminal

24       conduct.

25                       Thank you, Your Honor.

*U.S.A. v. Stone, et al.*

1               THE COURT:  Thank you.

2               With apologies to Mr. Seikaly, we are

3        going to suspend for today.

4               The marshal is beyond the time at which

5        prisoner handling should have occurred.  My apologies.

6        We will resume at 1:00 tomorrow.

7               I would like to see all counsel of record

8        before you leave today.

9                     (Court in recess at 5:10 p.m.)

10                       *      *      *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*U.S.A. v. Stone, et al.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18                     **C E R T I F I C A T I O N**

19            I certify that the foregoing is a correct

20      transcript from the digital sound recording of the

21      proceedings in the above-entitled matter and has been

22      prepared by me or under my direction.

23

24      \s\Marie J. Metcalf                      04/07/10

25      Marie J. Metcalf, CVR, CM                 (Date)