1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
2                           SOUTHERN DIVISION

3

      UNITED STATES OF AMERICA,
4
                            Plaintiff,
5
          -v-                           Case No. 10-20123
6
      D-1 DAVID BRIAN STONE, a.k.a. "RD,"
7         a.k.a. "Joe Stonewall," a.k.a.
          "Captain Hutaree,"
8     D-2 DAVID BRIAN STONE, JR., a.k.a.
          "Junior,"
9     D-3 JOSHUA MATTHEW STONE, a.k.a. "Josh,"
      D-4 TINA MAE STONE,
10    D-5 JOSHUA JOHN CLOUGH, a.k.a. "Azzurlin,"
          a.k.a. "Az," a.k.a. "Mouse," a.k.a.
11        "Jason Z. Charles,"
      D-6 MICHAEL DAVID MEEKS, a.k.a. "Mikey,"
12    D-7 THOMAS WILLIAM PIATEK,
      D-8 KRISTOPHER T. SICKLES, a.k.a.
13        "Pale Horse,"
      D-9 JACOB J. WARD, a.k.a. "Jake,"
14        a.k.a. "Nate," a.k.a. "Guhighllo,"

15    _____ Defendants./

16                      **DETENTION HEARINGS**
          **BEFORE HON. MAGISTRATE JUDGE DONALD A. SCHEER**
17                 United States Magistrate Judge
                   Theodore Levin U.S. Courthouse
18                       231 West Lafayette
                      Detroit, Michigan 48226
19
                      **(Thursday, April 1, 2010)**
20

      APPEARANCES:          RONALD W. WATERSTREET, ESQUIRE
21                          JOSEPH L. FALVEY, ESQUIRE
                            Appearing on behalf of the
22                          Government.

23                          WILLIAM W. SWOR, ESQUIRE
                            Appearing on behalf of Defendant
24                          David Brian Stone.

25

```
 1                          RICHARD M. HELFRICK, ESQUIRE
                            Appearing on behalf of Defendant
 2                          David Brian Stone, Jr.

 3                          JAMES C. THOMAS, ESQUIRE
                            Appearing on behalf of Defendant
 4                          Joshua Matthew Stone.

 5                          MICHAEL A. RATAJ, ESQUIRE
                            Appearing on behalf of Defendant Tina
 6                          Mae Stone.

 7                          RANDALL C. ROBERTS, ESQUIRE
                            Appearing on behalf of Defendant
 8                          Joshua John Clough.

 9                          HENRY M. SCHARG, ESQUIRE
                            Appearing on behalf of Defendant
10                          Kristopher T. Sickles.

11                          CHRISTOPHER N. SEIKALY, ESQUIRE
                            Appearing on behalf of Defendant
12                          Jacob J. Ward.

13                          MARK A. SATAWA, ESQUIRE
                            LISA B. KIRSCH SATAWA, ESQUIRE
14                          Appearing on behalf of Defendant
                            David Meeks.
15
           COURT RECORDER:  LOLITA GRANGER
16
           TRANSCRIBED BY:  MARIE J. METCALF, CVR, CM
17                          Federal Official Court Reporter
                            257 U.S. Courthouse
18                          231 W. Lafayette
                            Detroit, Michigan 48226
19

20
                (TRANSCRIPT PRODUCED FROM DIGITAL VOICE RECORDING;
21                  TRANSCRIBER NOT PRESENT AT PROCEEDINGS)

22

23

24

25
```

1           **TABLE OF CONTENTS**                    **PAGE:**

2      **Proceedings – Thursday, April 1, 2010**

3                   **DETENTION HEARINGS**

4      **DEFENDANTS:**

5      Michael David Meeks................................6

6      Jacob J. Ward...................................20

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*U.S.A. v. Stone, et al.*

1                        Detroit, Michigan

2                        Thursday, April 1, 2010

3                        At about 1:22 p.m.

4                            *   *   *

5              DEPUTY COURT CLERK:  The Court calls case

6    number 10-20123, United States of America versus David

7    Stone, among others.

8                    THE COURT:  Appearances?

9                    MR. FALVEY:  Good afternoon, Your Honor.

10   Joseph Falvey and Ronald Waterstreet appearing on behalf

11   of the United States.

12                   THE COURT:  Thank you.

13                   Defense appearances?

14                   For David Brian Stone, Mr. Thomas?

15                   MR. THOMAS:  Well, Your Honor, I'm for

16   Joshua Stone.  James Thomas on behalf of Mr. Joshua

17   Stone.

18                   THE COURT:  I beg your pardon.

19                   Mr. Swor is not present?

20                   MR. THOMAS:  It appears not.

21                   THE COURT:  For David Brian Stone, Jr.,

22   Mr. Helfrick is present.

23                   For Tina Mae Stone, Mr. Rataj is present.

24                   For John Clough, Mr. Roberts is present.

25                   For David -- Michael David Meeks, Mr. and

*U.S.A. v. Stone, et al.*

1    Ms. Satawa are present.

2              Mr. Scharg is present for Defendant

3    Sickles.

4              Mr. Seikaly is present for Defendant Ward.

5              I asked that the defendants and their

6    counsel be present today at this time so that the Court

7    could address the objections to the government's

8    proceeding by proffer.

9              I have received and reviewed Mr. Thomas's

10   brief.  I have received Mr. Rataj's written concurrence.

11   Is it safe to assume, counsel, that all defendants concur

12   in the brief?

13             MS. SATAWA:  On behalf of Mr. Meeks, we

14   would concur, Your Honor.

15             MR. ROBERTS:  On behalf of Mr. Clough, we

16   would, Your Honor.

17             MR. SCHARG:  On behalf of Mr. Sickles, we

18   concur.

19             MR. HELFRICK:  On behalf of David Stone,

20   Jr., yes.

21             MR. SEIKALY:  Also as to Mr. Ward, Judge.

22   Thank you.

23             THE COURT:  Thank you.

24             The Court will treat the motion as joined

25   by all defendants.  I have reviewed the brief as well as

U.S.A. v. Stone, et al.

1        the response brief filed by the government.  And I have

2        reviewed case authority cited by both sides, in

3        particular the *Windsor* case out of the Ninth Circuit and

4        the Sixth Circuit unpublished opinion unanimously

5        concurring with the ruling in the *Windsor* case.

6                     That ruling was that the government may

7        proceed in a detention hearing by way of a proffer, that

8        it is not required to present a witness and that the

9        defendant suffers no due process violation by reason of

10       the inability to cross-examine.

11                    Based on those authorities, I will

12       overrule the objection.

13                    Are we ready to proceed as to Michael

14       David Meeks?

15                    MR. FALVEY:  We are, Your Honor.

16                    THE COURT:  You may proceed.

17                    First of all, Ms. Satawa have you received

18       a copy of the pretrial services report and

19       recommendation?

20                    MS. SATAWA:  I have, Your Honor.

21                    THE COURT:  Thank you.  You may proceed.

22                    MR. FALVEY:  Good afternoon, again, Your

23       Honor.  Joseph Falvey appearing on behalf of the United

24       States.

25                    As with the other defendants, we've

*U.S.A. v. Stone, et al.*

1    prepared a number of talking points for the Court that

2    we'll be relying upon.  The defense counsel has been

3    provided a copy of those.  And I'll hand a copy for the

4    Judge forward at this time.

5              THE COURT:  Thank you.

6              MR. FALVEY:  Your Honor, based on the

7    proffer by co-counsel, AUSA Waterstreet, it's clear that

8    Mr. Meeks was present for the following Hutaree meetings

9    and training.  He was present on October 18th, 2008,

10   February 28th, 2009, the 27th and 28th of March 2009, the

11   13th of June 2009, which was the IED demonstration day,

12   the 25th of July 2009, the 22nd of August 2009, the 7th

13   of November 2009, the 12th of December 2009, the 9th of

14   January 2010, which was the day defendant one, David

15   Brian Stone revealed the plan for the covert operation in

16   April.  He returned after that on the 6th of February

17   2010 for the Kentucky summit trip.  And again, for the

18   February 20th, 2010 training.

19              Meeks is a long-time member of Hutaree,

20   Your Honor.  He is also an ex-marine and is referred to

21   by David Brian Stone as his heavy gunner.

22              He has not lived at his driver's license

23   address for over five years, yet has not sought to change

24   that address with the State of Michigan.

25              The United States Postal Service lists his

*U.S.A. v. Stone, et al.*

1    true address as vacant.

2              He, like the others, has demonstrated

3    survivalist training and a survivalist mentality.  He is

4    one of the trusted circle of David Brian Stone, most

5    notably evidenced by his participation in the Kentucky

6    summit trip.

7              During the June 13th, 2009 training, which

8    again was that day they were exploding IEDs, trip-wire

9    command detonated, et cetera, he suggested blowing up a

10   bridge across the River Raisin when the time came, when

11   the enemy came.

12             And also at that same day, after receiving

13   that training, after making that statement, in discussing

14   the alleged release of a pedophile down in Florida, said,

15   "We got to start over man.  We got to get rid of the

16   judicial system, everybody.  They need to die."

17             He discussed capping a member of law

18   enforcement and seizing that person's weapons.

19             Upon hearing that Senator Edward Kennedy

20   reportedly had a CCW permit, he stated, "They think

21   they're different."  "They" referring, it's assumed,

22   members of Congress.  "Wait until they find out that they

23   bleed exactly the same."

24             At the August 22nd, 2009 training, he

25   claimed to have a thousand tracer rounds for his AR-15

*U.S.A. v. Stone, et al.*

1    and indicated he would be doling it out to other Hutaree

2    members.

3                    This is corroborated by the search of his

4    residence which occurred yesterday, I believe, that

5    recovered 16 long guns to include two AR-15s, one AK-47,

6    an M1-A1A and another semi-automatic rifle, six gas

7    masks, along with their accompanying box of cartridges,

8    filters, two cases of MREs, thousands of rounds of

9    ammunition, not yet counted, stockpiles in the hundreds

10   of canned food, a binder of self-defense tactics,

11   including how to disarm knives, disarm gunmen and

12   improvise munitions.

13                   Also found were his Hutaree clothing, and

14   patches, and a plaque, a small plaque with a piece of

15   barbed wire on it that indicated "Remember Waco."

16                   On the 12th of December 2009, David Brian

17   Stone and Tina Stone's wedding day, in a conversation

18   with the undercover agent, he produced the document which

19   was described by Joshua Clough as a ready-made hit list.

20   And as you'll recall, Your Honor, that list included the

21   names of elected officials, federal judges and other

22   leaders.

23                   During the February 20th, 2010 training,

24   after hearing about the planned operation in April after

25   the Kentucky road trip, when he heard the -- David Brian

*U.S.A. v. Stone, et al.*

1    Stone's manifesto, he indicated -- and after a discussion

2    of taking on law enforcement and potential suicide, he

3    indicated his desire to die in a copicide situation.

4            He's been assigned by David Brian Stone to

5    obtain a van for that April operation and indicated the

6    only thing that was holding him back was he had not yet

7    saved up enough scrap in order to purchase -- to convert

8    that scrap to cash and purchase the vehicle.

9            He's also been tasked -- or was also

10    tasked by David Brian Stone to get component materials

11    for the IED that David Brian Stone was seeking.

12            Your Honor, that concludes the individual

13    information regarding Michael Brian -- I'm sorry.

14    Michael Meeks.

15            THE COURT:  Thank you.

16            Ms. Satawa, do you have evidence or

17    proffer?  Or Mr. Satawa?

18            MS. SATAWA:  Being a team is great, Judge.

19            MR. SATAWA:  Your Honor, as to the

20    affirmative proffer on behalf of my client, I would like

21    to first state that I suggest to Your Honor and this

22    Court that despite the fact that this is charged as a

23    conspiracy for purposes of this detention hearing, I

24    think the Court is proceeding properly in evaluating each

25    one of these defendants separately as it relates to the

*U.S.A. v. Stone, et al.*

1       individual circumstances under the Bail Reform Act and as

2       to whether or not my client qualifies for pretrial

3       release under the statute, Your Honor.

4                    I would first like to say, Your Honor,

5       that even the pretrial services report, when it's

6       examined, reads the entire way through as if it's going

7       to recommend release.  I suggest to the Court that the

8       reason for that is, is that if this Court sort of looks

9       at this as the scales of justice so-to-speak, Judge, the

10      only thing on the one side is the nature of the

11      allegations, in fact, and that is the only thing that

12      makes this a presumption case, Judge, is the nature of

13      the allegations.

14                   So you have that on the one side and on

15      the other side, Your Honor, you have everything else that

16      weighs substantially in Mr. Meeks' favor.  Starting with

17      the fact, Your Honor, both the -- I submit to the Court

18      that to argue that there is no set of conditions that

19      would both protect the public and ensure my client's

20      appearance in court is just frankly not true, Judge.

21                   My client has lived in the State of

22      Michigan his entire 40-year life, but for a three

23      and-a-half to four-year tour of duty in the United States

24      Marine Corps, where he was honorably discharged after

25      serving in Desert Storm, an action where he got a

*U.S.A. v. Stone, et al.*

1        combat-related medal, Judge.

2                        He is represented in the courtroom by at

3        last count six, seven or eight family members, Judge,

4        including brothers, parents.

5                        His one brother is a member of the State

6        of Michigan Bar, Your Honor.  His parents have stated and

7        expressed, as noted in the pretrial services report,

8        willingness to serve as a custodial guardian for Mr.

9        Meeks.

10                       Mr. Meeks could be ordered to be on house

11       arrest at that home, could even be tethered if the Court

12       felt it was necessary to protect the public, but

13       certainly is not necessary to have -- to be incarcerated.

14                       Just, my client has a job.  I have a

15       letter, Your Honor, that has been shared with the

16       government, that indicates that his job will be -- is

17       still waiting for him if, in fact, he is secure.  He's

18       able to be -- secure pretrial release.

19                       That job is with Interactive Metals, Your

20       Honor.  He is a truck driver.  He does not drive over the

21       road, Your Honor.  He does not leave the State of

22       Michigan.  He'll be confined to the Eastern District of

23       Michigan.

24                       And --

25                       MR. THOMAS:  Your Honor, may I interrupt?

*U.S.A. v. Stone, et al.*

```
1                    THE COURT:  You may.
2                    MR. THOMAS:  Mr. Scharg and I are going to
3      go upstairs.  We're not necessary for this part of the
4      proceeding.  But if your clerk will let the Judge know,
5      we'll come back down when you're ready to rule.
6                    THE COURT:  Very well.  I will likely take
7      these matters under advisement and enter orders either
8      late this afternoon or tomorrow, so you will all be
9      notified.
10                    MR. THOMAS:  But we've already argued.
11     And so if you'll allow us to leave.  Our clients have
12     given us their permission to do that.
13                    THE COURT:  You certainly are excused.
14                    Thank you very much.  You're excused.
15                    MR. WATERSTREET:  Your Honor, before they
16     go, however, the government intended to, at the end of
17     each individual proceeding, was going to seek an
18     opportunity to argue -- argue the whole detention issue
19     very briefly, Your Honor.
20                    MR. THOMAS:  I thought we had that
21     already.
22                    THE COURT:  Yeah.  It sounded yesterday
23     like I heard a lot of argument.
24                    MR. THOMAS:  I have no further argument,
25     Judge.  I'm willing to stand on what we've already done.
```

1          My client has given me permission to go and continue the

2          trial upstairs.  So I'd ask you to allow us to leave.

3                          THE COURT:  You are excused.

4                          MR. WATERSTREET:  Your Honor, will counsel

5          also waive an opportunity to hear my comments?

6                          THE COURT:  That is what my understanding

7          was.

8                          MR. WATERSTREET:  That is, to the extent

9          you'll allow me to make comments.

10                         THE COURT:  I will -- I will hear the

11         argument.  I can not imagine that it will play a

12         significant role in my decision after having heard the

13         evidence and all the presentation yesterday.

14                         MR. SCHARG:  If we are needed, we will be

15         taking an additional recess at 3:00.

16                         THE COURT:  Very well.  Thank you both.

17                         MR. THOMAS:  Your Honor, I think I have to

18         make a record regarding my client.

19                         THE COURT:  Please do.

20                         MR. THOMAS:  Mr. Stone, do you have any

21         objection to me leaving for now since this matter does

22         not relate to you at this point?

23                         DEFENDANT STONE, SR.:  No.

24                         MR. SCHARG:  And Mr. Waterstreet asked me

25         to do the same thing.  You have no objection to me --

*U.S.A. v. Stone, et al.*

1              DEFENDANT SICKLES:  As long as it's --
2       you're not going to be needing (unintelligible).
3              MR. SCHARG:  Okay.
4              THE COURT:  Thank you both.
5              Pardon the interruption.  Mr. Satawa, you
6       may continue.
7              MR. SATAWA:  Quite understanding, Your
8       Honor.  It's my understanding that brother counsel are
9       both in trial, so --
10             THE COURT:  That's correct.
11             MR. SATAWA:  Your Honor, again, he has
12      honorably served in the Marines, where he received an
13      honorable discharge at the rank of Corporal E4, having
14      been awarded various commendations which were on the
15      honorable discharge that has been proffered to the Court,
16      including a combat action ribbon and a combat decoration
17      which is a called a Meritorious Mast.
18             Judge, he has attended school in the area
19      at Washtenaw Community College.  He is certified as a
20      paramedic, having completed paramedic school.  Again,
21      Judge, he's worked for the last several years.  Four
22      interactive medals.
23             His immediate supervisor, Matthew
24      Anderson, is in the courtroom, Judge, his boss, willing
25      to attest to the fact that he is a trusted, valuable,

1     reliable employee, and his job will be waiting for him

2     if, in fact, released.

3                    THE COURT:  I have received Mr. Anderson's

4     letter and that would suffice.

5                    MR. SATAWA:  Thank you, Judge.

6                    He has been working there for seven years,

7     driving for six years.  It should be noted that his

8     driving is confined to the State of Michigan, in a

9     two-hour radius around Adrian, the City of Adrian.

10                    His parents, Eugene and Sylvia Meeks, are

11    in the courtroom, Judge.  They reside at 13531 Bemis Road

12    in Manchester, Michigan.  They have again agreed to serve

13    as a custodian for our -- for Mr. Meeks, and will allow

14    him to stay and live in his -- in their home.

15                    Also attending, Judge, are the rest of his

16    of family, including Greg Meeks, who lives in Ypsilanti,

17    Michigan; Todd Meeks, who lives in Napoleon, Michigan;

18    Douglas Meeks, again, who lives in Lansing, Michigan, and

19    is a member of the state bar.

20                    Judge, my client has zero resources to

21    flee, which is verified in the pretrial services report,

22    does not even own a passport, does not have any assets

23    that would allow him to flee.

24                    Judge, he has a minor criminal record from

25    1997 consisting of a misdemeanor drunk driving arrest --

*U.S.A. v. Stone, et al.*

1      conviction, excuse me, Judge.  And has had a clean record

2      in the 13 years since then.

3                   Your Honor, my client, upon his arrest,

4      waived *Miranda* and gave a statement of an hour or two to

5      the FBI.  I think -- and has been cooperative in this

6      investigation.  He assures me that he would pass a drug

7      test.

8                   Your Honor, again, and I also think that

9      it's important to note, Judge, that by way of proffer his

10     family can attest to the fact that my client didn't even

11     have internet access.  So some of the proofs that went to

12     sort of the alleged flash warnings and other information

13     that was put on the internet, communications that were

14     relayed through the internet, my client did not even have

15     internet access at his computer.

16                  Your Honor, again, it's -- the defense is

17     fully aware of the nature of the allegations and their

18     seriousness.  However, Judge, a presumption case does not

19     mean a -- a final determination is to be called, you

20     know, a non-rebuttable presumption.  You know, it means

21     that we start from a spot and then we look where it takes

22     us from there.

23                  Judge, lined up on the other side of the

24     scale, Your Honor, of the fact of the -- the charges,

25     which are the only thing I submit to the Court relate to

*U.S.A. v. Stone, et al.*

1     my client being detained.  And, Judge, I would submit,

2     even based on the proffer given by the government this

3     afternoon and the lengthy proffer given by Mr.

4     Waterstreet yesterday, my client's involvement, I would

5     submit to the Court, is in comparison to other members of

6     the -- this conspiracy not near the top, Judge, and

7     certainly not -- is certainly less culpable than the

8     allegations being raised against some of the leaders of

9     the conspiracy.

10            Judge, again, weighed against that or in

11    contrast to that is all these other personal things that

12    can be said that both ensure my client would appear in

13    Court as well as protect the community.

14            Judge, I would submit to the Court that

15    there is, in fact, a set of circumstances which would

16    include the parents serving as a custodian, which could

17    include house -- a house arrest, being confined to his

18    house, except for work purposes.

19            It could even include a tether if the

20    Court feels it's necessary, but there is certainly a set

21    of circumstances which would ensure both the safety of

22    the public and my client's presence at all future court

23    proceedings.

24            Judge, this is a man who served his

25    country honorably and has lived in this state his entire

*U.S.A. v. Stone, et al.*

1    life, but for serving his country honorably.  And I would

2    ask the Court to issue that order and allow my client to

3    be released pending the pendency of this case.

4                    Judge, one other thing.  I also think that

5    it's important to note that by all accounts from the way

6    this case has begun, this case may take longer than the

7    average criminal case that works its way through the

8    system.

9                    I would think that the Court should be

10   cautious to detain any client for the length of time it

11   may take this case to proceed to trial in front of Judge

12   Roberts as only a last resort, which is really what the

13   Bail Reform Act said, no set of circumstances ensures the

14   safety of the public and our client's presence.

15                   And I suggest, Judge, that in a case where

16   the case is as, shall we say, complex and complicated as

17   this case appears to be at its inception, Judge, I think

18   that the Court should take that warning as it is stated

19   in the statute even more to heart.

20                   Thank you.

21                   THE COURT:  Thank you.

22                   Mr. Falvey, rebuttal?

23                   MR. FALVEY:  Yes, Your Honor.  Just one

24   point.

25                   At the time of the defendant's arrest,

*U.S.A. v. Stone, et al.*

1    shortly thereafter, a search warrant was executed at the

2    address shown on his driver's license, which as it turns

3    out to -- turns out to be his parents' address and his

4    former residence.  As I said, he moved out over five

5    years ago.

6              At that time his parents indicated they

7    did not know where he lived other than a town, a small

8    town in Michigan, and either did not know the address or

9    would not provide the address.

10             Thank you, Your Honor.

11             THE COURT:  Thank you.

12             I will take the matter under advisement

13   together with the others.

14             MR. SATAWA:  Your Honor, may I just really

15   briefly -- although it's been said already in response to

16   what the government just said, I think it's important to

17   know that it wasn't like my client was hiding in a cave

18   or something.  He had a job.  He was working.  And had

19   regular steady employment during this period of time.

20             He was living in the State of Michigan,

21   working in the State of Michigan and has an employer who

22   is here to attest to those facts, Judge.  And I think

23   it's important the Court keeps that in mind in response

24   to what the government just argued.

25             Thank you.

*U.S.A. v. Stone, et al.*

1              THE COURT:  Thank you.

2              Defendant Sickles.  I beg your pardon.

3      Mr. Ward.

4              DEPUTY COURT CLERK:  Ward.

5              THE COURT:  Mr. Ward.  I beg your pardon,

6      Mr. Seikaly.

7              You may proceed Mr. Falvey.

8              MR. FALVEY:  Thank you again, Your Honor.

9      I have for you a set of talking points for Defendant

10     Jacob Ward.  The defense counsel has previously been

11     provided those.

12             THE COURT:  Thank you.

13             MR. FALVEY:  Your Honor, Defendant Jacob

14     Ward was present for the following Hutaree trainings and

15     meetings.  The 27th of September 2008, the 28th of March

16     2009, the 13th of June 2009, the IED training day, the

17     25th of July 2009, the 22nd of August 2009, the 7th of

18     November 2009, the 9th of January 2009, the day the

19     covert April exercise was discussed, and the 20th of

20     February 2010.

21             Our review of the pretrial services report

22     and our understanding is that defendant is unemployed and

23     lives outside the Eastern District of Michigan.

24             Nonetheless, he travels several hours here

25     to Michigan to train with the Michigan -- this militia

*U.S.A. v. Stone, et al.*

1    group rather than one that is more local to him.  He owns

2    no real property.

3                    Our understanding is that the residency he

4    lives in is a property on which his mother carries the

5    mortgage.

6                    He usually attends the training with Kris

7    Sickles.  However, there are several occasions when he

8    has attended by himself.  The risk is, is that the Court

9    would view him as someone who's just a tag-along of

10   Sickles.  But it's important to note that he has attended

11   by himself as well.

12                   He's viewed by David Brian Stone as a full

13   and active member of the Hutaree, a trusted associate.

14   He has demonstrated the Hutaree's extremist ideology and

15   he has often referred to the prosecutor's officer in his

16   county and the local police force in his county as his

17   enemies.

18                   As I noted, he was present for the 9

19   January training, yet returned with full knowledge to the

20   February 20th training.

21                   In July of 2009 Ward approached a former

22   acquaintance of his, a person who had been employed at

23   the same employer as him, now employed by the FBI, and

24   inquired as to whether or not he was under investigation

25   by the FBI.

*U.S.A. v. Stone, et al.*

1            Of course, the FBI agent didn't respond to

2    that and the conversation segued into his former employer

3    -- his former employer and his former employment, and he

4    indicated that the FBI employee would hear about it soon,

5    perhaps even read about it.

6            He was arrested for felonious assault,

7    convicted of the lesser included offense of assault, a

8    misdemeanor, and received a minimal sentence.

9            Thank you, Your Honor.  That concludes the

10   specifics with respect to this defendant.

11           THE COURT:  Thank you.

12           Mr. Seikaly.

13           MR. SEIKALY:  Thank you, Judge.

14           Judge, these talking points aren't

15   evidence.  I haven't heard anything that would show that

16   any of the talking points were proven, especially the one

17   about him being accepted by Mr. Stone.  He is -- at the

18   time of his arrest, he didn't attempt to flee.

19           He opened the door when he heard the

20   police, opened the door and followed their commands of

21   turning around and walking backwards until he was

22   handcuffed, never resisting in any manner.

23           There were no weapons found when he was

24   arrested during the search of the house.  He has no

25   history of failing to appear in court.  He did have a

1    misdemeanor back in 1997, over 13 years ago.  And he's

2    had no subsequent incidents of any matter that would --

3    of a criminal nature.  He has no passport.  He has no

4    money to flee.  He owns a car.  And I think that car is

5    valued at $300.

6             He didn't go to this Kentucky trip.  He

7    did -- allegedly they're saying he went to these

8    meetings, but since when are meetings of individuals

9    illegal in the United States?  Nothing was planned.

10            THE COURT:  That appears to be

11   inconsistent with the proffer, but proceed.

12            MR. SEIKALY:  Free speech is allowed in

13   the United States and it's not prohibited in any manner,

14   unless, you know, you're in a movie theater and you start

15   screaming "fire."

16            People are allowed to associate with

17   whoever they want in America.  There's been nothing

18   offered to show that he would not be returning to court

19   for any proceedings.  He has a car.  It's a short drive

20   from Huron, Ohio.

21            The presentence (sic) investigation, they

22   made a recommendation that he was not a threat.  I'm

23   sorry.  That he did not pose a risk of non-appearance.

24   They spoke to his mother who said that she would be a

25   third-party custodian.  Of course, she didn't want to put

1    up any money, but I don't -- a lot of people don't want

2    to do that.

3                So I would think that there's enough

4    procedures that can be followed to regulate his travel,

5    regulate where he is and assure his appearance in court.

6    And I don't believe that he is a threat to the community.

7                Thank you, Judge.

8                THE COURT:  Thank you.

9                Mr. Falvey, rebuttal.

10               MR. FALVEY:  No, Your Honor.

11               THE COURT:  Thank you.

12               I believe that we have now addressed each

13   of the defendants in the case.  Mr. Falvey you indicated

14   that you wished to argue.

15               UNIDENTIFIED SPEAKER:  Your Honor, are you

16   going to allow eight replies?

17               THE COURT:  I will allow very brief

18   argument and very brief replies.

19               UNIDENTIFIED SPEAKER:  Thank you.

20               MR. FALVEY:  Your Honor, Mr. Ward's

21   defense counsel resurrected or continued a theme you've

22   seen throughout; these are just words, these are -- this

23   is just training, this is mere association, and certainly

24   owning guns is not a crime, wearing a uniform is not a

25   crime, and training is not a crime, even military-style

*U.S.A. v. Stone, et al.*

1    training.

2                    But when persons with dark hearts and evil

3    intent get together and conspire to oppose by force with

4    firearms and violence the authority of the United States,

5    it is a crime.

6                    Now, we've mentioned the presumption and

7    we do take note of that.  However, we've presented much

8    more than that that more than adequately satisfies the

9    burden of establishing that no condition of release will

10   ensure the defendants' presence at trial and ensure the

11   public safety.

12                   With respect to dangerousness, the

13   indictment details some very serious charges, charges

14   that weren't brought lightly and it was not a bare-bones

15   indictment, but one that is full of factual information

16   that was found by the grand jury to have existed and

17   establishes probable cause that each and every one of

18   these defendants committed the crimes laid out there.

19                   Based upon the information you've heard,

20   there's a hierarchy obviously, a command structure, if

21   you will, in the Hutaree that was revealed, and some with

22   greater leadership responsibilities than others.

23                   And they maybe appear to be and some of

24   the defense counsel have called for you to compare each

25   of these defendants with the others and conclude, "Well,

*U.S.A. v. Stone, et al.*

1   that one's not as bad as the others," and perhaps should

2   merit release for that reason.

3          But when it comes to the safety of the

4   community, who's more dangerous, the one who directs

5   another to shoot or the one who pulls the trigger?  The

6   harm comes from the action, not just the command.

7          Some might say, "Cut off the head of the

8   snake and the rest of the snake will whither and die."

9   But as you well know, Your Honor, any effective fighting

10  force requires not just leaders, but subordinates capable

11  of following those orders, and subordinates who will step

12  up to the plate, and especially when one of their leaders

13  falls, and assume command of the organization.

14          And that's exactly what we saw here.  When

15  all of those were arrested, Josh Stone stepped up to the

16  plate and took command of the organization, took charge

17  of it.

18          Mr. Waterstreet detailed the acts he took

19  that were consistent with the Hutaree plan for engaging

20  law enforcement, retreating to the rally point, gathering

21  weapons, et cetera.  And his defense counsel noted,

22  "Well, he surrendered and he surrendered peacefully."

23  And other defense counsel have noted, "My client

24  surrendered and it was peaceful."

25          Yet each and every defendant, Josh Stone

*U.S.A. v. Stone, et al.*

1    included, surrendered peacefully when they were

2    encountered with overwhelming law enforcement presence.

3    That's it.

4              It's important to note that the indictment

5    -- and this still goes to dangerousness, Your Honor, the

6    indictment indicates that they conspired not only amongst

7    themselves, but with others.  Thus the release of any of

8    them allows them the opportunity to regroup, to regroup

9    with their fears against law enforcement now realized,

10   committed to this time no one getting a drop on them, and

11   obviously taking measures to make sure that it doesn't

12   happen again that they're caught.

13             Finally, it's important to remember that

14   the law separately punishes conspiracy.  And it does so

15   because concerted action is particularly dangerous.

16             Moreover, the law doesn't require that the

17   acts be completed.  The conspiracy itself is a separate

18   crime.  And although it's the government's position that

19   seditious conspiracy requires no overt acts, the

20   government has pled a multitude of overt acts.

21             With respect to flight risk, with all due

22   respect to pretrial services, the government believes

23   that all the defendants are flight risks.  The serious

24   nature of these charges create an incentive to flee

25   rather than face prosecution.

*U.S.A. v. Stone, et al.*

1            Each of the defendants is facing life in

2      prison.  A quick examination of the sentencing guidelines

3      reveals that almost the best case scenario is that they

4      would be facing a 42-level guideline calculation.  And

5      that guideline calculation, one short of the top of the

6      list, which is 43, is 30 years to life.

7            They have nothing to lose at this point,

8      Your Honor, other than to flee.  All have the survivalist

9      mentality that caused the pretrial services to recommend

10     that Mr. Clough be detained as a flight risk.

11            You've heard the evidence of that.  The

12     conspiracy itself --

13            UNIDENTIFIED SPEAKER:  Your Honor, I

14     thought these were going to be brief remarks.

15            THE COURT:  How long is this going to be,

16     Mr. Falvey?  I've heard the presentation.

17            MR. FALVEY:  Twenty more seconds, Your

18     Honor.

19            The conspiracy itself, the information

20     proffered by Mr. Waterstreet, demonstrates a disregard

21     for lawful authority and raises a serious question of

22     whether or not the defendants would comply with any

23     assurances that they give or any assurances that the

24     Court demands that they be present for trial.

25            Thank you, Your Honor.

*U.S.A. v. Stone, et al.*

1              THE COURT:  Thank you.

2              Mr. Swor, on behalf of Brian David Stone.

3              MR. SWOR:  Yes, Your Honor.

4              You know, the word that got swallowed up

5      by all the other words is "if."  If you believe the

6      government, if you believe the government's spin, if you

7      believe the government's fear.

8              It's interesting that the government is

9      fearful of the citizens and it poo-poos the fact that

10     citizens are fearful of the government.

11             I mean, they have this fear of the police.

12     Our country was founded on a fear of government.  The

13     federalist form of government that we have is

14     specifically that, to ensure and protect against

15     government encroachment.  We called them statists, those

16     that think that government can do no wrong.

17             These other comments, these great spin

18     comments, "survivalist mentality," whatever that means,

19     "dark hearts and evil intent."

20             We haven't seen anything from this proffer

21     that tells us that Mr. Stone had any evil intent.  They

22     may not like the fact that he dislikes the government,

23     they may not like the fact that -- another spin word --

24     his "manifesto," was that he didn't trust the government

25     or that he wanted to protect American values against what

*U.S.A. v. Stone, et al.*

1    he saw was encroachment.  They were training.  They were

2    preparing to respond, not to take concerted action.

3                    There's no evidence from this proffer that

4    these people intended to violate the law.  That's what --

5    your danger to the community argument.

6                    And the idea that they can blithely -- or

7    that the Court should blithely, without any evidence,

8    ignore the recommendation of pretrial services that Mr.

9    Stone is not a risk of flight, it is -- it just asks the

10   Court to violate the law.

11                   You know, this is a detailed indictment.

12   There have been a lot of detailed indictments found by

13   the grand jury.  I mean, these are all great buzz words,

14   but the fact is there has been no evidence.

15                   And as Mr. Thomas noted in this memorandum

16   regarding the form of the hearing -- and the statute

17   itself says that the hearing has to be based on evidence.

18   And we have a right of confrontation in

19   cross-examination.  It may be limited, but we have that

20   right.  We have been deprived of that right because the

21   government has chosen to proceed without any witnesses.

22   We were able to talk about the exhibits simply because we

23   had them, but we weren't able to cross-examine them

24   further.

25                   Safety of the community, that there was

*U.S.A. v. Stone, et al.*

1    people who directed and people acted.  I presume that

2    they're trying to say that Mr. Stone was one of the

3    directors.  But if you look through the proffer given by

4    the government, there was no direction given by Mr.

5    Stone.  There was talk.  There was conversation, heated,

6    angry, focused, but there certainly was no direction.

7         Then they poo-poo the idea that Mr. Stone

8    surrendered peacefully.  They say only because he was

9    faced with overwhelming opposition.  Well, there's no

10    evidence of that.  The fact is, he was confronted by law

11    enforcement and he did surrender peacefully.

12         You have a 45-year-old man who is married,

13    who is employed, who has lived here his entire life.  All

14    of his contacts are within the State of the Michigan,

15    within this district.  You can't have any more

16    relationship to this district that would support a

17    finding that he's no risk of flight.

18         There is nothing he is alleged to have

19    done other than give street signs to an undercover police

20    officer that could be considered any action that could

21    somewhere down the road lead to a danger to the

22    community.

23         Even the pretrial services report that

24    says because of the charges, he may be a risk of flight.

25    There are no facts suggested in the pretrial services

*U.S.A. v. Stone, et al.*

1      report that say to the Court he is a danger to the

2      community.  Nothing that you were told by way of facts

3      gives any factual basis for this Court to make an

4      independent finding that he's a danger to the community.

5             The government has used all kinds of fancy

6      words and spins and everything else, but the bottom line

7      is, there are no facts which suggest or establish that

8      Mr. Stone is a danger to the community such that there

9      are no conditions that can be fashioned.

10            Conditions can be fashioned regarding

11     residence, regarding employment, regarding reporting.

12     There are people who get released from this district who

13     have guidelines -- guidelines of -- you know, the Supreme

14     Court has already said the guidelines are out the window

15     because they can be manipulated.

16            For that reason, Your Honor, we would ask

17     the Court to deny the government's request for detention

18     and to fashion conditions of release that would allow Mr.

19     Stone to help assist counsel and prepare for trial in a

20     non-custodial situation.

21            THE COURT:  Thank you.

22            Mr. Helfrick for David Brian Stone, Jr.

23            MR. HELFRICK:  Yeah, and I will be brief,

24     Your Honor.

25            And I will say that, you know, in the

*U.S.A. v. Stone, et al.*

1    finest tradition, the government is going forward as
2    would Richard Convertino in playing hide-the-ball.
3              The government has made the argument that
4    the government has presented more than enough.  The
5    government hasn't presented anything to this Court, not
6    one witness.
7              And I understand that this Court has now
8    ruled that they can go forward by way of proffer.  The
9    fact is, if they're going to go forward by way of
10   proffer, then this Court should not afford it very much
11   weight at all.
12             Thank you.
13             THE COURT:  Thank you.
14             Mr. Thomas is absent.
15             Mr. Rataj, on behalf of Tina Mae Stone.
16             MR. RATAJ:  Yeah, just a couple of quick,
17   brief comments, Judge, in line with what Mr. Helfrick
18   said.
19             Judge, let me start out my comments by
20   pointing out to the Court, as we all know as being
21   lawyers involved in these proceedings, that there is a
22   strong presumption of innocence that the Court must take
23   into consideration.
24             Just because the government has come in
25   here with allegations of a serious nature does not make

34

*U.S.A. v. Stone, et al.*

1      -- does not make my client, for example, guilty.  They

2      have to bring in facts.  They have brought in absolutely

3      no facts in this case to suggest that my client is a

4      danger.

5                  Now, we've talked about that there are --

6      or we've talked about the presentence -- or the pretrial

7      report, excuse me.  And I pointed out that both parents,

8      my client's parents are prepared to act as third-party

9      custodians.

10                 Certainly a set of conditions can be

11     fashioned to protect the government's interest in this

12     case, which is the protection of the public.

13                 For example, Judge, stringent reporting

14     requirements, no use of the internet, no contact with any

15     of the individuals involved in this case, a tether, et

16     cetera.

17                 Your Honor's been up there for a long time

18     and you have a lot of wisdom.  And I believe that you can

19     fashion a set of circumstances, which, like I said, would

20     protect the government's interests.

21                 I think what's dangerous, and just to pick

22     up on what Mr. Swor had argued to Your Honor, is that

23     they're using words, spin words, okay, to create this

24     aura that, you know, these people, okay, were going to

25     take down the United States government with no facts to

*U.S.A. v. Stone, et al.*

 1    support it other than what we've heard from the U.S.

 2    attorneys.  And you cannot just use the words of the U.S.

 3    attorneys without any facts to support this argument that

 4    these people should be detained.

 5              I think that what's dangerous is that the

 6    government is attempting to prosecute people who have

 7    asserted their First and Second Amendment rights.  And

 8    what's dangerous is that my client is being prosecuted

 9    for potentially having a critical view of the government,

10    which is not illegal, Judge.

11              So again, I would ask you to fashion a set

12    of circumstances that will allow Mrs. Stone to be

13    released so she can assist me more easily with her

14    defense.

15              Thank you.

16              THE COURT:  Thank you.

17              Mr. Roberts on behalf of Joshua Clough.

18              MR. ROBERTS:  Thank you very much, Your

19    Honor.  I also will be brief.

20              You are certainly aware and we all

21    appreciate that you're going to have to find individual

22    specific findings of fact with regard to both factors;

23    dangerousness and risk of flight.

24              With regard to Mr. Clough, again, I remind

25    the Court that through the proffer yesterday, we heard

1    nothing about acts of violence committed by Mr. Clough.

2    And we can't forget the fact that despite what we heard

3    in terms of presentation by proffer, there's no

4    minimization that can be placed to the idea that when my

5    client was arrested he offered no resistence.

6              In fact, if he were to be faced with this

7    decision and fully embracing whatever this credo or motto

8    or manifestation is that government counsel has referred

9    to that there would have been a shoot-out.

10             There was no engagement.  There was no

11   hesitance, as I've understood it, in terms of his

12   peacefully surrendering.  He had no weapon on his person,

13   nothing that he could have used with him.

14             And the fact of the matter is, in terms of

15   his potential risk of flight, I would remind the Court

16   that Mr. Clough did not engage in hiding out, nor did he

17   engage in dropping out from society.

18             He was living open and notoriously with

19   his parents as a 28-year-old blemish-free individual, in

20   terms of having no prior untoward contact with the

21   criminal justice system.

22             And he had a job.  As a matter of fact,

23   his pretrial report reflects it was a security job at a

24   mall.  He probably doesn't have that anymore.  There's no

25   one here.  I'm not suggesting that I've got the mall

*U.S.A. v. Stone, et al.*

1    people here take him -- ready to take him back.  But the

2    point being he was not trying to live off the land, nor

3    under the radar as the suggestion may have been strongly

4    made.

5              When it comes to your individualized and

6    particularized findings, I think you will be hard-pressed

7    in terms of any indication that you could hang as an

8    underpinning to a ruling -- excuse me, that you could

9    support that he would be a risk of flight.

10             And considering the fact that we're in the

11   digitalized age and there are not only electronic

12   monitoring devices available, there's also GPS that can

13   be utilized, the government has no problem in most

14   circumstances finding individuals and allowing them the

15   largess of being released on large but unsecured bonds.

16             I understand in this circumstance their

17   position, but it shouldn't detract what normally would be

18   a litany of positive features in my client's unblemished

19   past.

20             And I would ask you to carefully consider

21   and render an opinion that would allow a combination of

22   conditions so that I don't have to be preparing this

23   matter with my client housed in the St. Clair County Jail

24   two hours round -- one way from my office, in order to

25   accomplish a defense.

*U.S.A. v. Stone, et al.*

1              Thank you.

2              THE COURT:  Thank you.

3              Mr. Scharg is not present.

4              Mr. or Ms. Satawa on behalf of Mr. Meeks.

5              MS. SATAWA:  Your Honor, on behalf of Mr.

6    Meeks, we -- there was discussion from the government

7    about harm from action.  There is no action or any facts

8    that can be pointed to that show that there was any

9    intent for action.  Free speech is that, free speech.

10             I would also point to this harm from

11   action and ask the Court or call the Court's attention to

12   an article in the Ann Arbor News on March 25th, 2010,

13   where the Bridgewater Township officials asked the

14   Hutaree, asked this supposed dangerous group to assist

15   them in finding two missing township citizens.  I have

16   the article available for the Court if you wish to see.

17             In addition to that, Your Honor, I would

18   like to just make a correction.  The government stated

19   that Mr. Meeks didn't -- that his parents didn't know

20   where he lived and they made some assertions that perhaps

21   he didn't have stable housing.

22             It's interesting that they say that, since

23   Mr. Meeks was actually taken into custody, gave his home

24   address to the agents, and still they didn't go to the

25   actual home address and search that residence until

1    yesterday while we were in court.  They went to his

2    parents' house and searched that residence after he was

3    in custody, after they already knew where he actually

4    lived.

5              So he does have solid ties.  He's lived in

6    that residence for seven years.  He's been a lifelong

7    resident of Michigan, with the exception of his military

8    service.  And he is a person who is unequivocally,

9    according to the pretrial services report, not a flight

10   risk.

11             Lastly, Your Honor, and I know that some

12   of my brother counsel have already stated that there are

13   just no facts here that can be relied upon to conclude

14   that the presumption wins when we balance the scales here

15   of safety of the community.

16             If this group was so dangerous and the

17   facts are so good, then where were the witnesses?

18   Where's the documentation?  There's all this reference to

19   this You-Tube video.  Well, my client doesn't even have

20   internet access, so he never had access to the You-Tube

21   video.  He never got the calls to action.  He never got

22   the flashes for everyone to come in.

23             As I've been telling you for now two days,

24   Mr. Meeks is different.  Mr. Meeks' involvement and this

25   so-called survivalist mentality that the government keeps

1    talking about, it stems from being trained in our

2    military by the United States government.

3                    He has no intent to violate the law.  He

4    was assembling with a group who looked for missing

5    people, helped other governments, and happened to have a

6    lot of legal weapons.  The weapons the government tells

7    you about that they found in his home, every single one

8    was registered and lawfully possessed.  It was not there

9    because he had some great big plot to overthrow the

10   government.

11                   So I would ask you to allow Mr. Meeks to

12   be released.  Thank you, Your Honor.

13                   THE COURT:  Thank you.

14                   Mr. Seikaly, on behalf of Mr. Ward.

15                   MR. SEIKALY:  Briefly, Judge.

16                   There have been no facts that show that

17   Mr. Ward is a danger to the community.  His mother, as a

18   matter of fact, is a corrections officer for the State of

19   Ohio at one of their correctional facilities.  And she

20   has indicated that Mr. Ward could reside at her place.  I

21   don't think a corrections officer for the State of Ohio

22   would allow anything to impede the justice system.

23                   These gentlemen seem to be exercising

24   their First and Second Amendment rights, established by

25   our constitution an awfully long time ago.  I don't think

1  he's a flight risk.  Probation -- or pretrial services,

2  when they interviewed, didn't think he was a flight of

3  risk -- or a risk of flight.

4            He -- you could form many conditions that

5  allow a release.  And like one of the attorneys

6  indicated, it's about two hours from here to the lock-up

7  facility being utilized.  It's hard to go up and visit

8  these guys.  It's a lot easier if they're out, come visit

9  us when they want.  Then we can prepare a defense.

10            My main thing to the Court is that we've

11  seen absolutely no facts other than what the prosecutor

12  is saying, to show that anything was done other than a

13  bunch of meetings and a bunch of camping exhibitions.

14            I think that the Court could formulate a

15  -- conditions of release that would satisfy everybody.

16            Thank you, Judge.

17            THE COURT:  Thank you.

18            For the record, I will permit Mr. Thomas

19  and Mr. Scharg on behalf of Joshua Matthew Stone and

20  Christopher T. Sickles to review the argument Mr. Falvey

21  made by reviewing the record, and I will allow them the

22  opportunity to make an argument on the record as well.

23            Mr. Falvey, does the government have a

24  brief rebuttal?

25            MR. FALVEY:  It does not, Your Honor.

*U.S.A. v. Stone, et al.*

 1                    THE COURT:  Very well.

 2                    I will take these matters under

 3      advisement.  I have many pages of notes.  There have been

 4      many hours of presentation and argument.  I will reduce

 5      my findings to a written order as to each defendant.  I

 6      will unlikely complete that process today.

 7                         As I am leaving next week, I will complete

 8      it prior to close of business tomorrow.  Counsel will be

 9      notified.

10                    And for the record, all counsel are

11      advised, as they already know, that my order is

12      appealable de novo to the district judge assigned to this

13      case.

14                    MR. HELFRICK:  Your Honor, in the event

15      you're not going to be completing this today, will the

16      defendants be brought back to the building tomorrow,

17      because in the event that you do order some or any of

18      them to be released, so that they're released for, you

19      know, Easter Sunday?

20                    THE COURT:  Yes, I will ask that the

21      Marshal return all of the defendants to court tomorrow in

22      the event that I determine that bond is appropriate or

23      for purposes of appeal should I determine the opposite.

24                    MR. HELFRICK:  Thank you, Your Honor.

25                    MR. RATAJ:  Your Honor, if I may?  Does

*U.S.A. v. Stone, et al.*

1      that mean that we should be here at one o'clock tomorrow?

2      No?

3                        THE COURT:  It is -- hopefully you will

4      know beforehand what my disposition is and I'll have to

5      leave that to your discretion.

6                        MR. RATAJ:  Fair enough.  Thank you.

7                        THE COURT:  Mr. Swor?

8                        MR. SWOR:  Apparently -- although we've

9      all filed appearances, not all of us have been recognized

10     by the ECF system.  Is there something we can do to

11     assist the Court in that process?

12                       THE COURT:  Mr. Swor is not on the EM-ECF

13     system?

14                       DEPUTY COURT CLERK:  You filed your

15     appearance yesterday?

16                       MR. SWOR:  Yeah.

17                       DEPUTY COURT CLERK:  My bet is by the end

18     of the day it will be on there.

19                       MR. WATERSTREET:  Will that be all, Your

20     Honor?

21                       THE COURT:  Yes.  Thank you, all.

22                       (Court in recess at 2:21 p.m.)

23                              *    *    *

24

25

*U.S.A. v. Stone, et al.*

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18                   C E R T I F I C A T I O N
19          I certify that the foregoing is a correct
20    transcript from the digital sound recording of the
21    proceedings in the above-entitled matter and has been
22    prepared by me or under my direction.
23
24    \s\Marie J. Metcalf                     04/08/10
25    Marie J. Metcalf, CVR, CM                (Date)
```