1       UNITED STATES DISTRICT COURT

2     FOR THE EASTERN DISTRICT OF MICHIGAN

3           SOUTHERN DIVISION

4

5

6   UNITED STATES OF AMERICA,

7           Plaintiff,              Case No.  10-20123

8     -vs-

9

10  D-1, DAVID BRIAN STONE, SR.

11  D-2, DAVID BRIAN STONE, JR.           Detroit, Michigan

12  D-3, JOSHUA MATTHEW STONE,            April 27, 2010

13  D-4, TINA MAE STONE,

14  D-5, JOSHUA JOHN CLOUGH,

15  D-6, MICHAEL DAVID MEEKS,

16  D-7, THOMAS WILLIAM PIATEK,

17  D-8, KRISTOPHER T. SICKLES,

18  D-9, JACOB J. WARD,

19           Defendants.

20  ----------------------------/

21

22     TRANSCRIPT OF BOND REVIEW HEARING - VOL. 1

23    BEFORE THE HONORABLE VICTORIA A. ROBERTS

24      UNITED STATES DISTRICT COURT JUDGE

25

1       <u>APPEARANCES:</u>

2

3

4       For the Government:          RONALD W. WATERSTREET, ESQ.

5                                    JONATHAN TUKEL, ESQ.

6                                    Asst. U.S. Attorneys

7

8

9       For the Defendants:          WILLIAM W. SWOR, ESQ.

10                                   RICHARD HELFRICK, ESQ.

11                                   TODD SHAUKER, ESQ.

12                                   JAMES C. THOMAS, ESQ.

13                                   MICHAEL NAUGHTON, ESQ.

14                                   MICHAEL A. RATAJ, ESQ.

15                                   RANDALL ROBERTS, ESQ.

16                                   MARK SATAWA, ESQ.

17                                   ARTHUR J. WEISS, ESQ.

18                                   HENRY M. SCHARG, ESQ.

19                                   CHRISTOPHER M. SEIKALY, ESQ.

20

21

22

23      Proceedings taken by mechanical stenography, transcript

24      produced by computer-aided transcription

25

**T A B L E   O F   C O N T E N T S**

**WITNESSES:**                                                    **PAGE**

**LESLIE LARSEN** (Government)

        Cross-Examination by Mr. Helfrick        29

        Cross-Examination by Mr. Swor            35

        Cross-Examination by Mr. Thomas          46

        Cross-Examination by Mr. Rataj           56

        Cross-Examination by Mr. Roberts         65

        Cross-Examination by Mr. Satawa          67

        Cross-Examination by Mr. Seikaly         73

        Examination by Mr. Waterstreet           76

        Recross-Examination by Mr. Seikaly       77

        Cross-Examination by Mr. Scharg          78

        Cross-Examination by Mr. Weiss           85

**E X H I B I T S**

**NUMBER**            **IDENTIFICATION**       **RECEIVED**

    None.

1          **Detroit, Michigan**

2          **Tuesday, April 27, 2010**

3          **(At about 1:31 p.m.)**

4                    **- - -**

5          **(Call to Order of the Court)**

6                    THE CLERK OF THE COURT: Court calls case number 10-20123, the

7          United States of America versus David Brian Stone, David Brian Stone, Jr., Joshua

8          Matthew Stone, Tina Mae Stone, Joshua John Clough, Michael David Meeks,

9          Thomas William Piatek, Christopher T. Sickles and Jacob J. Ward.  Counsel, please

10         identify yourselves for the record.

11                   MR. WATERSTREET: Ronald Waterstreet appearing on behalf of the

12         United States.

13                   MR. TUKEL: May it please the Court, Jonathan Tukel on behalf of the

14         United States.

15                   THE COURT: Good afternoon.

16                   MR. SWOR:  William Swor on behalf of David Brian Stone.

17                   MR. HELFRICK: Richard Helfrick and Todd Shauker from the Federal

18         Defender Office on behalf of David Stone, Jr.

19                   MR.  THOMAS:  James Thomas and Michael Naughton on behalf of

20         Joshua Stone.

21                   THE COURT:  I'm sorry.   Who's with you, Mr.  Thomas?

22                   MR.  THOMAS:  Michael Naughton is with me.  N-a-u-g-h-t-o-n.

23                   THE COURT:  All right.   Thank you.

24                   MR.  RATAJ:  Good afternoon, Your Honor.  Michael Rataj on behalf of

25         Tina Mae Stone.

1    MR. ROBERTS: Good afternoon, Your Honor. If it pleases the Court,

2 Randall Roberts appearing on behalf and with Mr. Joshua Clough.

3    MR. SATAWA: Good afternoon, Your Honor. If it please this honorable

4 Court, Mark Satawa appearing on behalf of and along with Michael Meeks.

5    MR. SEIKALY: Good afternoon, Your Honor. Christopher Seikaly

6 appearing on behalf of Mr. Ward.

7    THE COURT: Thank you.

8    MR. SCHARG: Good afternoon, Your Honor. Henry Scharg on behalf

9 of Kristopher Sickles.

10    THE COURT: All right. Thank you. Good afternoon, everyone. Oh, I'm

11 sorry. Mr. Weiss?

12    MR. WEISS: Good afternoon, Your Honor. May it please the Court,

13 Arthur Weiss on behalf of Mr. Piatek.

14    THE COURT: Thank you. Good afternoon. Good afternoon, everyone.

15 This matter is before the Court on motions filed by all nine of the Defendants to review

16 Detention Orders that were entered by Magistrate Judge Sheer. This Court is

17 reviewing the Detention Orders that were entered on a de novo basis, and I'd call on

18 Mr. Waterstreet or Mr. Tukel, whoever, to begin this.

19    I did review -- I'll tell you what -- I've reviewed the entire record that was made

20 before Magistrate Judge Sheer and certainly reviewed all of the motions and all of the

21 Government responses to those motions. So --

22    MR. SWOR: Your Honor, as a preliminary matter, William Swor. We

23 received electronically yesterday a recorded conversation from the Government with

24 an indication that they intend to play that during the hearing today. We also received

25 a transcript. We assume that the Government intends to offer that transcript as part

1    of the record.  For the record and for this Court, we object to the use of any transcripts

2    in these proceedings.  These recordings are in English.  They are intelligible.  They do

3    not need any of the -- they do not fit any of the purposes for which transcripts have

4    been used.  The tape or the conversation itself is the evidence and the tape should be

5    the only thing, or the conversation should be the only thing presented into the record.

6    There is no use for the transcript for this hearing.

7              THE COURT: All right.  Let me just ask a question.  Is this transcript

8    different and recording different from the transcript and recording that was entered in

9    front of Judge Sheer or is it the same?

10             MR. SWOR: It's a different one.

11             THE COURT: It is a different one, all right.  Do you have a response, Mr.

12   Waterstreet?

13             MR. WATERSTREET: Yes, Your Honor.  As a preliminary matter, the

14   typical Rules of Evidence do not apply in a Detention Hearing.  The transcript is not

15   the evidence; the recording is the evidence.  However, it is an aid to the Court and to

16   the listener as to the contents of that.  It helps identify the participants in the

17   conversation.  The whole purpose of it is to help this Court make an intelligent

18   understanding of the proceedings.  I don't see what harm there could possibly be by

19   giving the Court all the information possible to make an informed decision.

20             MR. SWOR: Well, our Honor, it simply -- then it's of no use.  I mean the

21   Court and the witness are going to presumably identify the speakers.  I mean if the

22   purpose of the tape is to hear what is said, then the Court must have to -- must have

23   to make a decision.  Yes, the Rules of Evidence do not apply at a hearing, but quite

24   frankly, I think this Court can hear quite well and needs no assistance in hearing what

25   is being said.

1    As far as using a transcript or what the Government claims is a transcript, this

2    is not hearsay; it's hearsay upon hearsay.  Who said what?  The Court can listen.  It

3    doesn't need the aid of the transcript.

4    THE COURT:  Mr. Swor, the Court overrules your objection.  I believe

5    that the Court is going to benefit, at least at this juncture, by having the transcript

6    available to it to read along with that recording and if at some point later in these

7    proceedings there becomes some controversy between what is in that transcript and

8    what is on the recording, we'll deal with it then.  But I can tell you, you make

9    presumptions about my hearing, but I can tell you I'm benefited when I can read

10   along.

11   MR. SWOR: That's my concern.  Well, that is my concern is the Court

12   will be reading and not listening and then let me ask for direction then.  Are we

13   supposed to object contemporaneously with any mistake or error or conflict or are we

14   to wait 'til the end and point out what we believe are conflicts?

15   THE COURT: I guess my preference would be, Mr. Swor, if you simply

16   kept track of the areas on the tape where you believe there is a conflict.  We'll just let

17   it run through and then I'll take up any objections that you have.

18   MR. SWOR: Thank you, Your Honor.

19   THE COURT: And let me correct the record also.  Mr. Piatek was not

20   detained by Judge Sheer.  His Order of Detention was entered in Indiana by Judge

21   Cherry.

22   MR. HELFRICK: Richard Helfrick.  Just a housekeeping matter, Your

23   Honor.  When we met last week, we discussed the fact that if an attorney filed a

24   motion in the case it would be basically assumed that all others were joining in without

25   having to file a separate piece of paper saying we join.  I just want to put that on the

1    record.

2           Two, for purposes of this hearing, I think perhaps likewise if we could just have

3    a rule that if one attorney objects, it's assumed that all the attorneys are objecting.

4           THE COURT: Okay, I'll deal with the latter first.  I'll take one objection to

5    apply to all Defendants.  With respect to your first point, Mr.  Helfrick, I've thought

6    about it and I think my preference is to require that if something gets filed, you file

7    something that simply says you're joining into it.  Otherwise, we may be dealing with

8    matters that don't pertain to certain Defendants or that you don't care about if we

9    haven't heard from you.

10          MR. HELFRICK: Okay.

11          THE COURT: All right.  Yes, Mr.  Thomas.

12          MR. THOMAS: Your Honor, this afternoon or this morning on a break

13   during court I noticed that the Government had come in to see you earlier today.  I

14   had received at about the same time, although I didn't have it in hand, notice from

15   your court that there was an ex parte meeting.  I would ask the Court to address that

16   issue.

17          THE COURT: All right, I will give you an overview of that.  The Court

18   entered an Order last week in connection with the Defense request that the

19   Government make the Case Agent available for cross-examination if the Government

20   intended to proceed in this hearing by proffer.  The Defendants continued to object

21   that the Government could proceed by proffer.  This Court ruled that the Government

22   was not required to produce witnesses, that it could proceed by proffer and the Court

23   also ruled that the Defendants would be allowed to cross-examine the Case Agent

24   and required the Government to produce the Case Agent for purposes of today's

25   hearing.

1          The Government wished to speak to this Court this morning because in their

2    written objection to presenting the Case Agent, they raised *Touhy* regulations -- the

3    exact cite to them escape me right now -- and the Government lawyers wanted to

4    discuss some of the specific language in the *Touhy* regulations and whether the Case

5    Agent would be required to reveal certain information that it appears *Touhy*

6    regulations would govern unless there has been a release by different agencies of the

7    Government.  That was my discussion with Mr. Waterstreet and with Mr. Tukel this

8    morning.

9          Anything else before we continue?  Mr. Waterstreet.

10          MR. WATERSTREET: Thank you, Your Honor.  Your Honor, the Court

11   did mention in its opening remarks that it did review the transcripts of the prior

12   proceeding and I do not intend to re-plow the same field so-to-speak, but I did want to

13   go through some of the items that were presented in the previous Detention Hearing

14   on March 31, 2010 to make sure that the Court was aware of the source of the

15   information, that it wasn't just me getting up here and just discussing some facts that I

16   may or may not have heard. So if the Court will indulge for a few moments here, that I

17   will go through and to the best of my ability identify the different times in which I talked

18   about a different issue and indicate where the information came from.

19          Back in December of 2008, I indicated that there was a -- various emails that

20   were issued as a result of an interview of a Federal firearms licensee by the ATF.

21   The basis of the information contained in there were the actual emails issued by

22   Joshua Clough and also issued by the Hutaree under the name of Joan Stonewall.

23          THE COURT: And the Government has copies of those emails?

24          MR. WATERSTREET: Yes, Your Honor.

25          THE COURT: All right.

1     MR. WATERSTREET: Another was concerning a video that was publicly

2  available from the Hutaree.  I have that available for the Court if the Court wishes to

3  review that.  I described it, the video to the Court, but that's a -- it's the Hutaree OZ-1

4  and it depicts different people firing off explosives and burning the flag of the United

5  Nations and then raising the Hutaree flag.  And again, that would be something that is

6  publicly available and I believe the media has picked up on that and played that

7  already.

8     THE COURT:  Mr. Waterstreet, in your timeline of events where does

9  that video fall?

10    MR. WATERSTREET: Well, Your Honor, what it was was an

11 explanation of yet another situation which I'm about to get to was some events

12 involving Josh Clough.

13    On November 15, 2008, Josh Clough and David Stone and when he was using

14 the nickname of Captain Hutaree appeared on a Internet broadcast on Liberty Tree

15 Radio on a broadcast called the Oz Files and again, that was something that was

16 publicly available.  During this broadcast, Mr. Clough discussed different perimeter

17 defense systems that could be employed to detect intruders and he described a

18 battery-operated trip wire detection system to be used by a combination of batteries,

19 clothes pens, wires and a piece of plastic.  I make reference to that because in that

20 very same video, the Oz, OZ-1 which depicts the explosive, there's a -- the camera

21 focuses in on the trip wire device and it's exactly the type of trip wire device that Mr.

22 Clough described manufacturing back in November 15, 2008.

23    THE COURT:  Mr. Waterstreet, while you are talking about trip wires, I

24 have a question.  In your proffer before Judge Sheer, you make reference to various

25 devices, the IEDs which are these improvised explosive devices, Bouncing Bettys,

1  explosively formed projectiles, EFPs and the trip wire.  Are those all illegal?

2            MR. WATERSTREET: Yes, Your Honor.  The manufacturing without a

3  license of an explosive is illegal.

4            THE COURT: Thank you.

5            MR. WATERSTREET: Then I believe I jumped ahead to June 13th,

6  2009 in which there was training out at the Tomer residence involving David Stone,

7  David Stone, Jr., Joshua Stone,  Joshua Clough, Michael Meeks, Thomas Piatek,

8  Jacob Ward and others, and this was a -- the explosives demonstration training.

9  Again, this information that the Government presented was a result of recordings

10  made during that training.

11            Moving ahead to July 25th, 2009 there was a barbeque at the Tomer Road

12  address with David Stone, David Stone, Jr., Joshua Stone, Joshua Clough, Michael

13  Meeks, Thomas Piatek, Jacob Ward and others and again this was an example of a

14  recorded conversation.

15            August 13, 2009 was a -- when an undercover agent was present and had a

16  discussion with David Stone.  Again, this was a result of a recorded conversation.  As

17  I said, Your Honor, the Government would proffer the same information as it did

18  before.  I'm just doing this for the benefit of the Court to find out the source of the

19  information.

20            August 22nd, 2009 was another training day.  Present were David Stone, Sr.,

21  David Stone, Jr., Joshua Stone, Tina Mae Stone, Josh Clough, Michael Meeks,

22  Thomas Piatek, Kristopher Sickles and Jacob Ward.  This was their photograph that

23  was eventually posted on the Hutaree website, which was Government's Proposed

24  Exhibit Number One.  That, the source of that came from a publicly available website

25  and again, the events that took place during that training was subject of being

1    recorded.

2          August 27, 2009 there was a shape charge demonstration in which a one-inch

3    hole was placed in a three-quarter inch plate of steel.  This too was subject to being

4    recorded.  September 13th, 2009 --

5                THE COURT:  August 27th, is that audio or video recording?

6                MR. WATERSTREET:  It was a video recording.  I believe Joshua

7    Clough was the one using the camera that day.

8                THE COURT: All right.  Thank you.

9                MR. WATERSTREET: September 13, 2009, this was subject to a

10   recording.

11         November 7, 2009 which David Stone, Joshua Stone, Joshua Clough, Michael

12   Meeks, Thomas Piatek, Kristopher Sickles and Jacob Ward were present during

13   training.  Again, this was subject to a recording as well.

14         On December 12, 2009, present during that were David Stone, David Stone,

15   Jr., Joshua Stone, Tina Stone, Joshua Clough and Michael Meeks; this was subject to

16   recording as well.

17         January 9th, 2010 was another training at the Tomer Road address.  Present

18   during that time were David Stone, David Stone, Jr., Joshua Stone, Joshua Clough,

19   Michael Meeks, Kristopher Sickles, Jacob Ward.  This was subject to a recording as

20   well.

21         January 14th, 2010, David Stone and Tina Stone met with an undercover agent

22   in which they discussed building several IEDs with PFPs.  Again, this was subject to

23   recording.

24         January 17th, 2010, an alert went out and it was shortly canceled.  This is a

25   result of contact to various members of the Hutaree and contact with the undercover

1      agent.

2            January 20, 2010, the undercover agent received an email from David Stone

3      with two files attached.  Those made up Government's Exhibits Two and Three which

4      was the diagram of the concave shaped copper disk laying on top of a can, and the

5      diagram of the EFP as it is explosively formed after detonation.  Those are -- were

6      publicly on Wikipedia and those were also sent to the undercover agent from David

7      Stone.

8            February 6, 2010, which I referred to as the planned Kentucky trip in which the

9      Government's proposed Exhibit Number Five in the transcript were played in court.

10     Present at that time were David Stone, Joshua Stone, Tina Stone, Joshua Clough,

11     Michael Meeks and Thomas Piatek.  As the Court is aware, that those items were

12     subject to recording.

13            I believe that those are the different times that I made reference to to particular

14     events, Your Honor.

15            THE COURT: Thank you.  Mr. Waterstreet, I have a question about part

16     of your proffer before Judge Sheer.  In one part you said that -- I think this was in

17     January -- you said that David Stone, Sr., told the members that they had to train for a

18     real operation in april.

19            MR. WATERSTREET: Yes, Your Honor.

20            THE COURT: My question is was it the concern for that operation,

21     whatever it was going to be that precipitated the arrest in this case?

22            MR. WATERSTREET: Yes, Your Honor.

23            THE COURT: And you went on to say that David Stone planned to

24     insert a team into a hostile area using a van.

25            MR. WATERSTREET: Yes, Your Honor.

1      THE COURT: And if anybody came who did not submit to the demands

2   of the Hutaree, they would be put on the ground by bullet or knife.  What was -- there

3   was a recording of this conversation?

4      MR. WATERSTREET: Yes, Your Honor.

5      THE COURT: And what is your understanding of what this real

6   operation was to be and what this language, inserting a team into a hostile area

7   meant?

8      MR. WATERSTREET: Well, Your Honor, I can only read the words of

9   David Stone and I can do that for the Court.  I have a copy of that transcript.  That

10  also -- that transcript was part of documents that were presented to Defense Counsel

11  on the -- during the Detention Hearing of March 31st.  I made reference to various

12  quotes from that and I can make reference to that again if the Court wishes.

13     THE COURT: Yes.

14     MR. WATERSTREET: This is the comments of David Stone, Sr.  and

15  the Court will have to bear with me; it's a rather long segment:  The idea of what we're

16  working on, we're working on the objective for everybody who wasn't here last month.

17  In April, we're going to drop on the ground and do a real op.  April is going to consist

18  of two trainings.  There will be the second Saturday of April and the fourth Saturday of

19  April.  Both teams, full teams.  One team will stay at base camp, basically at the

20  trailers.  We will have the radios running.  Radio operations will be your responsibility

21  for both times.  Apparently referring to a particular individual.  Running 24 hours a day

22  seven days or whatever.  You know what I mean.  As many hours as we're out.  One

23  team stays there, does patrol through the area.  Make sure everything is sitting tight

24  so base camp doesn't have to worry about someone coming in on them.  The other

25  team is getting dropped on the ground in April at a location I will decide.  I haven't

1    even decided where.  We're going to do a recon on our objective.  The idea is Ezra --

2    and I need to digress for a moment.  Ezra is a squad, a particular squad that the

3    Hutaree has:  Ezra is the recon team.  We're going to be laying on the ground.

4    They're going to do nothing more than watch the objective.  For what?  Whatever.

5    The idea is this puts us on the ground.  Hostile area.  Not supposed to be there.

6    We're going to go in incognito and sit on it for an entire day.  We're going to go in on

7    Friday night, early Saturday morning in the dark and be dropped off by moving

8    vehicle.  You'll go in, set up a hide.  Ezra team has got to set up a hide.  You will have

9    to set up an area without breaking -- and breaking is a term of art that you don't go

10   above the -- if you're on a hill and if you appear above the hill, silhouetted breaking

11   the hill be easily seen.  Going back to the transcript:  See like, like here we have the

12   advantage of a hill.  I don't want you to break that hill.  You've got to go in and set up

13   your cover so you can sit there and move around a little bit and not been seen.  The

14   rest of the team, their job is doing nothing more than watching their back door and do

15   short recon patrols down and around without the whole team going.  So point team

16   might go or command team might go or tail team.  We're not going to send the other

17   seven guys on this big patrol leaving them vulnerable.  Best off would be either point

18   team goes or other rotate point team and tail team.

19         Then he goes on:  Make sure they -- you keep them on regular basis because

20   what you see on one patrol if it's moved on the second patrol, you'll know something

21   is wrong.  We're going to be locked and loaded.  Radios will be up all the time.  If

22   you're made, somebody comes tripping along, they just happen to see you, we're

23   going to handle it as a hostile situation.  That means you're going to put them on the

24   ground either by putting bullets in them or if they're willing to get down on the ground

25   and let you leave the area peacefully, great.  But you're on that radio because your

1    ride will be coming in.  Whenever that ride comes in, there's going to be at least two

2    guns on that vehicle ready to cover you as you're extracting.  Nothing more than

3    basically using a helicopter.  Only difference, we're going to use a van to do it.

4                    THE COURT:  Mr. Waterstreet, let me interrupt you.  Is the Government

5    reading this as describing something other than a training?

6                    MR. WATERSTREET: Yes, Your Honor.  This -- as -- to use the words

7    of -- it will become clearer as I go on, Your Honor.  They're doing it as a real op, a real

8    operation.

9                    THE COURT: And I didn't write down everything that you said, but you

10   started out by saying we're going to drop on the ground and do a real operation and

11   then I thought the language was about two trainings.

12                   MR. WATERSTREET: They're going to do two trainings in April.  It will

13   be on the 2nd of April and the 4th of April, both teams, full teams.  Your Honor, for

14   what it's worth, all I can do is read what David Stone said.

15                   THE COURT: Oh, I understand that.  I guess maybe I should preface

16   this by asking another question and that is a lot of this about -- is about training that

17   the Hutaree engaged in.  Can you give me some background on the types of training

18   they were engaged in?  And I guess my second question is, is that training typical of

19   what militia members train on or about?

20                   MR. WATERSTREET: Well, Your Honor, I don't want to go too far afield

21   of what I have as recorded.  However, there have been a lot of reports issued by the

22   various members of other militias around Michigan that have been reported in the

23   newspaper  --

24                   THE COURT:  (Interjecting) I'm aware of that and I don't want to go

25   outside of this record.  I want you to tell me about this training that you have

1  information about and whether this training is typical of other training from what you

2  can gather, other training that other militia engage in.  That's the first question.  The

3  second question is do you have information that any of the training that they were

4  doing was illegal training?

5          MR. WATERSTREET: Well, if I can answer the first question -- the

6  second question first, Your Honor.  That is for the jury to decide whether it is illegal.

7  Making the explosives, the Court asked that question earlier, yes, that is illegal unless

8  you have a license.  So it's our understanding none of the individuals involved in this

9  case are licensed explosive -- explosives -- have a license to build explosives by ATF.

10         As to whether they were engaged in illegal activity, Your Honor, that is -- that's

11  the issue.  Did they conspire to oppose by force the authority of the United States?

12  And I submit if the Court listens to another recording that I intend to play, the Court

13  will hear those plans to oppose the authority of the United States.

14         The training, is it illegal to possess a firearm?  No.  Is it illegal to possess a

15  firearm when you're robbing a bank?  Yes.  So the question is -- for this Court to

16  decide, is there probable cause to believe these people conspired to oppose the

17  authority of the United States and whether they attempted to build a weapon of mass

18  destruction?  And I'm somewhat reminded that the -- back in law school when the

19  instructor asked you well, is this illegal, is this illegal, is this illegal?  And you're

20  walking down the primrose path and you keep saying no, no, no, no and you get to

21  the very end and well obviously, if you add all those things up together, yes it is a

22  illegal act.  Owning a gun is not a crime.  Going into a bank is not a crime.  Wearing a

23  bandana over your face is not a crime.  Handing a note to a teller is not a crime.

24  Making a withdrawal from a bank without a threat is not a crime.  But when you add all

25  those things up, it sounds like a bank robbery if in that note it said, and the intent was

1    to rob a bank. So I'm somewhat struggling with the Court's request to say is the

2    training itself illegal. As to --

3               THE COURT:  (Interjecting) You're saying if they were engaged in

4    training as part of their conspiracy to overthrow the Government, then that is an illegal

5    act.  It's an act in furtherance of their conspiracy?

6               MR. WATERSTREET: Yes, Your Honor.

7               THE COURT: All right.

8               MR. WATERSTREET: As to what other militias do, Your Honor, it's my

9    understanding that other militias have -- the Hutaree distinguished themselves from

10   other militias because they engage in live fire training.  They go out with guns loaded

11   and they do live fire.  They do live fire when they go on patrols, when they practice

12   their patrols and that was the draw of some of the members from other militias to the

13   Hutaree because of their training; that they actually engage in live fire training and

14   that was also part of what other militia groups believed that the Hutaree were different

15   from them because they did engage in that type of activity.  So they are not your

16   typical militia.

17               THE COURT: Okay, and one other question.  You're reading from this

18   transcript of remarks David Stone Sr.  gave on January 9th.  Is there mention there of

19   killing law enforcement?  If not there, can you tell me where that first appears?

20               MR. WATERSTREET: Where it first appears was long before law

21   enforcement was involved in this case.  This has been a longstanding belief of Mr.

22   Stone that law enforcement is the enemy.  I'm not sure I can put my finger right on the

23   very first date it was mentioned and we have it recorded, but I do have a recording

24   that I will be able to play to the Court that obviously precedes the April date because

25   everybody was arrested before the April date, that talks about their plans and various

1    plans they have to kill law enforcement and I can play that if I can -- soon as I get

2    through this, I'll be more than happy to do that.

3                    THE COURT: Is law enforcement part of the January 9th conversation?

4                    MR. WATERSTREET: Not as to this section that I have right now, Your

5    Honor.

6                    THE COURT: Okay.

7                    MR. WATERSTREET: I believe I left off with the quote the only

8    difference is we're going to use a van to do it, at which Josh Stone laughs and then

9    David Stone says:  Okay, but that's the idea.  That's what we're setting up.  That's

10   what we're going to practice and we're going to practice it and practice it and practice

11   it and practice it and that -- and it has to go off flawless.  Once you get dropped, you

12   can't be yapping.  You've got to keep your mouth shut and then Josh Stone calls out

13   one of the nicknames of Joshua Clough and everybody -- to which they laugh.  David

14   Stone then says:  Keep quiet -- stay quiet.  Keep talking -- talking to a minimum.  Start

15   to learn each other member of this team.  If Kris -- and he's referring to Kristopher

16   Sickles -- starts looking at something funny, Kris doesn't have to say I think there's

17   something funny over there.  Just by his actions you know something is wrong and

18   take appropriate action for it, all right?  That's the idea behind all of it.  We're going to

19   put us on the ground and make a real soldier out of everybody.  Hopefully under

20   peaceful conditions, but if it's not, then so be it.  Then Josh Stone says:  Welcome to

21   your first real training and then Josh Stone says:  I've got a question.  David Stone

22   says:  Don't be yappin' yourselves on the radio.  Josh Stone then asks:  So ah what,

23   let's say before dark we get seen rather we leave peacefully or kill them.  Ah, we get

24   on the radio and then we're going to get picked up?  David Stone:  You're going to get

25   extracted.  Okay.

1    Then there was a question asked:  And then what if somebody were to get

2    shot, what's the procedure for?  And David Stone says:  All bullets and casings will be

3    wiped down before you go out and anything that's not wiped down, don't go in the

4    field.  If you put bullets in somebody and put them on the ground, the extraction team

5    is on the way.  Just leave.  Don't stand around and talk about it.

6    Then a little bit later David Stone says:  If that means you know that we're in a

7    running fight and we're a half a mile from our original destination, so be it.  You'll get

8    picked up and you're gone.  Learn to live with it.  Putting bullets through bodies ain't

9    an easy thing, but hey, do it a couple times, it don't bother you.  Josh Stone then

10    laughs and says I love that.

11    Later Josh Stone is speaking to another individual and says:  As far as this

12    training in April, don't be afraid to pull the trigger on anybody if we have to.  That's like

13    right now.  The question is who would these people be though?  Josh Stone says:  I

14    don't know, in which the person says all right and Josh Stone then says:  I don't know

15    and frankly I don't care.  If they catch us, then we have to do our job.  Welcome to the

16    business of ah being in the business of shooting people.  Now if we wind up plugging

17    somebody, welcome to ah, ah, the first training of really shooting someone or maybe

18    not shooting them, killing them with a knife or if they don't want to work with us.

19    Frankly, I don't care.  They can die by knife or gun.  I don't care.

20    THE COURT:  Mr. Waterstreet, the Government reads all that to mean

21    that this wasn't really a training, but that they were euphemistically describing what

22    they intended to turn into a real situation?

23    MR. WATERSTREET:  They -- I believe it was part of the plan to go out,

24    put themselves in a hostile situation.  If somebody came across them, they would kill

25    them.

1          THE COURT: All right, and you said earlier that they were one of the

2    few or maybe the only -- I'm not sure what your word was -- militia that used live fire

3    training.  Do you mean that they -- in that training they actually went out and fired their

4    guns and they didn't -- they used live rounds?

5          MR. WATERSTREET: Yes, Your Honor.

6          THE COURT: All right.  Was that part of all of the training?

7          MR. WATERSTREET: Well, there was some training that they did that

8    they did not do live fire training.  There was some they would practice going out on

9    patrols, checking for trip wires, explosive recognition, things of that nature.  Now I

10   don't want to have the Court believe that other militias don't go out and use target

11   practices and things like that, but this militia did distinguish itself that it engaged in live

12   fire training as part of their patrol.

13         Your Honor, if I may, what I would like to do and I think it probably goes without

14   saying is that the Court has reviewed the Indictment and the charges themselves, the

15   Seditious Conspiracy, Attempted Use of Weapons of Mass Destruction, Teaching and

16   Demonstrating Use of Explosive Materials, and Carrying/Using a firearm During a

17   Crime of Violence, those are all crimes in which there is a presumption that there are

18   no conditions or combination of conditions which will assure the Defendants'

19   appearance or the safety of the community, and the Government has been able to

20   establish it's probable cause to believe these listed offenses were committed because

21   they -- a Grand Jury did return an Indictment. So therefore, as the Court -- I

22   mentioned earlier is that the -- since there is a presumption, the Defendants have the

23   burden of persuading the Court that there are conditions which will assure the safety

24   of the community and the appearance of the Defendants.

25         I Also would like to proffer the Presentence Reports as to the issue of

1   dangerousness to every -- all of the Defendants were recommended to be detention

2   based upon their dangerousness.

3           I wish to further proffer the transcript of the prior Detention Hearings, the audio

4   clip from the Kentucky trip that the Court made reference to before and Government's

5   Exhibit Five, the transcripts of that; the diagrams that were sent on how to make the

6   explosives and the photograph of the weapon seized from Thomas Piatek.

7           I wish to also direct the Court to the post-arrest flight of Joshua Stone.

8           Your Honor, not all of the members of the Hutaree have been charged in this

9   Indictment.  This Indictment includes nine people.  There's a list of more than 25 listed

10  members of the Hutaree who have trained with them and agreed with their doctrine.

11          THE COURT: In addition to the nine who have been indicted?

12          MR. WATERSTREET: There's a -- actually there is approximately 25

13  more, yes, Your Honor.  So there's two-thirds of the Hutaree members who are still

14  out among the public who have -- lawfully have access to weapons and could -- they

15  could access to help them to escape if they so desired.

16          Oftentimes I hear argued that well, my client doesn't have a passport so he

17  can't flee.  He has nowhere to go.  America's Most Wanted is leaving proof that

18  people need not flee the United States in order to hide, especially if they have

19  sympathetic supporters and fellow members willing to help them and we saw this

20  coming into play with what happened with Joshua Stone.

21          The arrest that took place on March 27th when several members of the

22  Hutaree were arrested in a warehouse in Ann Arbor.  One of the people who was not

23  present was -- one of the charged people who was not present was Joshua Stone.

24  One of the individuals who was at the arrest site in Ann Arbor contacted Josh Stone

25  and advised Josh Stone that who had been arrested and that the law enforcement

1    was perhaps looking for Josh Stone.

2         There was a Protocol that was set out as part of the Hutaree training.  There

3    was a 10-step Protocol and as part of that 10-step Protocol was to assess the

4    situation, contact members of the Hutaree, contact sympathetic members of other

5    militias, seek help, go to rally points, reassess the situation and frankly, Your Honor,

6    of the 10 steps, Joshua Stone completed nine of the 10 steps.  The last step was

7    entitled Point of No Return.

8         Joshua Stone, as has been reported, went to other militias seeking their help,

9    seeking firearms.  He called other members of the Hutaree.  Those people are not

10   indicted I think for -- I'm somewhat reluctant to mention their names because they are

11   not a matter of a public record, but those people that he did contact and he was with

12   were all listed members of the Hutaree.  They went to one of the rally points as was

13   set forth in the Protocol.  So a total of six adults plus one infant sought the assistance

14   of a sympathetic member.  They went to one of the rally points and they were able to

15   arm themselves with six firearms.  There was a two-day stand-off and luckily it ended

16   peacefully after a show of overwhelming force by law enforcement.  The weapons

17   were recovered.  The ammunition was recovered from the site.

18        Your Honor, it's really hard to imagine another charge the Defendants could

19   face from its onset that would establish by just that charge alone that they have no

20   respect for the authority of the Court.  By their charge, Seditious Conspiracy, their

21   plan is to oppose the authority of the United States.  I was trying to think of some

22   other ones like contempt.  Well, contempt at best is contempt towards one particular

23   court, not for the entire system.  Another one would -- perhaps escape.  That's only

24   seeking to avoid the authority for convicted conduct or soon to be convicted conduct

25   but this is by their charge and the charge alone shows their lack of willingness to

1    abide to the authority of the Court.

2            THE COURT: You mean the fact that the Government has charged

3    them shows that they disrespect the Court?

4            MR. WATERSTREET: That, and the fact that a Grand Jury has returned

5    an Indictment finding probable cause to believe that these people were engaged in

6    seditious conspiracy.  Yes, Your Honor, and that is one of the factors the Court can

7    consider; that the charges, the fact that it's an Indictment found on probable cause

8    versus this is somebody who has just merely been brought in under an arrest.

9        I do want to play an audio clip from February 20th, 2010 and to set the stage,

10   Your Honor, the people who are present are David Stone, who goes by the name of

11   RD which is a rank, the top rank of the Hutaree, which is a shortened version of

12   Radok, R-a-d-o-k.  Also present is Joshua Stone, Josh Clough, referred to as Az, A-z,

13   Michael Meeks, Kristopher Sickles and Jacob Ward.  Two other people who were part

14   of this training earlier that day but had left were David Stone Jr. and Tina Stone.

15   And this again to make sure we have the timeline straight, this is February 20th, 2010.

16   This is after the January 9th, 2010 training and where David Stone outlined the

17   operational plan for April that I read to the Court earlier; that anything that is not wiped

18   down, don't go into the field, putting bullets through some bodies ain't an easy thing

19   but hey, you do it a couple times it don't bother you.

20       After this speech -- and this is also an event that took place after the speech in

21   the van on February 6, 2010.  This is two weeks after David Stone identifies that the

22   enemy is the brotherhood working for the New World Order and present during that

23   speech is David Stone, Joshua Stone, Joshua Clough, Michael Meeks and Thomas

24   Piatek.  And in this conversation on February 20th, training had finished and they

25   were talking about suicide and suicide-by-cop which one referred to as cop-a-cide and

1    now the talk turned to killing law enforcement and taking on the Government.

2              THE COURT:  Mr. Waterstreet, just a couple of questions.  You are

3    offering this into evidence now?

4              MR. WATERSTREET: Yes, Your Honor.

5              THE COURT: And do we have it marked?

6              MR. WATERSTREET: Yes.  I will -- I have it as Government's -- the

7    tape itself is Government's Proposed Exhibit 1B for this -- I mean 1A is the tape and

8    1B is the transcript of that tape for the Detention Hearing dated April 27, 2010.

9              THE COURT: And another question.  Count Five of the Indictment, Mr.

10   Waterstreet, has the date of February 20, 2010 in it.  This is the Count that charges

11   seven of the Defendants with Carrying, Using and Possessing a Firearm During and

12   in Relation to a Crime of Violence.

13             MR. WATERSTREET: Correct, Your Honor.

14             THE COURT: Is this tape to substantiate that Count or if it isn't, can you

15   tell me -- because I haven't heard anything specifically about a firearm or a crime of

16   violence on February 20th.

17             MR. WATERSTREET: Well again, Your Honor, the Court has to make

18   the determination whether the conspiracy, seditious conspiracy is considered a crime

19   of violence and the Government submits that is considered a crime of violence.

20             THE COURT: But tell me what -- because I don't want to guess at what

21   your intentions are.  Tell me what the Government has in mind in charging Count Five

22   about conduct that happened on February 20th, 2010.

23             MR. WATERSTREET: As I mentioned, Your Honor, this conversation

24   took place after the live fire training where all the various charged Defendants

25   engaged in live fire training on February 20th, and that as I mentioned before, people

1 who were present earlier who engaged in it was  --

2     THE COURT:  No, I've got the list.  I've got the list.

3     MR. WATERSTREET: And that, Your Honor, again this is not the entire

4 recording of February 20th, 2010 but it is a little insight as to what their plans were

5 and what their intent was as a result of this training.

6     THE COURT: Okay.  So in Count Five, Carrying, Using and Possessing

7 a Firearm, that's the firearms they possessed during their training?

8     MR. WATERSTREET: Yes, Your Honor.

9     THE COURT: And they did this in relation to a crime of violence, the

10 crime of violence being this conversation advocating seditious activity?

11     MR. WATERSTREET: Yes, Your Honor, as well as the longstanding

12 conspiracy and agreement amongst all of them.  Also under the *Pinkerton* theory,

13 each person being held accountable for the acts of their co-conspirators, it would be

14 considered a crime of violence with acts of co-conspirators such as manufacturing

15 explosives, things of that nature.

16     THE COURT: Such as what?

17     MR.  WATERSTREET:  Manufacturing explosives and things of that

18 nature.

19     THE COURT:  All right.  And Count Four uses the date August 20th,

20 same charge.

21     MR. WATERSTREET: Yes, Your Honor.

22     THE COURT: And --

23     MR. WATERSTREET: And that is the photograph that was

24 Government's Exhibit One in the prior Detention Hearing, Your Honor, where it

25 depicts all the individuals carrying the various firearms.

1          THE COURT: So that's a photo of them carrying firearms and the crime

2    of violence being the Conspiracy?

3          MR. WATERSTREET: Conspiracy and attempted use of weapons of

4    mass destruction.

5          THE COURT: All right.

6          MR. WATERSTREET: Your Honor, Counsel should all have copies of

7    this transcript, is that correct?

8          MR. THOMAS: Do you have an extra one?

9          MR. WATERSTREET: I do.

10          THE COURT: Can I have one?

11          MR. WATERSTREET: Yes.  Here's the original, Your Honor.

12          THE COURT: Thank you.  Counsel, Mr. Waterstreet, since we have this

13    transcript but Mr. Swor is also challenging that the transcript is the same as the audio,

14    does Mrs. Coleman need to transcribe what she is hearing on this tape recording?

15          MR. SWOR: No, Your Honor.

16          THE COURT:  No?  You speak for everyone?

17          MR. SWOR: I believe I speak for everyone.  My objection -- yes.

18          THE COURT: Thank you.

19          (Audio tape began at about 2:28 p.m. -- ending at about 2:43 p.m.)

20          MR. WATERSTREET: Does the Court have specific questions

21    concerning any proffered materials?

22          THE COURT: I think I don't, Mr. Waterstreet.  Thank you.

23          MR. WATERSTREET: Your Honor, if necessary, I have some rebuttal

24    depending upon what they may proffer.  Thank you, Your Honor.

25          THE COURT: Thank you.  So the Court does make this finding; that the

1    -- all of the crimes that are charged here trigger presumption in favor of detention and

2    therefore, the Defendants then have a burden to produce evidence that would rebut

3    the presumption.  Mr. Swor.

4                    MR. SWOR: Your Honor, one comment and then one request.

5                    THE COURT: Okay.

6                    MR. SWOR: The first comment is the Government has asserted before

7    they started this last conversation that the burden on the Defendants is the burden of

8    persuasion.

9                    THE COURT: I just asserted I think the correct burden which is a burden

10   to produce and that's what I know the law to be.

11                   MR. SWOR: That's correct.  I was going to ask the Court to make that

12   finding. Second of all, I need five minutes.

13                   THE COURT: Okay.

14                   MR. SWOR: Thank you.

15                   THE COURT: Okay, we'll take five.

16                   **(COURT RECESSED AT ABOUT 2:44 P. M.)**

17                   (At about 2:56 p.m.)

18                   (Court,  Counsel and parties present)

19                   MR. SWOR: Your Honor, we were -- because Mr.  Helfrick had

20   requested to bring in the Case Agent for cross-examination, we thought it might be

21   more expedient for Mr.  Helfrick and I to switch positions on this particular session.

22                   THE COURT:  Okay, that's fine.

23                   MR. HELFRICK: And, Your Honor, it's my understanding that the Case

24   Agent is available and we would like to I guess call him to the witness stand.

25                   THE COURT: All right. Call him or call her?

1    MR. HELFRICK:  I don't know.  Whoever the Agent is.

2                    **L E S L I E   L A R S E N**.

3    Having been sworn under oath at about 2:57 p.m., testified as follows:

4                    <u>**CROSS-EXAMINATION**</u>

5    <u>**BY MR. HELFRICK:**</u>

6    Q.      Good afternoon.

7    A.      Good afternoon.

8    Q.      Could you state your name for the record please?

9    A.      Leslie Larson.  L-a-r-s-e-n.

10   Q.      Thank you.  And I apologize; I wasn't told that the Case Agent was a man or a

11   woman quite frankly.  I want to start with the arrest on March 27th and I represent

12   David Stone, Jr. and so most of my questions will be about Junior, okay?

13   A.      Okay.

14   Q.      And did you participate in the arrest on March 27th?

15   A.      Yes, I was present.

16   Q.      And the arrest took place as I understand it in Ann Arbor?

17   A.      Yes.

18   Q.      At a warehouse?

19   A.      Correct.

20   Q.      And at the time that Mr. Stone, Jr. was arrested or that this operation took

21   place, he did not attempt to flee, correct?

22   A.      No, he did not.

23   Q.      And at the time of his arrest he did not have any weapons on his person,

24   correct?

25   A.      Not that I believe.

1    Q.    Did you find any firearms or knives or anything on him?

2    A.    I did not take him personally into custody, so --

3    Q.    But being the Case Agent, have you reviewed the reports relating to the arrest?

4    A.    I have not had a chance to review all of the reports relating to his arrest.

5    Q.    Okay.  And to the extent that you have, there's no report that you've seen that

6    indicated he had any weapons, correct?

7    A.    Nothing that I've reviewed to date.

8    Q.    And nor did he make my threats at the time of the arrest, did he?

9    A.    Not that I recall.

10   Q.    He didn't threaten any law enforcement officers that were there, correct?

11   A.    Not that I heard.

12   Q.    Now there was subsequent to that, as I understand it, a search of his

13   apartment, correct?

14   A.    Yes.

15   Q.    Did you participate in that?

16   A.    No, I did not.

17   Q.    Have you reviewed any of the reports relating to the search of his apartment?

18   A.    I have not had a chance to review everything.

19   Q.    Do you know that there were no firearms found at his apartment?

20   A.    I have -- again, I haven't reviewed everything, but I do not believe that there

21   were any firearms at Junior's apartment.

22   Q.    Or explosives?

23   A.    Correct.

24   Q.    Or bomb-making materials of any kind?

25   A.    I haven't reviewed everything, so I'm not sure if there were those.

1    Q.    You probably would have heard about it if there had been, correct?

2    A.    Correct.

3    Q.    Someone would probably have mentioned that to you?

4    A.    Yes.

5    Q.    And likewise, there were no drugs or alcohol or drug paraphernalia found at his

6    apartment, correct?

7    A.    Not that I'm aware of.

8    Q.    And you know he's 19 years old, correct?

9    A.    Yes.

10    Q.    And he has no prior convictions?

11    A.    Correct.

12    Q.    I want to go back to the ATF investigation that took place in December of  '08

13    relating to this Federal firearms licensee, correct?  And there have been reports that

14    this individual was approached about trying to break his son out of jail, correct?

15    A.    Yes.

16    Q.    And that did not involve Junior, correct?

17    A.    No, it did not.

18    Q.    He wasn't the person saying you want help breaking him out?

19    A.    No.

20    Q.    In fact, there's no evidence he was even aware of this, correct?

21    A.    I can't answer that.

22    Q.    Let me ask you something just as a matter of -- the undercover agent, was he

23    basically wearing a wire or some sort of recording device whenever he met with these

24    individuals?

25          MR. WATERSTREET: Objection, Your Honor.  I don't understand how

1    this shows a risk of flight or a danger to the community.  This is clearly what the

2    Government feared would be a discovery attempt to find out more about the

3    techniques that were used by law enforcement in this investigation.  Therefore, I

4    would object to that.

5                    MR. HELFRICK: May I respond?

6                    THE COURT: Yes, you may.

7                    MR. HELFRICK: The reason I'm asking this, Your Honor, is this.  They

8    have played a number of tapes obviously already and at the proffer in front of

9    Magistrate Sheer, I had argued that there was no evidence that Junior had ever

10   agreed to what was being talked about, that he had assented to these things, that he

11   believed in these things and so I guess what I'm -- where I'm going with this is if

12   there's any recordings of Junior voicing his assent to these ideas, these beliefs, these

13   actions.  That's why I want to know basically most -- were most of these meetings

14   recorded or whatever and if so, is Junior ever on there saying yes, he too wants to kill

15   police officers.

16                   THE COURT: Well, that's a different question from whether the

17   undercover agent was wearing a wire.  I'll allow to you ask this question.

18   Q.    (By Mr. Helfrick continuing) Okay, I'll get to it.  On June 13th of  '09 there was a

19   training event and according to the proffer, there were a couple of demonstrations of

20   devices.  One of the things that was set off as I understand it was one of these

21   cardboard tubes with black powder in it, correct?

22   A.    Correct.

23   Q.    And it is also during the proffer it says that only one Junior was involved in was

24   this carbon tube filled with black powder, correct?  On that day?

25   A.    Yes.

1   Q.      And as I understand it his involvement was to put I guess a vice grip to a

2   battery or to a wire which detonated this particular device, correct?

3   A.      Yes.

4   Q.      And he did that at the direction of his father, correct?

5   A.      Yeah.

6   Q.      Now as I understand it, there was also a demonstration of what's been called a

7   Bouncing Betty that day, correct?

8   A.      Correct.

9   Q.      But it's also my understanding that this was not an actual Bouncing Betty, is

10  that correct as well?

11  A.      That's not my recollection.  You have the recording or the recording will be

12  entered into evidence.

13  Q.      All we have is the proffer at this point that there was a Bouncing Betty, but it's

14  my understanding that this was a simulated Bouncing Betty, not a real Bouncing

15  Betty.  Do you know if that's true or not true?

16  A.      I believe it was a real Bouncing Betty, but we would have to go back to the

17  recording to verify that.

18  Q.      The proffer, it was stated that on August of  '09, I believe August 15th and

19  August 27th, that the undercover demonstrated an IED on both of those occasions

20  that he had constructed, correct?

21  A.      Correct.

22  Q.      And is it also true that Junior was not present on those occasions?

23  A.      I don't recall.

24  Q.      On December 12th, '09, this is the wedding of David Stone, Sr.  and his wife,

25  okay?  Now it's my understanding that at that time there was something someone

1    referred to as a list of people, Government officials or whatever that was presented to

2    David Stone, Sr., correct?

3    A.      Yes.

4    Q.      And I understand that Junior was present at the wedding.  My question is was

5    he present whenever this list was given or was talked about?

6    A.      I don't know.  I wasn't there and I have not reviewed that.

7    Q.      Now today Mr. Waterstreet proffered that there is a Hutaree I guess website,

8    correct?

9    A.      Correct.

10   Q.      And is that website registered to Junior?

11   A.      No.

12   Q.      And I guess there's -- do they have anything besides the website?  There's a

13   Facebook page or something?

14   A.      I'm not sure.

15   Q.      Okay.  On this tape that they played here, this February 20th, 2010 tape that

16   was played today, Junior was not present during that conversation, was he?

17   A.      During which date?  I'm sorry.

18   Q.      The tape that was played just now today, February 20th of 2010?

19   A.      I'd have to go back to my notes to see if he was there that day.

20   Q.      If he was there, he would be listed on the transcript as being present though,

21   correct?

22   A.      If he didn't speak during it I'm not sure if he would be listed.  I didn't write the

23   transcript.

24   Q.      Okay.  If Mr. Waterstreet said that he had left before that, would that -- would

25   Mr. Waterstreet be telling the truth?

1    A.    I'm -- again, I'm not sure.

2    Q.    Okay.  I'm going to go back to my other question is this.  Based on all --

3  whatever number of recordings that took place, whether it was every time or the

4  majority of the time, is there any recording where Junior can be said to say that he

5  agrees with any of this stuff, either killing police, you know, doing things against the

6  Government, anything like that?

7    A.    I haven't had a chance to review all of the transcripts or all of the hours of

8  recording, so I'm not sure if there's a statement in there by Junior.

9    Q.    But you certainly haven't heard it if it exists.

10          MR. WATERSTREET: Your Honor, I believe she just answered the

11  question.  She hasn't had an opportunity to review them all and that she says she

12  doesn't know and by asking the same question again --

13          THE COURT: Sustained.

14          MR. HELFRICK: No further questions, Your Honor.

15          THE COURT: Thank you.

16                   **CROSS-EXAMINATION**

17  **BY MR. SWOR:**

18    Q.    Good afternoon, Agent.

19    A.    Good afternoon.

20    Q.    Agent, have you listened to the two recordings that the Government has

21  offered to the Court as -- in support of its detention motion?

22    A.    Not in their entirety.

23    Q.    Had you listened to the portion of the February 20th that was played today?

24    A.    Yes.

25    Q.    The recording we heard today -- I'm sorry -- the original recording that we

1    heard at the Detention Hearing said that in April -- April is going to consist of two

2    trainings, correct?

3    A.      Correct.

4    Q.      It also said we're going to do a real op, correct?

5    A.      Correct.

6    Q.      And those were in consecutive sentences, correct?

7    A.      I believe so.

8    Q.      At no time did Mr. Stone explain that that wasn't inconsistent, did he?

9    A.      That the training dates were not inconsistent?

10    Q.      That we're going to get dropped in the ground and do a real op, April is going to

11    consist of two trainings; there was never an explanation of what that meant, was

12    there?

13    A.      You listened to the recording --

14            MR. WATERSTREET: Your Honor, this is argumentative.

15            MR. SWOR: If there was anything the Government did was argument --

16            THE COURT: (Interjecting) Excuse me.  Overruled.

17            MR. WATERSTREET: Okay.

18    Q.      (By Mr. Swor continuing)  After January, the -- Mr. Stone did nothing to acquire

19    additional weapons, did he?

20    A.      By weapons, you mean firearms?

21    Q.      Firearms.

22    A.      I'm not sure if he did buy any additional firearms or not.

23    Q.      There's no evidence that he did, is there?

24    A.      I don't have any evidence that he acquired any additional firearms.

25    Q.      You are aware of the search of the house on Tomer?

1    A.    Yes.

2    Q.    There were no explosives found at that house, correct?

3    A.    I have not reviewed all of the evidence from the Tomer Road location.

4    Q.    All right.  Then you are not aware that there was any -- there were any

5    explosives found at the house, were there?

6    A.    I'm not aware if there are or are not at either.

7    Q.    And there were no automatic weapons found, correct?

8    A.    We have weapons.  They have not been sent to the laboratory to determine

9    whether or not they are fully automatic at this time.

10   Q.    So then as far as you know, all the weapons seized were legal weapons,

11   correct?

12   A.    No, I can't make that assumption.

13   Q.    You have no evidence to the contrary, correct?

14   A.    We have the weapons in the evidence room.  They have not been sent to the

15   laboratory for further examination.

16   Q.    In response to Mr. Helfrick's question about the August 22nd, 2009 and the

17   August 27th, 2009 explosion demonstrations.

18         MR. WATERSTREET: Your Honor, if I may, I think Counsel has it

19   wrong.  The question was August 15th, 2009 and August 27th, 2009.

20         MR. SWOR: Either way I stand corrected. That's fine.

21         MR. WATERSTREET: Okay.

22   Q.    (By Mr. Swor continuing) Are you aware of those?

23   A.    Yes.

24   Q.    And the person demonstrating and actually making the explosion was the

25   undercover agent, wasn't it?

1    A.    Yes.

2    Q.    As a matter of fact, the undercover agent was the only one who ever made a

3    explosive device, correct?

4    A.    No, not correct.

5    Q.    Mr. Stone did not make any explosive device, did he?

6    A.    I was not present for either of those trainings.

7    Q.    You've read the reports?

8    A.    I've read some of the reports.

9    Q.    You have read no report that said that Mr. Stone, Mr. David Brian Stone made

10   an explosive device?

11   A.    On those specific days?

12   Q.    On any days.

13   A.    There have been reports, yes.

14   Q.    There have been reports.  When?

15   A.    I don't have my notes.  I'm sorry, I cannot --

16   Q.    So some time --

17   A.    Yes.

18   Q.    -- Somebody said, is that what you're saying?

19   A.    Yes.

20   Q.    Did you investigate Mr. Stone's employment history?

21   A.    I have not personally investigated his employment history.

22   Q.    We're told that Mr. Stone sent an email to the undercover agent having a

23   diagram and a photograph, correct?

24   A.    Correct.

25   Q.    That diagram was simply a reprint of something that came off of Wikipedia,

1    correct?

2    A.      It appears that way.

3    Q.      The photograph similarly was an image taken off of the Internet, correct?

4    A.      Again it appears that way, yes.

5    Q.      At no time during this investigation or in your knowledge has Mr. Stone ever

6    instructed anyone how to make a bomb, correct?

7    A.      Again, I haven't reviewed all of the tape that we have so he could have

8    instructed that in some of the hours of recording that we have, so I can't fully answer

9    that question.

10   Q.      How long have you been the Case Agent on this case?

11   A.      Approximately two years.

12   Q.      And during two years your job as Case Agent was to monitor the evidence that

13   was being obtained, correct?

14   A.      Yes.  This was not my only investigation during this time period.

15   Q.      On February 6th we are told -- I'm sorry -- yeah, February 6th, Mr. Stone and

16   some of the others attempted to go to a gathering in Kentucky, correct?

17   A.      Yes.

18   Q.      And the manner in which they were going to this gathering in Kentucky was a

19   van, correct?

20   A.      I wasn't there, but yes.

21   Q.      The van was provided by the undercover agent, correct?

22   A.      Correct.

23   Q.      Because none of the Defendants have sufficient transportation to be sure

24   they'd get to Kentucky and back, correct?

25   A.      I haven't driven their vehicles, so I'm unaware of the condition of their vehicles.

1    Q.    Do you know what vehicles they have?

2    A.    I know some of the vehicles that they have.

3    Q.    Mr. Stone does not have, Mr. David Brian Stone does not have a vehicle by

4    which he could transport five or six or seven people to a meeting in Kentucky and

5    back, correct?

6    A.    No.  He does have through his wife Tina, a Mercury Villager which is a minivan

7    that I would think would seat six people.  I haven't been inside the vehicle.  I'm sorry.

8    I haven't had access to the vehicle, no.

9    Q.    But apparently they were better satisfied with the Agent's offer of his vehicle, is

10   that correct?

11              MR. WATERSTREET: I'm trying to find out --

12              THE COURT: Sustained.

13   Q.    (By Mr. Swor continuing) The February 20th conversation, the February 20th --

14   let me retract  that, Your Honor.  On the January 9th conversation, Mr. Stone said

15   we're working on an objective, correct?

16   A.    Yes.

17   Q.    He did not define an objective, correct?

18   A.    No.

19   Q.    And by March 27th, he still had not defined an objective, had he?

20   A.    Not to my knowledge.

21   Q.    There had been no training between February 27th and March -- February 20th

22   and March 27th for this "real op", had there been?

23   A.    I believe there was a training on March 20th, but again I wasn't present for it.

24   Q.    So you don't know what it consisted of?

25   A.    No, I'm sorry I don't.

1    Q.      Since you've been the Case Agent for two years, you can confirm that the "live

2    fire training" that took place was twice a year, correct?

3    A.      No.  I wasn't at any of the trainings, so I can't personally confirm that.

4    Q.      Can you confirm or deny that live fire training consisted of shooting weapons at

5    a backstop at a private shooting range?

6    A.      No, I'm sorry I can't confirm that.

7    Q.      Was your Agent present at any of those?

8    A.      I'd have to go back to my notes to see what days the Agent was there for over

9    that time period.

10   Q.      The Government tells us that there are 25 more members of the Hutaree who

11   are not arrested or charged, correct?

12   A.      Approximately.

13   Q.      And the Government knows who and where each of those people are, correct?

14   A.      We know roughly who they are and where they're located.

15   Q.      The March training that you just spoke about consisted of going out in the field

16   and testing radios, correct?

17   A.      I was not present at the March training.

18   Q.      Did you receive a report as to what the March training consisted of?

19   A.      No, I have not.

20   Q.      But you know it occurred?

21   A.      I suspect that it occurred.  Again, I wasn't there.  Our undercover agent was not

22   there.

23   Q.      Agent, you just testified a couple minutes ago that there was a March training.

24   A.      According to the Hutaree website I think that it listed the March training on

25   there, so I'd have to go back and review notes.

1    Q.    As future events?

2    A.    Yeah, there's a ticker that goes across, but again I would have to go back and

3    look to see.  I know that the undercover agent was not present for that, so I rely on

4    him for the reports.

5    Q.    So you don't know whether there was a March training or not?

6    A.    I was not present for that.

7    Q.    The question was you don't know whether there was a March training or not?

8                    MR. WATERSTREET: It's been asked and answered three times, Your

9    Honor.

10                   MR. SWOR: No, it has not, Your Honor.

11                   MR. WATERSTREET: I believe it has.

12                   THE COURT: What is the answer?  Do you know if there was a training

13   in March?

14                   THE WITNESS:  I do not know.

15                   THE COURT: You don't know.  Thank you.

16   Q.    (By Mr. Swor continuing) The January 9th conversation said that there are

17   going to be two trainings in April, correct?

18   A.    Yes.

19   Q.    And one was going to be the second Saturday of April and one was the fourth

20   Saturday of April?

21   A.    Correct.

22   Q.    Correct? Now you know, do you not, that on the second Saturday of April Mr.

23   David Stone was supposed to be at a shooting, the Knob Creek Shooting Exhibition in

24   Kentucky, don't you?

25   A.    I'm sorry.  I don't know that, no.

1    Q.      Do you know that on April 17th Mr. Stone was going to be training for work for

2    his job?

3    A.      No.

4    Q.      And there were no preparations taken for any kind of operation in April, were

5    there?

6    A.      I don't know if there were or not.

7    Q.      There were no meetings, correct?

8    A.      In April?

9    Q.      In March.  In April they were all in custody.

10   A.      I don't know if there were meetings or trainings in March.

11   Q.      Well, if there had been and -- wait a minute.  The Government has said that the

12   Government believes that there was an impending operation, a real op that was going

13   to take place in April and that it posed a threat to the community, correct?

14   A.      Correct.

15   Q.      You're telling me that your agency did nothing to monitor these people between

16   February 20th when this conversation was recorded and March 27th when they were

17   arrested?

18   A.      I believe the undercover was in contact with Mr. Stone in that time period, but

19   again I don't have my notes so I can't refer to how many contacts the undercover had

20   during the time period.

21   Q.      Have you been -- everybody's computers were seized during the execution of

22   the Search Warrant, correct?

23   A.      Correct.

24   Q.      Mr. Stone's has been gone through thoroughly, correct?

25   A.      I'm not aware of the computer exam results.

1    Q.      So then you do not know that no names of any targets were found in his

2    computer, correct?

3    A.      The computers -- I don't have the results of the computer examinations.  There

4    were several computers seized, lots of CDs, those types of things.  They have not all

5    been processed yet.

6    Q.      There were no specifics found of his computer of any plan to do anything,

7    correct?

8              MR. WATERSTREET: Your Honor, I believe the Agents twice testified

9    that she is not aware of the results and if he continues to keep asking questions about

10   what was found in the computer, I imagine the answer will be the same, that she is

11   not aware of the results.

12             MR. SWOR: Well, Your Honor  --

13             THE COURT: The last question was you don't know of any plans to do

14   anything.  What timeframe are you talking about, Mr. Swor?

15             MR. SWOR: At any time, especially on April of 2010.

16             MR. WATERSTREET: In the computer or in general?  I'm not sure I

17   understood the question then.

18             THE COURT: Please rephrase, Mr. Swor.

19             MR. SWOR: Thank you, Your Honor.

20   Q.      You are not aware of any result -- thank you, Your Honor.  Let me rephrase it

21   again.  No plan, whether on computer or on paper or on clay tablet has been found of

22   any plan to attack any specific person or target, correct?

23   A.      I am not aware.  I have not reviewed all of the documents and again have not

24   reviewed all of the recordings.

25   Q.      We have heard from the Government a claim that there was a trip wire

1   demonstration at one of the training sessions.  Do you remember that?

2   A.    Yes.

3   Q.    In fact, the trip wire demonstration was to show how the trip wire could be used

4   for defensive alert, correct?

5   A.    Correct.

6   Q.    Now we're told that there are 25 Hutaree that were not arrested or taken into

7   custody when these eight and then nine were -- or seven and then eight were taken

8   into custody, correct?  I sorry.   Let me do the sentence so it's a whole question.  The

9   remaining members of the Hutaree did not, when we these seven people were first

10   arrested, take up arms, did they?

11   A.    Did any other than  --

12   Q.    The remaining 25 Hutaree that we're told are out there, they did not take up

13   arms and attempt to free any of these people?

14   A.    Not to my knowledge.

15   Q.    By the way, do you know how many times these folks trained over the winter?

16   A.    I'd have to go back to my notes.

17   Q.    How about zero?  Do you know?

18   A.    Again, I'd have to go back to my notes.

19   Q.    Are you aware that they didn't train in the summer since you've been

20   monitoring them for two years because there's bugs and mosquitos out in the woods?

21   A.    I am aware of training in the summer.  I don't have the exact --

22          THE COURT: (Interjecting) Excuse, me.  Let her finish her answer.

23   Q.    I'm sorry.  Yes, Your Honor.

24   A.    I don't have the exact dates, but I'm aware that they do train in the

25   Summertime.

1    Q.    But not out in the woods?

2    A.    Yes, I believe out in the woods.

3    Q.    Do you know how long Mr. Stone has lived at his present address?

4    A.    No, I don't know the exact number of years he's lived there.

5    Q.    Do you know that he has no other home, correct?

6    A.    I believe that he has no other home.

7    Q.    And he has not traveled outside of the state of Michigan, correct?  Other than

8    go to Kentucky and back or actually Indiana and back?

9    A.    I know that he goes to Kentucky and he leaves the state that way, but I don't

10   know the exact times.  I'm not following Mr. Stone.

11   Q.    Nothing further, Your Honor.  Excuse me one second. Agent, the undercover

12   agent was supposed to go to Knob Creek with -- on April 10th with Mr. Stone or at

13   least was supposed to meet him there, wasn't he?

14   A.    I believe there might have been a conversation about that, but I don't have the

15   specifics on that.

16   Q.    Nothing further, Your Honor.  Thank you.

17         THE COURT: Thank you.

18                          **CROSS-EXAMINATION**

19   **BY MR. THOMAS:**

20   Q.    Agent Larsen, my name is Jim Thomas and I represent Joshua Stone.  We've

21   not met, have we?

22   A.    A previous trial I think.

23   Q.    You've been a Case Agent on this case for two years or you've been a Federal

24   Agent for two years?

25   A.    On this case for two years.

1    Q.    Obviously you're aware of who Joshua Stone is?

2    A.    Yes.

3    Q.    You know that he's 21 years old?

4    A.    Yes.

5    Q.    You know that he's recently married?

6    A.    Yes.

7    Q.    You know that he has no criminal record?

8    A.    Correct.

9    Q.    He's not been in any trouble of any sort?

10   A.    No.

11   Q.    Now do you know whether or not -- do you have any background information

12   relating to his education?

13   A.    I do not, no.

14   Q.    Did you ever know in your course of being the Case Agent in this case that he

15   was home-schooled?

16   A.    I do have knowledge he was home-schooled, yes.

17   Q.    And that -- and that he has seasonal employment?

18   A.    Yes.

19   Q.    You knew that he had worked on a sheep farm?

20   A.    I knew that he worked in the area for some farmers, yes, as part of his

21   seasonal employment.

22   Q.    And that that season was Springtime through the Summer into the close of the

23   Fall?

24   A.    I'm not sure of the exact timeframe that he worked.

25   Q.    But he was employed, you knew that?

1    A.    Yes.

2    Q.    And now you know in the course of your investigation that he had lived on his

3    grandfather's farm?

4    A.    Yes, I believe Ray Stone owns that property.

5    Q.    And then his father lived on a home of some sort on that farm?

6    A.    Yes.

7    Q.    And that Josh lived with his father even after he was married?

8    A.    Yes, that's my understanding.

9    Q.    Were you aware of his plans through your being in the investigation that since

10   he was married he was going to be moving out of the house?

11   A.    Not prior to the arrest I was not aware of that.

12   Q.    We all heard the tape.  You heard the tape.  As an agent, did you analyze that

13   tape?  Were you involved in the analysis of that tape?

14   A.    No.

15   Q.    But you heard the tenor of the tape, did you not?

16   A.    Yes.

17   Q.    This wasn't like an FBI briefing for execution of a search warrant, was it?

18   A.    Meaning that it wasn't --

19   Q.    Meaning sincerity, meaning seriousness.  Meaning -- I guess I'm doing a

20   compound question when I start doing that, but let's just talk about seriousness.  Did

21   you hear a lot of laughing there?

22   A.    I did hear laughing.

23   Q.    Did you hear a lot of joking on the tape?

24   A.    Some.

25   Q.    I mean somebody is talking about interdicting a car and all of a sudden my

1  client is talking about strippers.  Do you remember hearing that?

2  A.     I'm not certain if that was Josh Stone or who was talking about the strippers.

3  Q.     Somebody brought up strippers?

4  A.     Yes.

5  Q.     People were laughing?

6  A.     Right.

7  Q.     People were making noises like, sounding noises like a six-year old would do

8  when he's watching a cartoon.

9  A.     That's your interpretation.

10  Q.     Would you interpret it to be a sense of immaturity about what it was that was

11  being discussed?

12  A.     I interpreted that they were talking about killing police officers, so I don't think

13  you can joke around about that.

14  Q.     So you think that a discussion about killing a police officer without any action

15  whatsoever to be taken is something that is not allowed?  Should not be allowed?

16  A.     Well, I think with that conversation compounded with the rest of the

17  conversations and actions surrounding these subjects it has to be taken into

18  consideration that they may have been planning to do something.

19  Q.     May have been, and so now I want to talk to you a little bit about the sense of

20  maturity about it though.  When you hear somebody making a crashing sound or a

21  kaboom or laughing and joking almost like young children, like teenagers, that that

22  means to you that there's a sense of purpose about what it is that they're going to do?

23           MR. WATERSTREET: Your Honor, I believe this is argumentative and

24  the question is are they a risk of flight or danger to community, not her interpretation

25  or Counsel's interpretation.

1          THE COURT: Well, Mr. Waterstreet, there is a major issue here as to

2    whether these Defendants present a danger to the community.  That's the only reason

3    Pretrial Services is recommending against their bond.

4          MR. WATERSTREET: I understand that.

5          THE COURT: So your objection is overruled.

6          MR. WATERSTREET: If I may, Your Honor?  I understand the Court's

7    ruling, but I believe this is argumentative.  If Counsel wishes to make this argument to

8    the Court that it's immature and things of that nature, the question to the Agent is the

9    facts.  Was the recording made?  Does it accurately record the events that took

10   place?

11         THE COURT: Overruled.  I think this case is -- a lot of this case is going

12   to be about the spoken word and either the spoken word to conspire to commit illegal

13   acts or the spoken word to establish a motive or intention, and so these are

14   appropriate questions.  Overruled.

15   Q.    (By Mr. Thomas continuing) You heard conversations about Chinese troops?

16   A.    Yes.

17   Q.    Burning a United Nations flag?

18   A.    Yes.

19   Q.    We don't have Chinese troops in the United States, do we?

20   A.    Not that I'm aware of.

21   Q.    And burning the United Nations flag is not a crime, is it?

22   A.    No.

23   Q.    In fact, burning a United States flag is not a crime?

24   A.    No.

25   Q.    It could be construed as speech, could it not?

1   A.   It could be.

2   Q.   You're familiar with the term hyperbole?

3   A.   Yes.

4   Q.   Did you read the transcript of the prior Detention Hearing before you came in

5   here today?

6   A.   No.

7   Q.   You were not in court at that time.  I don't remember seeing you there.  Were

8   you there?

9   A.   No, I'm sorry.  I just got called in at the last minute to be over here.

10   Q.   They needed a body and they put it in on the witness stand and here you are.

11   A.   Here I am.

12   Q.   Under oath?

13   A.   Correct.

14   Q.   Well, I won't take too much more time, but I want to get into the area about

15   reality versus fantasy.  There seemed to have been a little bit of fantasy there, would

16   you agree, talking about Chinese troops?

17   A.   I think that there was some fantasy there.

18   Q.   And certainly when they're talking about strippers in a car, they were talking

19   about fantasy.  These guys were on a farm in Adrian for God sakes.

20   A.   I would think anyone could buy, rent, pay for a fee for strippers if they needed

21   that entertainment.

22   Q.   But not in the context of an operation, would you agree?

23   A.   They're not law enforcement.  You know, they don't train like law enforcement,

24   so their tactics are going to differ drastically from our tactics.

25   Q.   But you got a sense for the level of maturity in those conversations, did you

1    not?

2    A.    It's only an example of one conversation.

3    Q.    Let's talk about whether or not you thought that everybody seemed to be

4    talking at the same time.  Did you get that sense when you were hearing what was

5    being --

6    A.    There was overlap in conversation.

7    Q.    Some were talking about one thing and others we're talking about another.

8    They weren't exactly contiguous.

9    A.    I wasn't there, but they don't appear to be contiguous, no.

10   Q.    And in a room and you've probably been in a room where that type of a

11   conversation takes place.  You embrace certain parts of the conversation and adopt it

12   and you don't.  Sometimes you adopt everything that's being said, but sometimes not.

13   Would you agree?

14   A.    Correct.

15   Q.    Now were you involved in the pre-arrest conduct of Mr. Stone, Joshua Stone?

16   A.    Pre-arrest conduct?

17   Q.    He apparently was on a friend's farm in Hillsdale.  Were you out there?

18   A.    I was out there for some of that.

19   Q.    What time did the FBI get out there?

20   A.    It would --

21   Q.    Maybe I should do it better.

22   A.    I don't know the exact time.

23   Q.    Let me do it better.  How long before he actually came -- first of all, did he

24   come out and surrender?

25   A.    Not right away.

1    Q.    But did he?

2    A.    Eventually.

3    Q.    Without a weapon?

4    A.    He did not have a weapon on his person.

5    Q.    So what was the timeframe?  The FBI came out and then he came out and

6    surrendered?

7    A.    I think -- again, I wasn't out there for the entire time, but I think it was

8    approximately a day, day and a half.

9    Q.    Did the FBI do anything to announce their presence?

10   A.    Again, I wasn't out there for the whole time, but I do believe that our

11   negotiators attempted to make contact with the six individuals and the baby that were

12   out there.  I don't know the exact time that they attempted to make that contact.

13   Q.    But an attempt to make contact is different than actually letting the people

14   know you're out there, and my question goes to when did  -- if you know -- when did

15   David Stone -- I'm sorry -- Joshua Stone know that you were out there?  If you can

16   answer the question.

17   A.    I don't know.  I know that they made phone call attempts.  They used loud

18   speakers.  They drove vehicles up and back to announce presence, but I don't know

19   the exact timeframe on when all of those things were done.

20   Q.    Were you there when that occurred?

21   A.    No, I was not.

22   Q.    And so that's a big farm, was it not?

23   A.    Several acres, yeah.  Again, I don't know how many acres that was.

24   Q.    Obviously somebody had come to the conclusion that Mr. Stone and others

25   were on the premises at some point and time?

1    A.    Yes.

2    Q.    Do you know whether or not at the time that the FBI was doing the various

3    actions that you were discussing that you didn't witness whether or not Mr. Stone was

4    there on the premises at the time?

5    A.    I don't know the answer to that.  I'm sorry.

6    Q.    I mean it's entirely possible, is it not, that he  surrendered promptly upon being

7    notified of the fact that there were people there to arrest him?

8    A.    I don't know.

9    Q.    Do you know whether or not there was a television set in the trailer that was on

10   the property?

11   A.    I don't know.  I haven't seen the pictures of the trailer.

12   Q.    There was an issue about post-arrest, meaning the arrest of the other Hutaree

13   members and Mr. Joshua Stone's flight.  He went to a farm where he knew the

14   people.

15   A.    Right.

16   Q.    Right?

17   A.    Right.

18   Q.    And he was there with other friends, his wife and two friends and a child?

19   A.    His wife -- there were six total and a baby.

20   Q.    And to your knowledge was there ever any announcement that there was a

21   Warrant out for his arrest?

22   A.    I don't know.  I wasn't out there for that.

23   Q.    So if you say -- as you sit here now you don't know of any announcement that

24   there was a Warrant out for his arrest?

25   A.    I don't know what the exact phrase was that was announced over the loud

1    speaker.

2    Q.      What about publication?  Did the FBI publicize the fact that Mr. Joshua Stone

3    was wanted or that there was a Warrant out for his arrest by the media, by TV or

4    newspapers in Hillsdale?

5    A.      I think that there was notification put out by the news outlets, but I'm not certain

6    exactly what the phrase was that was put out there.

7    Q.      We know that there was publication and that there was publication that there

8    had been arrests of the Hutaree members because that came out pretty quickly.

9    A.      Right.

10   Q.      But I want to get to the specific of Joshua Stone and whether or not there's any

11   notice that he was a member and that they were looking for him in the media.

12   A.      Right.  I don't know when the news media first put out the timeframe that we

13   were looking for Josh.

14   Q.      And of course if it had occurred, there still is a question as to whether or not he

15   saw it?

16   A.      Yes.

17   Q.      And meaning Joshua Stone?

18   A.      Right.

19   Q.      And was he questioned after he was arrested?

20   A.      He was questioned.

21   Q.      Did anybody ask him whether or not he knew that there was a Warrant out for

22   his arrest?

23   A.      I don't know.  I would have to go back to his 302 to look at that.

24   Q.      You reviewed that before you came today?

25   A.      No, I'm sorry I did not.

1   Q.      You've reviewed it -- you said you would have to review it, but you haven't seen

2   it?

3   A.      I would have to go back and review it, I'm sorry.

4   Q.      Judge, can I have a moment?

5           THE COURT: Yes.

6           MR. THOMAS: Judge, I have nothing further.

7           THE COURT: Thank you.  Mr. Rataj.

8                          **CROSS-EXAMINATION**

9   **BY MR. RATAJ:**

10  Q.      Thank you, Your Honor.  I'll try to be brief and I'll try not to be repetitive.  Agent

11  -- it's Larsen, correct?

12  A.      Correct.

13  Q.      You and I have never met before?

14  A.      No.

15  Q.      And my name is Mike Rataj.  I represent Tina Mae Stone.  Just a couple quick

16  questions, okay ma'am?

17  A.      Sure.

18  Q.      Have you seen this that I've referred to it as the team's photo, Government

19  Exhibit Number One?  Have you seen that photograph before?

20  A.      Yes.

21  Q.      And you would agree with me that there's members, Hutaree members that are

22  photographed in this picture that are not sitting here as defendants in this courtroom?

23  Do you agree with that?

24  A.      Correct.

25  Q.      Would you agree with me, ma'am, that it is not illegal to be a member of

1    Hutaree?  You agree with that?

2    A.    Correct, yes.

3    Q.    They have every right, these people in this room have every right to be

4    members of Hutaree, correct?

5    A.    Yes.

6    Q.    And you would also agree with me, would you not, that they have the right to all

7    get together and have their photograph taken, correct?

8    A.    Yes.

9    Q.    And you would also agree with me there's nothing illegal about wearing

10   camouflage for purposes of this photograph, correct?

11   A.    Correct.

12   Q.    And even carrying a gun for purposes of this picture or posing with a gun?

13   A.    Correct.

14   Q.    Assuming that the guns were all legal, correct?

15   A.    Correct.

16   Q.    And do you have any information to tell Judge Roberts that any of the guns in

17   this picture were illegal?

18   A.    No.

19   Q.    Thank you.  Now you were present at the -- at this phony funeral or whatever it

20   was, this arrest in Ann Arbor on the 27th of March correct?

21   A.    Yes.

22   Q.    Did you have contact with Tina Mae Stone on that day?

23   A.    Yes, I did.

24   Q.    And would you agree with me that at no time after she was arrested or prior to

25   being arrested that she attempted to flee?  You agree?

1    A.    I agree.

2    Q.    And you would also agree that she came to this phony funeral unarmed,

3    correct?  She wasn't packing any heat?

4    A.    Not on her person.

5    Q.    She didn't have a gun tucked in her waistband or on her person anywhere,

6    correct?

7    A.    No.  There were guns in the vehicle that she traveled there with.

8    Q.    But she didn't travel in that vehicle now by herself, did she?

9    A.    Correct.

10   Q.    Thank you.  And also after you -- after she was arrested, she didn't say to you

11   or to any other agent I'm going to kill all you people for arresting me because I didn't

12   do anything wrong?

13   A.    No, she did not.

14   Q.    Now there was a Search Warrant executed at the -- at David Stone's

15   residence, correct?

16   A.    Correct.

17   Q.    And you're aware of the fact that Tina Mae Stone became David Stone's wife

18   on December 12th of 2009, correct?

19   A.    Correct.

20   Q.    And we've been using that date, December 12th, 2009, as a "meeting date",

21   correct?

22   A.    Correct.

23   Q.    But ma'am, isn't it a fact that that's the date that these two people got married,

24   that it was a wedding?

25   A.    Same day, yes.

1   Q.      So it's your position, the Government's position that this wedding was

2   somehow a ruse for some kind of clandestine meeting to figure out a way to kill a

3   cop?  Is that your testimony?

4   A.      No.  There was a wedding and the undercover was present for the wedding.

5   Q.      As a matter of fact, the undercover was actually the witness for Mr. & Mrs.

6   Stone, correct?

7              MR. WATERSTREET: Your Honor --

8              THE COURT: Sustained.

9              MR. RATAJ: I'll move on, Judge.

10  Q.      When the Search Warrant was executed at the Stone residence, you didn't find

11  any drugs or drug paraphernalia that you could attribute to Tina Mae Stone, correct?

12  A.      I have not gone through all the evidence at Tomer, but I have not found

13  anything.

14  Q.      As you sit here today, you cannot tell Judge Roberts that my client  possessed

15  illegal drugs, correct?

16  A.      Correct.

17  Q.      Or illegal drug paraphernalia, correct?

18  A.      Correct.

19  Q.      Are you aware of the fact that Tina Mae Stone has no prior convictions,

20  ma'am?

21  A.      Yes.

22  Q.      Are you aware of the fact that she's a mother of three adult children?

23  A.      Yes.

24  Q.      Are you aware of the fact that she's a grandmother?

25  A.      Yes.

1    Q.      Are you aware of her employment history?

2    A.      No, I'm not.

3    Q.      We've heard a lot of testimony or we've heard the tapes.  For the record, the

4    Government at the first Detention Hearing in front of Magistrate Judge Sheer played a

5    conversation that took place on January 9, 2010, correct?

6    A.      Correct.

7    Q.      You would agree with me that Tina Mae Stone was not present during this

8    recording, correct?

9    A.      I have to go back and see if she was present for that day or not.  I don't -- I

10   don't believe that she --

11   Q.      This was the trip down to Kentucky?

12   A.      The February 6th?

13   Q.      January 9, 2010.

14   A.      There was no trip to Kentucky on January 9th.

15   Q.      I'm sorry?

16   A.      I don't believe there was a trip to Kentucky on January 9th.

17   Q.      How about February 6?

18   A.      Yes, February 6th.

19   Q.      Was my client there for that?

20   A.      My understanding is she was there in the morning at the trailer, but was not

21   inside the van.

22   Q.      That was the date that Mr. Stone -- and we've all heard it all over the news

23   media -- Mr. Stone read his "manifesto", correct?

24   A.      Yes.

25   Q.      She wasn't in the van, was she?

1    A.    No.

2    Q.    Thank you.  Then we heard today Mr. Waterstreet played a tape dated

3    February 20, 2010, correct?

4    A.    Correct.

5    Q.    And you would agree with me that Tina Mae Stone was not present during that

6    conversation?

7    A.    I don't know if she was on the property, but I do not believe that she was there

8    to hear that conversation.

9    Q.    That's what I want to know, ma'am.  Was she there to hear the conversation?

10   A.    I don't believe so.

11   Q.    Thank you.

12         THE COURT: What date are you asking about?

13         MR. RATAJ: That would be February 20, 2010, Your Honor.

14         THE COURT: Thank you.

15   Q.    I do not suggest  -- we've heard a lot about training dates during these

16   detention hearings.  You with me?

17   A.    Right.

18   Q.    You would agree with me that there's nothing illegal about getting together and

19   training in the woods in camouflage with guns, is there?

20   A.    No.

21   Q.    As long as the guns are legal?

22   A.    And they can legally possess them.

23   Q.    That's correct.  Right?

24   A.    Right.

25   Q.    Now there is a website that's been referred to, correct?  A Hutaree website?

1    A.    Yes.

2    Q.    And you've looked at that website?

3    A.    I have.

4    Q.    You would agree with me that the Hutaree message is posted on the website,

5    correct?

6    A.    There are messages posted on the website.

7    Q.    That's right, and it's for all the world to see.  They're not hiding anything.

8    Would you agree with that?

9    A.    I don't believe there are any -- I'm not sure if there are private sections of the

10   website or not.

11   Q.    Well, let's talk about postings on message boards.  People can get on the

12   Hutaree website, can they not, and either agree or disagree with the message?

13   A.    I believe so.

14   Q.    Now obviously there were weapons that were confiscated pursuant to the

15   Search Warrant at the Stone residence, correct?

16   A.    Correct.

17   Q.    Are any of those weapons attributable to Tina Mae Stone illegal?

18   A.    We haven't run -- finished running the tests on all of those guns.

19   Q.    Do you have any information today to tell Judge Roberts that my client, Tina

20   Mae Stone, possessed illegal weapons?

21   A.    We are still running all the tests.

22   Q.    My question is quite simple.  Sitting here today can you tell Judge Roberts that

23   my client, Tina Mae Stone, possessed illegal weapons?

24              MR. WATERSTREET:  Your Honor, I believe the question has been

25   answered.

1          THE COURT: I didn't hear it.  It's a simple question.  Based on the

2    information that you have today, do you have any information that she possessed

3    illegal weapons?

4          THE WITNESS: I don't. The guns are being tested for latent fingerprints

5    so -- and they're being tested for their legality as far as if they were modified, not

6    modified.  So we do not have the results of the -- from the laboratory back on the

7    guns.  So she could have or could not have been in contact with guns that were illegal

8    from the search.  We just don't have the results back yet.

9    Q.    (By Mr. Rataj continuing) Then I take it that your answer is no, you don't have

10   any information, correct?

11   A.    Not at this time.

12   Q.    All right.  Are you in possession, Agent, Special Agent Larsen of any

13   recordings where Tina Mae Stone has expressed a desire to kill a police officer?

14   A.    Again, I haven't listened to all of the recordings, so I don't know specifically if

15   she has made statements like that.

16   Q.    But as you sit here today, you can't point to one for Judge Roberts, can you?

17   A.    Not right now, no.

18   Q.    Thank you.  One second, Your Honor, if I may.  Your Honor, I have no further

19   questions.  Thank you.

20         THE COURT: Thank you.

21         MR. THOMAS: Judge, could we approach please?

22         THE COURT: Okay.  This side please.

23              **(Sidebar conference as follows)**

24         MR. THOMAS: Judge, the Marshals have asked me about timing and I

25   have canvassed the other lawyers and some will be asking questions, some longer

1    than others.  I thought that as a courtesy to them I'd make the same query.  Do you

2    want to continue now and then finish this up or do you want to break and then do it

3    tomorrow?  Because Mr. Scharg and I don't have court tomorrow.

4                    THE COURT: Do we have to break?

5                    MR. THOMAS: No.  It's only the Marshals' request; that's the only

6    reason why I brought it up.

7                    THE COURT: The Marshals are requesting that we take a break now?

8                    MR. THOMAS:  At some point.

9             MARSHAL REED:  Marshall Pat Reed.

10                   THE COURT: When do we have to stop?

11            MARSHAL REED:  You can go as long as you want to go, Judge.

12                   MR. THOMAS: I was hearing from another voice.

13                   THE COURT: Okay.  Inside your head?

14                   MR. THOMAS: I was talking about strippers and China.

15                   MR. WEISS: Judge, I'm advised from the parking lot attendant that he

16   leaves about five o'clock.  That's where my car is.  If we're going past five, can I just

17   run out, pay my bill and run back?

18                   THE COURT: We're not going to go past five and if we don't finish

19   today, we'll talk about a time tomorrow to come back.

20                    (END OF SIDEBAR CONFERENCE)

21                   THE COURT: Mr.  Roberts.

22                   MR. ROBERTS:  Thank you very much, Your Honor.

23                             **CROSS-EXAMINATION**

24   **BY MR. ROBERTS:**

25   Q.      As part of your involvement for the couple of years that you've been

1   investigating this activity, you have no doubt viewed, visited the website on more than

2   one occasion?

3   A.      I have.

4   Q.      Now it's my understanding and correct me if I'm wrong -- I represent Joshua

5   Clough by the way -- my understanding is that there's a logo or a phrase at the bottom

6   of the website that appears on the website all the time and the phrase, as I

7   understand it, is Hutaree have and are willing and ready, are you or something to that

8   effect?

9   A.      I think yes, something to that effect.

10  Q.      That's on the bottom of that website all the time, correct?

11  A.      I think so.

12  Q.      You've told us earlier in one of the other lawyers' question, your answer was

13  that you were present at the feigned memorial service where the arrest of most of

14  these individuals occurred, correct?

15  A.      I was there, yes.

16  Q.      My client, Mr. Clough was present at that feigned memorial service, correct?

17  A.      He was.

18  Q.      He did not attempt to flee, did he?

19  A.      He did not.

20  Q.      He did not have a firearm on his person or any other weapon on his person at

21  the time of his arrest, did he?

22  A.      No.

23  Q.      We heard earlier questions about an offer made by some individuals to help

24  the FFL break his recently arrested son out of custody.  Do you know what I'm talking

25  about?

1    A.    Yes.

2    Q.    Mr. Clough was not part of that conversation, was he?

3    A.    Not to my knowledge, no.

4    Q.    You had an opportunity presumably, again correct me if I'm wrong, to engage

5    in debriefings of your undercover agent as these training sessions occurred and as

6    his participation occurred, correct?

7    A.    Most of them, yes.

8    Q.    You're not aware of Joshua Clough detonating any explosives, are you?

9    A.    I am not aware, no.

10   Q.    You're aware that Mr. Clough has no prior criminal convictions?

11   A.    Correct.

12   Q.    As a matter of fact, you're not aware of any assault that he's committed against

13   a human being, are you?

14   A.    I am not aware of that, no.

15   Q.    Is it also correct that in a vast majority of these training days or training

16   sessions Mr. Clough operated the video camera that was recording these events?

17   A.    My understanding is he videotaped some of the trainings, but I'm not sure if he

18   did all of them.

19   Q.    Nothing further, Your Honor.  Thank you.

20         THE COURT:  Thank you.

21                      CROSS-EXAMINATION

22   BY MR. SATAWA:

23   Q.    Good afternoon, Agent Larsen.

24   A.    Good afternoon.

25   Q.    My name is Mark Satawa.  I represent Michael Meeks.  We've never met

1    before, have we?

2    A.      No.

3    Q.      Agent Larsen, you testified that you are the Case Agent in this case, is that

4    right?

5    A.      Correct.

6    Q.      The individual in charge of this investigation, the FBI Agent in charge of this

7    investigation?

8    A.      Yes.

9    Q.      And have been so for two years?

10   A.      Yes.

11   Q.      And in fact, is that the length of the investigation into these Defendants?

12           MR. WATERSTREET: Your Honor, what is --

13           MR. SATAWA: (Interjecting)  I'll ask the question this way then.

14   Q.      Has there ever been a Case Agent in charge of this investigation to your

15   knowledge other than you?

16   A.      There's a team of Agents that work on this investigation.  I'm just one of the

17   team, but I'm the team leader, if that makes sense.

18   Q.      Okay.  Have you been the leader during the entire investigation?

19   A.      Yes.

20   Q.      And could you tell us approximately what percentage of time during this

21   investigation you've had an Undercover involved in meeting with these individuals or

22   at least my client?

23           MR. WATERSTREET: Your Honor --

24           THE COURT: Sustained.

25   Q.      (By Mr. Satawa continuing) I believe that Mr.  Roberts just asked you who was

1    the Agent at the FBI directing the actions of the Undercover.  Was it you?

2                MR. WATERSTREET: Your Honor, objection.  What is the relevance of

3    who was the controlling agent for the FBI as to determination of whether they're a risk

4    of flight or danger to the community?

5                MR. SATAWA: Well, Your Honor, this individual doesn't seem to have a

6    real memory of just about anything she's asked that would possibly even help any of

7    the Defendants, so I'm just curious as to -- in fact, her own words were I was called in

8    at the last minute because we needed -- they needed a body so here I am.  So my

9    question to her is in response to many of the questions she's been asked, she has

10   said I'm not aware of that, I don't have knowledge of it, I don't have my notes, I

11   haven't reviewed that, I don't know.  My question to her is designed as an offer of

12   proof to elicit whether or not there's anyone that would know or in fact is she the

13   person best -- in the best position to give us that information.

14               MR. WATERSTREET: She's here with their request, Your Honor.  That's

15   the witness they sought to have come here.  She found out just a few hours before

16   she was to appear of the Court's Order.

17               THE COURT: No.  Well, if she just found out, that's the Government's

18   problem and not ours or not mine and not the Defendants because I did tell you, was

19   it Thursday or Friday?

20               MR. SATAWA: Thursday, Judge.

21               THE COURT: Thursday to be prepared with an Agent to testify.

22               MR. WATERSTREET: I apologize, Judge.  I was not here for that and

23   personally found out  --

24               THE COURT:  (Interjecting) Mr. Tukel was here.

25               MR. WATERSTREET:  I personally found out about the Order this

1    morning and immediately called.

2                THE COURT: I find that very hard to believe.  Mr. Tukel, you heard this

3    Court tell you to have an Agent here on Monday to testify.

4                MR. TUKEL: You did, Your Honor, and then we filed authorities and we

5    weren't sure that this proceeding was going forward because there were some

6    procedure issues that we raised.

7                THE COURT: Mr. Tukel, I think you know the rules not only that prevail

8    in this court, but in other courts.  Once a Court enters an Order, unless there's some

9    kind of stay of that Order, proceedings are going to move forward as that Order

10   suggests.  I asked for that authority.  I asked the Defendants to respond to it, but at no

11   time did I tell you to put a halt on having an Agent here to testify.

12               MR. TUKEL: I did not put a halt on anything, Your Honor.

13               THE COURT: Well, you didn't take steps to move this proceeding

14   forward in a meaningful way by having an Agent here with knowledge and I share the

15   frustration of the Defense team with all of the responses that are coming from this

16   witness that she doesn't know anything.

17               MR. TUKEL: To the extent that I'm responsible for that, I apologize.

18               THE COURT:  So Mr. Waterstreet, your objection is overruled and you

19   can answer the question.

20               MR. SATAWA: Thank you, Your Honor.  I think we'd all like an answer to

21   the question.

22               THE WITNESS: Can you ask it again please?

23   Q.      Sure.  Is there someone that you're aware of that would have more answers or

24   better answers than the ones you've been giving?

25   A.      The only other person would be the undercover agent.

1   Q.   You were the one directing that undercover agent?

2   A.   Not all of the time.

3   Q.   You were in charge of the team investigating these Defendants?

4   A.   Yes.

5   Q.   And the undercover agent was a part of the team investigating these

6   Defendants?

7   A.   Yes.

8   Q.   Your investigation of my client and the other Defendants went on for about two

9   years, according to your testimony.  I'm just curious.  During that two-year period, is

10   the FBI or yourself at least aware of any actual crimes -- any actual incidents of

11   violence perpetrated against any police officers?

12   A.   Pertaining to the nine Defendants?

13   Q.   Yes.

14   A.   No.

15   Q.   Against anyone at all?

16   A.   Of these nine Defendants?

17   Q.   Yes.

18   A.   No.

19   Q.   In fact, are you aware similar to the question you've been asked a few times as

20   to my client, Michael Meek's adoption of the idea of killing police officers other than

21   the proffer and the recordings that have been submitted to the Court either on March

22   27th or to today?

23   A.   Not other than the recordings.

24   Q.   This arrest on March 27th was based on a pretext.  In other words, individuals

25   were told this would be a memorial service for an individual that they knew, a friend of

1    their'?

2    A.      Yes.

3    Q.      And according to you or at least -- excuse me -- the Government, Mr. Meeks

4    has made a statement in the past that he wished to die by cop-a-cide?

5    A.      Yes.

6    Q.      In other words, he wanted to die because police officers shot and killed him so

7    he could be a martyr for this cause?

8    A.      According to the recording.

9    Q.      On March 27th when he went to this funeral memorial service, he was

10   arrested?

11   A.      Yes.

12   Q.      He was arrested by police officers or law enforcement officers?

13   A.      Yes.

14   Q.      He was arrested by over 30 Agents of the FBI?

15   A.      I don't know how many were there, but approximately.

16   Q.      Did he pull out a gun?

17   A.      No.

18   Q.      Did he say you're going to have to kill me?

19   A.      No.

20   Q.      Did he resist in any way?

21   A.      No.

22   Q.      Did he die by cop-a-cide?

23   A.      No.

24   Q.      Did he take any actions to suggest that the statement I want to die by

25   cop-a-cide was true in any way?

1    A.    No.

2    Q.    In fact, after his arrest he cooperated with the FBI, is that right?

3    A.    He gave a statement.

4    Q.    He waived Miranda?

5    A.    Yes.

6    Q.    He signed a Miranda waiver form?

7    A.    Yes.

8    Q.    And he talked to you?

9    A.    Yes.

10   Q.    After that you searched -- by the way, when my client was arrested he had no

11   firearm on his person?

12   A.    No.

13   Q.    And you searched his residence and the residence of his parents?

14   A.    Correct.

15   Q.    Were any bombs found?

16   A.    Not that I recall.

17   Q.    Any explosive devices?

18   A.    Not that I recall.

19   Q.    Any illegal guns?

20   A.    There were guns seized and again, I don't know if any of them are illegal until

21   they go to laboratory.

22   Q.    Do you have any information today that my client was in possession of illegal

23   guns?

24   A.    No, I do not.

25   Q.    Any unregistered guns?

1   A.      No.

2   Q.      Any automatic, fully automatic weapons?

3   A.      Again, I don't know if they're fully automatically entitle they go back to the lab.

4   As of right now, no.

5   Q.      Again, as questioned by Mr. Swor, the only bomb or explosive device that you

6   are aware of in connection to my client was made and manufactured by an FBI

7   undercover agent?

8   A.      Correct.

9   Q.      No further questions, Your Honor.  Thank you.

10          THE COURT: Mr. Seikaly.

11                      **CROSS-EXAMINATION**

12  **BY MR. SEIKALY:**

13  Q.      Agent Larsen, my name is Christopher Seikaly.  I represent Jacob Ward.

14  We've never met before, have we?

15  A.      No.

16  Q.      Now Mr. Ward was arrested in Huron, Ohio at his mother's home?

17  A.      Yes.

18  Q.      Were you present?

19  A.      No.

20  Q.      Have you any information whatsoever as to whether he -- he gave no

21  resistance, correct?

22  A.      No.

23  Q.      He was asked by the police, whoever were there, FBI Agents or whoever to

24  walk back -- come out of the house and walk backwards toward them?

25  A.      I don't know what the commands were.  I wasn't present, but there was no

1   resistance.

2   Q.   And they searched that house?

3   A.   Yes.

4   Q.   You're aware that that's his mother's house?

5   A.   Yes.

6   Q.   You're aware that his mother is a Corrections Officer for the State of Ohio?

7   A.   Yes.

8   Q.   When you searched that house, did you find any weapons?

9   A.   No.

10   Q.   Did you find any bombs?

11   A.   No.

12   Q.   Bomb-making material?

13   A.   No.

14   Q.   Any illegal substances?

15   A.   No.

16   Q.   Anything that would have been illegal at all?

17   A.   I don't believe so.

18   Q.   You're aware of the fact that he's a pizza delivery person in Huron, Ohio for

19   Domino's Pizza?

20   A.   At one point and time I believe he was.

21   Q.   He's 33 years of age?

22   A.   Yes.

23   Q.   Do you have any information whatsoever that he possessed at any time any

24   bombs?

25   A.   I do not have any information on that.

1    Q.    That he possessed any IEDs?

2    A.    No.

3    Q.    That he possessed any type of explosive devices whatsoever?

4    A.    No.

5    Q.    That he gave instruction on how to prepare, build, make explosive devices?

6    A.    No.

7    Q.    He was not on this trip to Kentucky, was he?

8    A.    No, he was not.

9    Q.    So he didn't hear the -- for lack of a better word I think somebody called it

10   manifesto or speech that Mr. Stone gave?

11   A.    Correct.

12   Q.    Are you aware of any other time that he might have heard that?

13   A.    That specific speech?

14   Q.    Yes.

15   A.    I'm not aware.

16   Q.    Is there any reason why he could not, if he did possess a gun, possess a gun?

17   A.    No.

18   Q.    He's not a convicted felon?

19   A.    He's not.

20   Q.    Did you confiscate his mother's computer?

21   A.    I do not -- I don't know if we did or not.  I'd have to go back and look at the

22   tabulation on that.

23   Q.    If it was confiscated, you're not aware of any improper things on that

24   computer?

25   A.    I am not, no.

1    Q.      Thank you.

2            MR. WATERSTREET:  Your Honor, before we move on, I haven't done

3    any Redirect of the witness or Cross actually that I would normally do of the witness,

4    but as to Mr. Seikaly's client, may I ask one?

5            THE COURT: Is that the only Redirect or examination you see yourself

6    engaging in?

7            MR. WATERSTREET: As to what has been proffered?

8            THE COURT: As to all of them?

9            MR. WATERSTREET: Questions for this witness, yes.

10           THE COURT: Why don't you wait?

11           MR. WATERSTREET: It was just the timing of the series of questions.

12           THE COURT: All right.  Go head.

13                              **EXAMINATION**

14   **BY MR. WATERSTREET:**

15   Q.       I believe Mr. Seikaly asked you questions concerning firearms possessed by

16   Mr. Ward.  Do you remember those series of questions?

17   A.      Yes.

18   Q.      Did there come a point and time to your knowledge that Mr. Ward's firearms

19   were taken away by somebody?

20   A.      Yes.

21   Q.      By whom?

22   A.      His mother.

23   Q.      Why?

24   A.      She felt that Mr. Ward was mentally unstable and felt that it best that she

25   confiscate those weapons away from him.

1       Q.      Thank you.

2               THE COURT: Thank you.  Anything further?

3                           **RECROSS-EXAMINATION**

4       **BY MR. SEIKALY:**

5       Q.      Do you know when that occurred?

6       A.      I don't know exactly.  I think it was July, 2009.

7       Q.      Back in July?

8       A.      Yes.

9       Q.      So he didn't have any weapons during the -- this August 15th, 27th, '09, the

10      wedding on December 12th of  '09, this training that occurred on February 20th?  He

11      had no weapons in his possession, correct?

12      A.      My understanding is that he would travel to the Hutaree training area in Clayton

13      or not for the wedding, but for the Hutaree trainings and would receive weapons once

14      he got to David Stone's trailer.

15      Q.      He didn't have any weapons of his own?

16      A.      Yes.

17      Q.      He would utilize someone else's?

18      A.      Yes.

19      Q.      Somebody would loan him a gun?

20      A.      Yes, but he did not come with any.

21      Q.      Do you know how this confiscation of his weapons took place?

22      A.      I don't know.  No, I'm sorry.  I know that his mother took them and gave them

23      to a family member and then when she was interviewed, the family member dropped

24      the guns off where the Agents were interviewing the mother and Agents took

25      possession of those firearms.

1    Q.      What are they?

2    A.      I believe one is a handgun and I'm not sure what the other one is.  I think

3    there's two or three.

4    Q.      Thank you.

5              THE COURT: Thank you.  Mr. Scharg.

6                              **CROSS-EXAMINATION**

7    **BY MR. SCHARG:**

8    Q.      Thank you.  Good afternoon, Agent Larsen.

9    A.      Good afternoon.

10   Q.      I represent Kristopher Sickles.  I have some questions for you.  This has been

11   an ongoing investigation for approximately two years, is that correct?

12   A.      Yes.

13   Q.      Into the Hutaree militia?

14   A.      Correct.

15   Q.      When did Kris Sickles first get on the radar or identified as participating in this

16   militia training?

17   A.      We started the investigation in the end of 2008 and I believe it was at that time.

18   Q.      Is it fair to say that over the period of two years there were a number of

19   meetings and training sessions?

20   A.      Yes.

21   Q.      And from the information we got from the Government at the initial Detention

22   Hearing, Mr. Sickles was only identified in the meeting session trainings on

23   September 27th, 2008, August 22nd, 2009, November 7, 2009, January 9, 2010 and

24   February 20, 2010.  Is it fair to say that Mr. Sickles was not a participant or not -- not

25   present at a number of the meetings or training sessions?

1    A.    Yes.

2    Q.    Mr. Sickles was not present at the training session or meeting when the

3    explosives devices were demonstrated, is that correct?

4    A.    I don't recall on that.  I'm sorry.

5    Q.    He was not present at the Kentucky summit?

6    A.    Correct.

7    Q.    He was not present at the wedding?

8    A.    Which wedding? There were two weddings.

9    Q.    Was he present at either wedding?

10   A.    I don't believe he was present at either wedding.

11   Q.    And he was not present during this memorial service?

12   A.    No.

13   Q.    On March 27th?

14   A.    Correct.

15   Q.    In fact, Mr. Sickles was arrested at his home in Sandusky, Ohio, is that

16   correct?

17   A.    Yes.

18   Q.    On the same day?

19   A.    Correct.

20   Q.    Mr. Sickles, from the information that you had received and the information that

21   you had in the surveillance and investigation, Mr. Sickles was 27 years old?

22   A.    Yes.

23   Q.    And he lived in northwest Ohio for most of his life?

24   A.    Right.

25   Q.    He actually -- you had information that he had moved to Seattle, Washington

1    for a short period of time?

2    A.    Yes.

3    Q.    But then he returned to raise his family in the Sandusky/Huron area, is that

4    correct?

5    A.    That's correct.

6    Q.    When he was taken into custody, he was home with his two minor children,

7    four years old and approximately seven months old?

8    A.    Yes.

9    Q.    And there was -- he surrendered without incident?

10   A.    Yes.

11   Q.    And in fact, there was a cache of weapons and ammunition and other military

12   items at the house, is that correct?

13   A.    Correct.

14   Q.    None of them were illegal?

15   A.    I don't know if they are or not.  Not to my knowledge at this point.

16   Q.    At the present time as we are here today and as you're testifying, you do not

17   know of any illegal ammunition or armament that he had in his home?

18   A.    Correct.

19   Q.    You agree with me that there was a substantial amount of weapons and

20   ammunition, but as you testified here today, there is -- you have no evidence that

21   there was any illegal weapons or ammunition, is that correct?

22   A.    Correct.

23   Q.    Just addressing some of the issues that were raised at the initial Detention

24   Hearing in front of Judge Sheer, the Government argued that Mr. Sickles was the

25   self-proclaimed leader of the Ohio militia?

1   A.   Yes.

2   Q.   Is it fair to say that there is one member of the Ohio militia as far as you know

3   and it was Mr. Sickles?

4   A.   I think there were two.

5   Q.   Oh, I'm sorry.  It was twice as many?

6   A.   Correct.

7   Q.   The Ohio militia, being the self-proclaimed leader of the Ohio militia, there were

8   two members of that militia?

9   A.   Yes.

10  Q.   Mr. Sickles was one of them?

11  A.   Correct.

12  Q.   Mr. Sickles had called for a million man armed march on Washington?

13  A.   Yes.

14  Q.   To -- in terms of the Second Amendment right to bear arms, is that correct?

15  A.   Yes.

16  Q.   And there was no march?

17  A.   No march.

18  Q.   Didn't get off the ground, did it?

19  A.   No.

20  Q.   Not even the two militia members from Ohio made it to that million man march?

21  A.   Not that I'm aware of.

22  Q.   Okay.  We talked about his weapons, but he also had a CCW permit at the

23  time?

24  A.   Yes.

25  Q.   At that time?

1    A.    Correct.

2    Q.    All of the arms, meaning all of the weapons in his possession at that time were

3    confiscated and seized by the Government, is that correct?

4    A.    Yes.

5    Q.    Any ammunition, any weapons, they were all seized, is that correct?

6    A.    Yes, anything that was present.

7    Q.    You're not aware of any other armament or weapons that he had in his

8    possession or that he has control over?

9    A.    No.

10    Q.    So if he was released on bond, there's no indication that he has either

11    possession or control of any weapons out on the street, is that correct?

12    A.    Correct.

13    Q.    And in fact, Ohio has been contacted.  Has there been any proceedings to

14    rescind his CCW permit?

15    A.    I'm not aware of any.

16    Q.    And you're aware of the fact that a CCW permit can be rescinded or negated

17    by simply contacting the Ohio authorities, is that correct?

18    A.    Yes.  I'm not aware that we've done that.

19    Q.    Now in terms of his residence outside of the state of Michigan, would you

20    agree with me that Sandusky or Huron Township, Huron, Ohio are closer to the

21    Michigan border than a lot of areas of Michigan are to southeast Michigan?

22    A.    Yes.

23    Q.    Let me put it this way.  Sandusky, Ohio, Huron, you're about an hour from the

24    Michigan border?

25    A.    Roughly.

1    Q.    A lot closer than Marquette, Michigan?

2    A.    Yes.

3    Q.    Is that correct?

4    A.    Correct.

5    Q.    So when the Government indicates that he lives outside the Eastern District of

6    Michigan, he lives in very close proximity, is that correct?

7    A.    To the Eastern District, yes.

8    Q.    He, meaning Mr. Sickles, has one prior misdemeanor conviction?

9    A.    Correct.

10   Q.    From your information, and there's no evidence in terms of your investigation of

11   any Capias history, any evidence of flight, risk of flight, is there in his history?

12   A.    Not that I'm aware of.

13   Q.    Okay.  The Government proffer indicated that on February 20 of 2010 he

14   desired a  -- he mentioned a desire to act as a martyr or martyrdom.  Are you aware

15   of that?

16   A.    Yes.

17   Q.    That's based upon this transcript, this tape that we heard today, is that correct?

18   A.    Correct.

19   Q.    It was in the context of that conversation?

20   A.    Yes.

21   Q.    You're not aware of any background or experience or training he had in

22   explosive devices, do you?

23   A.    No.

24   Q.    You're not aware of any assaultive behavior towards police officers, are you?

25   A.    I am not, no.

1    Q.    In fact, did you or are you aware of law enforcement contacting Huron, Ohio

2    police authorities and being informed that they did not believe that Kristopher Sickles

3    was a threat to them?

4    A.    I'm not aware of that.

5    Q.    You didn't read any newspaper articles or quoting of the police officer down

6    there?

7    A.    No.

8    Q.    Do you know of any attempts by your Bureau or by any law enforcement to

9    contact law enforcement in Huron to determine their perception of any threats that Mr.

10   Sickles would present to them?

11   A.    Mr. Sickles' investigation was run out of our Toledo Office, so I do believe that

12   the Toledo Office was in contact with Huron Police Department, but I don't know the

13   context of that conversation.

14   Q.    But you're not aware of any information that Toledo, Ohio Office received that

15   Mr. Sickles would be a threat to local law enforcement?

16   A.    Correct.

17   Q.    This one incident regarding this cat.  Do you have any information when

18   supposedly -- when this cat was killed?

19   A.    My understanding is the cat was killed approximately 10 years ago by Mr.

20   Sickles.

21   Q.    Ten years ago.  Thank you.  I have no further questions.

22          MR. WEISS:  Your Honor, if I could just ask the Court a question.  My

23   client is a little bit differently situated, Mr. Piatek, because he had a detention hearing

24   in Indiana.  With the Court's permission, I'd like to incorporate the witnesses that were

25   presented on his behalf and simply by examining the Agents, supplement that record.

THE COURT: That's fine.

MR. WEISS:  Thank you.

**CROSS-EXAMINATION**

**BY MR. WEISS:**

Q.     Good afternoon, Agent.

A.     Good afternoon.

Q.     I'm name is Art Weiss and I represent Mr. Piatek.  You were present during the proffer that Mr. Waterstreet made this afternoon, correct?

A.     Yes.  Correct.

Q.     And he mentioned that there was a meeting or some emails transpired around on or about December, 2008 pertaining to someone who had a Federal firearms license?

A.     Yes.

Q.     And there was some talk about he had a relative that was incarcerated?

A.     Yes.  The FFL had a relative?  Yes.

Q.     Yes.  And there was an allegation about members of Hutaree talking to him about getting that relative out of custody?

A.     Yes.

Q.     To your knowledge, did Mr. Piatek have any involvement in those emails or those conversations?

A.     No.

Q.     Mr. Waterstreet also indicated that on or about November 15th, 2008 there was an Internet radio broadcast.  Do you recall that?

A.     Yes.

Q.     Again, was Mr. Piatek on that Internet radio broadcast?

1 A. I haven't reviewed it, but I do not believe so.

2 Q. Okay.  Now he also indicated that there was a training session on or about

3 June 13, 2009.

4 A. Yes.

5 Q. What did that training session consist of, ma'am?

6 A. The training session consisted of -- I believe there was a meeting where

7 everyone just kind of congregates together and they split up into different patrol

8 groups, went out into the wooded area and there were several IED demonstrations

9 that occurred on that day.

10 Q. Now when you say there were several IED demonstrations, did that pertain to

11 all of the patrol groups?

12 A. I don't know.

13 Q. Do you know which patrol group Mr. Piatek was in?

14 A. No, I'm sorry I don't; not for that day.

15 Q. What demonstrations did he participate in regarding IEDs on or about June 13,

16 2009?

17 A. I don't know.

18 Q. Then Mr. Waterstreet indicated that there was a barbecue on or about July 25,

19 2009?

20 A. Yes.

21 Q. What transpired at that barbecue besides the obvious?

22 A. Conversation, food, the normal things that happen at a barbecue.  There was

23 some anti-government talk.  I haven't reviewed the entire transcript.

24 Q. What is it that Mr. Piatek said on or about July 25th, 2009 that was

25 anti-government in nature?

1    A.    I'd have to go back and review that.

2    Q.    At this juncture can you point to anything that he said that day that is

3    anti-government in nature?

4    A.    No.

5    Q.    Or that he heard that day that was anti-government in nature?

6    A.    I can't point to anything specifically.

7    Q.    Thank you.  Now Mr. Waterstreet also indicated that on or about August 22nd,

8    2009 there was another training session?

9    A.    Yes.

10              THE COURT:  What is your date?

11              MR. WEISS: August 22nd, 2009, Your Honor.

12              THE COURT: Thank you.

13   Q.    (By Mr. Weiss continuing)  And I believe there's testimony that that's when that

14   group photo was taken, the class photo?

15   A.    Yes.

16   Q.    What did that training session consist of?

17   A.    I think that was again another patrol exercise in the woods and gathering of

18   people before and after the patrol.

19   Q.    And what did Mr. Piatek do on or about August 22nd, 2009 during this patrol in

20   the woods?

21   A.    Patrolled in the woods.  I don't know what his exact actions were that day.

22   Q.    What about the people that he patrolled -- one question at a time.  I apologize.

23   Who did he patrol with that day?

24   A.    I don't know.

25   Q.    So you don't know what he did or what the people that he patrolled with did on

1    or about August 22nd, 2009, correct?

2    A.    I know that they patrolled in the woods, but I don't know their specific actions.

3    Q.    Then there was another training session on or about November 7, 2009?

4    A.    Correct.

5    Q.    What did Mr. Piatek do on or about November 7, 2009 at this training session?

6    A.    I believe that November 7th training session took place not at the Tomer Road

7    residence; it was at a different location in North Adams Township, Michigan and I

8    believe that that also was another training exercise.  At that location several holes

9    were dug as part of their fortification efforts.  I do not have any direct knowledge on if

10   Mr. Piatek dug any of those holes.

11   Q.    Was he present when any of the holes were dug?

12   A.    I don't know specifically if he saw the holes being dug or not.

13   Q.    Again, they broke up into groups?

14   A.    Yes.

15   Q.    Different groups did different things?

16   A.    Yes.

17   Q.    We don't know who was in Mr. Piatek's group?

18   A.    Correct.

19   Q.    And we don't know what Mr. Piatek's group did?

20   A.    Correct.

21   Q.    There's been talk about two weddings.  Did I understand that correctly?

22   A.    That is correct.

23   Q.    One was on or about December of 2009?

24   A.    The 12th.

25   Q.    December 12th, 2009 and whose wedding was that?

1   A.   David Stone Sr. and Tina Stone.

2   Q.   Was Mr. Piatek present?

3   A.   I don't think so.

4   Q.   And when was the second wedding?

5   A.   March 13th.

6   Q.   Of this year?

7   A.   2010.

8   Q.   Whose wedding was that?

9   A.   Josh Stone.

10   Q.   And again, Mr. Piatek was not present?

11   A.   No.

12   Q.   January 20th, 2010 Mr. Waterstreet indicated that there was an email sent from

13   Mr. Stone?  Did I understand that correctly?

14   A.   I think that might be the right date.

15   Q.   And that email, as I understand it, consisted of diagrams that were taken from

16   a publication?

17   A.   Yes.

18   Q.   That had -- the origin of that publication had nothing to do with Hutaree,

19   correct?

20   A.   Correct.

21   Q.   It was just information out there?

22   A.   Yep, publicly available.

23   Q.   Who was that email sent to?

24   A.   To the undercover agent.

25   Q.   To your knowledge it was not sent to Mr. Piatek, was it?

1    A.    It was not.

2    Q.    Thank you. Have you interviewed all of the members of Hutaree?

3    A.    I have not personally.

4    Q.    Have your fellow Agents interviewed all of them?

5    A.    All of the nine Defendants.

6    Q.    What about the other 25 plus or minus that are not in the courtroom today?

7    A.    No.

8    Q.    So we don't know what portions of the Hutaree dogma they adopt and they

9    don't adopt, correct?

10   A.    Correct.

11   Q.    We don't know what they knew and what they didn't know?

12   A.    Correct.

13   Q.    Did any or all of those 25 individuals participate in the various training

14   sessions?

15   A.    Some did.  Some correspondence was over email, phone.

16   Q.    For example, the training session that occurred on or about June 13th, 2009,

17   did any of those 25 not indicted individuals attend and participate?

18   A.    Yes, I believe so.

19   Q.    Did any or all of those 25 unindicted individuals appear at the July 25th, 2009

20   barbecue?

21   A.    I'd have to go back and check, but I believe so.

22   Q.    Did any or all of those 25 unindicted individuals participate --

23             MR. WATERSTREET:  (Interjecting) Your Honor, if I may, what is the

24   relevance of unindicted --

25             MR. WEISS:  Your Honor, I would assume the fact that they're

1    unindicted means that the Government didn't have evidence to believe they engaged

2    in criminal activity and it was my understanding and obviously if the Court corrects me

3    I'll apologize, that one of the purposes of asking the Agent to be here today was to

4    determine the weight of the evidence, and my impression was from Mr. Waterstreet's

5    proffer that simply participating in these various training sessions is indicia of guilt

6    sufficient to warrant my client's pretrial detention. I'm just trying to flush out to see

7    whether or not there were similarly-situated individuals who attended these various

8    training sessions who aren't even under Indictment, let alone under pretrial detention.

9           MR. SWOR: In addition, Your Honor, the Government has suggested

10   that -- has suggested that all of these nonindicted individuals might be available to

11   assist any one of the Defendants in escape or flight or hiding from the Government.

12   So I think Mr. Weiss's question is appropriate.

13          MR. WATERSTREET: As to this Agent's ability to decide who should be

14   brought -- who charges should be brought against, what the Grand Jury thought was

15   sufficient, I don't think it's --

16          MR. WEISS: That wasn't my question.

17          THE COURT: I understand your question and I understand your reason

18   for asking it.  I believe it is a question that is pertinent to the weight of the evidence

19   and the objection is overruled.

20          MR. WEISS: Thank you very much, Your Honor.  Do you want the

21   question repeated, ma'am?

22          THE WITNESS:  Please.

23   Q.     (By Mr. Weiss continuing) I believe I was asking you whether or not any or all

24   of the 25 unindicted Hutaree members were present at the August 22nd, 2009 training

25   session?

1    A.      I think so.  I have to go back and check my notes, but I do believe there were

2    individuals there.

3    Q.      To your knowledge, were any or all of the 25 unindicted Hutaree members

4    present at the November 7th, 2009 training session?

5    A.      Yes.

6    Q.      Thank you.  Could I just have a moment, Your Honor?

7            THE COURT: Yes.

8            MR. WEISS: Nothing else.  Thank you, Your Honor.

9            THE COURT: Thank you.  Any examination of this witness by the

10   Government?

11           MR. WATERSTREET: We have no questions, Your Honor.

12           THE COURT: No questions.  All right.  Agent Larsen, you can stand

13   down.  Thank you.

14       Let me just inquire because we're going to bring this to conclusion.  Are there

15   any other Defense witnesses?

16           MR. HELFRICK: Your Honor, as I indicated last week at our meeting, I

17   submitted some letters to the Court for consideration.  All of those individuals who

18   wrote letters are present in court.  I don't intend to call them, but if the Court has

19   questions for them or if Mr. Waterstreet has questions for them they're here and

20   they're available, but I didn't intend to call them as witnesses.

21           THE COURT: Thank you.  Anyone else?

22           MR. RATAJ:  Your Honor, Mike Rataj on behalf of Tina Mae Stone.  Her

23   father who was interviewed by Pretrial Services prior to our Detention Hearing in front

24   of Magistrate Judge Sheer is also here.  Mom and Dad both are here.  They both

25   agree to act as third-party custodians.  I don't propose to put them on the witness

1   stand, but if Your Honor or the Government wishes to ask them any questions, they're

2   here.

3                    THE COURT: Thank you.  Mr.  Thomas.

4                    MR. THOMAS: I had spoken to you about a letter I was going to get

5   from my client's wife.  I got it faxed to me on Monday.  I have the original now.  I only

6   had the fax.  I'd like to proffer it to the Court.

7                    THE COURT: Thank you.  And her name is?

8                    MR. THOMAS: Judge, it's a three-page letter.  It's from his wife,

9   Shannon Stone, and I would indicate to the Court that she's here and supports that

10   letter and if she were asked to be questioned about it, that she's available to do that.

11                   THE COURT: Thank you.  Mr. Rataj, what is your client's father's name

12   please?

13                   MR. RATAJ: It's Timothy Kelly and Henrietta Kelly.

14                   THE COURT: Thank you.  And Mr. Helfrick, the letters you have please

15   identify who they're from.

16                   MR. HELFRICK: Yes. One is from his fiancee -- Brittany Bryant, his

17   fiance.  The second is from her father, Kevin Bryant and the last one is from Mr. &

18   Mrs. Claude Vandavender (phonetic).

19                   THE COURT: Thank you.  Any other information, Mr. Satawa?

20                   MR. SATAWA:  Good afternoon, Your Honor.  Likewise on behalf of Mr.

21   Meeks, Your Honor, my client's two parents are in the courtroom who are willing to

22   serve as custodians of Mr. Meeks.  And Your Honor, just as importantly, my client's

23   employer, Matthew Anderson, wrote a --

24                   THE COURT:  Excuse me.  Mr.  Weiss, who is your client?  Mr.  Piatek,

25   you're distracting me.

1            MR. WEISS: I apologize, Your Honor.

2            THE COURT:   Thank you.  You were saying what, Mr. Satawa?

3            MR. SATAWA:  Your Honor, my client's parents are present in the

4    courtroom and are willing to serve as third-party custodians of my client, Mr. Meeks.

5    They are available in the courtroom.  I do not intend on calling them.  However, if the

6    Court or the Government wishes to ask them questions, they are available.  Their

7    names are Eurgen and Sylvia Meeks.

8            THE COURT: Give me the spelling.

9            MR. SATAWA:  E-u-r-g-e-n and Sylvia Meeks, Your Honor.  Also my

10   client's employer, Matthew Anderson, wrote a letter of support of my client which was

11   submitted at the Detention Hearing last month in front of Judge Sheer.  I know it's part

12   of the record that the Court has reviewed, but Mr. Anderson is also likewise in the

13   courtroom today and available for questioning if necessary by either the Government

14   or this Court.

15           THE COURT: Thank you.  Anyone else?  Mr. Roberts.

16           MR. ROBERTS: Thank you very much.  I intend on calling no further

17   witnesses, but we also have the parents of -- both parents of Mr. Joshua Clough here

18   and available and that's Charlotte and William Clough, but I was not going to call

19   them.  Just they're here just like everybody else's parents.

20           MR. SCHARG: On behalf of Mr. Sickles, Your Honor, his mother Pam

21   Romick and Kelly Sickles, both of the Sandusky, Ohio area.  They are referenced in

22   the Pretrial Services Report and both have agreed to act as third-party custodians.

23   As I proffered to you -- well, at -- proffered before and developed during

24   Cross-examination of the Case Agent, Mr. Sickles was residing in a home with his

25   wife, Kelly and two minor children who are four years old and one years old.  His wife,

1    Kelly works outside the home and I would ask the Court consider home detention for

2    Mr. Sickles with tether or GPS which would allow his wife to work and he would

3    remain home providing daycare services for his two minor children.

4              THE COURT:  Mr. Swor.

5              MR. SWOR: Your Honor --

6              THE COURT: I really just wanted -- I do have time set aside tomorrow.

7    My question was if anyone had any other witnesses.   I'm hearing proffers only.  No

8    one else has any other witnesses, is that true?

9              MR. SWOR: That is correct, Your Honor.  And I just as I indicated to the

10   Court last week, I have Mr. Stone's father, Ray Stone here.  He is prepared to be

11   examined by the Court should the Court wish and his mother, Ada Thornton who does

12   not live with his father, and is not here and for the record both of them have indicated

13   their willingness to act as third-party custodians.  If you want to hear my proffer, fine.

14   If not, we'll wait 'til tomorrow.

15             THE COURT: Thank you.

16             MR. SATAWA:  I'm sorry.  Just to clarify the record, I was right the first

17   time.  I couldn't read my own sloppy notes taken.  It's actually Eugene, my client's

18   father.  So to the extent the Court wants to consider the third-party custodian,  I think

19   it's important for the Court to have the right name of the father.

20             THE COURT: Thank you.  Anyone else?  Mr. Waterstreet, is there

21   anything else that you want to direct the Court's attention to?

22             MR. WATERSTREET: Well, Your Honor, if these people are going to be

23   proffered, I would like to have an opportunity to hear from them and question them

24   and then I might have some rebuttal.

25             THE COURT: So are you saying you want to put them on the witness

1   stand?

2             MR. WATERSTREET: If I could, yes, Your Honor.  I would like to do

3   that.

4             THE COURT: The Court has set aside 1:30 tomorrow to resume.  I think

5   it was cleared.  Does that work for everyone?

6             MR. WEISS: I have  a  matter in State court.  If I have a problem with the

7   State Judge may I direct that staff to Your Honor's staff?

8             THE COURT: Yes. Didn't Carol clear the time tomorrow with you?

9             THE CLERK OF THE COURT: I put it on our calendar.  We do have the

10  morning as well.

11            THE COURT:  But not on their calendar?

12            MR. SATAWA: I'll try to resolve my situation in the morning.

13            MR. THOMAS: I have a sentencing in Grand Rapids on a case that's

14  been adjourned three times.

15            THE COURT: Does tomorrow morning work for everyone?

16            MR. SEIKALY:  I have three different district courts to be at.

17            THE COURT: I need to take a moment then.

18            **(Proceedings adjourned at about 5:02 p.m.)**

19                         -  -  -

20

21                **COURT REPORTER'S CERTIFICATION**

22

23

24  STATE OF MICHIGAN)

25                   )  SS.

JANICE COLEMAN, CSR/RPR
OFFICIAL FEDERAL COURT REPORTER
(313) 964-5066

1    COUNTY OF WAYNE  )

2

3

4    I,  Janice Coleman,  Official Court Reporter, certify that the

5    foregoing pages are a correct transcript from the record of

6    proceedings taken by me to the best of my ability in the

7    above-entitled matter.

8

9

10                        S/_____

11                         JANICE COLEMAN, CSR 1095/RPR

12

13

14

15   DATED:  May 10, 2010

16

17

18

19

20

21

22

23

24

25