1              UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF MICHIGAN

3                  SOUTHERN DIVISION

4

5

6    UNITED STATES OF AMERICA,

7                  Plaintiff,          Case No.  10-20123

8         -vs-

9

10   D-1, DAVID BRIAN STONE, SR.

11   D-2, DAVID BRIAN STONE, JR.        Detroit, Michigan

12   D-3, JOSHUA MATTHEW STONE,         April 28, 2010

13   D-4, TINA MAE STONE,

14   D-5, JOSHUA JOHN CLOUGH,

15   D-6, MICHAEL DAVID MEEKS,

16   D-7, THOMAS WILLIAM PIATEK,

17   D-8, KRISTOPHER T. SICKLES,

18   D-9, JACOB J. WARD,

19                  Defendants.

20   ----------------------------/

21

22         TRANSCRIPT OF BOND REVIEW HEARING - VOL 2

23         BEFORE THE HONORABLE VICTORIA A. ROBERTS

24            UNITED STATES DISTRICT COURT JUDGE

25

<u>**APPEARANCES:**</u>

For the Government:              RONALD W. WATERSTREET, ESQ.

                                JONATHAN TUKEL, ESQ.

                                Asst. U.S. Attorneys


For the Defendants:             WILLIAM W. SWOR, ESQ.

                                RICHARD HELFRICK, ESQ.

                                TODD SHAUKER, ESQ.

                                JAMES C. THOMAS, ESQ.

                                MICHAEL A. RATAJ, ESQ.

                                RANDALL ROBERTS, ESQ.

                                MARK SATAWA, ESQ.

                                ARTHUR J. WEISS, ESQ.

                                HENRY M. SCHARG, ESQ.

                                CHRISTOPHER M. SEIKALY, ESQ.

Proceedings taken by mechanical stenography, transcript

produced by computer-aided transcription

1                          **T A B L E   O F   C O N T E N T S**

2

3       **WITNESSES:**                                              **PAGE**

4       **RAY STONE (Defense)**

5              Cross-Examination by Mr. Waterstreet     14

6              Direct-Examination by Mr. Swor           25

7       **KEVIN RAY BRYANT (Defense)**

8              Cross-Examination by Mr. Waterstreet     27

9       **DONNA POPEJOY (Defense)**

10             Cross-Examination by Mr. Waterstreet     32

11      **TIMOTHY M. KELLY (Defense)**

12             Cross-Examination by Mr. Waterstreet     40

13      **WILLIAM CLOUGH (Defense)**

14             Cross-Examination by Mr. Waterstreet     45

15             Direct-Examination by Mr. Roberts        46

16      **SYLVIA MEEKS (Defense)**

17             Cross-Examination by Mr. Waterstreet     51

18             Direct-Examination by Mr. Satawa         57

19      **NADEEN BOBER (Defense)**

20             Cross-Examination by Mr. Waterstreet     58

21             Direct-Examination by Mr. Seikaly        63

22      **BRIAN LEUTTKE (Government Rebuttal)**

23             Direct-Examination by Mr. Waterstreet    68

24                          **E X H I B I T S**

25      None.

1            **Detroit, Michigan**

2            **Wednesday, April 28, 2010**

3            **(At about 1:50 p.m.)**

4                    **- - -**

5            **(Call to Order of the Court)**

6            THE CLERK OF THE COURT: Court calls case number 10-20123, the

7    United States of America versus David Brian Stone, David Brian Stone, Jr., Joshua

8    Matthew Stone, Tina Mae Stone, Joshua John Clough, Michael David Meeks,

9    Thomas William Piatek, Kristopher T. Sickles and Jacob J. Ward.

10           MR. WATERSTREET:  Ronald Waterstreet appearing on behalf of the

11   United States.

12           MR. TUKEL:  May it please the Court, Jonathan Tukel on behalf of the

13   United States.

14           THE COURT: Good afternoon.

15           MR. WATERSTREET:  Good afternoon.

16           MR. SWOR: William Swor on behalf of David Brian Stone.

17           MR. HELFRICK: Richard Helfrick and Todd Shauker of the Federal

18   Defender Office on behalf of David Stone, Jr.

19           MR. THOMAS: James Thomas and Michael Naughton on behalf of

20   Joshua Stone.

21           MR. RATAJ:  Good afternoon, Your Honor.  Mike Rataj on behalf of Tina

22   Mae Stone.

23           MR. ROBERTS: Your Honor, if it please the Court, my name is Randall

24   Roberts.  I appear on behalf of Joshua Clough.

25           MR. SATAWA: Good afternoon, Your Honor.  If it please this Honorable

1    Court, Mark Satawa appearing on behalf of Michael Meeks.

2                    MR. SEIKALY: Good afternoon, Your Honor.  Christopher Seikaly and I

3    appear on behalf of Jacob Ward.

4                    MR. SCHARG: Good afternoon.  Henry Scharg on behalf of Kristopher

5    Sickles.

6                    MR. WEISS: Good afternoon, Your Honor.  May it please the Court,

7    Arthur Weiss on behalf of Mr. Piatek.

8                    THE COURT: Thank you.  Good afternoon, everyone.  This is the

9    continuation of a hearing to review the bond detention orders that were put in place by

10   Magistrate Judge Sheer.

11           When we ended yesterday, all of the -- most of the Defendants said that they

12   didn't have any other witnesses to offer, but they did have information pertinent to the

13   background of their clients and many were offering third-party custodians and I

14   believe Mr. Waterstreet said he wanted to put some of these people on the witness

15   stand.  Does that continue to be true, Mr. Waterstreet?

16                   MR. WATERSTREET: Yes, Your Honor.

17                   THE COURT: Thank you.  Mr. Swor?

18                   MR. SWOR: Thank you, Your Honor.  Your Honor, on behalf of David

19   Brian Stone, we will proceed by proffer and as I proffered yesterday, Mr. Ray Stone,

20   my client's father is in the courtroom.  He is willing to be the eyes and ears of the

21   Court and act as a third-party custodian.  Additionally, my client's brother, Ron Stone,

22   who could not be here because of work has offered to act as third-party custodian, as

23   is his mother,  Edith Horton, who could not be here today because of illness.

24           I have given their information to Pretrial Services and as I understand it,

25   Pretrial Services has contacted both -- well, actually I took Mr. Ray Stone upstairs to

1    Pretrial Services and Pretrial Services contacted Mr.  Ron Stone and discussed with

2    them their ability and willingness to act as third-party custodians and I believe they

3    have -- Pretrial Services has made a report to the Court.  I would indicate I have not

4    seen that portion of the report.

5           We rely on the portion of the Pretrial Services Report that indicates that Pretrial

6    Services finds that Mr. Stone is not a risk of flight and *United States versus O'Brien*,

7    895 F.2d  810 indicates that the Pretrial Services Report is sufficient to rebut the

8    presumption that my client is a risk of flight and --

9           THE COURT: One moment, Mr. Swor.  Thank you, Mr. Swor.

10          MR. SWOR: That same holds true for *US versus Abad*, 350 F.3d 793

11   which is an 8th Circuit Opinion.

12          With regard to the presumption that because -- and again, Pretrial Services

13   indicates that it's recommending detention based on a danger to the community solely

14   upon the charges and I would note for the Court that the report, that Pretrial Services

15   hedges that by simply saying they may be a risk of flight.  The -- or that he may be a

16   risk to the community.  By proffer of fact --

17          THE COURT: Mr. Swor, may I stop you because I'm trying to think

18   about how this afternoon is going to unfold?  What you are saying to the Court I think

19   is more by way of a closing argument, and I would prefer that I hear all of the

20   testimony.

21          MR. SWOR: I had intended it, Your Honor, to explain what we were

22   going to offer and what we were not and at this point I was going to make a factual

23   proffer to the Court.

24          THE COURT: All right.  But if I understand it correctly, all the

25   Defendants have opted not to examine your third-party custodians, which means that

1    the Government has them now as witnesses.

2              MR. SWOR: The Court instructed that the -- that -- I don't believe -- first

3    of all, I don't believe the statute provides that the Government can call them as

4    witnesses and cross-examine them.  In fact, the statute specifically reserves the right

5    to call witnesses to the Defendant and we have proffered their information to the

6    Court and have proffered them to Pretrial Services for examination.  If the Court -- I

7    suppose it's within the Court's discretion to instruct them to take the stand and allow

8    the Government to examine them, and if that's the way you want to do it, then I will

9    simply say Mr.  Ray Stone is present in the Court and if the Court wishes to examine

10   him  --

11             THE COURT: At the close of yesterday, Mr. Swor, I believe all Counsel

12   indicated that their third-party custodians were available for the Court or for the

13   Government to examine.  Now you're raising a different issue than what you agreed to

14   yesterday and my preference is to put all of the evidence into the record and I will

15   hear your summation later.

16             MR. SWOR: I assumed that the proffer about the facts relating to

17   dangerousness was by way of evidence not simply argument.  If the Court wishes, we

18   will do it step-by-step.  Mr. Stone is here.  He's available.

19             THE COURT: I understand.  Mr. Swor, tell me what you would say

20   different by way of summation than you will say right now in making your argument

21   concerning your client's lack of dangerousness.

22             MR. SWOR: Yesterday the Government made several argumentative

23   points about what it said the facts were or what it proffered the facts are that this

24   Court should rely on to find dangerousness, and not only -- and they put days and

25   times and argument about what those facts meant.  I simply have 12 points of factual

1   or -- that if we were to present evidence, our evidence would show.

2                    THE COURT: And I'm asking you if you were to present evidence, what

3   would be different from between your proffer and what you would say in a closing?

4                    MR. SWOR: In a closing I need to refer to some fact that is in the

5   record.  If I don't put the proffer in, I can't argue it.  I can't -- if I put Mr. Stone up -- if

6   the Court instructs Mr. Stone to take the stand and then we do that for all nine

7   Defendants, we're then in a situation where the Court has heard from the potential

8   custodians, but the issue of fact of -- unless the Court is saying it's already decided

9   that the Defendants are not a danger to the community, I can't just argue that --

10                    THE COURT: The Court isn't saying that, but my question remains.

11  Would you say anything different now than what you would say in a closing other than

12  what you would say in the closing would be referenced back to what you put in as

13  your proffer?

14                    MR. SWOR: In a closing I intend to be much briefer.  This is brief.  My

15  closing will probably be nothing more than Your Honor, you've heard the facts.

16                    THE COURT: Go head.

17                    MR. SWOR: Whichever way you want to do it.

18                    THE COURT:  Go head.

19                    MR. SWOR: Okay.  One, my proffer.  At no time did David Brian Stone

20  offer to break anyone out of jail; any claim to the contrary is false.

21                    Two, there was no real training or real op planned for April, 2010.  David Stone

22  was scheduled to attend a shooting exhibition called The Knob Creek Shoot in

23  Kentucky the second weekend of April, 2010 and was scheduled for work training on

24  April 17th, which is the third weekend in 2010.

25                    THE COURT: Mr. Swor, can you tell me -- I understand that the

1    Defendants claim that April was to be training.

2              MR. SWOR: The Government claims that.  The Government claims that

3    it was a real -- "real op".

4              THE COURT: But you claim that it was to be simply training?

5              MR. SWOR: No.  The training I'm referring to is my client's training for

6    his place of employment.  There was no -- notwithstanding the comment that we're

7    going to do training, what I'm saying is there was no training planned.

8              THE COURT: All right.  Then whatever we call it, I'm concerned about

9    Mr. Stone's comments about what would they do if they get themselves involved in a

10   hostile situation, and he says put a bullet in them or if they just willingly get down on

11   the ground and let you leave the area peacefully, then that's great.

12             MR.  SWOR:  Other than say that it is speech, it is braggadocio, it is

13   what it is, you know you've heard the tape or you've heard the conversation, the

14   recording and you heard my cross-examination and see this is where closing

15   argument differs from the proffer.  That is I understand the Court's concern and if

16   we're having this situation, this is akin to closing and that's what my -- I was trying to

17   avoid.

18             THE COURT: Well, get back to the substance.

19             MR. SWOR: Third, between February 20th --

20             THE COURT:  (Interjecting) I mean that's your full answer to my

21   question?

22             MR. SWOR: No, it's not my full answer.  It is not my full answer, but it is

23   a significant part of the answer and I believe the response to that is in fact appropriate

24   closing.  It wouldn't be appropriate proffer and this is difficult because there's nine of

25   us here and I'm sure the Court wants to do it in some kind of organized fashion.

1    THE COURT: Mr. Swor, I'll make the decisions about how I proceed.

2    Just don't use up our time by talking about anything other than the substance.

3    MR. SWOR: If you want me to answer the question, the answer to that

4    question is as you recall, the conversation -- quite frankly, the first time I heard the

5    conversation I thought these guys were in a bar.  There's a lot of cross-talk going on.

6    There's a lot of loose talk going on and all it is is talk.  It is not a plan.  It is not a

7    conspiracy.  It is simply talk.  There was in fact nothing that was done to advance from

8    talk to anything else.

9    As I asked the Agent yesterday, what happened -- what did they do after that?

10    She said, although she said the undercover agent was in contact, she conceded that

11    she was not aware of anything that had been done to prepare or advance from the

12    date the statement was made until this "op" which was supposed to happen in April.

13    So it is talk and nothing more.

14    THE COURT: And the February 6th?

15    MR. SWOR: In the van.

16    THE COURT: In the van where they passed the Hudson police officer,

17    your client says we're going to pop him guaranteed.  What is that?

18    MR. SWOR: Talk; stupid, hateful talk, but it's nothing more than talk.

19    There was nothing done.  There was no action taken.

20    THE COURT: Well, Mr. Swor, the question becomes does action have

21    to be taken for your clients to be charged with a crime?

22    MR. SWOR: Conspiracy requires an action in furtherance of the

23    conspiracy.

24    THE COURT: I believe that's not true for Seditious Conspiracy and talk,

25    talk, talk often gets people in trouble and involved in charges of conspiratorial

1    conduct.

2            MR. SWOR: Your Honor, then any time anyone says anything bad or

3    threatening about a police officer, to hold that would mean that seditious conspiracy

4    extends to anything, any comment, any conversation and would be so overbroad that

5    it couldn't be constitutional.

6            THE COURT: So is your position that an overt act is required and your

7    client just making a statement like this could never be charged as criminal conduct?

8            MR. SWOR: Not in and of itself.

9            THE COURT: All right.

10           MR. SWOR: In fact, the next thing I was going to proffer was between

11   February 20th and the date of his arrest, Mr. Stone acquired no new firearms or

12   explosives and did not direct anyone to acquire firearms or explosives.

13       Next.  To the best of his knowledge and recollection the only explosive devices

14   constructed or used were those constructed and used by the undercover agent.

15       Next.  The trip wire exercise referred to in the Government's proffer was a

16   practice exercise to avoid a trip wire.  The system to pick up the trip wire was

17   designed by the Federal undercover agent and taught to the members by the Federal

18   Agent.  The trip wire used in the practice was a fake.

19       Next.  The only live fire practice engaged in during training exercises was

20   conducted at a private shooting range on the range and at a backstop target.  That

21   took place twice a year.

22           THE COURT: And do you have dates for when that happened?

23           MR. SWOR: I do not.  Next.  Training in the woods was conducted with

24   unloaded weapons, with empty chambers.

25       Next.  At the time of his arrest, there were no explosives in Mr. Stone's home

1    with the exception of an M-80 firecracker which had been purchased over the Internet

2    over a year before using Mr. Stone's own name.

3          Next.  The list referred to in the Government's original proffer was printed from

4    a publicly available website and given to him.  It had no addresses, no addresses

5    were researched or obtained for the individuals on that list.

6          Next.  David Brian Stone is an American taxpayer.  His income taxes are

7    current.  During the search of his home, the Government seized all of his tax records,

8    including copies of his tax returns.

9          Next.  Contrary to the representation by the Government, to the best of our

10   knowledge all of the weapons owned or possessed by David Brian Stone were legally

11   acquired and legally possessed.

12         Finally, the trip to Kentucky on February 6th was only possible because the

13   undercover agent volunteered to provide the vehicle and pay for the gas.  David Brian

14   Stone had no other transportation available to make the trip.  His wife's vehicle, which

15   is an early '90s  model Villager would not have made the trip.  There were no plans for

16   who would go on the trip.  Anyone who showed up went.  The trip was to be down and

17   back the same day.

18         That is the extent of our factual proffer and if the Court wants me to argue at

19   this point, I will.  If the Court wants me to sit down until later, I will.

20              THE COURT: Let me ask Mr. Waterstreet.  Do you have a witness that

21   you'd like to examine in connection with Mr. David Stone, Sr.?

22              MR. WATERSTREET: My understanding is he's offering those three

23   potential custodians, a Ronald Stone, Ray Stone and Edith --

24              MR. SWOR: Horton.

25              MR. WATERSTREET: Excuse me?

1              MR. SWOR: Horton.

2              MR. WATERSTREET: Horton?

3              THE COURT: Okay.

4              MR. WATERSTREET: I would like an opportunity to speak to those

5    individuals here in open court and if I could take a look at the Pretrial Services Report

6    or information that they obtained?

7              THE COURT: Okay.

8              MR. SWOR: Your Honor, as I indicated, only Mr. Ray Stone is here.

9              THE COURT: While we're waiting, Mr. Swor, I have a question.  What

10   list are you talking about?

11             MR. SWOR: The Government complained that there was some kind of

12   hit list at the original Detention Hearing in front of Magistrate Sheer.  They claimed

13   that there was some kind of hit list of Government officials and I have never seen the

14   list; the Government hasn't made it available to us.

15             THE COURT: And where are you saying it originated from?

16             MR. SWOR: On the Internet.  If it's the list that the -- the only list I'm

17   aware of is a list of people that was printed off the Internet that did not have

18   addresses, that simply had their names and their positions.

19             THE COURT: All right.  Thank you.  Are you ready, Mr. Waterstreet?

20             MR. WATERSTREET: Yes, Your Honor.  I just want to make sure I

21   understand the report I got from Pretrial Services.  It's a three-page report and it goes

22   by Defendant and then one first for Mr. Brian David Stone, Sr.  and then Junior and

23   then things of that nature.

24             THE COURT: Did you get nine of them, Mr. Waterstreet?

25             MR. WATERSTREET: Well, I believe all nine of them are included in

1    this three-page report.

2             THE COURT: Yes.  And all right, there was an updated report?

3             MR. WATERSTREET: I believe the only person they have available is

4    Ray Stone.

5             THE COURT: That's true; that's what Mr. Swor said.  Mr. Stone, come

6    forward.

7             MR. SATAWA: I seem to not have gotten a copy of that.  Is there

8    another one of that?

9             MR. WATERSTREET: Your Honor, if I may, I believe there was --

10                        **R A Y   S T O N E,**

11        Having been sworn under oath at about 2:11 p.m., testified:

12             MR. WATERSTREET: Your Honor, if I may, it's my understanding there

13   were a number of witnesses that are -- can be proffered for this matter.  It's my

14   understanding many of these people are relatives of the various Defendants in more

15   than one way, and I would just ask that any prospective witnesses or custodians

16   would be asked to leave the courtroom to be sequestered so that we make sure that

17   we only get the information from the witness and not from what they heard from

18   somebody else.

19             MR. HELFRICK: Your Honor, I object to that and as the Government is

20   fond of saying, the Rules of Evidence don't apply in these proceedings.  All of my folks

21   were here all day yesterday and so they've already heard everything that's gone on

22   up until this point, not to mention at the previous detention hearing in front of

23   Magistrate Judge Sheer.  So I don't see how there can be any concern that these

24   people are tailoring their testimony.

25             THE COURT: I will not honor that request, Mr. Waterstreet.  Let's

1    proceed.

2                    MR. WATERSTREET: Thank you.

3                    **CROSS-EXAMINATION**

4    **BY MR. WATERSTREET:**

5    Q.    Can you please give your full name?

6    A.    Ray Dean Stone.

7    Q.    And how old are you, sir?

8    A.    I'm 71 and a half.

9    Q.    And where do you live, sir?

10   A.    6087 Tomer Road, Clayton, Michigan.

11   Q.    And that is a large property that you own, about a 10-acre piece of property?

12   A.    Yes.

13                   THE COURT: Just let me interrupt you, Mr. Waterstreet.  For purposes

14   of these proceedings which are public, I am not going to require witnesses to give

15   their street address.  I believe a -- let's start out with a county first.

16   Q.    (By Mr.  Waterstreet continuing)  What county do you live in then?

17   A.    Lenawee County.

18   Q.    Now the property you own is a 10-acre parcel?

19   A.    Yes.

20   Q.    And you have a house on that 10-acre parcel?

21   A.    Yes.

22   Q.    And your son, David Stone, has two trailers on that piece of property, correct?

23   A.    Yes, hooked together.

24   Q.    And who lives with him in that property?

25   A.    His wife, Tina and his son, Josh and his wife.

1    Q.    And do you know Josh's wife's name?

2    A.    Shannon.

3    Q.    Is there anybody else that lives there?

4    A.    No.

5    Q.    And how long has your son lived there?

6    A.    Since '98, 1998; 12 years.

7    Q.    You've thrown him off the property between '98 and up to today, right?

8    A.    No.

9    Q.    You've never thrown him off the property?

10   A.    Nope.

11   Q.    So he's lived there constantly the entire time?

12   A.    Yes.

13   Q.    Well, didn't he live with Tina Stone on Bird Lake?

14   A.    They moved on their own to Bird Lake.

15   Q.    Well, first I asked if you threw him off and you said no and then I said they've

16   lived there the entire time and you said yes.

17   A.    Well, they moved to Bird Lake on their own.

18   Q.    Okay.

19   A.    I didn't throw them off.

20   Q.    So they haven't lived on that property the entire time?

21   A.    No.

22   Q.    And do you allow your son and his group to do training on your property?

23   A.    At times they have.

24   Q.    And the training is live fire training?

25   A.    No.

1    Q.    They've never shot any weapons?

2    A.    Only on the backstop.

3    Q.    Well, that wasn't my question, sir.  My question was did you ever allow them to

4    engage in any live fire training?

5    A.    That is not a live fire training.

6    Q.    What is a live fire training?

7    A.    That is a target.

8    Q.    What is live fire training then?

9    A.    Live fire training would be like you're in the military.

10   Q.    And you've seen them engage in that activity, correct?

11   A.    No.

12   Q.    Now your son has mentioned to you more than one occasion his dislike of law

13   enforcement, correct?

14           MR. SWOR: Objection, Your Honor; relevance.  This is a hearing as to

15   whether this person is an appropriate third-party custodian.  This is -- as you said to

16   us yesterday, this is not an exploration, discovery fishing expedition.  Thank you.

17           THE COURT: Mr. Waterstreet.

18           MR. WATERSTREET: The question is -- the Court will understand with

19   my next question if I may get to that question.

20           THE COURT: What's your next question?

21           MR. WATERSTREET: Is he like-minded?  Do you hold the same

22   opinions as your son --

23           MR. SWOR: Judge, that's his opinion --

24           MR. WATERSTREET:  -- concerning law enforcement?

25           THE COURT: Sustained.  Sustained.  Sustained.

1    Q.      (By Mr. Waterstreet continuing) Do you understand that the Judge is going to

2    entrust you to basically tell on your son if he engages in any illegal conduct, correct?

3    A.      Yes.

4    Q.      And if your son engaged in illegal conduct, you would have no problem

5    identifying that to law enforcement, right?

6    A.      I know a lot of law enforcement.

7    Q.      That wasn't my question, sir.  You wouldn't have a problem telling law

8    enforcement that your son is breaking the law, right?

9    A.      That's correct.

10   Q.      And to your knowledge has your son engaged in any criminal conduct in the

11   past?

12   A.      No.

13   Q.      Now you own firearms at your home, correct?

14   A.      Yes, I do.

15   Q.      And what firearms do you have at your home?

16   A.      I have hunting rifles.

17   Q.      And can you tell me what particular type of weapons they are?

18   A.      High-powered rifles.

19   Q.      Can you tell me what particular type of weapon?

20   A.      What do you really want to know?  You mean what caliber they are?

21   Q.      What type of weapon they are.

22   A.      They're high-powered rifles that you deer hunt with.

23   Q.      They're all rifles?

24   A.      Yes.

25   Q.      There's not a shotgun among them?

1   A.   I have a shotgun.  I also use that for hunting.

2   Q.   Why don't we go through what weapons you do have, sir?  Can you tell me

3   specifically what weapons you do have?

4   A.   I don't figure that's any of your business.

5        THE COURT: Mr. Stone, it is the business of this Court and so the

6   question is please list the types of weapons you have in your home.

7        THE WITNESS: You mean as far as caliber-wise?

8        THE COURT: Just tell us what kind of guns you have in your house.

9        THE WITNESS: They're high-powered rifles and a shotgun.

10  Q.   (By Mr.  Waterstreet continuing)  Can you tell me what type they are?

11  A.   You've got to be more pacific. (sic)

12  Q.   Have you ever heard of a 30-06?

13  A.   Yes.

14  Q.   Is it a 30-06?

15  A.   Yes.

16  Q.   Have you ever heard of an AR-15?

17  A.   Yes.

18  Q.   Or any of them AR-15s?

19  A.   Yes, I own one.

20  Q.   How many weapons do you own?

21  A.   Probably half a dozen.

22  Q.   And what do you plan on doing with those weapons?  Are you planning on

23  keeping those weapons when your son is there?

24  A.   Yes, I plan on keeping them.

25  Q.   What if the Court says no, you have to get rid of those guns, you're not allowed

1    to have guns while your son is living with you?

2    A.    I don't understand that he'd be living with me.

3            MR. SWOR: Your Honor, our proposal -- the two residences are a

4    hundred yards apart.  Mr. David Stone could remain in his home and his father would

5    be a third-party custodian only a hundred yards away.  I don't think that's inconsistent.

6    That's the proposal I've made, the suggestion I have made to Pretrial Services and

7    the one I would make to the Court.

8            I would also indicate to the Court that we have indicated that we would make

9    arrangements to store those weapons off premises if the Court were to release Mr.

10   David Brian Stone into his father's custody.

11           THE COURT: Well, apparently Mr. Stone, Ray doesn't know of the

12   agreement to store guns off premises.

13           MR. SWOR: Mr. Stone does have a slight hearing impairment.  We

14   talked about this upstairs with Mr. Nugent. I'm making that representation as an officer

15   of the Court, and I'm telling the Court that we also discussed it with my client's brother

16   Ron Stone, who does not live in the immediate area.

17           THE COURT: Continue, Mr. Waterstreet.

18   Q.    (By Mr. Waterstreet continuing) Where do you keep these firearms?

19   A.    In my home.

20   Q.    Where in your home?

21   A.    In my closet.

22   Q.    Does your son know that they're there?

23   A.    Yes, he knows they're there.

24   Q.    Does your son have access to your house?

25   A.    No.

1   Q.      You don't allow your son in your house?

2   A.      Whenever he comes to visit, which is (sic) very often.

3   Q.      It is or is not?

4   A.      He doesn't come very often.

5   Q.      You're not very close with your son even though he lives a hundred yards

6   away?

7   A.      Yes, I'm close with him.

8   Q.      How often does he come and visit?

9   A.      Not very often at all.  I visit with him.

10   Q.      Well then, have you seen items in his home that give you concern?

11   A.      No.

12   Q.      Does he have a lot of firearms in his home?

13   A.      Yes, he did have.

14   Q.      Did he have any particular firearms that were rather short in length?

15              MR. SWOR: Your Honor, I'm going to object now.  This is far afield.

16   This is not the narrow purpose of this hearing.

17              THE COURT: The firearms have all been confiscated?

18              MR. WATERSTREET: Well, we believe we've gotten the ones from the

19   trailer.

20              THE COURT: Well, if Mr. Stone is released, he would have no weapons

21   in his home.  So move on please.

22   Q.      (By Mr. Waterstreet continuing) And you understand that the Judge's Order is

23   that he would have no access to firearms?  Do you understand that?

24   A.      Yes.

25   Q.      And that he could not come into your house and borrow your weapons?

1     A.     I don't loan my weapons to nobody.

2     Q.     Did your son ever pay you rent for his group of people to train on your

3     property?

4     A.     No.

5     Q.     Was there an agreement at one time that you asked him to do that?

6     A.     No.

7     Q.     If he was released, would you allow him to continue to train on your property?

8     A.     No.

9     Q.     So the only place he has to live is basically at your pleasure because you allow

10    him to park his trailers on your property, correct?

11    A.     Yes.

12    Q.     You indicated that -- well, the attorney mentioned that you're hard of hearing, is

13    that correct?

14    A.     Yes.  My hearing is -- I've got hearing loss.

15    Q.     And is that from work?

16    A.     Work mainly;  age is another.

17    Q.     Are you a good friend of Mark Koernke?

18    A.     No.

19    Q.     Is your son a good friend  of Mark Koernke?

20    A.     I have no idea.

21    Q.     Now didn't you talk to some Agents back on March 27th, 2010?

22    A.     Yes.

23    Q.     And didn't you say that you've met Mark Koernke, K-o-e-r-n-k-e, several times?

24    A.     It's been years ago.

25    Q.     And that you've visited his residence on at least a dozen occasions?

1   A.      Approximately, yes.

2   Q.      And that you even attended sessions with your son, David?

3   A.      Yes.

4   Q.      And that you described the relationship between yourself and Mark Koernke as

5   friendly?

6   A.      As far as I know of.

7   Q.      And that David visited Mr. Koernke often since his release from prison?

8   A.      I don't know.

9   Q.      Do you remember telling the Agents that you are aware that David has visited

10  Koernke since his release from prison and that --

11  A.      Yes.

12          MR. SWOR: Again --

13  A.      But this is irrelevant.  This has nothing to do why I'm here today.

14          THE COURT: Excuse me, Mr. Stone.  Can you tell me the relevancy of

15  these questions, Mr. Waterstreet?

16          MR. WATERSTREET: Your Honor, I will proffer as to what Mr. Koernke

17  is.  Mr. Koernke is a person that has been convicted of killing a police officer in the

18  past, served time.  He's a member of a militia group that has ideology very similar to

19  Mr. Stone.

20  Q.      You don't have any control over your son as to who he would meet with?  You

21  can't stop your son from meeting with Mr. Koernke?

22  A.      Neither can anybody else stop anybody from meeting with anybody.

23  Q.      I agree.  And that your son is in the process of storing supplies?

24  A.      What do you mean supplies?

25  Q.      Well, food.  He is storing away food, bulk supplies of food?

1    A.    That's your opinion.

2    Q.    Well, no.  I'm just asking -- okay.  Do you recall speaking to the Agents on

3    March 27, 2010?

4    A.    Yes.

5    Q.    And do you remember stating that you understand that there's supplies stored

6    in David's trailer in bulk?

7    A.    Do you have my exact words to those people?

8    Q.    I'm reading exactly what they wrote down.  He, being you, understands that

9    there are supplies stored in David's trailer in bulk.

10         MR. SWOR: Your Honor, I'm going to object.  I mean if -- I would

11   assume that if there was supplies stored in bulk, that would have been noted during

12   the Return on the Search Warrant and the Government would have proffered it as

13   some kind of factual proffer, even if it were relevant.

14         THE COURT: Objection is sustained.  Mr. Waterstreet, I think this is

15   going well beyond this person's appropriateness as a third-party custodian.

16   Q.    Sir, do you have any handguns as well?

17   A.    I have two.

18   Q.    What type of handguns are those?

19   A.    One is a nine millimeter and one is a .22.

20   Q.    And do you recall indicating that your son and Mr. Koernke have like-minded

21   ideas about police officers?

22   A.    I have no idea what they have in common.

23   Q.    Do you remember one question specifically you indicated that you've heard

24   your son say I don't like cops?

25   A.    Who doesn't?

1    Q.    And then --

2    A.    I hear that from a lot of people.

3    Q.    You also said perhaps he was influenced by Koernke because you've heard

4    Koernke say the exact same things?

5    A.    I have not heard Koernke say that.

6    Q.    Koernke expressed aloud also his poor opinion of law enforcement?

7    A.    I have no idea.  I haven't seen Koernke in years.

8              THE COURT: Excuse me, Mr. Stone.  Mr. Waterstreet, again your

9    questions are to be confined to the appropriateness of the witness's role as a third

10   party custodian.

11   Q.    (By Mr. Waterstreet continuing) And to make sure I understood what you said

12   is that nobody can control anybody else, is that your belief?

13   A.    I can't even control you, can I?  It's the same way you can't control me.

14             THE COURT: Mr. Stone, please.  You're only to answer questions and

15   they need to be responsive.

16   Q.    (By Mr. Waterstreet continuing) And so likewise, you would not have control

17   over your son?

18   A.    If I have custodian (sic) of him, yes.

19   Q.    I have no further questions.

20                              **DIRECT-EXAMINATION**

21   **BY MR. SWOR:**

22   Q.    Mr. Stone, how long did David and Tina live away from the trailer?

23   A.    Middle part of September 'til the first part of January, 2009.

24   Q.    If the Court gave you instructions as to what your son were allowed to do and

25   were not allowed to do, would you observe those instructions?

1    A.    Yes.

2    Q.    And if your son violated the rules, would you contact the Court and report to the

3    Court that he had violated the rules?

4    A.    Yes.

5    Q.    Nothing further.  Thank you.

6            THE COURT: Any Recross-examination, Mr. Waterstreet?

7            MR.  WATERSTREET:  No, Your Honor.  I got the impression the Court

8    wants to get through all the witnesses as quickly as possible and then --

9            THE COURT: Well, I guess I need to see if other Defense Counsel want

10   to proceed as Mr. Swor did.

11           MR. WATERSTREET: The only reason I ask is I don't know if the Court

12   wants me to respond to the proffers by rebuttal at this point or when everybody is

13   done.

14           THE COURT: When everyone is done please.  Thank you.

15           MR. HELFRICK: Your Honor, Richard Helfrick on behalf of David Stone,

16   Jr.

17           Pretrial Services indicated that they interviewed his mother, Donna Popejoy as

18   --

19           THE COURT:  Oh, excuse, me.  Mr. Stone, you can step down.

20           MR. HELFRICK: Your Honor, Pretrial interviewed his mother, Donna

21   Popejoy as a possible third-party custodian and she's present in court.  However, I

22   would also point out that the Defendant's future father-in-law, Kevin Bryant, has also

23   offered to be a third-party custodian.  He was not interviewed by Pretrial Services and

24   I don't know --  he's present by the way as well and I don't know if the Government

25   wants to hear from both of them or if the Court is inclined to just give custody to the

1    mother.

2              THE COURT: I'm not inclined to give custody to anyone at this juncture.

3    Is your client expressing a preference for where he would go if I did give him bond?

4              MR. HELFRICK: Not necessarily.

5              THE COURT: All right.

6              MR. HELFRICK:  Mrs. Popejoy is present if Mr. Waterstreet wants to call

7    her.

8              THE COURT: Mr. Waterstreet.

9              MR. WATERSTREET: Your Honor, I'm a bit confused because I believe

10   there were three other prospective --

11             THE COURT: For Mr. Stone, Sr.?

12             MR. HELFRICK: Your Honor, I've submitted three letters to the Court

13   from individuals. Of those three, only Mr. Bryant has offered to be a third-party

14   custodian.  They are all present, but they aren't here for --to be -- if the Court wants to

15   confine this to third-party custodians, it would be either his mother or his future

16   father-in-law.  But as I say, everyone is here.  I don't know that we have time for four

17   or five witnesses.

18             THE COURT: I do want to confine the questioning to people who have

19   offered themselves as third-party custodians.  So your pleasure, Mr. Waterstreet?

20             MR. WATERSTREET: I guess Mr. Brittany Bryant's father.

21             MR. HELFRICK: Mr.  Bryant.

22                        **K E V I N   R A Y   B R Y A N T,**

23             Having been sworn under oath at about 2:34 p.m., testified:

24                            **CROSS-EXAMINATION**

25   **BY MR. WATERSTREET:**

1    Q.    Good Afternoon, sir.

2    A.    Good afternoon.

3    Q.    What county do you live in?

4    A.    Lenawee.

5    Q.    And I understand you've been suggested as a third party or a third-party

6    custodian for David Stone, Jr.?

7    A.    Yes.  They lived with me with my grandson for the previous five months.

8              THE COURT REPORTER:  May I have your name, sir?

9              THE WITNESS:  Kevin Ray Bryant.  They moved out like a month ago.

10   Q.    (By Mr.  Waterstreet continuing) Okay.  And have you made any type of living

11   arrangements?

12   A.    I have one room.  The room that they had in the past is still open.

13   Q.    So it is -- is it your suggestion or your belief that he would be living with you?

14   A.    Absolutely; if they are released, or his mother.

15   Q.    And you're not related to him by blood in any way, correct?

16   A.    No.  My grandson.

17   Q.    Your daughter is not married to him, correct?

18   A.    Not at this time.

19   Q.    And your daughter is not employed at this time as well, correct?

20   A.    No, sir.

21   Q.    So they will -- they, that being David Stone, Jr. and your daughter and your

22   grandson will be living with you?

23   A.    Correct.

24   Q.    And you have the financial wherewithal to take care of them?

25   A.    Yes.

1   Q.      Do you know David Stone, Jr.'s real name -- what his name was before it was

2   changed?

3   A.      I just call him Junior.  I mean, I -- no, I don't.

4   Q.      When did you first meet him?

5   A.      Maybe a year and a half.

6   Q.      Where was he living when you met him a year and a half ago?

7   A.      I'm not sure.  He'd just come out.  We have motorcycles and bond fires.  We

8   have a motorcross track at my house.  We used to race my son and they'd come out

9   and would watch the motorcycles and have bond fires.

10  Q.      So you don't know where he was living prior to --

11  A.      Not for sure.  I mean I know when he moved to -- I went and moved them to

12  my house, it was around the first part of October from Bird Lake and I'm not sure of

13  the exact date, but it was -- my grandson was like a week old.

14  Q.      Who was living with them at Bird Lake?

15  A.      They were living with their dad and I think his wife.  I had never met Tina; I

16  didn't know her, but they were gone and we went up and picked the stuff up and just

17  brought it to my house.

18  Q.      And he moved out from living with you?  David Stone and your daughter

19  moved out from living with you?

20  A.      Yes.  They had got an apartment in Adrian.

21  Q.      Now up -- after they moved out -- do you recall when they moved out?

22  A.      It was -- I think it was in March some time.

23  Q.      March of this year?

24  A.      March of this year.

25  Q.      And during March of this year after they moved out, were you -- would you visit

1  them daily?

2  A.     Not daily.  I mean I would visit them because we had helped them you know,

3  and getting a couch and table and chairs and they had other things necessary for a

4  new family and we visited sometimes couple times a week, three times.  I don't know.

5  Q.     In moving the items from the Bird Lake address to your house, did you move

6  any uniforms or things of that nature?

7  A.     No.  No weapons, no uniforms.  We moved the baby crib and their dressers

8  and their bed, clothes.  I seen no uniforms or anything like that.

9  Q.     Are you aware that a search was done at the apartment that belongs to your

10  daughter and was shared by Junior?

11  A.     Yes.

12  Q.     And you're aware that they did take uniforms and things of that nature out of

13  there?

14  A.     No.  I was aware that they took some boots and like camouflage clothes, but I

15  was not aware of any informs.  They took like Bibles and computer and digital

16  camera.

17  Q.     Right.  And then the Hutaree dog tags, things of that nature?

18  A.     I had never seen those.  I thought it said hut-a-tree.  I never even knew what

19  the heck that was.

20  Q.     So you're not -- you don't believe in the Hutaree philosophy then?

21  A.     I don't know what their philosophy is.  I believe that you follow the law the best

22  to your ability and a taxpayer and do the right thing.

23  Q.     So you did not have a particular concern that you shared with your daughter

24  about what Junior was doing by training with his father?

25  A.     Absolutely not.  As my note stated, in the five months that Junior lived with me I

1    had never even heard anything offensive.  I was in complete shock.

2    Q.      No, no.  So you never -- so you never heard anything about the Hutaree during

3    the entire time that they were living with you during those five months?

4    A.      I had heard about they had like practice sessions and I would give him a lot of

5    crap about it because I said if you want to do that, you might as well join the military.

6    Q.      Right.  And your daughter, she participated in some of that training as well?

7    A.      I don't know.  I'm not aware of that.  As I said, I didn't even -- I hadn't even

8    heard of Hutaree.  I'd heard of militia because we had had a militia guy down the road

9    from us many years ago.  I can't recall.  He ran for Sheriff of Lenawee.  I don't

10   remember his name.

11   Q.      So the answer to my question is you don't know whether your daughter was

12   also training with the Hutaree as well?

13   A.      I don't know.

14   Q.      You don't know what they were trained for then?

15   A.      No.  I mean the only thing they would talk about, they'd go out and have dinner

16   or barbecues, whatever.  Kind of like a BS session the way I --

17   Q.      Well, you're kind of intimating that you do know what they were training about.

18   A.      No.  I'm saying I knew they got together and I know what a militia is.  I've seen

19   things on TV.

20   Q.      Well, I'm not asking you to guess.  I'm asking you specifically did you know

21   what they were training to do?

22   A.      No.

23   Q.      Did you know what type of weapons Junior kept at his father's house?

24   A.      No.  I was not aware he had weapons.  I do not have guns.

25   Q.      Sir, I appreciate you wanting to say your piece, but just answer my questions if

1    you could please.  So you have no idea what the Hutaree plan was, correct?

2    A.      No.

3    Q.      You had no idea whether your daughter trained as part of the Hutaree, correct?

4    A.      Correct.

5    Q.      You have no idea what Junior was doing when he went for training, correct?

6    A.      No.

7    Q.      You had no idea what type of weapons he had kept at his father's place,

8    correct?

9    A.      Correct.

10   Q.      I have no further questions.

11           THE COURT: Thank you.  Mr. Helfrick, any Cross?

12           MR. HELFRICK: No.  No, thank you, Your Honor.  But I'd like to reiterate

13   since Pretrial interviewed his mother, if Mr. Waterstreet wants to interview his --

14   Junior's mother  --

15           THE COURT: Let's ask.  Mr. Waterstreet, do you have an interest

16   questioning Miss Popjoy? (Phonetic)

17           MR. WATERSTREET: May I have a moment? Yes, if I could have her.

18                   **D O N N A   P O P E J O Y,**

19           Having been sworn under oath at about 2:43 p.m. testified:

20                       **CROSS-EXAMINATION**

21   **BY MR. WATERSTREET:**

22   Q.      Good afternoon, ma'am.

23   A.      Good afternoon.

24   Q.      Can you give us your full name please?

25   A.      Donna Elaine Popejoy.

1    Q.    Now have you always gone by the name Donna Elaine Popejoy?

2    A.    Yeah, for the last year.

3    Q.    Miss Popejoy, have you gone by any other name since you were -- you've

4    become an adult?

5    A.    I've been married to David Stone.

6    Q.    And what was your name when you were married then?  Was it Stone?

7    A.    Ah-hum.

8    Q.    Or hyphenated or anything like that?

9    A.    It was Stone.

10   Q.    It was Stone?

11   A.    Ah-hum.

12          THE COURT: Miss Popejoy, you have to give a verbal response.

13          THE WITNESS: Sorry.

14   Q.    And you're the biological mother of David Stone, Jr., correct?

15   A.    I'm his mother mother, yes.

16   Q.    Biological mother?

17   A.    Yes.

18   Q.    And he was known by a different name?

19   A.    Yes, he was.

20   Q.    Prior to having his name changed to David Stone, Jr.?

21   A.    Yes.

22   Q.    It was Shawn, right?

23   A.    Yes, it was.

24   Q.    And there came a point and time based upon what was going on in that house

25   you felt it was important for you to leave, correct?

1    A.    The marriage fell apart, yes.

2    Q.    As a matter of fact, you'd been threatened at gunpoint?

3    A.    No.

4    Q.    You don't recall filing --

5              MR. HELFRICK:   (Interjecting) Your Honor, I'll object to this as being

6    outside the scope of whether or not she's a suitable third-party custodian.

7              MR. WATERSTREET: Well, it goes to her credibility, Your Honor.  If

8    she's saying she's willing to do something and she's under oath subject to penalties of

9    perjury and she denies an event, I think that goes directly  --

10             THE COURT:   (Interjecting) Yeah, but the event needs to be relevant to

11   what is going on here, so sustained.

12   Q.    (By Mr. Waterstreet continuing) You're of the belief your son, Shawn, doesn't

13   share the same views as David Stone Sr., correct?

14   A.    Correct.

15   Q.    When is the last time you attended any of the Hutaree training?

16   A.    I never knew about none of this Hutaree until you all arrested them.

17   Q.    So you were not one of the founding members of the Hutaree?

18   A.    No, sir.

19   Q.    And to your knowledge you never knew the Hutaree existed before your son

20   was arrested?

21   A.    Not 'til the arrest come forward in the papers.

22   Q.    And it's your opinion that your son has been dragged into something he's not a

23   part of?

24   A.    Yes.

25   Q.    And do you think he's being wrongly accused?

1    A.    Yes.

2    Q.    And despite the fact you believe he's wrongly accused, if for some reason your

3    son were to violate a condition of bond, you would immediately contact the Court so

4    that he could be arrested?

5    A.    Yes, I would.

6    Q.    Without -- you gave Pretrial Services your address and I'm not asking you to

7    give that out.  Is that the address that you would be living at with your son?

8    A.    Yes, it is.

9    Q.    Are you employed?

10   A.    Yes, I am.

11   Q.    And who else lives with you?

12   A.    My husband.

13   Q.    And who is that?

14   A.    Harry Popejoy.

15   Q.    And are you making room just for your son or are you making room for your

16   grandson and your son's fiance?

17   A.    My son, my grandson and my son's fiance.

18   Q.    You have no idea what her involvement is with the Hutaree, do you?

19   A.    No, I don't.

20   Q.    You don't know what type of weapons that your son kept at his father's trailer

21   as part of the Hutaree, do you?

22   A.    No, I don't.

23   Q.    When was the last time you saw your son before he was arrested?

24   A.    Maybe a week or two before he got arrested.

25   Q.    Did you help him move?

1    A.    Yes, I did.

2    Q.    And where did he move to?

3    A.    He moved into Adrian.

4    Q.    Do you know where?

5    A.    South Main to that apartment.  We furnished him with some furniture and other

6    stuff that he needed and his fiance needed and grandbaby needed.

7    Q.    Do you know where your -- do you know if your son will have employment

8    when he gets out?

9    A.    Yes, he should.

10   Q.    And do you know where that will be?

11   A.    Probably at the farm.

12   Q.    What farm is that?

13   A.    The farm that he used to work for, the sheep farm.

14   Q.    He's not going back to any of his other prior jobs?

15   A.    He lost his job, the new one that he had.

16   Q.    He had a seasonal job?

17   A.    That's the sheep farm.

18   Q.    He also had another seasonal job at an explosives -- I mean a fireworks --

19   A.    That I have no idea about.  I know he had the job, but I don't know if they would

20   let him back there.

21   Q.    Have you ever heard of Colonial Fireworks?

22   A.    Yes.

23   Q.    He worked at Colonial Fireworks seasonally, correct?

24   A.    Yes, he did.

25   Q.    Do you have any firearms?

1    A.    No.

2    Q.    Does your husband have any firearms?

3    A.    Yes.

4    Q.    What type of firearms are they?

5    A.    Two shotguns; I couldn't tell you what kind because I never have seen them

6 and I don't use them.

7    Q.    Are they for sport?

8    A.    He uses them deer hunting.

9    Q.    And I assume you don't go deer hunting with him?

10    A.    No.

11    Q.    If it was a condition of the release, you would -- your husband would happily

12 give those weapons up?

13    A.    Yes, he would.

14    Q.    Where are you employed, ma'am?

15    A.    Where am I employed?

16    Q.    Yes.

17    A.    Do I have to give that?  I don't need the Press to be honest interfering with my

18 job and going and talking to my boss and everything else because my boss does

19 know I've been here and he would not like me to give out that information.  I mean I

20 can give it to you  --

21        THE COURT: Miss Popejoy, I won't require you to put that in this public

22 record.

23        THE WITNESS: Okay, thank you.

24    Q.    (By Mr. Waterstreet continuing) How long have you been so employed?

25    A.    Over a year.

1      Q.      Your Honor, may we go side bar so I can get that information to see if I need to

2      follow-up on that?

3                       THE COURT: Miss Popejoy, could you come over here please?

4                       THE WITNESS: Yes I can.

5      **SIDEBAR PROCEEDINGS TAKEN, NOT ORDERED TRANSCRIBED**

6                       MR.  WATERSTREET:  Thank you, Your Honor.

7                       THE COURT: Thank you.  Any questions?

8                       MR. HELFRICK: No questions, Your Honor.  Thank you.

9                       THE COURT: You may step down.

10                      MR. THOMAS: Judge, I tendered a letter from the Defendant Joshua

11     Stone's wife in anticipation that that was going to be my proffer.  It seems to me that

12     third-party custodian to her would be something that would be an additional

13     assurance to the Court, and so I'll volunteer her for third-party custodian and I will

14     allow her to be cross-examined, recognizing that she has a marital privilege and

15     recognizing that she was at some point and time marching with the -- or practicing

16     with the Hutaree.

17                      THE COURT: Okay.

18                      MR. THOMAS: So she has a 5th Amendment privilege which she's

19     going to have to be advised of, but I think that for purposes of this limited interrogation

20     we should not be running afoul of that.

21                      THE COURT: Well, Mr. Thomas, this is a little tricky because I think that

22     the Government would have a legitimate interest in these Defendants, if they are

23     released, in not associating with people who are associated with the Hutaree and if

24     you're telling me that his wife is and she will invoke the privilege, then perhaps she is

25     not the appropriate custodian.

1    MR. THOMAS: So then I won't argue third-party custodian, but I am

2    going to argue that he should be released in accordance with the letter that I've

3    submitted to you and given a copy to Mr. Waterstreet and I won't proceed any further.

4    THE COURT: Is there anyone else who could be a third-party

5    custodian?

6    MR. THOMAS: Not at this time.

7    THE COURT: Thank you.

8    MR. THOMAS: Recognize, Judge, we have a lot of family, but most of

9    the family is sitting at tables with us and so we're kind of limited in our ability to do

10   that.

11   THE COURT: Okay, thank you.  Mr. Rataj.

12   MR. RATAJ: Good afternoon, Your Honor.  Mike Rataj on behalf of Tina

13   Mae Stone for the record.

14   Your Honor, Mr. Timothy Kelly is Tina Mae Stone's father.  He's been

15   interviewed by Pretrial Services twice now, once before our initial detention hearing in

16   front of Magistrate Judge Sheer and again this morning -- I believe it was this

17   morning.  But in any event, he's here and I'm prepared to let Mr. Waterstreet call him

18   to the stand and question him.

19   THE COURT: Thank you.  You do want to question him, Mr.

20   Waterstreet?

21   MR. WATERSTREET:  If I may have a moment, Your Honor?

22   THE COURT: Sure.  Mr. Kelly, can you start making your way forward?

23   **T I M O T H Y   M.   K E L L Y,**

24   Having been sworn under oath at about 2:57 p.m., testified:

25   MR. SWOR: Your Honor, this does not effect my client directly.  May I

1        be excused from the courtroom for two minutes?

2                        THE COURT: Yes.  Sure.

3                              **CROSS-EXAMINATION**

4        **BY MR. WATERSTREET:**

5        Q.      Good afternoon, sir.

6        A.      Good afternoon.

7        Q.      Can you please give us your full name?

8        A.      Timothy Michael Kelly, Sr.

9        Q.      And you're the father of Tina Stone?

10       A.      Yes.

11       Q.      And before these proceedings took place, when's the last time you saw your

12       daughter?

13       A.      I believe it was the Friday before she was arrested.

14       Q.      Have you ever gone out to visit where she lives?

15       A.      No.

16       Q.      Do you have any idea where she lives?

17       A.      I do now.

18       Q.      Before that?

19       A.      No.

20       Q.      Do you know who she lived with?

21       A.      Yes.

22       Q.      And who's that?

23       A.      David Stone.

24       Q.      You're not related to a person named Dan Kelly, are you?

25       A.      No, sir.  Wait a minute; not the one you're talking about.  I'm related to a Dan

1   Kelly, but he's my brother and he's about 80.  He's Dan H. Kelly.

2   Q.    What Dan Kelly did you think I was talking about?

3   A.    Well, I seen in the paper there was a Dan Kelly that was over at -- that was

4   over on Church Road that was when they had the stand-off.  I saw that in the paper.

5   Q.    So you're not related to the Dan Kelly who was part of the stand-off?

6   A.    No.

7   Q.    Your daughter has not always gone by the name of Tina Stone, correct?

8   A.    Correct.

9   Q.    What names has she gone by?

10  A.    Tina Jones, Tina Booty (phonetic), Tina Hazendahl (phonetic) and David Stone

11  -- or I'm sorry -- Tina Stone and before that it was of course Tina Kelly.

12  Q.    And where was -- when was the last time your daughter lived with you?

13  A.    Oh, boy.  I believe it was when she was 17.  She was raised at our home in

14  Smith City and she left at 17.  That's the last time she lived with us.

15  Q.    How --  my mother always told me --

16          THE COURT:  Can I interrupt you, Mr. Waterstreet?  Mr.  Kelly, can you

17  sit closer to the microphone?  I'm having difficulty hearing you.

18  Q.    Maybe I should have asked it another way.  How many years has it been since

19  your daughter has lived with you?

20  A.    Twenty-seven roughly.  That's pretty close.

21  Q.    Would it be fair to say your daughter is a head-strong woman?

22  A.    Pretty strong, yes.

23  Q.    When she was -- in the 17 years that she was living with you, would it be fair to

24  say you had full control over what she did?

25  A.    Yes.

1    Q.      So it wasn't like she was chaffing under your direction to get out of the house?

2    A.      No.  She was 17 and she wanted to move.  You know that age.

3    Q.      And what control have you had over your daughter in her decision-making

4    process in the 27 years since she's left you?

5    A.      Well, politically mainly.  I mean we brought her up from right and wrong, but

6    politically she listens to what I say pretty much and except voting for the Governor,

7    she wouldn't do that.  She voted for Voss.  She did vote for Obama.  I thought that

8    was a plus, so just -- I don't get into what she says.  I'm not into her family life.

9    Q.      So you don't know what she does on a day-to-day basis?

10   A.      No.

11   Q.      You don't know what her beliefs are right now concerning the Government?

12            MR. RATAJ: Your Honor, I'll object to that question because I don't even

13   know what relevance that would have.  It's almost like the question assumes that if

14   you have some -- if you take issue with the Government, then you're somehow

15   committing a crime.

16            THE COURT: Sustained.

17            MR. RATAJ: Thank you.

18   Q.      (By Mr. Waterstreet continuing) Do you understand your role as the custodian

19   is that if your daughter was engaged in any illegal conduct, you would have to turn her

20   in?

21   A.      Absolutely.

22   Q.      And the question I'm trying to get at is if you're a like-minded individual and

23   believe that what she's doing is perfectly appropriate, you may not turn her in.

24   A.      If she violates the Court Order, she will be turned in immediately.

25   Q.      Do you have any firearms?

1   A.   No, I don't.

2   Q.   So you would not provide those to her, correct?

3   A.   Absolutely not.

4   Q.   Do you have a grandson named Ricky?

5   A.   Booty?

6   Q.   Yes.

7   A.   Yes.

8   Q.   Do you know whether he was part of this group as well?

9        MR. RATAJ: Your Honor, I'll object.  What's the relevance and purpose

10  of this exam?

11       THE COURT: This would be Tina Stone's son?

12       MR. WATERSTREET: Yes.

13       THE COURT: It's appropriate.  Overruled.

14  A.   The first I knew about it was when they had the arrest down on Church Road.

15  Before that, I wasn't aware of it.

16  Q.   Okay.  So he was arrested as part of that stand-off with Dan Kelly?

17  A.   He wasn't arrested.  He was there.

18  Q.   He was there during the stand-off?

19  A.   Right.

20  Q.   Now is he going to be moving in with you as well?

21  A.   No. He lives with his father.

22  Q.   He doesn't live with Jasmin?

23  A.   I believe he does, but they live with his father, Richard in Waldren.  That's the

24  last I know.  Maybe they've gotten a place within the last week that I don't know about.

25  Q.   You're not that close with him?

1    A.     No. I had seen him -- last time I saw him was -- well, I guess it was probably

2    Thanksgiving.

3    Q.     Now what kind of control would you have over your daughter while she's living

4    with you?  Do you work?

5    A.     No.  I'm retired.

6    Q.     So you'd be with her 24 hours a day?

7    A.     Pretty much.

8    Q.     Do you have any idea what your daughter has alleged to have been involved

9    in?

10    A.     What I've read in the paper, yes.

11    Q.     Are you like-minded in any way with any of her beliefs, those allegations?

12    A.     Well, if those are her beliefs, I'm absolutely appalled with what was said.

13    Q.     I have no further questions.

14               THE COURT:  Thank you.  Any Cross?

15               MR. RATAJ: None, Your Honor.  Thank you.

16               THE COURT: Thank you, Mr. Kelly.  You can step down.

17               MR. ROBERTS: Your Honor --

18               THE COURT:  Just one moment.

19               MR. ROBERTS: Oh,  I'm sorry.  This is Randall Roberts on behalf of

20    Joshua Clough.

21           As I've indicated to the Court, Mr. & Mrs. Clough are both here.  We're

22    proffering them as potential third-party custodians.  That's where he was residing prior

23    to his arrest.

24               MR. RATAJ: Your Honor, may I make the same request Mr. Swor

25    made?

1    THE COURT: Yes.  Mr. Waterstreet.

2    MR. WATERSTREET: Yes, I'll have questions of Mr. Clough.

3    THE COURT: Who do you want first?

4    MR. WATERSTREET: Mister.

5    THE COURT:  Mr. Clough.  Let's take a short break.

6    **(Court recessed at about 3:07 p.m.)**

7    (At about 3:20 p.m.)

8    (Court, Counsel and parties present)

9    THE COURT: Mr. Waterstreet.

10    MR. WATERSTREET: I believe Mr. Clough, Your Honor.

11    **W I L L I A M   A.   C L O U G H**,

12    Having been sworn under oath at about 3:21 p.m., testified:

13    **CROSS-EXAMINATION**

14    **BY MR. WATERSTREET:**

15    Q.    Can you give us your full name, sir?

16    A.    William A. Clough.

17    Q.    I'm not going to ask you exactly where you live, but can you tell me what

18    county you live in?

19    A.    Lenawee.

20    Q.    And does your son, Joshua live with you?

21    A.    He does.

22    Q.    And my understanding you're offering him to be able to move back as being a

23    third-party custodian?

24    A.    Yes, sir.

25    Q.    Do you understand that the weapon that you just went out and purchased will

1  have to be taken out of your home?  Do you understand that, right?

2  A.     Yes.

3  Q.     And you also understand that if the police come into your home, you can't

4  barricade yourself in your home like you did the last time?  Do you understand that as

5  well, correct?

6            MR. ROBERTS: Your Honor, I don't believe that's a fair question and I

7  don't think that that's actually the state of the law depending on what happened.

8            THE COURT: I believe Mr. Roberts is correct.

9  Q.     (By Mr. Waterstreet)  When the police came in to execute the Search Warrant

10  and they announced they were police, you barricaded yourself in your home, didn't

11  you?  It's a simple yes or no.

12  A.     No, it's not.

13  Q.     It's a simple yes or no.  You and your wife barricaded yourself in a room with a

14  handgun, didn't you?

15  A.     But we didn't know who it was.

16  Q.     And it took five minutes for you -- five to 15 minutes for you to find out that it

17  was the police?

18  A.     No, sir.

19  Q.     I have no further questions.

20            THE COURT: Thank you.  Mr. Roberts, any questions?

21            MR. ROBERTS:   Yes, Your Honor if I may.

22                         **DIRECT-EXAMINATION**

23  **BY MR. ROBERTS:**

24  Q.     Mr. Clough, the incident you were just directed to was a situation involving

25  execution of a Search Warrant at your home?

1 A. Yes, sir.

2 Q. What date did that occur?

3 A. I believe it was the 27th of March.

4 Q. Was Joshua present?

5 A. No, he wasn't.

6 Q. What time of day or evening was it?

7 A. On or about 6:30 to seven.

8 Q. Where were you?

9   THE COURT: 6:30 to seven what?  A.m. or p.m.?

10   THE WITNESS: P.m.

11 Q. (By Mr. Roberts continuing) Where were you, sir?

12 A. I was taking a nap.

13 Q. When did you become aware that something was occurring at your home out

14 of the usual?

15 A. My wife came into the bedroom and said that there are a bunch of crazy people

16 running around the house.

17 Q. Did she describe them in more detail than that?  Anything they may have with

18 them?

19 A. No, sir.

20 Q. Nothing about weapons?

21 A. Not at that point, no.

22 Q. And when she communicated this to you, you were located where, sir?

23 A. In the bedroom.

24 Q. And did you hear your outer -- your door to the outside, both doors be

25 breached?  Did you hear them breached?

1   A.      No, sir.

2   Q.      Did anybody knock and announce?

3   A.      Not that I heard.

4   Q.      What next happened after your wife alerted you in the bedroom?  What next

5   occurred?

6   A.      Okay.  I pulled her into the bedroom.  I locked one door over here and then I

7   went and locked another door over here.

8   Q.      There are two doors to the bedroom?

9   A.      There is.  I then --

10   Q.      Why did you do that?

11   A.      It's been the proper action according to the law for the past couple decades

12   that if you have an intruder in your house, that you are to go to a safe place and

13   secure the doors and do everything you could to avoid a confrontation.

14   Q.      Had you -- other than your wife alerting you and now you taking action, the two

15   of you and your locking your bedroom doors, had you heard anything up to that point

16   that would tell you who it was?

17   A.      Well, I have to wear hearing aids and I wasn't wearing them at the time.  Then

18   there was a banging on both doors at the same time.

19   Q.      The inner doors to your bedroom?

20   A.      Correct.  I guess they were using battering rams both at the same time and

21   there was yelling that I couldn't comprehend because there was a pitch above where I

22   have problems.  Finally I got them to quiet down and I asked them, I said who are you

23   and they said the FBI.  At that point I said I have a Concealed Carry Permit and the

24   gun is in here with us, and the reason that I did that was during our instructions, the

25   instructor told us that if you're ever involved in a traffic stop, that the first words out of

1    your mouth need to be that you have a CCW and where the gun is.

2    Q.      And you alerted --

3    A.      -- that's pretty much the same thing as a traffic stop only a little bit more

4    intense.

5    Q.      Yes.  And you alerted them to that?

6    A.      I did.

7    Q.      And after they identified themselves in the form you described and you alerted

8    them to the fact that you had a firearm in the bedroom with you, what next occurred?

9    How much longer did it take?

10   A.      As soon as they told me it was the FBI, I laid the gun down on the bed and I

11   said what do you want us to do.  At that point, they said open the door slowly, stick

12   both hands out and then they took me and cuffed me and set me in the living room

13   and then they did the same thing to my wife.

14   Q.      Now the individuals that you've been referring to as they, you said that they

15   identified themselves to you as FBI?

16   A.      Correct.

17   Q.      That was through the closed doorway, right?

18   A.      Yes.

19   Q.      When you finally were able to see them when the doors were open, how were

20   they attired?  What did they have on?

21   A.      They had full combat gear on.

22   Q.      Did anybody have masks over their faces that you could see?

23   A.      No.

24   Q.      Did they have weapons with them?

25   A.      I didn't really notice.  I saw them carrying around weapons afterwards.

1    Q.    Did you comply with their requests from that point forward once you were

2    satisfied that it was Federal investigators that were in your private home?

3    A.    Yes, sir.

4    Q.    You recognize the fact that if your son were to be granted the capability of

5    being free on bond during the pendency of this case into your custody as a third-party

6    custodian, that you would be required to monitor his behavior to make it -- certain that

7    it was in compliance with the Court's directives, correct?

8    A.    Yes, sir.

9    Q.    You understand that that would also require that you report any infractions that

10    he may engage in of the Judge's Order immediately, Pretrial Services or the Court

11    directly?

12    A.    Yes, sir.

13    Q.    I have no further questions.

14            THE COURT: Thank you.  Anymore, Mr. Waterstreet?

15            MR. WATERSTREET: No, Your Honor.

16            THE COURT: Thank you.  Mr. Clough, you can step down.  Thank you.

17    Do you wish to cross-examine Mrs. Clough?

18            MR. WATERSTREET: No, Your Honor.

19            THE COURT: Thank you.  Mr. Satawa.

20            MR. SATAWA: Good afternoon, Your Honor.  Your Honor, I would like to

21    first join Mr. Swor's factual proffer and add only specific to my client that regardless of

22    what was said on the two tapes presented to the Court, I would suggest that the

23    specific statements attributed to my client alone certainly do not raise, I don't believe,

24    a concern that he is the type of danger to the community or a flight risk.  Well, I guess

25    the Pretrial Services Report does not suggest he's a flight risk, but it does not raise to

1    a level of causing concern of him being a danger to the community as suggested by

2    the Pretrial Services Report and the Government's response to my Motion for Bond.

3           Your Honor, having said that, yesterday I tendered the following proffer to the

4    Court related to my client's military record and military service which was admitted at

5    the first Detention Hearing before Magistrate Judge Sheer; my client's boss, Matthew

6    Anderson of Interactive Metals to attest to the fact that my client is a valued

7    employee, as well as the fact that he would have his job waiting for him if he were

8    released on pretrial release.  And finally, Your Honor, his family members would

9    agree to be third-party custodians for my client.  They include his parents as well as

10   his brother, Douglas Meeks who's a member of the Bar.

11          The primary family member, however, that would be the primary third-party

12   custodian or the person who seems most obvious to be third-party custodian would be

13   for him to live with his parents, that being his mother, Sylvia Meeks at the addresses

14   noted in both the Pretrial Services Report as well as the Supplemental filed today.

15   Sylvia Meeks is present in the courtroom and available for questioning by the

16   Government if they so choose.

17          THE COURT: Thank you.  Mr. Waterstreet, do you wish to examine Mrs.

18   Meeks?

19          MR. WATERSTREET: Yes, Your Honor.

20          THE COURT: Mrs. Meeks, come forward.

21                    **S Y L V I A   M E E K S,**

22          Having been sworn under oath at about 3:32 p.m., testified:

23                    **CROSS-EXAMINATION**

24   **BY MR. WATERSTREET:**

25   Q.    Ma'am, you've been introduced as Sylvia Meeks, but can you give the Court

1    your full name?

2    A.      Sylvia Marie Meeks.

3    Q.      I'm not going to ask you Miss Meeks, your street address, but my

4    understanding is you live in Manchester, Michigan?

5    A.      Yes.

6    Q.      Is that correct?

7    A.      Yes, Washtenaw County.

8    Q.      And it's my understanding that your son, Michael Meeks, does not live with

9    you?

10   A.      No, he does not.

11   Q.      And do you recall back in March of 2010 some Agents coming to your house?

12   A.      I certainly do.

13   Q.      And during that time they were asking for information from you as to where

14   Michael Meeks lives, correct?

15   A.      Yes.

16   Q.      And you were unable to give them a street address as to where your son lived?

17   A.      I did not know the address.  I knew that it was Timberlane; I don't know the

18   number.  Can I say that three of us were asked that evening and all three said he lives

19   on Sweezy (phonetic) Lake.

20   Q.      All you knew --

21   A.      (Interjecting)  And I can take you there.  I mean I don't know the address.

22   Q.      All you knew was the town in Novell?

23   A.      Norville.

24   Q.      Norville?

25   A.      Yes, he lives in Norville and he lives on a lake and I know where it is and I

1    have been there.

2    Q.    When's the last time you were there?

3    A.    Well, the last time is probably a week ago.

4    Q.    Before that?  Before he was arrested?

5    A.    It had been awhile.

6    Q.    How long is awhile?

7    A.    Maybe a year.  I don't know.

8    Q.    I'm going to show you what is marked Government's Exhibit Three and tell me

9    if you recognize the interior of this particular home.

10   A.    Yes, I do.

11   Q.    And what is that?

12   A.    It's his front living room looking into the kitchen.

13   Q.    Is that the condition you saw last time you were there?

14   A.    Yes, pretty much.

15            MR. SATAWA:  Doesn't that have to be admitted before it can be

16   shown?

17            THE COURT: No.  I mean she has to --

18            MR. SATAWA: Judge --

19            THE COURT: Do you have an objection to this exhibit?  I've taken my

20   eyes off of it.  Do you have an objection?

21            MR. SATAWA: Your Honor, my objection is this.  I'm not certain as to

22   what relevance that exhibit has other than to show what the FBI does to you when

23   they raid and ransack your house, but other than that  --

24            THE COURT: She identified this as how the apartment or the house

25   lived (sic) when she visited a year ago.

1          THE WITNESS: No.

2          MR. SATAWA: That was my other objection.  Your Honor, I believe Mr

3    Waterstreet was mischaracterizing Mrs. Meeks'  answer.  I believe her answer was

4    that's what it looked like when she was there a week ago, not  --

5          THE COURT:  Was that the question? Is this what it looked like when

6    you were there a week ago?

7          MR. WATERSTREET:  No, I did not ask that -- when she visited there.

8          MR. SATAWA: The last time, Judge, which was a week ago after the

9    FBI did that to the house.

10          MR. WATERSTREET: No, the FBI did not do that to the house.

11          MR. SATAWA: Yes, they did.

12          MR. WATERSTREET: Excuse me.

13          THE COURT: Excuse me. Excuse me.

14          MR. WATERSTREET:  Your Honor, this was a photograph -- I will

15    proffer to the Court this was a photograph taken upon entry into Mr. Meeks'  home.

16          MR. SATAWA:  And I would proffer that that's a complete lie.  It was a

17    photograph taken after the FBI did that to the home.

18          THE COURT: Well, the question to Mrs. Meeks is, is this the condition

19    the apartment looked at when you last visited it and what did you mean by that

20    question, Mr.  Waterstreet?  A year ago or a week ago?

21          MR. WATERSTREET: I meant a year ago. I'm sorry.

22          THE COURT: A year ago, so it's not how it looked a year ago and so

23    this doesn't -- is not admitted.

24          MR. SATAWA: Thank you, Your Honor.

25    Q.     (By Mr. Waterstreet continuing) Does your -- your son has certain views of the

1  Federal Government, correct?

2  A.    I hear that, yes.

3  Q.    And are you like-minded with your son's views of the Government?

4  A.    Not usually, no.

5  Q.    And so you don't believe that the Government was involved in murder of 83

6  men women and children at Waco?

7         MR. SATAWA: Your Honor, objection.

8         THE COURT: Sustained.

9         MR. SATAWA: I will note for the record it's been objected to once at

10  least by Mr. Rataj and Mr. Waterstreet I suggest is dragging these proceedings on

11  much longer than they need to be for the limited purposes of whether or not my client

12  and the codefendants should be given pretrial release by this Court.

13         THE COURT: Mr. Waterstreet, the Court has asked you, this will be the

14  third time I think now, to confine your questioning to the appropriateness of the

15  witness as a third-party custodian and whether she shares views about what

16  happened at Waco in this Court's opinion is not relevant.

17  Q.    (By Mr. Waterstreet continuing) Ma'am, your son -- how long ago did your son

18  move out and move into this house?

19  A.    I don't know exactly, but it was in January of either seven or eight years ago.

20  Q.    And in those seven or eight years your son has not changed the address for

21  his driver's license, correct?

22  A.    That's what I understand, yes.

23  Q.    And your son does not have a mailbox at his home in Norville?

24  A.    No.

25  Q.    And as a matter of fact, it's your understanding that it's -- the Post Office

1    believes it to be a vacant home?

2    A.    I don't know about that, but --

3    Q.    So based upon if the Government were to try to find your son, they would go to

4    the Secretary of State, they would be sent to your house?

5    A.    Ah-hum.

6    Q.    Is that correct?

7    A.    It seems so, yes.

8    Q.    This was prior to his arrest.  If they tried to find him by seeing if he had any mail

9    delivered, they would not find him --

10         MR. SATAWA:  (Interjecting) It calls for speculation on behalf of this

11   witness, Judge.

12         THE COURT: Sustained.

13   Q.    (By Mr. Waterstreet continuing) Do you have any idea why your son --

14         MR. SATAWA: (Interjecting) Objection.  Calls for speculation as to what

15   her son may or may not have done.

16         THE COURT: Sustained.

17   Q.    (By Mr. Waterstreet continuing) Did your son ever share with you why he

18   wanted to have your address rather than his home address?

19   A.    It was easy.

20   Q.    What do you mean easy?

21   A.    He could come by and see us and pick up his mail.  When he bought the house

22   in January that year, he had a lot of expenses, including a new furnace that needed to

23   be put in and there was -- he was just trying to save money.

24   Q.    So for seven years he couldn't save up enough money for a mailbox?

25   A.    Well, no.  It was convenient.  It was a stable address --

1    Q.      For an unstable person?

2                        MR. SATAWA: Objection.

3                        THE WITNESS:  I'm sorry,  No, no, no.

4                        THE COURT: Excuse me.   Excuse me.  Mr. Waterstreet --

5                        MR. SATAWA: Judge, that's argumentative.

6                        THE COURT: It's stricken from the record and Mr. Waterstreet, allow the

7    witness to answer her -- answer your question rather than you answer your questions.

8                        MR. WATERSTREET: Yes, Your Honor.

9                        MR. SATAWA: I'd ask the Court to admonish Counsel that -- she struck

10   it from the record, but Judge, that comment was completely inappropriate for a

11   courtroom in a hearing of this nature.

12   Q.      (By Mr. Waterstreet continuing) Ma'am, did he explain to you why?

13   A.      No.  That was -- I'm not sure he ever explained that to me.  I assumed that.

14   Q.      Did he ever indicate to you that he wanted to not let people know where he

15   really was?

16   A.      Anybody who knows him knows where he's at.

17   Q.      That wasn't my question, ma'am.  Did he ever indicate to you that he really

18   didn't want people to know where he was?

19   A.      No, not really.

20   Q.      What do you mean not really?

21   A.      No, he did not.

22   Q.      I have no further questions, Your Honor.

23                        THE COURT: Thank you.

24                                    **DIRECT-EXAMINATION**

25   **BY MR. SATAWA:**

1   Q.      Just to clarify, Mrs. Meeks.  The photograph you were shown when you were at

2   your son's house about a year ago, that is not what the condition of the house was?

3   A.      No, it was not.

4   Q.      Thank you.

5            THE COURT: Thank you.  Anything further, Mr. Waterstreet?

6            MR. WATERSTREET: No.

7            THE COURT:  Mrs. Meeks, you can step down.

8            MR. SEIKALY: Good afternoon.  Christopher Seikaly appearing on

9   behalf of Jacob Ward.

10           Your Honor, Nadeen Bober is Mr. Ward's mother.  She when originally

11  interviewed by the Pretrial Services on March 29th, she indicated that she was willing

12  to act as a third-party custodian.  She's a Corrections Officer for the State of Ohio.

13  She's present should Mr. Waterstreet care to examine her.  I will save any other

14  remarks for closing, I guess.

15           THE COURT: Thank you.  Mr. Waterstreet, do you want to

16  cross-examine Miss Bober?

17           MR. WATERSTREET: Yes.

18           THE COURT:  Miss Bober, come forward please.

19                    **N A D E E N   B O B E R,**

20           Having been sworn under oath at about 3:43 p.m., testified:

21                       **CROSS-EXAMINATION**

22  **BY MR. WATERSTREET:**

23  Q.      Good afternoon, ma'am.

24  A.      Good afternoon.

25  Q.      Can you pull the mic?  Thank you.  What's your full name, ma'am?

1    A.    Nadeen Louise Bober, not Bober.

2          THE COURT:  Sorry.

3    Q.    And how do you spell that?

4    A.    B-o-b-e-r.

5    Q.    Ma'am, I notice you mentioned -- you said greetings to your son, correct?

6    A.    Correct.

7          THE COURT: I'm sorry.  What's your question.

8    Q.    I notice you greeted your son?

9    A.    Correct.

10   Q.    That's Jacob Ward?

11   A.    Jay Ward.

12   Q.    There came a point and time based upon your understanding of his mental

13   capabilities that you thought it was best to take his guns away from him, correct?

14         MR.  SEIKALY:  Judge, I'm going to object as to these question -- this

15   question.  It doesn't have anything to do with if she would be a suitable third-party

16   custodian and I thought the Court directed the Prosecutor to limit his questions to that.

17         THE COURT: I did with respect to the other witnesses.  Your point in

18   these questions?

19         MR. WATERSTREET: How she intends to control him based upon his

20   level of mental unstableness, Your Honor.

21         THE COURT: Overruled.

22   Q.    (By Mr. Waterstreet continuing) Is it true that you came to a point based upon

23   your son's mental stability that you thought it was best to take firearms away from

24   him?

25   A.    The firearms are not in the house because we felt that he needed to see

1   somebody in the mental health field.  We did not know was anything wrong with him

2   or not, but I wanted to be a hundred percent sure that my son was okay.

3   Q.      Are you aware that he was able to get firearms from somebody else when he

4   went for training?

5   A.      No.

6   Q.      You were not aware of that?

7   A.      No.

8   Q.      You've expressed a concern about his mental state to the point where you

9   believed he was actually delusional, isn't that true?

10   A.      I'm not a mental health facilitator.  I don't know what his problem is.

11   Q.      But you've expressed some concern about some of his thought process,

12   correct?

13   A.      Yes.

14   Q.      That, for example, he thought the Mafia was after him?

15   A.      Correct.

16   Q.      And that he thought that he has a girlfriend from Malta who is being held?

17   A.      Malta?

18   Q.      Maybe I'm mentioning the wrong country.

19   A.      My goodness!  I don't know anything about Malta.

20          MR. SEIKALY: I object to this line of questioning.  It's not relevant to

21   anything.  We've asked -- he's asked her about what her concerns were about his

22   mental health, she's told him and now to develop any further, she is not a mental

23   expert.  She is not a doctor.  She told him what her feelings were about it and I think

24   that should be enough for the purposes of this hearing.

25          THE COURT: I'm going to overrule you at this time, Mr. Seikaly.

1    Q.     Do you remember speaking with an Agent back in March, March 30th?

2    A.     Yes.

3    Q.     And that you believed that your son had a delusional belief about a woman

4    named Tonya?

5    A.     We don't know whether she exists or not; we have not met her.

6    Q.     That's part of your concern, whether she's real or made up?

7    A.     We have not met her.  We don't know.

8    Q.     And that he had some concern that his former employer had tampered with his

9    brake lines and had some complicity with the Chief of Police?

10    A.     What do you mean by complicity to Chief of Police?

11    Q.     Well,  that he had some assistance with it from the Chief of Police in order to

12    tamper with his brake lines.

13    A.     I do not remember anything about the Chief of Police and brake lines.

14    Q.     Do you remember speaking with that Agent on March 30th, 2010?

15    A.     Correct.

16    Q.     And you noted that some mental -- that you believed your son was slipping

17    over time?

18    A.     No, I never said slipping.

19    Q.     Mental slippage?

20    A.     No, I never said slippage.

21    Q.     What terms did you use to try to explain that you didn't think your son --

22    A.     (Interjecting) I explained that he thought these thoughts that I just mentioned

23    about work and about the girlfriend.  We did not know what was real and what was

24    not.

25    Q.     Well, I understand you don't know whether it was real or not, but I just want to

1   make sure I understand what the belief was or what he was saying so that whether it's

2   true or not is -- you follow what I'm saying?

3   A.      No, sir.

4   Q.      My question is, did he believe that his -- he had a problem with his former

5   employer?

6   A.      His former employer?  Which one?

7   Q.      Jim West?

8   A.      Yes.

9   Q.      And that he believed that Jim West had tampered with the brake lines of his

10  car?

11  A.      Correct.

12  Q.      And that somehow the Chief of Police, a John Majoy (phonetic) was involved?

13  A.      John Majoy (phonetic) was an officer at that time.

14  Q.      And that your son believed that he had told you that West and Majoy had killed

15  somebody and dumped their body?

16  A.      Yes, but I also told -- may I say?  I also told this Agent that he got this

17  information from the West family.

18  Q.      Okay.

19  A.      All this information has been fed to him.

20  Q.      What would you do -- now my understanding is you're employed.  What would

21  you do to make sure that your son would be properly supervised?

22  A.      I have done so all along.  He has not broken any laws.  There has not been

23  any weapons in the house.  You found nothing besides ransacking my house.  Now

24  he has -- he's got jury duty next month.  You know, he's also a Mason.  He's trying to

25  get another job, so I don't -- what do you mean by me supervising him when I have all

1  along?

2  Q.    So the question -- my question is would you be able to watch him 24 hours a

3  day?

4  A.    I work.  I will not be there all the time.  No, he would be in the house alone.

5  Q.    Is it part of your son's belief that the Mafia or the Government is holding Tonya

6  in captivity someplace?

7  A.    I'm not sure what he thinks on that really.  All I know is something about that

8  she's got testimony and that she's testifying to the Federal Government.  I don't really

9  know a lot.

10         MR. SEIKALY:  Excuse me.  Judge, what does this have to do with

11 whether she --

12         THE COURT:  Well, I think it's been probed enough.  Sustained.

13 Q.    (By Mr. Waterstreet continuing) Okay.  There's nobody else who would be at

14 home with him?

15 A.    Just the cat.

16 Q.    I have no further questions.

17         THE COURT: Do you have questions, Mr. Seikaly?

18                          **DIRECT-EXAMINATION**

19 **BY MR. SEIKALY:**

20 Q.    Do you understand if the Judge said that you could be the third-party custodian

21 for your son, it would be your responsibility to advise the police should he commit any

22 crimes?

23 A.    Correct.

24 Q.    Should he violate any part of whatever orders the Judge makes?

25 A.    Correct.

1   Q.      You have no problem with that?

2   A.      I have no problem with that.  If he committed anything, I would turn him in in a

3   heartbeat.

4   Q.      As part of your job as a Corrections Officer, do you keep a weapon at the

5   house?

6   A.      No, sir I do not.

7   Q.      Thank you.

8           THE COURT:  Miss Bober, I have some questions.  Has your son ever

9   received any mental health counseling that you are aware of?

10          THE WITNESS: Not that I'm aware of.

11          THE COURT: So you don't know that he's ever been diagnosed with

12  any kind of mental --

13          THE WITNESS: No ma'am, I do not.

14          THE COURT: -- illness.  And I have a few questions about his

15  employment record.  He worked for -- from 2002 to 2008 at Jim's Pizza Box?

16          THE WITNESS: Yes, ma'am.

17          THE COURT: Do you know why he left that employment?

18          THE WITNESS: They had a -- the West family, one of the Wests told

19  Jacob that Jim West had worked on the brakes with this other guy and Jim West

20  found out about it and two police officers and their cars and Jim West came to my

21  house and started yelling at Jacob and trying to assault Jacob and I stayed in

22  between them and saying he was fired because Jacob made this statement that he

23  had heard from Jim West's brother.

24          THE COURT: About Jim tampering with the brakes?

25          THE WITNESS: Yes.  Jim West's brother told Jacob that.

1          THE COURT: Then he worked at the Sandusky Mall for about six

2   months?

3          THE WITNESS:  Yes.

4          THE COURT: Do you know why that employment ended?

5          THE WITNESS:  He said he was being harassed at work.

6          THE COURT: Thank you.

7          THE WITNESS: Yes, ma'am.  Thank you.

8          MR. SCHARG: Good afternoon, Your Honor.  Henry Scharg on behalf of

9   Kristopher Sickles.

10          As I indicated to the Court yesterday, we were proffering Kelly Sickles as a

11   third-party custodian and at this time I would offer her up for examination.

12          THE COURT: Do you wish to cross-examine Kelly Sickles?

13          MR. WATERSTREET: May I have one moment, Your Honor?

14          THE COURT: Yes.

15          MR. WATERSTREET: I have no questions, Your Honor.

16          THE COURT: Thank you.  Mr. Weiss.

17          MR. WEISS: Your Honor, at the Detention Hearing that my client had in

18   Indiana, witnesses were presented and one was my client's brother, Stanley, who was

19   cross-examined by the Government at that point.  According to a Memorandum of

20   today's date, Pretrial Services interviewed him telephonically I presume, and he

21   indicated that he would be or act as a third-party custodian if the Court saw fit, and I

22   would proceed then by proffer on that basis as well as the transcript where the

23   Government had a full opportunity to cross-examine him at length.

24          THE COURT: Thank you.  Mr. Waterstreet, do you have the transcript

25   from the Bond Hearing of Stanley Piatek?

1              MR. WATERSTREET: Yes I do, Your Honor.

2              THE COURT: All right.  Okay, thank you.  Are there any other Defense

3      witnesses?

4              MR. SWOR: No, Your Honor.

5              MR. HELFRICK: No, Your Honor.

6              MR. THOMAS: Your Honor, I need two seconds please?  If you go

7      through the rest of them,  I'll have an answer for you.

8              THE COURT:  Okay.  Yes.

9              MR. RATAJ: No more witnesses, Your Honor.

10             MR. ROBERTS: On behalf of Joshua Clough, no more witnesses,

11     Judge.

12             MR. SATAWA: No, Your Honor.  Thank you.

13             MR. SEIKALY: On behalf Mr. Ward, no.

14             MR. SCHARG:   On behalf of Kristopher Sickles, no more witnesses,

15     Your Honor.

16             MR. WEISS: On behalf of Mr. Piatek, no, Your Honor.

17             MR. THOMAS: Judge, we don't have any further witnesses.

18             THE COURT: All right.  Thank you.  I will hear summation.

19     Government?

20             MR. WATERSTREET: Your Honor, there is a bit  -- I did have some

21     rebuttal.

22             THE COURT: You have some rebuttal?  I'm sorry.  Yes.

23             MR. WATERSTREET: And I assume all the proffers that were intended

24     to be made have been made of fact?

25             THE COURT: I assume.  I'm assuming so.

1    MR. HELFRICK: I don't know if I did it on the record.  The only thing I

2    would proffer in addition is the Pretrial Services Report that was prepared.

3        THE COURT: Yes, those are in the record.

4        MR. SATAWA: As well as obviously anything that was addressed in

5    front of Judge Sheer.  All the factual proffers made there are incorporated into this

6    record as well.

7        THE COURT: Okay.

8        MR. WEISS: Your Honor, for example, in the Pretrial Services Report

9    pertaining to Mr. Piatek, under risk of flight they mention a passport and then they

10   indicate that that could be handled by other conditions.  By proffer, it's my client's

11   belief that his passport was at his residence.  He's not been back to his residence

12   since his arrest.  He knows that at his residence a Search Warrant was executed and

13   he believes his passport is in the custody of the Government, so I don't know if it's

14   things like that if the Court is asking by way of proffer or to leave that for argument.

15       THE COURT: I'll leave it for argument.

16       MR. WEISS: Thank you.

17       THE COURT: Anyone else or does the Defense rest?  Everyone rests?

18   Okay, thank you.  Mr. Waterstreet.

19       MR. WATERSTREET: Your Honor, the United States would call ATF

20   Special Agent Brian Leuttke.

21       THE COURT:  I'm sorry.  Give me the name again, Mr.  Waterstreet.

22       MR.  WATERSTREET:  L-e-u-t-t-k-e.

23                    **B R I A N   L E U T T K E,**

24   Having been sworn under oath at about 3:59 p.m., testified:

25       MR. WATERSTREET: Your Honor, in response to the Court's concern

about whether certain firearms that were in possession of the Defendants were in and

of themselves illegal and finding out that the FBI had not sent those off for evaluation,

our Office made a special request of the ATF, Bureau of Alcohol, Tabacco & Firearms

to come over and look at a particular set of guns that they believed did not meet the

criteria of being lawfully possessed, and I'm here to present that information to the

Court.

           THE COURT: Thank you.

**DIRECT-EXAMINATION**

<u>BY MR. WATERSTREET:</u>

Q.     Sir, can you please introduce yourself to the Court?

A.     My name is Brian Leuttke.  I'm a Special Agent with the Bureau of Alcohol,

Tabacco & Firearms stationed in Grand Rapids, Michigan.

Q.     Mr. Leuttke, can you just give us a little -- excuse me, Agent Leuttke -- can you

give us a little bit of information about your background, your experience and training

and if you've ever been qualified as an expert and in what fields?

A.     I served three years in the 82nd Airborne Division.  I have a Bachelor of Arts

degree from the University of Michigan with a major in Criminal Justice.  I served or

worked three years, approximately three years as a U.S. Customs Inspector here in

Detroit.  I was a police officer for the City of Novi, Michigan for four years and I've

been with -- Special Agent with ATF since 1998.  I've testified -- been qualified to

testify as an expert witness 24 times in the Western District of Michigan.  I teach

internationally.  I've taught twice at the International Law Enforcement Academy,

specialize in firearms identification at the International Law Enforcement Academy

located in Botswana, Southern Africa and four times in the International Law

Enforcement Academy in Budapest, Hungary where I teach firearms identification to

1   police officers from various countries.

2   Q.      And have you ever been qualified to determine whether a firearm meets the

3   standard of being a lawful weapon or considered a short barrel weapon under Federal

4   law?

5   A.      Yes, I have.

6   Q.      And can you, without going into the particulars of this case, can you just give

7   the Court a brief overview of what is considered a lawfully possessed firearm and

8   what is considered a short barrel rifle or shotgun?

9               MR. SWOR: Your Honor, I think that that's a matter of law.  It certainly is

10  not the domain of an opinion.  Either the law says something or the law doesn't say

11  something.  This witness doesn't determine what is and is not lawful.

12              THE COURT: Mr. Waterstreet.

13              MR. WATERSTREET: I'm not asking him to determine what is the law.

14  It's my understanding I'm asking him to what he understands the law is concerning  --

15              THE COURT: Overruled.

16  A.      As it pertains to the four firearms I examined today, Your Honor, four rifles, all

17  having barrels less than 16 inches in length categorized as short barreled rifles.  The

18  legal length is over 16 inches and the four firearms I examined today had barrels

19  ranging from eight and a half inches to 14 and a half inches in length.

20  Q.      And --

21              MR. SWOR: I'm sorry.  Could we have that repeated?  Could he repeat

22  the statement, Your Honor?

23              THE COURT: You want him to repeat his answer?

24              MR. SWOR: Yes,  please.

25  A.      Of the four firearms that I examined today, they ranged -- the barrels had --

1  they ranged in length from eight and a half inches, one of them, the shortest and the

2  longest was 14 and a half inches in length.

3  Q.      The four firearms that you examined, did you go over to the FBI Office here in

4  Detroit?

5  A.      Yes, I did.

6  Q.      Were you asked to take a look at some weapons that the -- that there was

7  some belief that they perhaps were not 16 inches in length?

8  A.      Yes, four rifles.

9  Q.      And did you then conduct some type of an examination of those weapons to

10  see if they were in fact of legal length?

11  A.      Yes, I did.  The testing procedure is rather simple.  You take a dowel rod.  You

12  close the action of the firearm so the bolt is at the chamber.  You drop a dowel rod

13  down the muzzle end of the rifle -- of the barrel and at the highest point one of the

14  rifles, a Ruger rifle appeared to be cut off by a hacksaw.  It was not a professional

15  barrel job.  You give -- you measure to the highest point on the end of the muzzle to

16  determine the overall length.  On three of the other rifles, one of them being a

17  Kalashnikov-style rifle and the other two being AR-15 rifles, had flash suppressors on

18  the end.  I measured them with the flash suppressor on .  However, they were not

19  permanently attached which is required by law and I was able to untwist them by hand

20  and I took another measurement which would be more accurate and even with the

21  flash suppressors attached, they were still well under the 16-inch as required.

22  Q.      Did you prepare a report to reflect the results of your investigation or your

23  examination?

24  A.      Yes, I did.

25  Q.      I'll show you what is marked Government's Proposed Exhibit Number Four.

1    You have there the report as well as your Curriculum Vitae.  Do you recognize that

2    Report?

3              MR. SATAWA:  Your Honor, I'd like to place an objection on the record.

4    I would like to first note for the record that apparently based on testimony that was

5    given that went as late as five o'clock yesterday, when the FBI was not able to comply

6    with this Court's Order last Thursday and had the FBI Agent notified and here properly

7    prepared to testify yesterday, they somehow managed to get an ATF Agent from

8    Grand Rapids here from five o'clock yesterday to this afternoon, not only having done

9    that but having had him the opportunity to review four firearms, prepare a report, a

10   report that oh by the way, has not been furnished to myself or any other Defense

11   Counsel.

12             THE COURT: So what is your objection?  That you don't have the

13   report?

14             MR. SATAWA: Yes, Judge.  Or no notice that this was happening or any

15   notice that they were going to proffer this information or use the Report, an expert or

16   this type of testimony in any way.

17             THE COURT: Mr. Waterstreet?

18             MR. WATERSTREET: Well, Your Honor, I'm somewhat confused.

19             MR. SATAWA: I'll unconfuse it for him.

20             THE COURT:  Excuse me.  Mr. Waterstreet.

21             MR. WATERSTREET: I don't want to sound flippant but, Your Honor, I

22   found out about the problem that existed and the concern of the Court and I made

23   sure that our Office got the Court the information that it desired.

24             THE COURT: I don't know what you're talking about.

25             MR. WATERSTREET: The information the Court asked me yesterday,

1    which I was unable to give you an answer is was there anything in and of themselves

2    of those firearms that was illegal, and I told you I could not give you that answer.  The

3    Agent could not give you that answer, and I made sure that we were able to give the

4    Court the information that it requested of the Government as quickly as possible.

5                    THE COURT: Well, I think the objection of the Defense is that -- I did

6    ask that question, you didn't know the answer to it and I'm hearing the objection being

7    that the Government was able to act with much speed in getting an examination

8    completed and an official report prepared and the Defendants have not seen any of

9    that and may not be prepared to cross-examine this witness.

10                   MR. SWOR: In addition, Your Honor, I think all of us by now have made

11    discovery demands, including a demand under Rule 16 for -- and we've received none

12    of this.

13                   MR. WATERSTREET: Well, frankly Your Honor, not everybody has

14    made a discovery request.

15                   THE COURT: Has someone made a request that would include the

16    report that Agent Leuttke has?

17                   MR. SATAWA: Mr. Meeks has, Judge.  I have.

18                   MR. RATAJ: So has Tina Mae Stone.

19                   MR. SEIKALY: I made request on behalf of Mr. Ward.

20                   MR. HELFRICK: I think I filed the original request and other people

21    joined in, Your Honor.

22                   MR. SATAWA: Your Honor, I think it's fair to classify this as

23    sandbagging, particularly based on the Government's actions yesterday.  This is a

24    continuation of the Government not complying with this Court's Orders or the

25    discovery -- the rules of discovery and Judge, this is improper on any number of

1    levels.

2          THE COURT: I'm not going to allow the testimony, Mr. Waterstreet.  I

3    think the Defendants lodge a legitimate objection here.  The Court ordered the

4    Government last Thursday to have an Agent here prepared to give testimony and I

5    think that there certainly would have been a major question about the lawfulness or

6    the unlawfulness of all of the weapons that were seized during the search.  The

7    Government did not comply by having a witness here yesterday who was prepared to

8    give answers in the areas that you knew the Defendants would be curious about,

9    which would be the sufficiency of the evidence and the weight of the evidence and

10   that certainly would include whether these firearms were legal or not legal, and so you

11   had from Thursday until yesterday to have a witness here prepared; you didn't do that

12   and overnight you were able to get some major testing done,  an expert here from the

13   other part of the state, a formal report prepared, a report that the Defendants have

14   asked for and not been provided and they certainly are not going to be prepared to

15   cross-examine this witness in the time that we have allotted.  So I asked that

16   question, but it certainly shouldn't have been -- it should have been part of what the

17   witness was prepared to answer yesterday and not a rebuttal case.

18          MR. WATERSTREET: Your Honor, I understand the Court's concern

19   and I appreciate it and I hope the Court can appreciate the situation I was placed in.  I

20   was unaware of the Court's Order on Thursday.  I was not here Thursday.  I was not

21   here Friday.  First day I was back was on Monday.

22          MR. SATAWA: Judge, Mr. Tukel was in the courtroom.

23          THE COURT: Excuse me.  Excuse me.

24          MR. WATERSTREET: Your Honor, when I found out that the

25   information had not been provided, that the information was not available to the Court

1   and especially after the Court's question, our Office made sure that the Court had the

2   information it needed and if the Court finds fault, I will take full blame and full

3   responsibility for it and if the Court wishes not to consider this information, I can

4   appreciate that, but I hope the Court appreciates the fact that the Government was

5   trying to provide the information that the Court had a concern about.

6                THE COURT: I understand what you were trying to do or are trying to

7   do, Mr. Waterstreet, and I don't know that you should take the fall for your Office.  Mr.

8   Tukel was at that meeting and Mr. Falvey was at that meeting and what I directed the

9   Government to do could not have been clearer, so --

10               MR. WATERSTREET: That being said, Judge, what I'll do is I'll move

11  on.  I'll ask the witness to please step down and I will move on with the summation by

12  the Government, if I may.

13               THE COURT: Thank you.  Thank you, Agent.

14               MR. WATERSTREET: May I proceed then, Your Honor?

15               THE COURT: Yes, you may.

16               MR. WATERSTREET: Your Honor, the Government proffered the

17  information to this Court that was previously presented before Judge Sheer and then

18  in addition to that played a  -- one additional audio clip and from that playing of that

19  clip we got a little bit greater insight as to what the different ideas of the various

20  members of the Hutaree were concerning their desire and different methods by which

21  they suggested to kill law enforcement for nothing more than being members of law

22  enforcement.  And it has been suggested here that as a result of overlapping

23  conversations, the people were not listening or not agreeing to it, but if the Court

24  wishes, I can play it again and I suggest to you if the Court listens closely, everytime

25  the leader of the Hutaree, David Stone begins to speak and he gets more than one or

1    two sentences out of his mouth, everybody stops talking and they listen.  And I'd

2    suggest to the Court if the Court wishes, I can play it again, but I believe the Court can

3    rely upon its own memory. Lawyers  --

4                    THE COURT:  Mr.  Waterstreet, let me ask you this question.  You said

5    that people allowed Mr. Stone to speak without interrupting him.  You're saying

6    everybody became quiet.

7                    MR. WATERSTREET: Yes.

8                    THE COURT: Would you explain to me -- we all know that mere

9    presence where a crime may be planned is not in itself a crime.

10                   MR. WATERSTREET: Correct.

11                   THE COURT: So please tell me how you implicate all the Defendants in

12   Mr. Stone, Sr.'s comments.

13                   MR. WATERSTREET: Well, Your Honor, if I may go back to an example

14   that I used previously from way back in law school when the Professor says if you

15   only have this and you only have this and you only have this.  If we only took the one

16   statement made on February 20th in a vacuum, I could understand the Court's

17   concern and I could understand Defense argument that this was nothing more than

18   mere talk.  But Your Honor, this has been an ongoing event where the Hutaree have

19   laid out the plan to kill law enforcement, laid out the various ways to kill law

20   enforcement and then have taken steps to train using the firearms, have laid out the

21   idea of using explosives, laid out the idea of using trip wires to kill law enforcement

22   when they come to arrest them and they go through training in order to detect the trip

23   wires and have built explosives to insure that the injuries occur to law enforcement.

24          There have been -- there was -- have been statements made concerning

25   adding shrapnel to the explosives in order to increase their lethality.  There's been talk

1   about Bouncing Bettys to increase the lethalness of any trip wire.  This is not

2   something that's been done in a vacuum, but it's been an ongoing quest.

3        As a matter of fact, David Stone in this February 20th conversation alone

4   indicated a great way in which they could take out the convoys by using IEDs.  David

5   Stone had requested other people to obtain the diagrams to give to somebody who

6   they believe could make an explosive, an explosively formed projectile to be able to

7   be used against law enforcement in that convoy.  So it's not just mere talk, Your

8   Honor.  It's conversations coupled with training coupled with action.

9        If I may, Your Honor, you know anytime when law enforcement learns of the

10  intent to be harmed -- of harm to be placed upon the unsuspecting public, it can't

11  simply just stand by and wait and hope nothing happens, and whenever police

12  intervene before the actual event takes place, the Defendants can make the same

13  argument that has been made here today and been made previously, is that they

14  never intended to follow through with it, everything they did was legal, there was no

15  specific plan, it was just talk, it was mere words.

16            THE COURT: Mr. Waterstreet, let me ask you this.  That they may never

17  have intended to follow through on any of the things that they planned, that's an

18  important consideration, isn't it?  Doesn't there have to be some evidence that

19  something is imminent?

20            MR. WATERSTREET: There's not a requirement of something being

21  imminent, Your Honor.  There has to be -- for a conspiracy, there has to be some step

22  towards that event taking place.  The fact that they want to use IEDs and they go and

23  collect the materials in order to make those explosives is one of the factors.  The fact

24  that they want to take on law enforcement and they trained to take on law

25  enforcement.

1    THE COURT: I guess my question was really limited to some of the

2    speech here because I'm certain that there's going to be a challenge on First

3    Amendment ground or a First Amendment defense in the case and with respect to

4    speech, doesn't there have to be evidence that any threat, any violence is imminent or

5    -- and that it is likely in order to meet the clear and present danger test?

6    MR. WATERSTREET: It doesn't -- frankly, Your Honor, my

7    understanding of the law is that there is no requirement of immediate act having to

8    take place.

9    THE COURT: Now I'm not talking about something that necessarily is

10   going to happen within a day or a week.  My definition of imminent is probably broader

11   than that; I think the law is broader than that as well.  But I asked you yesterday

12   whether it was the conversation in January about training in April that led the

13   Government to believe that there was going to be an attack on law enforcement in

14   April and you said yes.

15   MR. WATERSTREET: Law enforcement or some unsuspecting

16   individual, some innocent soul.  Yes, Your Honor.

17   THE COURT: But my question is what in the January 9th conversation

18   makes it clear that there was planned an attack on law enforcement as early as

19   January?

20   MR. WATERSTREET: Well, Your Honor, again I'm somewhat

21   constrained by the statements that Mr. Stone made and he says this is a real

22   operation.  We're going to be putting into a hostile situation.  Somebody comes upon

23   you, you're going to shoot him or you're going to put him on the ground.

24   THE COURT: I understand that, but where's the tie to law enforcement?

25   They're charged in Count One with Seditious Conspiracy which is to overthrow the

1    Government, and I assume that in these charges you are coupling law enforcement or

2    law enforcement and the United States Government are interchangeable?

3            MR. WATERSTREET: Yes, Your Honor.  The way that David Stone has

4    referred to The Brotherhood, yes.

5            THE COURT: So what in January 9th ties whatever plan there may have

6    been underway to an attack on the United States or on law enforcement?

7            MR. WATERSTREET: Your Honor, I understand the Court's concern,

8    but I don't want the Court to be focusing solely on the January 9th event.

9            THE COURT: I'm focusing on it because that was your answer to my

10   question yesterday.  You said that that is -- the January 9th tape is what caused the

11   Government to believe that there was going to be an attack in April.

12           MR. WATERSTREET: Yes.  We believed that as a result of that, a date

13   -- specific date was set forth that somebody could be placed at risk.

14           THE COURT: Somebody and not necessarily the Government or a

15   representative of the Government?  Because I have looked at this transcript.  I'm just

16   asking you to point it out to me where is the tie to the Government or law enforcement

17   at January 9th?

18           MR. WATERSTREET: In that particular -- in this particular section that

19   has been presented there is no mention of The Brotherhood or law enforcement.

20           THE COURT: There's more to this tape?

21           MR. WATERSTREET: Yes.

22           THE COURT: Where there's mention of The Brotherhood or the

23   Government?

24           MR. WATERSTREET: I could not answer that question without

25   reviewing it, Judge.  I don't want to sound as if I'm avoiding the question, but I don't

1    want to say something that is incorrect.  However, Your Honor, I understand the Court

2    is seeing this in somewhat of a vacuum and  --

3                    THE COURT: (Interjecting)  No, that's not true.  I'm not looking at it in a

4    vacuum.  I'm listening to what the argument of these Defendants is.  Their major

5    argument here is sufficiency of the evidence and the weight of the evidence.  That's

6    the only thing they have to argue here really.

7                    MR. WATERSTREET: Well, Your Honor, at this point and time I'm not

8    sure the issue is sufficiency of the evidence because this is not a preliminary

9    examination and I appreciate the Court's concern.  I understand the Court's concern.

10   If the Government isn't going to prevail, I'm not about to have people sit in jail knowing

11   that the Government will not prevail.  I understand that is the Court 's concern.

12                   THE COURT: The Court understands it's not a preliminary examination

13   as well, but in the statute that I have to look at, one of the considerations is the

14   sufficiency and the weight of the evidence, right?

15                   MR. WATERSTREET: I'm not sure the term sufficiency of the evidence.

16   I believe it's the weight of the evidence.

17                   THE COURT: All right, let's go with weight of the evidence and it is the

18   weight of the evidence and the seriousness of the crime -- I guess that's it.  The

19   seriousness of the crime, the weight of the evidence that our Pretrial Services Officer

20   has relied upon in making a recommendation that these Defendants are not bondable.

21   That's the only reason.  We've heard testimony today from people who are for the

22   most part very credible.  None of these Defendants for the most part have criminal

23   records.  Some are employed; some not, but under any other circumstance, any other

24   crime the Government may not be arguing that these Defendants are not bondable.

25   So it is the crime and it makes the weight of the evidence very, very important in the

1    considerations that I have to take into account in deciding whether to grant them bond

2    or not.

3                    MR. WATERSTREET: I understand the Court's concern.  Your Honor,

4    weight of the evidence I believe the case law says is one of several factors and it is

5    not the most important factor.

6                    THE COURT: I understand that, but in this case, in this case it becomes

7    the most important.

8                    MR. WATERSTREET: Your Honor, when I said unfortunately the Court

9    is seeing this in a vacuum, I'm suggesting that the entire Government's case has not

10   been laid out and that's not the intent of a Detention Hearing as well.  That the Court

11   is not able to see the progression along the way as they're getting closer and closer to

12   the event, and I proffered that and perhaps I failed to proffer that information in a

13   sufficient way for the Court to feel comfortable and I'll be more than happy to do that

14   again to explain at a particular meeting David Stone tasks certain people to go get the

15   materials in order to make the explosives.  Because as the April date comes up

16   closer, more and more things are being requested and asked to be done, and I feel

17   Your Honor -- I apologize to the Court and I'm remiss by not having pointed some of

18   the details out earlier to allay the Court's concerns. But as the date becomes closer to

19   the April date, it becomes more and more important to obtain the materials to make

20   the IEDs and the explosives.  For example, on -- if the Court will just give me a

21   moment, I've got to find the transcript.

22                   THE COURT: Mr. Waterstreet, have you made any proffer or has any

23   evidence been presented where there is a discussion of something to happen in April

24   other than in the January 9th tape?

25                   MR. WATERSTREET: No, I have not proffered anything more than that,

1    other than the fact that there appears to be -- there's the urgency in order to have the

2    explosives ready in time.

3          For example, Your Honor, Joshua Stone was tasked to go out and obtain some

4    of the materials in order to make those concave disks for the explosives.  Tina Stone

5    was tasked to put aside large cans and they were able to provide large cans and a

6    road sign that was going to be modified into the IED.

7          There was again the arrest of David Stone at the funeral service.  There were

8    four signs found in the vehicle belonging to David Stone that were going to be handed

9    over, with the understanding that those would be manufactured and made into the

10   IEDs, the explosively formed projectiles.  So as the date of April became closer, the

11   urgency and the planning became a little bit more important for the events to take

12   place.

13         As I was mentioning, Your Honor, from the clips that have been played, from

14   the proffer that has been made and from the Indictment, it is clear that they have

15   repeatedly stated their desire to kill law enforcement and, Your Honor, those are the

16   very people who would be seeking to enforce this Court's Order in the event anybody

17   violated a condition of bond.

18         And I recall yesterday somebody suggested the use of a tether and while I read

19   their Pretrial Services Report, I'm not sure in each and every instance it's been

20   established that it's even feasible due to the rural location that a tether is possible for

21   all the people.  But tethers aren't applicable to anybody in this case and I'll suggest

22   why.

23         Tethers are not really intended for people who are dangerous, who the Court

24   believes to be dangerous because it really doesn't minimize their dangerousness at

25   all.  It doesn't stop a person from pulling a trigger, from setting off an explosive,

1    stopping a person from making false 9ll telephone calls to lure law enforcement to

2    their home.    Further, it can simply be cut off and all that does is because of the delay

3    in the response time, it doesn't tell you where they are; it tells you where they're not.

4          Further, there's no assurances that they will follow these Court's Orders and

5    not continue on with their plan if they are released, seeing that there are more than --

6    there are only nine of the members of the Hutaree who have been charged.  There's

7    no assurance that other people will not -- who are sympathetic to them will not provide

8    them firearms and frankly, Your Honor, there's really not much of a motive for them to

9    stay in this area.  Before the -- prior to Detention Hearing the Guidelines showed all

10   these Defendants had a Guideline range of 43, and understanding the Guidelines are

11   just that and the Court has discretion, that starts as a Base Offense Level of 30 years

12   up to life.

13         We had some insight, Your Honor, as to what members of the Hutaree would

14   do when they are confronted with the fact that law enforcement is after them.  I can

15   proffer some specific acts conducted by Joshua Stone when he knew he was wanted

16   by law enforcement and it's been suggested that Joshua Stone somehow did not

17   know he was wanted, but I can proffer some information to the Court of what acts he

18   did engage in knowing that he was wanted by law enforcement and if the Court

19   wishes, I can do that as well.  But suffice it to say, there's no guarantee that these

20   people will not engage in the same type of activity as Joshua Stone knowing that

21   they're wanted, having people sympathetic to their cause, arming them and helping

22   them to avoid prosecution.

23         Now I've heard argument, Your Honor, that it's not a crime to disagree with the

24   Government; I agree.  It's not a crime to train with guns; I agree.  It's not a crime to

25   wear a uniform; I agree and it's not a crime to associate with like-minded people, but

remember it's not a crime to engage in military-style training, to disagree with the Government, to associate yourself with like-minded people, to rent a truck, to buy diesel fuel, to buy fertilizer, buy an explosive fuel and go to a Federal Building.  And frankly, with somebody like Timothy McVeigh since we know what happened --

MR. SWOR:  (Interjecting) Your Honor, objection.  Your Honor --

MR. THOMAS: Objection, Your Honor.  Objection.

MR. WATERSTREET: We don't know what would have happened had law enforcement been able to intervene before the events took place.

As to the standard of review, Your Honor, I'd just remind the Court that the Court needs to be reasonably assured of the appearance of the Defendants and the safety of any other person in the community.  There has to be a reasonable assurance.  Since this is a charge in which the presumption arises, the Court has to be satisfied and reasonably assured.

And with all due respect, I believe in their hearts every member of the families of these Defendants who love their family members want to do the best for them and will say that they will turn them in if given an opportunity.  But Your Honor, I just would like to remind the Court, when a person is released on bond, what it comes down to is a promise,  plain and simple.  It's a promise of the defendant, not of the third-party custodian, it's the promise of the defendant that they will abide by the Court's Order and it's a promise of the defendant that they will not harm a member of the public and that's a promise by them that they will abandon their plans to oppose the Government.

And throughout this hearing we've heard constantly the same theme from the Defense is that what the -- what they said were mere words, mere words that can be disregarded because that's all they are.  Well, what is sauce for the goose is sauce for

1    the gander, Your Honor.  It's mere words of their promise that they will now abandon

2    their plans.  Now knowing that the Government is aware of their activities, their

3    self-serving statements that they will now abide by the Court's Orders are nothing

4    more than mere words.  So either mere words mean something that they plan to

5    follow through with it, or mere words means they don't plan to follow through with it.

6    Thank you, Your Honor.

7              THE COURT: Mr. Waterstreet, I do have a few more questions and I

8    think that the Defendants saying they will or will not abide by conditions set by this

9    Court certainly don't rise to the level of the mere words that we're talking about now

10   that enjoy Constitutional protection.  So one of the questions I have, you -- the

11   Government has emphasized that the Defendants have this dislike for law

12   enforcement and all their plans were directed towards law enforcement.  How does

13   that translate into a plot against the United States Government to commit seditious

14   conspiracy?

15             MR. WATERSTREET: Well, I believe in the February 20th statement as

16   well as the statement that was given on February 6th, the van tape.

17             THE COURT:  Yes.  Can you get your two statements?  Because this is

18   very important to the Court and I need to know what language you're relying upon in

19   these statements to say that they were part of the plot to commit seditious conspiracy.

20   You've already told me that there's nothing in January 9th that links whatever plan

21   they had to the United States, at least not in what you have proffered to the Court and

22   I would think that you would have proffered what demonstrates the commission of a

23   crime.

24             MR. WATERSTREET: Well, if I may, Your Honor.  As I said, I did not

25   look to this Detention Hearing as a preliminary examination where the Government

1  needed to spell out the elements of the crime in order to establish that the crime had

2  been committed.

3           THE COURT: And as I said, I'm not treating it as a preliminary

4  examination; I'm treating it as a bond hearing that the Court takes very seriously.  So

5  you opted to proceed by proffer.

6           MR. WATERSTREET: Yes, Your Honor.

7           THE COURT: And you have submitted a tape of January 9th as part of

8  your proffer and there's no mention in that tape of the United States or a plot to

9  overthrow the United States or commit seditious conspiracy against the United States.

10  So now you're telling me it's in February 6th and it's in February 20th and I want to

11  know the language, the words that you are relying upon to make your case and my

12  questions go to the weight of your evidence.

13           MR. WATERSTREET: Everyday we watch ever so close for those evil

14  blue helmets to appear on our streets.

15           MR. THOMAS: Your Honor, can we have a page please?

16           THE COURT: What statement are you on?  What date?

17           MR. WATERSTREET: This is February 6, 2010; the speech in the van.

18           MR. SCHARG: Can he indicate who was present at that speech?

19           THE COURT: I have a statement here and it says present:  David Brian

20  Stone, Joshua Matthew Stone, Joshua Clough, Michael Meeks and Thomas Piatek.

21           MR.  WATERSTREET: Everyday we watch ever so close for those evil

22  blue helmets to appear on our streets, but as long as they're Interpol law enforcement

23  mercenaries called The Brotherhood working for the New World Order are doing such

24  a great job, we don't need to watch for these new foreign armies to come to our

25  shores.  They're already here.  This is referring to law enforcement.  We need to

1    actually stop and see who the enemy has hired to do their job of destroying what is

2    left of our nation and our freedoms, implying that law enforcement has been hired by

3    the evil, greedy New World Order.  This is our nation.  Because of American people

4    asleep at the wheel we find ourselves with this mess.  It is our cross to bear and we

5    need to ask the simple question how much longer are we going to put up with foreign

6    armies controlling our streets and highways.  Law enforcement.  The Hutaree is not

7    an allie with everyone across the nation, but make no mistake about it; we will fight

8    along anyone who calls the New World Order the enemy and sees them as terrorists

9    as we do. We have heard that there are people out there looking for a single leader to

10   lead them, but that just makes it easy, an easy target for these elitist terrorists.  We

11   have in place the perfect system.  In closing, I say we need to quit playing this game

12   with this elitist terrorist and actually get serious because this war will come whether

13   we are ready or not.  As I stand here now, I say we will never be fully ready.  It's a

14   major change of lifestyle.  A war of this magnitude will not be easy, but like the

15   rattlesnake on the Gadsen flag, we have rattled and worn the New World Order.  It is

16   now time to strike and take our nation back so that we may be free again from

17   tyranny.  Time is up.  February 20th, page 10.

18              THE COURT: The Court has a statement which was admitted as

19   Government's Exhibit 1B and it shows present on February 20th David Brian Stone,

20   Joshua Matthew Stone, Joshua Clough, Michael David Meeks, Kristopher Sickles and

21   Jacob Ward.

22              MR. WATERSTREET: Yes, Your Honor.  David Stone:  In everybody --

23              THE COURT: What page are you?

24              MR. WATERSTREET: Page 10, Your Honor, towards the bottom.

25              THE COURT: Thank you.

1    MR. WATERSTREET: Beginning with David Stone:  And everybody's

2    afraid to band together and say you know what?  If we take out those derelicts, who's

3    left to stop us from going after the big head?  Everybody wants to start after the

4    Federal Agents, but you realize the big head is way up here.  You got to start down

5    here.  Start whack.  You take a step out of the ladder, what happens?  The big head

6    comes down.  He's going to fall towards you.  You ain't got to -- after you go after the

7    right guy there individually, no you take out his minions because he's got all these

8    minions protecting him.  Start taking them out.  Then some other people join in about

9    taking out a Judge and things of that nature, and then Michael Meeks says:  I'm

10   looking at everybody right here to take out virtually anybody and I mean virtually

11   anybody.  You just got to be motivated enough to go and do it.  Josh Stone:  Yeah,

12   you got to be motivated and stick together.  I know what you mean.  David Stone

13   page eight:  And everybody's waiting.  Oh yeah, well what if the Chinese troopers ever

14   get here?  Troops -- excuse me -- troops ever get here?  Why should they?  Average

15   Joe who wears a police uniform says County Sheriff on the side beats down your

16   door, drags you out, bankers foreclose on your house, they take your car.  They laugh

17   at you,  high five each other and go back to the department.  You don't, you don't

18   need a foreign Army.  Those guys are doing it.  They're loyal.  I loyal to Interpol, thank

19   you.  These guys are stupid.  Oh, my God.  Who's the enemy?  The guy driving that

20   car right there.

21       And, Your Honor, if the Court would indulge me, I have another tape that I can

22   play concerning Tina Stone's desire to become an armed conflict with law

23   enforcement.  It's a very, very short tape or otherwise I can read it to the Court.

24           THE COURT: I guess my preference is that if you want to put in more

25   evidence that you read it.  Another question though; I've heard this and I guess the

1   leading case on this seditious conspiracy, **Brandenberg versus Ohio,** says that

2   seditious conspiracy is punishable when the advocacy is directed to inciting or

3   producing imminent lawless action, likely to produce such action against the United

4   States and so I get back to the question I asked you when you were first up there

5   about the imminence, about the likelihood and about the United States.  And just tell

6   me how you have just read to me, how what you have just read to me satisfies

7   **Brandenberg**.

8             MR. WATERSTREET: Your Honor, I feel like again I'm with that law

9   school question.  Other than this, what do you have?  It's the entire proffer that the

10  Government has presented where the theme is that The Brotherhood is the enemy, all

11  law enforcement; Federal, State and local law enforcement and David Stone says:

12  Everybody wants to go after the Federal Government first, but what you have to do is

13  you have to go towards the local first.  They're the arms of the Federal Government.

14  Once you get rid of them, the Feds will come in and then he talks about that and he

15  makes fun of the fact that Federal Agents will come after them with a stapler or a

16  letter opener and that in his opinion will last all of three minutes. If the Court wishes, I

17  can play that.

18            THE COURT: No.  You've produced a transcript?  Has this been

19  produced as evidence to the Defendants?

20            MR. RATAJ: No, Your Honor, I can tell you it hasn't.  This is the first

21  time I've heard it.  Now we're going to hear a tape from Tina Stone?

22            THE COURT: The evidence is closed.  That's okay.  We're doing

23  summation.

24            MR. WATERSTREET: Okay.  Does the Court have any other --

25            THE COURT: I don't at this time, Mr. Waterstreet.  Thank you.

1    MR. SWOR: Your Honor, as you know, the burden is on the

2    Government to persuade the Court that the Defendants are a danger and will not

3    abide by this Court's rulings.  It is not because there are 25 people out there that the

4    Government didn't arrest, how do you know they won't.  The question is what has the

5    Government done to prove to you or suggest to you that they will?  And the answer is

6    they have produced nothing.

7        The Pretrial Services Report says clearly these people -- certainly David Brian

8    Stone is not a risk of flight and the only reason that the Pretrial Services Report found

9    that no bond was available was because of the charges he might be a threat to the

10   community.  That does not do anything to further the Government's obligation to

11   persuade the Court that he will do something to the community or that he will be a risk

12   of flight.

13       The fact is these are talk.  This is ideas.  When that Agent sat on the stand

14   yesterday and I asked her what did the Defendants do, what did Mr. Stone do after

15   the January 20th conversation?  I don't know that they did anything.  Did they talk to

16   each other?  I don't know.  The fact is, is that after January 9th other than this

17   conversation on February 20th and then the raid on March 27th, there is nothing

18   before this Court to lead this Court to believe that this man or quite frankly any of the

19   others, were imminently or ever going to do anything.

20       We're told about as the April date got closer, except we don't know what the

21   April date was.  There is no April date.  The testimony was we didn't know of any April

22   date.  We know that Mr. Stone was not going to be in town on April 10th; that he was

23   going to be occupied with his employer's business on April 17th.  And by the way just

24   as an aside, he's been at that employer for most of the last 14 years.

25       THE COURT: I believe doesn't the transcript say the second and the

1    fourth Saturdays?

2          MR. SWOR: The second weekend was the 10th when he was not going

3    to be in town.  The fourth was the 24th, and there was no evidence and I asked her.  I

4    asked her specifically what had they done?  What had they said?  They had acquired

5    no weapons.  They had acquired no explosives.  They had taken no action.  Mr. Stone

6    had taken no action to move along towards this imminence issue.

7          THE COURT: Didn't they already have the weapons?

8          MR. SWOR: They had some weapons.  They certainly did not have

9    anything to make an IED.  They didn't have anything to make a weapon of mass

10   destruction.  They didn't have an automatic weapon.  We didn't hear anything about

11   millions of rounds of ammunition.  We didn't hear anything about chatter going back

12   and forth between them.  I would think that if there is a plan, that somewhere we

13   would have heard something about what the plan was.  We heard yesterday that

14   there was no definite plan.  We heard only that there was this general hateful speech.

15   There were ideas.

16          If you only take one statement, the Government says.  If you took all of the

17   statements, they're inconsistent.  They're irrational at times.  They are never followed

18   up with any activity.  They are -- we've not been offered any evidence that anything

19   took place.  Who were they -- where were they going to get dropped off?  When were

20   they going to get dropped off?  This is -- March 27th is two weeks before the earliest

21   date and nothing, nothing, absolutely nothing had been done.  Nothing had been

22   talked about.  Nothing had been planned.  Nothing had been accumulated.

23          We heard on the tape about some extraction team.  Do we have anything to

24   show that there was any plan of what an extraction team is or was or who would be in

25   it?  And if it was only these nine people that were going to do it, how many units were

1   they talking about?  How were they going to do it?  It's like they're telling us they're a

2   threat to law enforcement, but they weren't training in urban warfare or police warfare.

3   They were running around in the forrest with unloaded weapons. This was an ongoing

4   conversation.  Quite frankly, my client has said nothing worse than you can hear on

5   television or radio or any one of a billion Internet screens on any given day.

6           We're told there's a diagram and we're referred to Exhibit Number Two.  Exhibit

7   Number Two is anything but a diagram.  A diagram tells you how to do something,

8   how to build something.  All Exhibit Number Two is, you go from point A to point B

9   and it's just this is what happens as it goes.  I can't even read it.  It doesn't -- it

10  certainly is not a diagram to make a weapon.  It is certainly not a diagram to make an

11  IED.  It is certainly not a diagram to make -- I don't know even -- I don't know what it

12  is, but it's just simply this track picture.

13          As the April date got closer, more and more things done.  That Agent sat on

14  that stand yesterday and told us nothing got done.

15              THE COURT: Mr. Swor, the Agent who was on the stand yesterday did

16  say that it is the undercover agent who has the most information about this and that

17  agent is not available for -- let me finish.

18              MR. SWOR: I'm sorry.

19              THE COURT: The Agent didn't testify, the Court couldn't require that

20  Agent to testify as part of this hearing.

21              MR. SWOR: Then the Court --

22              THE COURT: And so this is my question.  Assume that the undercover

23  agent can fill in the blanks, has much more information.  Mr. Waterstreet is correct; it's

24  not a preliminary examination.  What if there is information available that shows that

25  there was something that was imminent and was likely to occur and your client is the

1   one who made -- as you've put it -- the most hateful of speeches of all the evidence

2   that the Government has?

3          MR. SWOR: What if is not the standard. The standard is there must be

4   some evidence. We haven't even had a proffer that anything happened, you know.

5   We've stood here, we've sat here and we've heard nothing. This is the Agent in

6   charge of the case, the traffic cop. Somebody should have known something. You

7   told the Government to bring somebody here that knew what was going on. Now -- so

8   now they failed to do that and so we're going to say no harm, no foul? We're just

9   going to let them not have evidence or proof? What have they produced to persuade

10  the Court that their fear, that their proffer is true?

11         You know, there was a movie Tom Cruise was in a couple years ago where

12  they had evolved policing to anticipating criminal conduct and whenever one of these

13  little windows popped up, they went out and arrested people, not because they had

14  committed a crime, but because they thought they were likely to commit a crime.

15  They're going to prevent crime from being committed. It's not the standard here. We

16  have not evolved to where we can predict.

17         This Court is here to deal with what has happened and as we stand before this

18  Court, nothing has happened or at least no proof that anything has happened has

19  been offered. There is no there there. What if is not the burden of proof. What if is

20  not the standard. The rule of law is that the Government must persuade the Court

21  that there is a preponderance of evidence, there is a reason not to believe that the

22  Defendants won't do something, but that the Defendants will do something.

23         THE COURT: Mr. Swor, there are numerous crimes that are committed

24  simply through the use of language. You are saying it's just words, it's just language

25  but if somebody agrees with another to commit a crime, if somebody simply offers to

commit a crime or orders another person to commit a crime, requests somebody to commit a crime, those are just words and they're crimes.  They could rise to the level of being crimes, and that's what the Government is saying; is that you have someone who -- but they're not saying that they're just words.  Mr. Waterstreet has also argued that your client took steps towards the commission of the crimes that are charged in the Indictment.

MR. SWOR: First of all, none of these words are an instruction to anyone to commit a crime; they're just talk.  Remember, nobody here -- in none of these speeches does he say go kill that cop or go kill that big head or anything else.  There's no command or direction to do anything.  There is amorphous speech.

Second of all, there is -- even, even when you're saying that speech can rise to the level of a crime, there has to be some specific -- something specific about the speech that it clearly is criminal conduct.  Here, he's not -- he's just talking in generalities.  He's saying take out the cops.  We heard that 50 years ago.  We heard that fluorinating the water was a Government conspiracy to poison people.  He's talking -- Mr. Stone is talking here about Chinese troops, about blue helmet troops, which generally are understood to be UN troops.  He does not say somebody go kill that Hudson cop or somebody go kill that Sheriff.  As a matter of fact, they talk about how the Sheriffs are generally lawless because if the police hold you to a standard, but if you find them committing a crime they get away with it and that was the next sentence that Mr. Waterstreet didn't read in the February 20th transcript on page eight:  These cops break the law and you call them out on it and they're just like ah, you know they just, they just, it don't apply to us.  They act like they're above the law.  So that's the complaint on that page that the law enforcement is not law enforcement, but is actually acting against the law.  That's the complaint.

1      This is not a preliminary examination, but the Court must find -- must be

2   satisfied, must find probable cause to believe that these people were going to commit

3   a crime and the crime isn't just talking.  There was nothing offered to this Court of any

4   -- and the Court is absolutely right -- of any imminent illegal activity.  What we heard

5   was January 9th, February 6th and February 20th.  We didn't hear that on January 9th

6   they said this and then they did this.  We didn't hear on February 6th and remember,

7   February 6th was reciting a speech that was never given; that it was a speech that

8   was solicited -- that the presentation of that speech on February 6th was solicited by

9   the undercover officer while they were in the van and after February 6th, we didn't

10   hear any evidence that after February 6th they went and did this.

11      We've heard this February 20th thing and I disagree.  Everytime David Stone

12   talked, everybody didn't shut up.  It was a mad house.  The first time I listened to that

13   tape, again I thought they were back in a bar or something because ta, ta, ta, ta.

14   Everybody was talking at once.  Everybody was competing and the reason you heard

15   Mr. Stone's voice is he was closest to the microphone.

16      There has been -- look, the law says that they're indicted.  The law says the

17   burden of going forward shifts to us.  We have gone forward.  We have said to the

18   Court they are not a risk of flight and we have been confirmed in that by Pretrial

19   Services and we have offered citizens who have said they would act as third-party

20   custodians.  The law says we have the burden of going forward, not of persuasion but

21   of going forward with the evidence.  Well, we've gone forward and said Judge, there's

22   a bill hole in the middle of this.  There is no there there.

23      The Government always has the burden of persuasion and that's what the

24   statute says, and the Government has offered nothing.  The Court has raised very

25   good questions and I think that they're questions that ought to be the basis for

1    releasing the Defendant.

2           It's speech coupled with action and we have seen no action.  We have been

3    told about no action.  If you're going to -- look, they conducted a search.  Forget about

4    whether they went and examined the weapons or not.  If there was gunpowder, we

5    would have heard about it.  If the Search Warrants had produced anything of any

6    consequence, we wouldn't be talking about tapes, we'd be talking about what the

7    Search Warrant disclosed and the Search Warrants have disclosed nothing.  An

8    inventory of presumptively -- and we've heard that several times -- legal weapons

9    legally possessed.  They were not -- this was not a group of people -- and Mr.

10   Stone, there's no testimony that Mr. Stone went to work with a gun on his hip or that

11   he carried it everywhere he went.  He used it when he was playing soldier in the

12   woods.  He didn't carry it when he went into town or anything else.

13          Your Honor, there are conditions which can be shaped which will assure Mr.

14   Stone's appearance in court and will assure that he is not a risk to the community.

15   Thank you.

16          THE COURT: Thank you.

17          MR. SATAWA: Your Honor, not to bring up sort of a practical pragmatic

18   issue, but I told the people that have my car keys that I'd be done by five o'clock and

19   they told me if I wasn't out there that my car keys would be taken somewhere.

20          THE COURT: All right.   We'll take a break.  I do want to finish this

21   hearing today, so we'll take a break and you can retrieve your keys.

22                    **(At about 5:06 p.m., court recessed)**

23          (At about 5:23 p.m.)

24          (Court,  Counsel and parties present)

25          THE COURT: Mr. Helfrick.

MR.  HELFRICK: Yes,  Your Honor.  Richard Helfrick on behalf of David Stone, Jr. Your Honor, it is our position that Mr. Stone, Jr. should be released on a bond and that there are conditions the Court can set that will assure his appearance in court and that there's no danger to the community.

I just want to review the facts about David Stone, Jr. He's 19 years old.  He has no prior convictions and has no prior contact with the law, for that matter.  He was born and raised in Michigan.  His only ties are to Michigan. He was employed at the time of the arrest and his employment, I'm assuming, seasonal employment that he has every summer on the farm that he works at.  He has a six-month old son with his fiance, Brittany.

At the time of his arrest, he did not have any weapons.  He didn't attempt to flee.  He did not make any threats to law enforcement or to anyone else.  The search of his apartment, there were no weapons, no explosives, no drugs, no drug paraphernalia, no hate literature.

The Government does not proffer once or attribute to him any statement which would indicate that he disliked the police and wanted to harm them in any way, or that he agreed with statements by others who made such statements.  There's been no proffer or no statement by him that he wished or agreed to wage war against the United States or to resist the lawful authority of the United States or that he agreed with people who made such statements.

Did he participate in militia training?  Absolutely, and he's been doing so ever since he was a boy.  Is that illegal?  No.  There's been nothing proffered to this Court that would indicate that he is a risk of flight or a danger to the community.  In fact, the opposite is true.  The Court -- I have proffered to the Court letters that show that he's a hard-working, responsible father trying to provide for his family.  The facts in the

1   Pretrial Report support this as well and if he is dangerous, who is he a danger to?

2        There's nothing in the proffer that would indicate that David Stone, Jr. is a

3   danger to anyone.  The evidence is that he did nothing more than other similarly

4   situated individuals who have not been arrested or indicted.  Quite frankly, his major

5   crime appears to be that his name is David Stone.

6        He isn't at any of these meetings where the Government has played these

7   tapes with his speech, for whatever it's worth.  He wasn't on the trip to Kentucky when

8   this other speech was made and with respect to the one tape that or transcript Mr.

9   Waterstreet was reading from a few moments ago when the Court asked about how is

10  this a seditious conspiracy, show me the language that indicates that they were going

11  to wage war or try to overthrow the Government, in that speech I think if you read the

12  Indictment closely and if you look at these speeches, what he's talking about in that is

13  not hate of the United States.  He's talking about what they call the New World Order.

14  The New World Order is not the United States.  If you go up and look it up in

15  Wikipedia or various places, New World Order is another conspiracy theory that there

16  are these eight bankers somewhere that are controlling the world and that everyone is

17  there working for them and that The Brotherhood is working for the New World Order.

18  This isn't a conspiracy to overthrow the United States; this is a conspiracy to get the

19  United States back if anything from the New World Order.

20       Count One they allege -- I mean this is the key -- this is the key to the case --

21  that they were to levy war against the United States to oppose by force the authority

22  of the Government of the United States and to prevent, hinder and delay by force the

23  execution of any United States law and a conspiracy to do something about the New

24  World Order is not a conspiracy to overthrow the Government of the United States.

25  So unless the Court has any other questions, I have nothing further.

1          THE COURT: Thank you.

2          MR. THOMAS: Your Honor, James Thomas on behalf of Joshua Stone.

3   I'm going to adopt the arguments that have been made regarding the weight of the

4   evidence in this case and I believe it's already been elucidated sufficiently.

5          The Detention Hearing that we had originally had pointed out very important

6   factors regarding Mr. Stone; I've adopted that and I also want to adopt the factual

7   recitations that are within this Report from Pretrial Services, and that is that Mr. Stone

8   is 21 years old.  He has no prior criminal history.  He's newly married to Shannon,

9   who had given the Court a letter and she's here in court to support her husband.

10         He has been employed.  His employment was seasonal, but we're coming into

11  the area where we get employment and if this Court were to release him, it would be

12  with the direction that he seek and maintain employment, which he has done in the

13  past.

14         THE COURT:  Mr. Thomas, if the Court released your client, where

15  would he live?

16         MR. THOMAS: Well, I think that the plan is this, Judge.  That his wife

17  obtain an apartment away from his father and away from his grandfather whether

18  they're released or not.  It was his intention to do so with his wife, but he was unable

19  to do so because of finances.  But as I said coming into the season for employment

20  and the fact that his wife does have limited resources from an annuity that she's

21  receiving from a lawsuit, we think that this can be done.

22         THE COURT: And he would live with her?

23         MR. THOMAS: Yes.

24         THE COURT: There's allegations that she's an active Hutaree member?

25         MR. THOMAS: Well, she was supporting her husband and she was in

1  the Hutaree.  The photograph that you see has got her picture on it, but I will tell you

2  that she's very, very disenamored with the Hutaree.  She had been trying to get her

3  husband to get out of the Hutaree and certainly is not supportive of the movement,

4  and so I think that being with her would be the only exception that we would ask as it

5  relates to having an affiliation or association with any members of that group or any

6  other militia.

7         THE COURT:  Mr. Thomas, at the Detention Hearing in front of

8  Magistrate Judge, weren't there a couple of people who came forward as potential

9  third-party custodians of your client?

10        MR. THOMAS: Judge, we have potential third-party custodians, but I did

11  not want him to go into any situation where he was with anyone that was affiliated with

12  the Hutaree.

13        THE COURT: So the people who are offered at that first Detention

14  Hearing are Hutaree affiliates?

15        MR. THOMAS: Who had not been indicted or charged, but I think that

16  it's important at this point to assure the Court that he is not going to continue with that

17  group and that he will not have any contact with that group and he will abide by the

18  Court's direction with respect to that.

19        There were other people that would stand up and have third-party custody, but

20  I did not offer that and I'm hoping that the Court would consider a GPS tether for this

21  reason, and I said this to Judge Sheer.  There are studies that say that people that

22  are on GPS tether are less likely to commit crimes; that they're more likely to comply

23  with the conditions in terms of their release just because of the fact that they have the

24  tether, that daily minute-by-minute reminder that they are within the jurisdiction of the

25  Court.  Now we'll try to work out the logistics as it relates to where they live so that it

1   can be in an area where a tether can be employed.  So that we can then have a

2   meaningful tool for not only Pretrial Services to monitor his whereabouts, what he's

3   doing and when he's doing it real time, but also to do this thing that I am suggesting

4   sociological studies have shown and that is that tether is a deterrent to future crime.

5   Tether is encouragement to comply with the Court's Orders.

6          Now I've got a 21-year old young man and I've heard his conversations and

7   they were -- and I can tell you my description is immature, not well thought out and

8   certainly under the scrutiny of the light of day he would probably love to take those

9   words back.  But when it came time for him to do what it is that Mr. Waterstreet

10  suggests, and that is that he was going to put himself in a position where he would

11  fight, he did not.

12         There is a reasonable disagreement between the Government and myself as to

13  what it was that happened out there and what it was that the Defendant knows, but

14  the end result was --

15                THE COURT: You're talking about when he was arrested?

16                MR. THOMAS: That's correct.  The end result was that he surrendered,

17  that he did not fire one shot, that there was no brandishing of firearms and that the

18  Defendant when he knew what was going on did surrender.

19         So this is a young man who was home-schooled.  He's been under the

20  influence of his father.  He has been working with his father and living with his father

21  and on his grandfather's premises all his life.

22         We have a plan and we think that this plan will do both things and that is

23  assure that he will appear in court when he's directed to do so and that he will not be

24  a danger to the community.  Whatever weapons that were had or were available to

25  him were confiscated.  He has very little resources.  His risk of flight is very, very low.

1    He hasn't got even a car, doesn't have a passport, hasn't traveled out of the country

2    ever and so I ask the Court to give him a release on a tether.

3                    THE COURT: Thank you.  Mr. Rataj.

4                    MR. RATAJ: Thank you, Your Honor.  Your Honor, I'll be very brief.  In

5    doing so, I'll adopt the arguments of Mr. Swor and Mr. Helfrick and Mr. Thomas as

6    related to the weight of the evidence or lack thereof in terms of the Government's

7    case.

8             Your Honor, my client is 44 years old.  She's a lifelong resident of Michigan.

9    She's a high school graduate of Columbia Central High School in Brooklyn, Michigan

10   which is over there by the Irish Hills.  That where she was raised by her father who

11   you've heard from.  She's the mother of three children ages 25, 23 and 18.  She's a

12   grandmother.  She has absolutely no criminal history.  She's always been employed.

13   As a matter of fact, Your Honor, she's worked in nursing homes with the elderly.

14   She's been a cabinet maker and she's also worked as a substitute teachers aide with

15   Headstart where she had to go through a background check to be able to have that

16   job.  So those are the -- this is the person, Your Honor, that the Government claims is

17   a danger to the United States.

18            Now we know that Pretrial Services has recommended that -- or has stated

19   that Miss Stone is not a risk of flight and that's well-documented in the Pretrial

20   Services Report.

21            Regarding the issue of dangerousness, Your Honor, just a couple of quick

22   points and this just follows my cross-examination of the Agent from yesterday.  We

23   know that it's not illegal to belong to Hutaree.  We showed the picture to the Agent.

24   She agreed with me on all my points; that it's not illegal to be a member of Hutaree.

25   That it's not illegal to wear camouflage clothing illegal.  It's not illegal to train in the

1    woods and carry around a legal gun.  And we also heard from the Agent yesterday

2    that she had absolutely no evidence to present to Your Honor that any of the guns

3    that were confiscated from the Stone residence were illegal.  Again, Your Honor, my

4    client has no criminal record.  She doesn't use drugs.

5         The tape recordings.  The Government,  I would say that 95% of their

6    argument over the last two days is based on these recordings.  Well, Your Honor, my

7    client wasn't there.  She had nothing to do with those recordings and those

8    conversations, so you can throw that right out.

9         There's no evidence that she possessed a bomb or any bomb-making

10   materials and when I asked the Agent yesterday, Your Honor, at the end of my

11   cross-examination, do you have any evidence, any taped conversation, anything to

12   present to Your Honor regarding my client's involvement in a conspiracy or a plan or a

13   plot to kill an officer, to kill a police officer or overthrow the Government, her answer

14   was I don't have any.

15        So based on all of that, Your Honor, we've rebutted the presumption.  The

16   Government has not carried its burden.  They have to prove dangerousness by clear

17   and convincing evidence and they failed miserably.  Clearly Your Honor can fashion a

18   combination of conditions that would assure my client's presence in court and that she

19   is not a danger to the community, and I've seat set forth what I believe would be the

20   appropriate conditions, Your Honor, in my papers and obviously a point Mr.

21   Stone or -- strike that -- Mr. Kelly, Tina Stone's father to act as a third-party custodian.

22   He's told Your Honor under oath that if he found that she was violating any of the

23   terms and conditions of any bond that Your Honor may fashion, that he will

24   immediately contact the appropriate authorities.

25        You can put a tether on her.  You can have her report weekly to Pretrial

1    Services.  You can tell her that she can't possess any firearms or any ammunition.

2    You can tell her that she can't use the computer and you can tell her that she can't

3    use any drugs or alcohol.  Those are conditions, Your Honor, that will satisfy the

4    Government and the Court.  Thank you.

5                    THE COURT: Mr. Rataj, a question.  Can you give me any information

6    about your client's 2006 charge for Obstructing and Assaulting a Police Officer?

7                    MR. RATAJ: She wasn't convicted of that, Your Honor.

8                    THE COURT: What was it?

9                    MR. RATAJ: She got involved in an argument between her daughter

10   and I believe it was her boyfriend or husband -- boyfriend at the time and that was it

11   and --

12                   THE COURT: Was charged?

13                   MR. RATAJ: She was not charged.

14                   THE COURT: She was not charged?

15                   MR. RATAJ: My understanding she was not charged.

16                   THE COURT: I think the Report the Court got says otherwise, but --

17                   MR. RATAJ: She wasn't convicted, I know that.

18                   THE COURT: Charged?

19                   PRETRIAL SERVICES OFFICER:  According to the report, Your Honor,

20   charged and convicted, sentenced to six months' probation.

21                   MR. RATAJ: That's news to me.  That's news to me.

22                   THE COURT: Maybe you can talk to your client and you can answer my

23   question.

24                   MR. RATAJ: That's fine, Judge.

25                   THE COURT: Thank you.

1            MR. RATAJ: Your Honor, the facts of the case are this.  First of all, she

2    was -- she pled guilty to Obstructing a Police Officer.  What it was is that she tried to

3    stop her 17-year old daughter from leaving her house with a 15-year old boy.  The

4    police were called.  She got involved.  I guess she was -- she did plead guilty to

5    interfering with the police officer and she was on six months nonreporting probation.

6            THE COURT: Thank you.

7            MR. RATAJ: Thank you.

8            MR. ROBERTS: Good afternoon, Your Honor.  Thank you.  First of all,

9    this is Randall Roberts on behalf of Joshua Clough, and I'd like to amend the pleading

10   that I filed.  I had inadvertently left out a citation and I want to bring that to Your

11   Honor's attention.  It should appear in -- on pages I think it's seven of the pleading or

12   six.  Just a moment, Your Honor.  It's at the top of page six.  It follows the paragraph

13   that it continued from page five and the last sentence was inadvertently eliminated

14   and provides the citation that I wanted to direct Your Honor to, and that is potentially --

15   in this case, the potentially large quantity of drugs involved -- the case that I'm going

16   to cite -- is not a measure of the propriety of pretrial release or detention.  Otherwise,

17   there would be no release for those defendants alleged to be involved in large scale

18   narcotics distribution and the case that I wanted to cite was ***United States versus***

19   ***Lopez,*** 827 F.Supp 1107.  It's a District Court from New Jersey 1993 decision and it

20   has to do with the presumptions that we're dealing with.

21          Your Honor, the other thing I wish to do at this time is adopt and incorporate by

22   reference the arguments -- the pleadings and arguments made at the Detention

23   Hearing, the arguments and pleadings made by co-counsel today and that will yet be

24   made, the Pretrial Services Reports, both the original one and the one that was

25   supplemented with the interview today of my client's parents.

1        Just a couple of quick things I wish to direct Your Honor's attention to and this

2   has to do with the strength of evidence against my client.  First of all, the tape

3   recording that we heard from the -- and there's been much play about this -- from

4   February 20th, 2010.  This is my client's I would suggest attempts that Mr. Joshua

5   Clough's statements on page three, we could just write out in front well, you went

6   further than I did, but I'm like you could just go down the road before ahead of him

7   and just throw out nails and crap.  And then there's some further conversation that

8   continuing on page four.  My client's attributed with this following statement:  I was

9   thinking more like harassing people or harassing as opposed to starting the -- now we

10  can fill in the blank.  I don't know what was going to follow in the young man's word

11  after that, but it seems to suggest to me that Mr. Joshua Clough was making efforts to

12  mitigate or minimize or settle things down.  This is not inflammatory remarks.  He's

13  not going yeah, yeah and then we can do this, that and the other thing.  It sounds like

14  he's suggesting alternative methods other than direct attacks on whatever target they

15  were having some discussion about.

16       My client's parents have been proffered to Your Honor as I suggest appropriate

17  third-party custodians.  The incident that was discussed, obviously we're talking about

18  a rural area, people running around the yard with full camo on, no showing, no

19  demonstrated indication that they were law enforcement while they were outside.  The

20  couple took flight to a place that they considered the safest place in their house, not

21  knowing who it was that was about to breach their home and once they realized and

22  things settled down and the commotion stopped, it was clear that they were most in

23  compliant at point and time.  As a matter of fact, there were seizures made and the

24  Cloughs did nothing to interfere.  I would suggest, Your Honor, that this family is a

25  suitable place for Mr. Clough, my client to reside.

1    He's 28 years old.  He's lived there with them his whole life.  They've lived in

2    that area for 40 years in that particular home and they have represented through Mr.

3    Clough that he would certainly monitor his son's activity and he would report dutifully

4    to Your Honor if in fact there were any untoward actions taken by his son with regard

5    to the Court's admonition or rules or Order.

6    We discussed some of the facts of the case, but one things for sure.  We know

7    that there was reference made to a trip device.  There was a speech on Liberty Tree

8    Radio or something like that I think that we heard reference to by the Government and

9    it was very clear in that conversation that Mr. Joshua Clough was engaged in that he

10   had designed and was talking about a trip wire device for perimeter control, not for

11   detonation of anything, for defensive perimeter control.

12   Again, we also heard from the testifying agent that a lot of times that there

13   were so called training sessions under way, my client, Mr. Joshua Clough was the

14   videographer.  Now true enough, the Agent said that didn't always happen, but his

15   position then is a little bit different than maybe had been led for us to understand.

16   We know that the Case Agent had the opportunity during the investigation to

17   debrief and receive reports from the undercover officer after he participated in these

18   sessions, and the reports that the Agent received with reference to live firearm

19   training or live fire exercises had to do with, according  to the information that's been

20   outlaid, firing at a dirt mound on private property and that's the extent of it.

21   We also know from her testifying --

22   THE COURT:  Mr. Roberts, would you just go back to that?  The live fire

23   training, I believe it was Mr. Swor who said that that was done twice a year.  Are you

24   talking about the same live fire training?

25   MR. ROBERTS:  The only live fire training I've heard about, yes.

1          THE COURT: Where was it connected?

2          MR. ROBERTS: It was on private property, as I understand, and the

3   testimony was that it was -- the rounds were fired into a target mound, a mound of

4   dirt, a backstop and I think there's been other evidence produced today or proffered

5   that whenever they were active and out in the woods, they weren't carrying live

6   ammo.

7          We also know from the Case Agent she was present, Special Agent Leslie

8   Larsen was present at the time of the feigned memorial service when the arrest of I

9   think five of the members of this Indictment occurred.  We know that my client, Mr.

10  Joshua Clough made no attempt to flee.  He did not have any weapons on his person.

11  We know that he has no convictions, no prior untoward activity with law enforcement.

12  We know that he was not involved in any effort or offer to break out the FFL sons from

13  jail or confinement.

14         We know from the testimony from the Agent that Joshua Clough did not set-off

15  any explosives and we also know from her testimony that there was reference made

16  to messages that were sent out through the website at a couple of specific positions --

17  times in this investigation and that supposedly the sign-off was something along the

18  lines of Hutaree is prepared and has exchanged fire or something like that.  Are you

19  ready?  That is, from her testimony yesterday, that appears to be a standard logo like

20  the Geico lizard at the bottom of this website.  It's always there.  It's not specifically

21  put out for any particular communications.  It's just always present.  It's part of this

22  display.

23         Joshua Clough has -- there's been no -- no evidence at all introduced that he

24  made any personal effort to purchase explosives or purchase components for

25  explosives or designing any explosives or detonating any explosives.  As a matter of

1  fact, as I understood the testimony the only person that detonated anything was the

2  undercover agent.

3       Mr. Clough presents in a normal circumstance, not to say this is abnormal, but

4  in a circumstance where we normally would be considering likelihood of bond or

5  consideration of letting someone be pretrial released, he normally would present in

6  the kind of persona that we would grant that kind of request to.  Save for the serious

7  allegations of this charge, there's nothing else that would paint Mr. Joshua Clough in a

8  position that he would not respond favorably to bond.  He has no prior convictions, no

9  prior arrests or contact with law enforcement, no bench warrants, bond forfeiture, no

10  Capiases, no indication that he would fail to abide by Court Order.  He's had no prior

11  failure then reported for appearing -- for failing to appear to court.

12       He does have no major sources of capital and while it's true that he did

13  possess a passport, I'm not sure where that even is at this point and time after the

14  search.  I'm not suggesting anybody else would know, but that is routinely something

15  that courts in this district are confronted with with individuals who have passports and

16  those are typically turned in as a condition of bond.

17       He had -- also most prominent is that not only did he live with his parents, he's

18  not committed or known to commit ever a violent act toward anyone.  He had a job; he

19  doesn't now, but living with his parents and having employment, even when he was a

20  part-time videographer, wedding photography and stuff that he did for like nine years

21  before, he's not one that's living under the radar.  He's open and notorious.

22  Everybody knows where he resides.  He's not living out in a tin can somewhere

23  underneath the ground.  He's done nothing to alienate himself from the world and he's

24  not signed up any manifesto.  There's been no ritualistic initiation of violent acts like

25  joining some sort of a gang or some kind of initiation like that.  This is a young man

1    who every indication would be that he would return to court when he's supposed to.

2    We are asking Your Honor to consider all the evidence that you have, I'm sure,

3    and think about it in terms of if you will please a combination of conditions that would

4    satisfy the requirement and I think that we should be able to come up with conditions

5    other than confinement for this young man and I ask you to so find.

6    THE COURT: Thank you.

7    MR. SATAWA: Good evening, Your Honor.  Your Honor, I will likewise

8    join the arguments of co-counsel, specifically those of Mr. Swor, Mr. Rataj, Mr.

9    Helfrick relating to the proofs -- Mr. Roberts -- relating to the proofs in the sufficiency

10    of the evidence presented.

11    Before I go any further, I spoke briefly with Mr. Waterstreet during the recess

12    and after that discussion I believe that he raises -- he raised a good point with me that

13    I think should be addressed to the Court.  This Court raised a concern that Mr.

14    Waterstreet was sort of placed in a difficult position here over the last couple of days

15    and I don't believe for a moment that Mr. Waterstreet is -- you're only as good as the

16    information you receive.  When I objected to the admission of that photograph and

17    suggested that the condition of the house was how the FBI found it rather hand how

18    the FBI left it, when I suggested that that was the condition of the -- the statement that

19    that was the condition the house was found when the FBI got there was a lie was not

20    attributed to Mr. Waterstreet, but rather what the Agents were telling Mr. Waterstreet.

21    THE COURT: All right.

22    MR. SATAWA: And I think that his -- the conversation I had with him

23    deserved that clarification and notation.  I did not mean to allege that Mr. Waterstreet

24    was engaging in anything improper in any way and making any sort of false

25    representations to this Court.

1          THE COURT: The Court doesn't believe Mr. Waterstreet has done that.

2          MR. SATAWA: And I did not mean to suggest it and I told him I would

3     make that statement after our discussion.

4          THE COURT: Thank you.

5          MR. SATAWA: Your Honor, as to my argument I would say this.  I think

6     the first thing the Court should keep in mind is that given the notoriety of this case, the

7     seriousness of the charges, the difficulty that many of the factual legal issues

8     presented, it's likely to be a case that will be a lengthy case in terms of its progression

9     through the Court system through Your Honor's courtroom.  I think that for that reason

10    the Court should be even more careful in reviewing the issue of pretrial detention

11    because if this Court were to detain Mr. Meeks or any of the Defendants, I think it's

12    likely to be an Order of Detention that would last for several months, if not multiple

13    years.

14         Judge, I also would like to reference both Pretrial Services Reports that if you

15    were to read them without reading the conclusion, one would think they would

16    recommend pretrial release.  There is nothing contained in those reports that

17    suggests my client is either a flight risk or a danger to the community,  but for as other

18    counsel have noted, the nature of these charges and the presumption that goes along

19    with those charges. That's why I think the Court was correct in asking the

20    Government about those facts in its proffer and argument.

21         Judge, because when one looks at everything but the charges in this case, my

22    client presents himself to the Court as a 40-year old man who has honorably served

23    his country in the United States Marine Corp; honorably discharged in April, 1992  at

24    rank of Corporal E4.  He's a combat veteran of Desert Storm who has received two

25    combat-related decorations for his service in Desert Storm.  He has a job.  Your

1   Honor has in front of her a letter from his employer in Manchester, Michigan

2   Interactive Metals signed by Matthew Anderson who attests that that job is still waiting

3   for Mr. Meeks upon his release.

4   He has two parents who are fully supportive of him, Eugene and Sylvia Meeks,

5   along with three brothers, also all very supportive of him, including one who is an

6   attorney,  a member of the State Bar of Michigan.  Those parents have agreed to

7   serve as a third-party custodian of Mr. Meeks and we heard from his mother, Sylvia

8   Meeks, who I would suggest to the Court could not have come across as anything

9   other than a law-abiding, concerned citizen with no baggage, to use a colloquialism.

10   Your Honor, my client has no resources to flee and in fact, has no passport.

11   Your Honor, his only prior criminal contact was a misdemeanor Drunk Driving in 1997,

12   15 years ago --  or 13 years ago.  But, Your Honor, all of these things weigh heavily

13   that my client is neither a flight risk nor a danger to the community.

14   Very briefly, Your Honor, my comments as to the evidence will be confined to

15   this.  Judge, the testimony of the Agent, Leslie Logan (sic) was that for two years the

16   FBI investigated and had contact with this group that my client is alleged to have been

17   a member of.  During cross-examination, the Agent admitted to me and to the Court

18   that at that time they are aware of no violent acts that this -- that my client or this

19   group perpetrated.  They are aware of no acts against police officers or ordinary

20   citizens.  They are in fact aware of nothing other than, as Mr. Swor and Mr. Rataj, Mr.

21   Roberts have admirably summarized, that's all they've done.

22   Your Honor, my client was stated to have made the statement that he would

23   want to die by cop-a-cide and Your Honor, regardless of what statements are made

24   by other Defendants in this case, my client makes a total of two or three statements

25   on each one of the statement at most, particularly the two tapes that are the focus of

1    the Government's proffer.  One of those statements is a long soliloquy about how he

2    didn't like how a police officer in his AA/NA group during an AA/NA discussion who

3    was accused of running over a pregnant woman got off just because he was a police

4    officer.  Another time, Your Honor, he makes a very generalized statement of well,

5    you don't have to go after the minions.  You can go after the top people, but again no

6    specific threat, no specific indication that there was any action meant to be solicited

7    by that comment or suggestive that there was any plan related to that statement.  In

8    fact, Your Honor, when my client was arrested he like all the others in this Indictment

9    peaceably surrendered, did not resist the police.  My client did not attempt to die by

10   cop-a-cide; in fact, did just the opposite.  He cooperated with the FBI.  He waived

11   Miranda.  He gave them a statement.  He answered their questions.

12          Judge, there is, I submit to you, certainly a combination of conditions that this

13   Court can fashion that would satisfy the two concerns we have here today and that is

14   a -- this protection of the community and his appearance.  Judge, I would ask this

15   Court to issue an Order of Pretrial Release for my client.  I would ask that Order to

16   contain an assignment of his parents, Sylvia and/or Eugene Meeks as his third-party

17   custodian, that he be forced to keep his job and maintain employment and that he be

18   given home detention at his parent's home in Washtenaw County.  That if the Court

19   felt it necessary to add even the additional element of a tether, it could be added.  But

20   all those things certainly would assure this Court of the two primary -- the two factors

21   we are here today and that is both protection of the community and his appearance in

22   court.  Thank you.

23          MR. SEIKALY: Good evening, Judge.  Christopher Seikaly.  As you

24   know, I represent Jacob Ward.

25          Judge, I adopt the law stated by Mr. Swor and the other co-defendants, the

statements made.  I would like the Court to adopt or allow me to adopt the Pretrial

Services Report which indicated that he was not a flight risk.  The only reason that

Detention Order was entered, as you know, was because of the seriousness of the

charges.

He has no major criminal history.  He had a misdemeanor assault case back

Mr. Ward is 33 years old.  At the time of the arrest he was living with his mother

who was up and testified, Miss Bober.  I hope I pronounced it right that time.

He has no major criminal history.  He had a misdemeanor assault case back

when he was 19, about 14, 15 years ago.  He served a probationary term.  He

successfully completed the probation.  There is no history of him not appearing for

any court proceeding that was scheduled.  There have been no Capiases issued, no

warrants for his arrest issued for failing to appear in court.

His mother testified that she would be willing to be the third-party custodian,

that she would tell this Court should her son violate any of the conditions that you

gave.

He has a potential job as a pizza delivery person with Domino's Pizza.  He's

hoping that should the Court allow him to leave -- be released on pretrial bond, that he

would get that job delivering pizzas.

When he was arrested they found no guns, no bombs, no bomb-making

material him.  When the Agent that was here, Agent Lawson (sic),  I asked her if there

was any evidence that he had made bombs, supplied material for bombs, did anything

concerning bombs and her response was no.

The only recording that he is on is the one from the 20th.  He was not in the trip

to Kentucky, so he wasn't there when this statement was made allegedly by Mr.

Stone.  He was at the meeting for the 20th of February, 2010 but that was a whole

bunch of people that seemed to me talking over one another.  I think one of the

attorneys said it sounded like a barroom discussion where one guy would say something and everybody is laughing and saying other things.  The only discussion that Mr. Ward had was that he described a police officer who was arrested for -- or drunk driving and nothing ever happened with him.  There's never been any statement -- there has not been any statements or any evidence presented or proffered that he made any threats against authority, that he did anything other than play Army.  That's not illegal.

His mother took away his guns.  He has no weapons.  His mother is a Corrections Officer for the State of Ohio and is probably the best person to keep an eye on somebody and report to the Court any deviation from the rule that you might set down.

He's not a flight risk.  He has no funds.  He has a car.  I asked Mom how long it took her to get here from Huron, Ohio and it was just under two hours, so it's not a great distance for him to go to come to court.  He'd be able to report for any pretrial service meetings that are required and more importantly he would be able to come to my office to assist in the defense of his case.

There are conditions that this Court could impose that would assure that the safety of the community is protected, that he appears for court.  That in my brief I believe I asked the Court to allow him to reside with his mother in Huron, Ohio appoint her as a third-party custodian, perhaps give a reasonable curfew, regular reporting of course to Pretrial Services and either home detention or a GPS tether.  That would give him the opportunity to help in his defense and to proceed in his life.

Judge, more importantly there really has been nothing offered to show other than a photograph of him with a group of individuals holding a gun other than I think there was a video that we saw that showed him with a gun.  It doesn't -- there's no

1    evidence proffered that showed him threatening anyone, indicating that he wanted to

2    kill police and indicating that he wanted to overthrow the Government of the United

3    States or anything of that nature.

4        I adopt the statements and the law indicated by co-counsel as to the weight of

5    the evidence and sufficiency of the evidence.  Thank you, Judge.

6        THE COURT: Thank you.

7        MR.  SEIKALY:  Did you have questions?

8        THE COURT:  I don't.

9        MR. SCHARG:  Good evening, Your Honor.  Again, Henry Scharg

10   appearing on behalf of Kristopher Sickles.

11       I'll be brief.  First of all, I'd like to adopt the statements and arguments of

12   brother counsel in terms of the weight of the evidence.

13       It is our position that Mr. Sickles should be released on some type of pretrial

14   release.  I believe that there are conditions that can be set by this Court to address

15   the issues of danger to the community.  There is no risk of flight based upon the

16   Pretrial Services Report.

17       In terms of background, Mr. Sickles is 27 years old.  He is married.  His wife,

18   Kelly is in the courtroom and as the Court probably should recognize separate from all

19   the other proffers today is that the Government did not see a need to cross-examine

20   her in terms of her ability to act as a third-party custodian.  I assume that's on -- I

21   assume -- I shouldn't assume but I do assume that's based upon the fact that she

22   would be an appropriate and proper third-party custodian.

23       At the time of his arrest I believe on March 27, Mr. Sickles was home in the

24   prefabricate house or trailer that he owns and cohabitates with his wife and two minor

25   children who are four years old and I believe eight months old.  He was providing

1   home care, daycare for his children while his wife works outside the home.  At the

2   time that the law enforcement executed a Search Warrant, Mr. Sickles was home

3   alone with his children, offered no resistance.  There was a cooperative surrender.

4          All weapons and ammunition that Mr. Sickles possessed were seized at that

5   time.  Based upon my conversation with his wife, Kelly, who's here and if the Court

6   has any additional questions of her she would be prepared to answer any concerns

7   that court has, is that all weapons have been removed from that home.  She does not

8   -- she was not aware of any agenda of the Hutaree.  She does not adopt any of the

9   agenda of the Hutaree.  She does not agree with any of the philosophy of the

10  Hutaree.  She also has indicated that her main concern is the welfare of her children

11  and obviously there's a void in the ability to provide for daycare for her children who

12  are the primary concern of her's and she assured me and I'm sure she will assure the

13  Court and I believe that the Government has no issues with the fact that if Mr. Sickles

14  violated any conditions of this Court, that she would contact the Court regarding any

15  violations.

16         The Government at one time argued the fact that because the Sickles lived

17  outside the Eastern District of Michigan and he lives in Sandusky which is where that

18  amusement park, Cedar Point is very close to Huron, that that was a concern.  As I

19  argued before and I argue today, their home in Sandusky, Ohio is closer to this

20  courthouse than a lot of other cities in Michigan that are in the Eastern District.  I see

21  that as a positive -- that geography location as a positive and not as a negative

22  because in fact he is away from the main area, training area of the Hutaree in

23  southeast Michigan and in fact, he's outside the -- he's outside the radar and he's

24  outside the area which I think -- which goes in his benefit as that he would be no

25  danger to the community and no danger that he would be communicating with other

1     members or co-defendants in this case.

2          We believe furthermore, as I indicated yesterday, the Ohio militia, I was

3     correct.  It has two members.  He participated in these training sessions and as you

4     learned yesterday, that although there was a number of training sessions over a

5     period of two years, Mr. Sickles was not present at a significant number of those.  He

6     was not present during the trip to Kentucky where the manifesto speech was voiced.

7     He was not present at the -- either one of the weddings.  He was not present at the

8     funeral of the -- this facade funeral in Ann Arbor.  He was present for some training

9     sessions and I say that because it appears that he was not in the nucleus of the

10    Hutaree Movement.  He was more of an outsider than an insider in many respects

11    who participated in this militia training.

12         His  -- if this Court -- his criminal record involves one misdemeanor in 2004

13    where he did not serve any time; it was fines and costs in disseminating some

14    improper, inappropriate materials.

15         If the Court grants some type of pretrial release in this matter as to third-party

16    custodianship, he would reside with his wife in their home with the two children.  We

17    are not -- we are seeking and asking the Court to consider home detention.  There's

18    no reason for him to leave the house other than to go to court and other -- for other

19    reasons that are approved by the Court.  His main role if he was released on bond

20    was to take care of his two minor children in the home while his wife worked.  Pretrial

21    house arrest with other conditions set forth by this Court should assure -- again

22    should assure the Court that he's not a danger, no risk of flight and/or danger to the

23    community.  Thank you.

24         THE COURT: Thank you, Mr.  Scharg.  Mr.  Weiss.

25         MR. WEISS: Thank you, Your Honor.  First of all, with the Court's

1   permission I'll incorporate the remarks made previously by Defense Counsel and just

2   to relate a few remarks as they relate to Mr. Piatek.

3          First of all, the statute talks about whether the Court can set conditions or a

4   combination of conditions that will reasonably assure the appearance of the person

5   and the safety of the community.  I stress the -- or the phrase reasonably assure

6   because at times during Mr. Waterstreet's remark to the Court he kept using the term

7   or the word guarantee.  The statute doesn't require a guarantee and the cases

8   construing that phrase differentiate between reasonably assure and guarantee and

9   guarantee is not required.

10         Cognizant that the factors under 3142(g) first is the nature and seriousness of

11  the offense.  No question that the offenses alleged in the Indictment are serious, but

12  the statute creates a rebuttable presumption, not an irrebuttable presumption which at

13  times listening to the Government's argument, it's because of the nature of the

14  offenses that ipso facto they're to be detained.  The statute doesn't require that and

15  the Supreme Court in the Salerno (phonetic)  case when it upheld the constitutionality

16  of the Bail Reform Act of l984 made reference to the fact that it's a rebuttable

17  presumption, not irrebuttable.

18         In terms of the weight of the evidence, there's no question that there was

19  evidence introduced that would indicate that Mr. Piatek is a member or was a member

20  of Hutaree, but as the testimony indicated both here and at the Detention Hearing in

21  Indiana, membership in Hutaree is not a criminal offense.  The fact that he attended

22  various training sessions and I appreciate the Court's colloquy with Mr. Swor in terms

23  of that the Case Agent didn't know all the information and that had the Undercover

24  testified, that perhaps we would have gotten additional more information.  I appreciate

25  that concern, but we didn't limit who the Government brought.  The Government knew

1    it had a burden of going forward and of ultimately persuading the Court that the

2    presumption has not been overcome.  They chose the individual that they presented

3    and whether that person knew everything, a little bit or nothing, the Government with

4    all due respect will have to bear that burden, no pun intended.  But not us.

5         Going quickly through the Agent's testimony as relates to Mr. Piatek.

6    Apparently something occurred in December of 2008 regarding an individual who had

7    a Federal firearms license and was approached about maybe getting a family member

8    out of custody.  The Agent indicated Mr. Piatek had nothing to do with that.        In

9    November of 2008 there was some talk about or testimony regarding a Internet radio

10   broadcast.  Again, Mr. Piatek had nothing to do with that.

11        In June, June 13th of 2009, there was a training session and Mr. Piatek was

12   present.  When I asked the Agent what happened there and what Mr. Piatek's role

13   was, she indicated that they were split up in various patrol groups.  She doesn't know

14   what group Mr. Piatek was in or what that group did.

15        He was present apparently at the July 25th, 2009 barbecue and from the

16   testimony it doesn't appear that anything other than a normal barbecue transpired.

17        There was the August 22nd, 2009 training session in the woods.  It was an

18   exercise.  Again, we don't know what transpired, although we do know that there was

19   a photograph and there were a number of individuals.  Not all of those individuals

20   were charged and Mr. Waterstreet at length during his summation indicated well,

21   there are these other people out there and if you allow Mr. Piatek or the others to be

22   released on bond, that these other people may help them.  Well, we didn't frame the

23   Indictment.  We obviously didn't tell the Government or determine who was going to

24   be indicted.  I would assume that the Government made its decision based on the

25   information that they have and if they truly believed that the other 25 or so members

1    were really a danger to other persons or the community, that they would have taken

2    action.  These people were arrested about a month ago and to the best of my

3    knowledge no additional members have been detained or brought before a judicial

4    officer or arrested.  So with all due respect, I think that argument has to be given

5    whatever consideration it should be.

6         Then we go to November 7, 2009.  There was again a training session.  Mr.

7    Piatek is alleged to have been present.  They were at different locations.  Some holes

8    were dug, but in terms of what Mr. Piatek did or what he was exposed to we don't

9    know.

10        Then there was something transpired on December 12th, 2009.  Mr. Piatek is

11   not present.

12        On January 9th, 2010 is when the testimony indicates that this discussion was

13   had regarding the real ops, something to happen in April 2010.  Significantly, Mr.

14   Piatek is not present.  Now Mr. Waterstreet at length talked about going back to law

15   school and about well, if you have a note and if you have a gun and you walk into a

16   bank.  The problem is he wasn't there and there is no information either on this record

17   or in the record in Indiana to indicate that he was made aware of that or that he knew

18   anything about it.  So we don't even have the note, let alone the gun, let alone the

19   mask, let alone walking into a bank because he wasn't there and knew nothing about

20   it.

21        I believe also December 12th, 2009 was the wedding.  Again, Mr. Piatek was

22   not present.

23        We then go to January 20, 2010 when there was an email that was sent from

24   Mr. Stone.  We have no information as to whether or not it was sent to Mr. Piatek or

25   he received it, but apparently it was a diagram or diagrams that were obtained from a

1   recognized publication, Wikipedia, and again I'm not sure what if any bearing that has

2   upon the weight of the evidence against Mr. Piatek.

3       Admittedly, Mr. Piatek was present for the trip to Kentucky on or about

4   February 6, 2010 and I listened to the recording that was introduced at the Detention

5   Hearing in Indiana as well as the transcript that was presented to Defense Counsel in

6   Indiana and in reviewing that, number one, Mr. Piatek doesn't say anything and the

7   testimony of the Agent who testified in Indiana indicated he didn't know what if any

8   reaction Mr. Piatek had or whether he had even heard it.  But significantly his voice

9   and his words do not appear on the tape recording, and Mr. Waterstreet for the Court

10  a short while ago read a portion of that.  The phrase we want to take our nation back,

11  we want to take our country back.  If we go on the radio and we listen to Limbaugh or

12  Beck or Hannity or turn on Fox News, there are millions of people in this country that

13  want the country back to the people.  There's nothing in there about firearms or IEDs

14  or explosives or shooting people or killing police officers; it's simply we want to take

15  our country back.  So whether he heard it or not, it's like listening to the radio.

16      The other day when Congress passed the Health Care Plan and occasionally I

17  do listen to Limbaugh; sometimes I find it humorous.  Limbaugh was talking about that

18  the bastards that voted for it should be killed.  Did I have an obligation to call the FBI

19  or the FCC because Limbaugh was advocating that the members of Congress that

20  voted for the Health Care Plan should be killed?  I have a real problem with impacting

21  a man's freedom based on whether he heard something and if he heard it, it's

22  advocating taking the country back, which millions of people are talking about these

23  days.

24      Then -- that's the last that we hear of Mr. Piatek is that conference.  The

25  February 20th clip and transcript that were introduced and which a lot of discussion

1    and testimony was had, Mr. Piatek was not present.  He was not there.  He's not part

2    of the conversation.  He wasn't even there and even though the Government in their

3    response to my motion to revoke the Detention Order makes reference that he's

4    charged in two 924(c) counts, he's not charged in Count Five which deals with the

5    firearms that were present at the training on or about February 20th.  And in Count

6    One, I believe Count -- on page seven where it talks about that every conspirator that

7    was present at the meeting had a firearm and was charged in Count Five.  He was not

8    there.  Again, he's being held accountable or the Government will want to hold him

9    accountable and have him detained for something that transpired that he wasn't even

10    around for, that he wasn't present and there is nothing either on the Indiana record or

11    this record that he was aware of it, assented to it, whatever adjective anyone wants to

12    use.  He didn't know about it, there's no proof that he did and there's no proof that he

13    participated in it.

14          Admittedly when he was arrested, he wasn't at home but search warrants were

15    executed at his residence and about 40-some guns were taken and about 13,000

16    rounds of ammunition.  The testimony at the Indiana Detention Hearing indicated that

17    there no illegalities associated with either the guns or the ammunition.

18          There was also testimony presented that his hobby was collecting weapons

19    and I believe when -- if the FBI did a thorough search of his residence, they will find

20    receipts for lawful purchases going back to the early  '90s.  We have the accumulation

21    of a hobby over approximately a 20-year period and again, no illegality, no

22    impropriety.

23          He also had a State-issued permit or license and if the Court sees fit to grant

24    him bond, we have no problem with turning that license in and having it suspended for

25    whatever period of time the Court deems it appropriate.

1       As it relates to the condition about character, his mental/physical condition,

2   family ties to the community, he has no mental or physical abnormalities.  He has four

3   siblings.  He has a daughter, two grandchildren.  He is the primary caregiver for a

4   special needs brother with whom he owns a family residence.  He is friendly with his

5   neighbors.  He assists in community endeavors such as the Cub Scouts and Boy

6   Scouts and participates in the 4th of July parade.  Here the Government is alleging

7   this man can't stand the Government, can't -- but yet he celebrates our Government's

8   independence.

9       He's a member of the Fraternal Order of Police.  Yet he can't stand police

10  officers, he wants to kill them, but he's a member of the FOP down there.  He was

11  described by his neighbors as not hurting anyone and that they would feel

12  comfortable him watching their children.

13      He's been employed for the same job for 17 years and he goes to work

14  everyday.   He has no prior convictions.  There was some testimony introduced in

15  Indiana that about 20 years ago there was a traffic matter for which he was not

16  convicted.  Judgment was withheld.  He was placed on supervision, completed the

17  supervision without incident and the case was dismissed.  So there's at least a

18  history, even though there's no conviction, of being able to abide by conditions of

19  supervision.

20      I will note in Mr. Waterstreet's response to my motion to revoke that he made

21  an allegation about a girlfriend going to the authorities in February of this year

22  concerned about Mr. Piatek having a weapon and that she would be injured.  To the

23  best of my knowledge, he was never charged.  I don't believe he was ever

24  investigated because he's never been contacted by any law enforcement regarding

25  this and it's been several months, and during the week before he was arrested, he

1    went out on a date with this woman and I trust if they did a thorough search they will

2    find that this weekend is his birthday and it's also the birthday of this lady friend's

3    brother and that she had planned a joint birthday for both Mr. Piatek and the brother

4    this weekend.  So if this woman is concerned, why a month or two months after this

5    supposedly articulated concern she's planning a birthday party for him and goes out

6    with him?

7            So there is no criminal history.  There's no indication of any violence and I

8    would also indicate that although the ties that I've indicated are to Indiana, the statute

9    reads ties to the community and the cases that I cited in my brief indicate it doesn't

10   have to be the community where the Defendant is charged.  It can be any community

11   in the United States where the Defendant has ties.

12          He doesn't have access to any of his weapons right now.  There's testimony

13   that was uncontradicted at the Detention Hearing in Indiana that he's never misused

14   or utilized his weapons for any purposes and would not hurt anybody.

15          I respectfully submit that if the Court wanted to place him on tether -- he

16   resides with his brother in a house that the family has owned since the 1950s.  He

17   doesn't have a problem with putting that up as collateral too, knowing that the family

18   residence if he did something, which I don't believe he would, would be gone and it's

19   been in the family since the 1950s.  It was evaluated by a State agency a couple

20   years ago, he believes for $160,000 and there is no mortgage.

21          So in terms of the third-party custody of his brother who's a professional

22   accountant, he has a college degree and I believe also a Masters Degree in addition

23   to a Bachelors degree.  Tether, putting up his own residence -- with all due respect

24   putting your money where your mouth is I think the Court with all due respect can

25   fashion a combination of conditions which would reasonably assure his continued

1   presence and the safety to the community.  Does the Court have any questions?

2              THE COURT: No.  Thank you.  Mr. Roberts, I do have one question

3   about Mr. Meeks.  The Government argues that -- I'm sorry -- it's you, Mr. Satawa.

4   I'm sorry.  The Government argues that your -- it was your client that the Government

5   says got material from his job to manufacture explosives.

6              MR. SATAWA: What the Government I believe claimed in their brief was

7   that my client has a military history and therefore some sort of special knowledge

8   nondefined about explosives, which has not been proven or shown in any way and

9   also that his job at Interactive Metals, which is a scrap metal and demolition company

10  that my client had somehow access to both a truck and scrap metal that would be

11  used for an explosive device.  That is my understanding of the allegation that they

12  made.  I suppose Mr. Waterstreet could be asked more about that.  But Judge, the

13  fact that my client was a United States Marine and now works for a scrap metal

14  company can mean a lot of things other than what the Government has proffered as

15  well.

16             THE COURT: Thank you.  Then I have a question from -- for any of the

17  Defense Counsel.  Can someone give me a working definition of the New World

18  Order?  I think somebody gave me something, but I didn't quite write it down.  Mr.

19  Helfrick.

20             MR. HELFRICK: I did a Google search either last week or earlier this

21  week and there's like any number of theories or whatever definitions of what the New

22  World Order is, but most of them are these conspiracy theories that there's some

23  group of individuals or Governments that are controlling basically the world or plan to

24  control the world.  But the New World Order is not equivalent to the United States of

25  America.  If you do a Wikipedia or Google search, you'll see there's a number of

1    different theories of what the New World Order, who it is, what it is, what they're up to,

2    but it's these conspiracy theories.

3            THE COURT: Thank you.

4            MR. WATERSTREET: If I may, I perhaps can help you because I made

5    reference to it in the original detention hearing.

6            THE COURT: All right.  It's in the Indictment also, isn't it?

7            MR. WATERSTREET: Yes, Your Honor.

8            THE COURT: So, yes.

9            MR. WATERSTREET: On page eight of my opening remarks on March

10   31st.  The New World Order who they refer to as an elitist in charge is a powerful and

11   secretive elitist group with global agenda that seeks to have one Government and to

12   supplant the Government of the United States and is working with the United States.

13           As to the question as to Mr. Meeks, Your Honor, the proffer was that Mr.

14   Meeks was tasked by David Stone to obtain different pieces of metal or different

15   metals in order to help make the explosives.  That's the proffer.

16           THE COURT: All right.  Mr. Waterstreet, do you have anything more that

17   you want to put in the record?

18           MR. WATERSTREET: No.  I think we've gone back and forth long

19   enough, Your Honor.

20           THE COURT: All right.  Thank you.

21           MR. SATAWA: Judge, I don't take exception to anything Mr. Waterstreet

22   said.  I mean the idea of task versus actually having done anything is obviously two

23   different things.

24           THE COURT: Thank you.  All right.  Anyone with anything else before

25   we adjourn for today?

1        MR. WATERSTREET:  No, your Honor.

2        THE COURT: Thank you.  We are adjourned.  I'll issue an Order soon.

3   Thank you.  Excuse me, everyone.  Mr. Scharg has something he wants to put on the

4   record. Yes.

5        MR. SCHARG: Relative to Mr. Sickles, if you do not release him on

6   bond, could he -- could you recommend that he be transferred to Milan because of the

7   fact that his family all live in Sandusky, Ohio?  He's now in Sanilac County which is six

8   hours away and it is inconvenient to all parties.  If you do not grant pretrial release, we

9   request detention at Milan.

10        THE COURT: All right.  Thank you.

11        MR. ROBERTS: Your Honor, same request because it's in proximity to

12   my office and my client's family.

13        THE COURT: Okay.  There are other Defendants who are putting in a

14   request for Milan?  Anybody who doesn't?

15        MR. THOMAS: Joshua Stone does.

16        THE COURT: Is there anyone who does not?  Okay.

17        MR. RATAJ: Everybody does, Your Honor.  Thank you.

18        THE COURT:  Thank you.  It's only a request; you all know that.

19   Anything else?  Thank you.  We're adjourned.

20        **(Proceedings adjourned at about 6:38 p.m.)**

21              **- - -**

22        **COURT REPORTER'S CERTIFICATION**

23

24

25   STATE OF MICHIGAN)

1                        )  SS.

2       COUNTY OF WAYNE  )

3

4

5       I,  Janice Coleman,  Official Court Reporter, certify that the

6       foregoing pages are a correct transcript from the record of

7       proceedings taken by me to the best of my ability in the

8       above-entitled matter.

9

10

11                       S/_____

12                          JANICE COLEMAN, CSR 1095/RPR

13

14      DATED:  May 10, 2010

15

16

17

18

19

20

21

22

23

24

25