UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                        Case No: 10-20123
                                             Honorable Victoria A. Roberts

DAVID BRIAN STONE, ET AL.,

       Defendants.
_____/

## ORDER GRANTING DEFENDANTS'
## MOTIONS FOR JUDGMENT OF ACQUITTAL ON COUNTS 1-7

## I.     INTRODUCTION

This matter is before the Court on Defendants' motions for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.  Each Defendant filed an individual motion.  The Government filed a response in opposition to Defendants' motions (Doc. 761).  A hearing was held on March 26, 2012.

The Court considered the parties' arguments and reviewed the evidence offered at trial.  Defendants' motions are **GRANTED**.

## II.     BACKGROUND

Defendants are charged with: (1) Seditious Conspiracy (18 U.S.C. § 2384); (2) Conspiracy to use Weapons of Mass Destruction (18 U.S.C. § 2332a(a)(2)); (3) Use and Carrying of a Firearm During and in Relation to a Crime of Violence (18 U.S.C. § 924(c)(1)); and (4) Possessing a Firearm in Furtherance of a Crime of Violence (18

U.S.C. § 924(c)(1)).  In addition, Defendants David Stone, David Stone, Jr., and Joshua Stone are charged with weapons-related offenses.

Trial began at the beginning of February.  The Government's proofs closed on March 22, 2012; the following day Defendants filed Motions for Judgment of Acquittal and concurrences in each others' Motions.  Defendants move for acquittal on the conspiracy charges (Counts I and II), as well as the charges dependent on the existence of the conspiracies (Counts III-VII). On March 25, the Government responded. The Court heard arguments on March 26.

## III.    ANALYSIS

### A.    Standard of Review

Rule 29(a) of the Federal Rules of Criminal Procedure allows defendants to move for a judgment of acquittal at the close of the prosecution's case.  It reads:

> **(a) Before Submission to the Jury.** After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. The court may on its own consider whether the evidence is insufficient to sustain a conviction. If the court denies a motion for a judgment of acquittal at the close of the government's evidence, the defendant may offer evidence without having reserved the right to do so.

In reviewing a Rule 29 motion, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Though the Court may "draw reasonable inferences from basic facts to ultimate facts," *see id.*, it must be mindful that "charges of conspiracy are not to be made out by piling inference upon inference."  *Ingram v. United States,*

360 U.S. 672, 680 (1959) (quoting *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943)).

**B.    Conspiracy Law and the First Amendment**

In order to sustain a conviction for conspiracy, the Government must prove that each Defendant: (1) agreed to violate the law; (2) possessed the knowledge and intent to join the conspiracy; and (3) participated in the conspiracy. *See United States v. Sliwo*, 620 F.3d 630, 633 (6th Cir. 2010); *see also* Sixth Circuit Pattern Jury Instructions §§ 3.01A, 3.03 (To prove a conspiracy, the government must show that (1) two or more individuals conspired to commit the crime; and (2) that each defendant voluntarily joined the conspiracy, knowing of its main purpose and intending to help advance its goals.). In addition, a conspiracy requires a specific plan. *See Pinkerton v. United States*, 145 F.2d 252, 254 (5th Cir. 1944) (holding that a criminal conspiracy requires (1) an object to be accomplished; (2) a plan or scheme embodying means to accomplish that object; (3) an agreement by two or more defendants to accomplish the object; and (4) an overt act, where applicable); *see also United States v. Bostic*, 480 F.2d 965, 968 (6th Cir.1973).

"The elements of a conspiracy may be proven entirely by circumstantial evidence, but each element of the offense must be proved beyond a reasonable doubt." *United States v. Wexler*, 838 F.2d 88, 90 (3d Cir. 1988) (citations omitted).  Indeed, it is common for a conspiracy to be proved by circumstantial evidence; a criminal agreement is rarely explicit.  Thus, in the absence of "proof of a formal agreement among the conspirators . . . a tacit or mutual understanding . . . is sufficient to show a conspiracy." *United States v. Lee*, 991 F.2d 343, 348 (6th Cir. 1993).  "One of the requisite elements

3

the government must show in a conspiracy case is that the alleged conspirators shared a 'unity of purpose', the intent to achieve a common goal, and an agreement to work together toward the goal." *Id.* (citation omitted). "In the absence of evidence of these essential factors, a guilty verdict on a conspiracy charge cannot be sustained." *Id.*

The issue of guilt or innocence in a conspiracy is always an individualized inquiry. *Kotteakos v. United States*, 328 U.S. 750, 772 (1946) ("Guilt with us remains individual and personal, even as respects conspiracies. It is not a matter of mass application."). The government must prove the intent of each individual conspirator to enter into the conspiracy, knowing of its objectives, and agreeing to further its goals. *See* Sixth Circuit Pattern Jury Instruction § 3.03. Consistent with these principles, it is useful to note that there are two distinct intents required to prove the crime of conspiracy -- the basic intent to agree, which is necessary to establish the existence of the conspiracy, and the more traditional intent to effectuate the object of the conspiracy. *United States v. United States Gypsum Co.*, 438 U.S. 422, 443 n.20 (1978); Sixth Circuit Pattern Jury Instruction, Committee Commentary 3.03; 2 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 12.2 (2d ed. 2011).

Where a conspiracy implicates First Amendment protections such as freedom of association and freedom of speech, the court must make a "specially meticulous inquiry" into the government's evidence so there is not "an unfair imputation of the intent or acts of some participants to all others." *United States v. Dellinger*, 472 F.2d 340, 392 (7th Cir. 1972). It is black-letter law that "[a] defendant cannot be convicted of conspiracy merely on the grounds of guilt by association, and mere association with the members of the conspiracy without the intention and agreement to accomplish an illegal

4

objective is not sufficient to make an individual a conspirator." *Lee*, 991 F.2d at 348.

Likewise, mere presence at the scene does not establish participation in a conspiracy.

*United States v. Paige*, 470 F.3d 603, 609 (6th Cir. 2006).

The Government has consistently maintained that this case is not about freedom of speech or association, but about the specific acts of violence alleged in the Indictment. The Court relied upon these representations in denying Defendants' pre-trial motions for a jury instruction on the *Brandenburg* case, and the heightened *strictissimi juris* standard for sufficiency of the evidence (Docs. 610, 618). However, much of the Government's evidence against Defendants at trial was in the form of speeches, primarily by Stone, Sr., who frequently made statements describing law enforcement as the enemy, discussing the killing of police officers, and the need to go to war. Indeed, at oral argument on March 26, 2012, the Government asked the Court to find the existence of a seditious conspiracy based primarily on two conversations involving Stone, Sr., and others -- the first on August 13, 2009, and the second on February 20, 2010.

Additional evidence the Government relies on includes Defendants' participation in various military-style training exercises, anti-Government literature found in some of the Defendants' homes, and guns and ammunition collected by various Defendants. But, none of these things is inherently unlawful. While this evidence may provide circumstantial proof that some of the Defendants planned to do something unlawful, the Indictment sets forth a specific plot to draw law enforcement to Michigan from around the country by killing a member of local law enforcement. The Indictment alleges the Defendants would then attack the funeral procession and retreat to "rally points" to

conduct operations against the government with the intent that these operations would be a catalyst for a more widespread uprising between the Hutaree and the Federal Government.

Because the Government's proofs consist overwhelmingly of speech and association, the Court takes particular care to analyze the evidence against each defendant to determine whether it is capable of convincing beyond a reasonable doubt. *See Dellinger*, 472 F.2d at 393.

### C. Count I- Seditious Conspiracy

### 1. Seditious Conspiracy Requires that Acts of Force be Directed Specifically at the Government of the United States

Count One of the Indictment charges Seditious Conspiracy, 18 U.S.C. § 2384. Under that statute:

> If two or more persons in any State or Territory, or in any place subject to the jurisdiction of the United States, conspire to overthrow, put down, or to destroy by force the Government of the United States, or to levy war against them, or to oppose by force the authority thereof, or by force to prevent, hinder, or delay the execution of any law of the United States, or by force to seize, take, or possess any property of the United States contrary to the authority thereof, they shall each be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C.A. § 2384.

Specifically, the Government charges Defendants with conspiring to "oppose by force the authority" of the United States Government. Essential to that charge, Defendants must have agreed to oppose some positive assertion of authority by the United States Government; mere violations of the law do not suffice. *Baldwin v. Franks*,

120 U.S. 678, 693 (1887).

In *Baldwin*, the Supreme Court discussed what must be proven to convict a defendant of seditious conspiracy. The defendant was charged with seditious conspiracy for conspiring with others to unlawfully arrest and expel a group of Chinese citizens from a California town where they lawfully resided. 120 U.S. at 681. The defendant and his coconspirators violently removed the Chinese citizens from their homes and businesses and forcibly placed them on a steam-boat that was departing the town. *Id.* The Supreme Court held that these facts could not support a charge of seditious conspiracy because the force was exerted against the Chinese citizens, and not against the government in its efforts to protect them. *Id.* at 694.

In reaching its conclusion, the Supreme Court made clear that to be convicted of seditious conspiracy, one must specifically oppose by force the government of the United States while it is exerting its authority. The Court stated:

> All, therefore, depends on that part of the section which provides a punishment for 'opposing' by force the authority of the United States . . . . This evidently implies force against the government as a government. To constitute an offense under the first clause, the authority of the government must be opposed; that is to say, force must be brought to resist some positive assertion of authority by the government. A mere violation of law is not enough; there must be an attempt to prevent the actual exercise of authority.

*Id.* at 693. Because Baldwin's conspiracy was for "ill treatment itself," and "not for hindering or delaying the United States in the execution of their measures to prevent it," the charge could not stand. *Id.* at 694.

In *Anderson v. United States*, the Eighth Circuit applied *Baldwin* and dismissed a

seditious conspiracy charge where the force sought to be exerted was "not against those whose duty it should be to execute the laws." 273 F. 20, 26 (8th Cir. 1921). Defendants were charged with seditious conspiracy for conspiring to prevent, hinder and delay by force, various laws of the United States, including the congressional declaration of war with Germany, and laws relating to conscription. *Id.* at 22-23. In furtherance of the seditious conspiracy, the Indictment alleged that the defendants circulated books and periodicals calling for strikes and the overthrow of the capitalist system and criticizing the war and individuals who joined the armed services. *Id.* at 24-24.

Relying on *Baldwin*, the Court stated that for the Indictment to sufficiently charge seditious conspiracy, the purpose of the conspiracy must be "the exertion of force against those charged with the duty of executing the laws of the United States . . . ." *Id.* at 26. The court then held that the Indictment was insufficient because the "force was to be exerted, not against those whose duty it should be to execute the laws, and while attempting to do so, but its application was to be made against industrial and commercial activities by lawless acts during strikes for the purpose of accomplishing alleged socialistic ends . . . ." *Id.*

The law is clear that seditious conspiracy requires an agreement to oppose by force the authority of the United States itself. It must be an offense against the Nation, not local units of government. *See Commonwealth of Pennsylvania v. Nelson*, 350 U.S. 497, 505 (1956) ("Sedition against the United States is not a local offense. It is a crime against the Nation." (citation and quotation marks omitted)). Any overt act in

furtherance of seditious conspiracy must further a common plan to oppose the United States by force; otherwise, "the seditious conspiracy statute would expand infinitely to embrace the entire agenda of anyone who violated it . . . ." *United States v. Rahman*, 854 F. Supp. 254, 260 (S.D.N.Y. 1994); *see also Haywood v. United States*, 268 F. 795, 800 (7th Cir. 1920) ("[The seditious conspiracy statute] should not be enlarged by construction.").

The discussions of seditious conspiracy in *Baldwin* and *Anderson* are important to this case; while the Government presented evidence of vile and often hateful speech, and may have even shown that certain Defendants conspired to commit some crime – perhaps to murder local law enforcement -- offensive speech and a conspiracy to do something other than forcibly resist a positive show of authority by the Federal Government is not enough to sustain a charge of seditious conspiracy. A conspiracy to murder law enforcement is a far cry from a conspiracy to forcibly oppose the authority of the Government of the United States.

As explained more fully in Subsection 3 below, the evidence is not sufficient for a rational factfinder to find that Defendants came to a concrete agreement to forcibly oppose the authority of the Government of the United States as charged in the Indictment; that would be an agreement to retreat to rally points after drawing federal law enforcement from across the country to Michigan to engage in a large-scale uprising or "war" with these agents.

**2.**	**The Seditious Conspiracy Charge in the Indictment Contemplates a Widespread Uprising Against the United States Government**

As the basis for the charge of seditious conspiracy, the Indictment alleges a multi-step plan intended to catalyze an uprising against the United States Government. Second Superseding Indictment (Doc. 293), Count 1, pp. 6-7. The first step of the general plan was to commit a violent act to draw the attention of law enforcement. Among the acts the Indictment alleges members of the Hutaree discussed include: killing a member of law enforcement after a traffic stop; killing a member of law enforcement and his or her family at home; ambushing a member of law enforcement in a rural community; luring a member of law enforcement with a false 911 emergency call and then killing him or her; and killing a member of law enforcement and attacking the funeral procession with weapons of mass destruction. *Id.* p. 6. Although all of these acts are alleged, by the end of the hearing on March 26, 2012, the Government focused the Court's attention on attacking a funeral procession as the plan of the conspiracy.

The second step alleged in the Indictment is that once violent action had been taken and a response by law enforcement provoked, Hutaree members would retreat to one of several rally points. *Id.* p. 6-7. Third, the Hutaree would defend their position and conduct operations against the government. *Id.* Fourth, and lastly, according to the Indictment, the Hutaree intended that this engagement would be a catalyst for a more widespread uprising against the United States Government. *Id.* p. 7.

At the hearing, the Government argued that the final step of the plan – the intent that the Hutaree's engagement with law enforcement would be a catalyst for a more

widespread uprising against the United States Government -- was non-essential to sustain a charge of seditious conspiracy. The Government said that what's essential to the plan is triggering a response from law enforcement from all across the country, which the Hutaree believed would necessarily include representatives of the federal government. The government says sufficient evidence was presented to establish this conspiracy. The Government says that because members of the Hutaree believed that state and federal law enforcement are inherently connected, an attack on a funeral procession of law enforcement from all over the United States would constitute opposition by force to the authority of the United States Government.

The Government's current position is not in accord with the Indictment or a previous order of this Court, where Magistrate Judge Komives recognized that this last stage – the uprising against the Government of the United States -- was a necessary element of the alleged seditious conspiracy. In rejecting Defendants' argument that the Indictment should be dismissed because the alleged conspiracy involved "a local plot, involving a local officer, and a local battleground," Magistrate Komives wrote:

> It is true that the initial step in defendants' alleged plan was the assassination of a local law enforcement official. This first step, however, is alleged to have been a means toward the group's ultimate goal of provoking an armed confrontation with local and federal law enforcement officials. And there can be no doubt that conspiring to deliberately provoke an armed conflict with federal law enforcement officials constitutes a conspiracy to "oppose by force the authority" of the United States and to "by force . . . prevent, hinder, or delay the execution of any law of the United States." 18 U.S.C. § 2384. It may be that the evidence at trial will establish nothing more than a local plot against local law enforcement officials, but the indictment alleges more than this.

Komives R&R (Doc. 269 pp. 6-7), *adopted* Doc. 297. He concluded that "[i]f the

evidence at trial does not establish this second goal of the conspiracy, then *Baldwin* will require that defendants be acquitted." *Id.* p. 9.

The Court need not decide whether a conspiracy to attack the funeral procession of a local law enforcement officer would be within the ambit of the seditious conspiracy statute, though; as explained in greater detail below, the Government did not provide sufficient proof of the existence of any conspiracy at all.

In addition, the Government's Trial Memorandum (Doc. 734) seeks to substantially alter the Government's theory of the case from that charged in the Indictment. The Government says it is not certain whether the Hutaree intended to initiate the conflict, or simply engage in it once it was initiated by others. On the other hand, the Indictment describes a specific plan that was to be *initiated by* members of the Hutaree. The Hutaree's "general plan" was to commit some violent act to provoke a response from law enforcement. After the violent act, the Hutaree planned to attack the funeral procession, and then retreat to a "rally point." From there, they would defend against the government. This engagement would serve as a catalyst for a more widespread uprising against the United States Government.

As Defendants pointed out on March 26th, the Government insisted at the bond hearing in April 2010 that the Hutaree intended to commit an imminent violent act that could result in deaths to civilians. Further, the Court pointed out on March 26, 2012, that the Government said in its opening statement that the Hutaree had a specific plan to attack a funeral procession to draw the attention of law enforcement. The Government has consistently maintained that the Hutaree had a plan to take affirmative

violent action; indeed, Count I of the Indictment contemplates a plan that was to be initiated by the Hutaree.

Nowhere does the Indictment say that the Hutaree simply intended to engage in a conflict once it was initiated by other forces.

The prosecution is not "free to roam at large -- to shift its theory of criminality so as to take advantage of each passing vicissitude of the trial . . . ." *Russell v. United States*, 369 U.S. 749, 768 (1962). If the Government now admits that the plan alleged in Count I of the Indictment did not exist, then Defendants must be acquitted. The inescapable conclusion of such a tactic is that the Government recognizes that its proofs at trial failed to establish the plan described in the Indictment, so it is attempting to formulate an alternative theory of criminal liability. The Government appears to be attempting to broaden the charges contained in Count I; yet, "after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself." *Stirone v. United States*, 361 U.S. 212, 215-16 (1960). This is because defendants are entitled to have fair notice of the criminal charges against them so that they can prepare a defense. *United States v. Combs*, 369 F.3d 925, 935 (6th Cir. 2004).

Defendant's relied upon the Government's theory of the case as set forth in the Indictment to formulate their defenses. The Government cannot now say that the alleged plan set forth in Count I is irrelevant. Any amendment to the Indictment can only be made by the grand jury. *Russell*, 369 U.S. at 770.

### 3. The Evidence Against Defendants is Insufficient to Sustain the Charge

#### i. David Stone, Sr.

The Government's strongest case is against David Stone, Sr.; however, even the evidence against Stone is not enough to sustain the seditious conspiracy charge. First, it is well-settled that a defendant cannot be convicted of conspiring with someone working on behalf of law enforcement, even if that person is working undercover. *See, e.g.*, *United States v. Pennell*, 737 F.2d 521, 536 (6th Cir. 1984) ("[P]roof of an agreement between a defendant and a government agent or informer will not support a conspiracy conviction."). While a government agent may serve as a link between Stone and other conspirators, there must be "genuine conspirators" apart from Stone himself. *See United States v. Rogers*, 118 F.3d 466, 478 (6th Cir. 1997).

Essential to the seditious conspiracy charge is evidence of an agreement between David Stone and the coconspirators to spark an uprising with federal law enforcement after attacking a funeral procession. While the record contains evidence that Stone may have wanted to engage in a war with the federal government and/or "the Brotherhood," it is totally devoid of an agreement to do so between Stone and the other Defendants.

The Government summarized the evidence against Stone in its Response to Defendants' Motions for Judgment of Acquittal and reiterated some of this evidence at the hearing on the motion. (Doc. 761). The bulk of this evidence includes training sessions where various explosive devices and firearms were used and where Stone

14

makes anti-Government statements.  For example, on October 18, 2008, Stone mentions "rally points" and a desire to "kill."  On December 8, 2008 Stone tells Murray in an email to "stand ready" to go to war against the ATF if the ATF "pushes further."  Likewise, on December 20, 2008, Stone refers to one of his guns as a "cop killer."  On August 27, 2009, Stone says a shape charge would definitely take out a convoy.  While vile, all of this speech is protected by the First Amendment.

The Court is aware that protected speech and mere words can be sufficient to show a conspiracy.  In this case, however, they do not rise to that level.  Stones' statements and exercises do not evince a concrete agreement to forcibly resist the authority of the United States Government. His diatribes evince nothing more than his own hatred for -- perhaps even desire to fight or kill -- law enforcement; this is not the same as seditious conspiracy.

At the hearing, the Government contended that the conspiracy evolved on August 13, 2009 when Stone, Joshua Stone, and others plotted an attack on "the Brotherhood," consisting of all law enforcement, local and federal; they discussed killing a local police officer and attacking the funeral procession.  Stone  states that in three days 1,000 members of law enforcement would converge for the funeral, and that he would need mortars.  This "plan" is utterly short on specifics.  Further, it is a stretch to infer that other members of the Hutaree knew of this plan, and agreed to further it.  More importantly, though, is that the alleged plan makes no reference to a widespread uprising against the United States Government.  That Stone may have had some vague belief that local police officers were members of the "Brotherhood," and were, therefore,

somehow connected with federal agents is of no consequence.  *See Rahman*, 854 F.

Supp. at 259-60 (holding that whether Defendant subjectively believed murder of Israeli

citizen would further seditious conspiracy was irrelevant, because the law of seditious

conspiracy has objective limits).

The next time Stone mentions "rally points" is on August 22, 2009; then he tells

the other Defendants if the Government starts backing them in with swine flu

vaccinations, they have a "rally point."  This is obviously insufficient to establish an

agreement between Stone and others to forcibly oppose the authority of the United

States Government.

On September 13, 2009 Stone tells Murray that the Hutaree's goal "is to go to

war."  He mentions killing police officers and their families and says that fifteen or twenty

members of the Hutaree would be ready to pull the trigger.  While these statements are

offensive and disturbing, the Indictment alleges a specific agreement to forcibly oppose

the United States Government -- not to go on a shooting rampage, not to go to war with

police officers in general.  Moreover, a desire or goal to go to war on the part of Stone

alone is not enough to sustain the conspiracy charge against him; the Government

needs to show Stone agreed with at least one other person to carry out the goal.  It did

not.

Stone again mentions going to war on February 6, 2010 while attempting to

attend a militia summit.  He also makes a vague reference to getting to "the feds" and

the Hutaree's intention to oppose the Brotherhood.  Again, absent more concrete

evidence of an agreement to spark the uprising central to the seditious conspiracy

charge, Stone's remarks during the road trip evince little more than Stone's distrust of the federal government and desire to fight against it.

That others in the car did not explicitly oppose Stone's remarks does not convince the Court that there was a specific agreement to oppose the United States Government while that Government exercised its authority, and in the manner specified in the Indictment. This would require too many inferences. While it is often necessary to make certain inferences from circumstantial evidence in conspiracy cases, the plethora of inferences the Government asks this Court to make are in excess of what the law allows. But, the Government crosses the line from inference to pure speculation a number of times in this case. Charges built on speculation cannot be sustained.

Finally, on February 20, Stone engages in a conversation with Meeks, Sickles, Piatek, Joshua Stone, and Clough about killing police officers. Stone again brings up the idea of murdering an officer and attacking the funeral procession. Nothing resembling an agreement to spark an uprising with the Federal Government is reached during this conversation. Defendants toss out ideas of ways in which to kill police that are often incredible; more importantly, they never come to a consensus or agreement on ways in which to oppose federal agents by force. Stone even states, "there's a hundred and one scenarios you can use." This back and forth banter, like the other anti-government speech and statements evincing a desire -- even a goal -- to kill police, is simply insufficient to sustain the seditious conspiracy charge; it requires *an agreement and plan of action*, *not mere advocacy* or hateful speech.

### ii.    Joshua Stone

The Government calls Joshua Stone a central figure in the seditious conspiracy. Evidence of this is woefully lacking. Much of the evidence against Josh Stone, like many of the Defendants, involves his mere presence at the scene while David Stone rants about going to war and killing police. His presence at the scene and association with the Hutaree do not make him guilty of joining any conspiracy, let alone a seditious conspiracy. Nor does his failure to actively disagree transform him into a seditious conspirator.

Joshua Stone was present at and participated in the August 13, 2009 and February 20, 2010 conversations, but no agreement was reached on those occasions and nothing in the record suggests that a prior agreement to forcibly oppose the United States Government was reached.

The other evidence against Josh Stone suggests he had familiarity with firearms and explosive devices, participated in trainings, and shared his father's hatred of the government. But none of this is inherently unlawful. The evidence is not sufficient to sustain the charge that Josh Stone was somehow preparing to act unlawfully -- specifically to engage in an uprising against the Federal Government -- pursuant to an agreement to do so.

### iii.    Tina Mae Stone

The Government says that Tina Mae Stone joined the Hutaree in August, 2009, when she was Stone, Sr.'s girlfriend, and that she soon became an "active, engaged, and vocal member." The Government says that she was party to a discussion on

January 9, 2010, regarding planning for the upcoming trip to Kentucky. She heard Stone, Sr. discuss how the Hutaree needed to be aware that the ATF were all over Kentucky. In addition, she accompanied Stone, Sr. to a meeting with the UCE at the undercover warehouse in Ann Arbor on January 14, 2010. There, while Stone, Sr. and the UCE discussed explosives, Tina Stone inquired whether she needed to buy more coffee in metal cans so that they could be used to make explosively formed projectiles ("EFPs"). She also joked that she would take one for the team and drink more wine, presumably so that the bottles could be used to make explosives. The Government's response brief states that Tina "played an active, unhesitant, and continuing role in obtaining materials to use in building EFPs -- wine bottles, street signs, and cans."

The Government stated at the hearing that Tina Stone's agreement to oppose the government of the United States by force can be inferred from her statements regarding coffee cans and wine bottles, and the fact that she apparently did not object to statements Stone, Sr. made while she was in his presence. Tina Stone's counsel, though, pointed out that she only attended one Hutaree training session, on August 22, 2009, and did not attend any of the three that occurred between that date and the arrest of the Hutaree members. Counsel also maintained that Tina Stone never collected materials for use in making explosives. Further, counsel pointed out that Tina Stone was not even present on the two occasions in which Stone, Sr. allegedly discussed his plan to attack a funeral procession.

The evidence against Tina Stone is minuscule. There is no evidence that she was aware of any plan by Stone, Sr. to attack law enforcement vehicles and to revolt

against the federal government. Further, even if the plan did exist, there is no evidence

that Tina Stone agreed to it, knowing of its objective. That Tina Stone made a joke

about drinking more wine, and inquired whether she should buy more coffee in metal

cans, does not support a reasonable inference that she agreed to oppose by force the

authority of the United States. "[C]onjecture and surmise regarding what a defendant

may have intended or known is insufficient to support a conviction" in a conspiracy

case. *United States v. Coppin*, 1 F. App'x 283, 291 (6th Cir. 2001).

### iv.    David Stone, Jr.

The Government's primary evidence against Stone, Jr. is that he participated

actively in the training sessions, attending eight over the course of the investigation.

The Government says he was also familiar with explosives, as shown by his role in a

demonstration during the June 13, 2009 training. The Government says he was "party

to" discussions of the so-called April Op, and that "if he had not had conflicting plans, he

would likely have been a part of the core group of Hutaree members who were elected

for the February 6, 2010 trip to Kentucky."

The Court cannot infer from Stone, Jr.'s mere presence at training sessions that

he agreed to a plan to oppose by force the authority of the United States. Counsel

pointed out at the hearing that there are many perfectly legal reasons why Stone, Jr.

could have attended the training sessions. The fact that Stone, Jr., and other

Defendants attended training sessions, is not evidence of any agreement at all, let

alone an agreement to oppose the United States by force. Moreover, the fact that

Stone, Jr., and other Defendants did not openly disagree with the hateful, anti-

government speech of Stone, Sr., is not evidence that they agreed with him, or that a plan existed to oppose the United States government by force.  Stone, Jr., does not utter hateful words on any of the hours of tape the Government introduced into evidence.  Most importantly, Stone, Jr. cannot be convicted based on his association with Stone, Sr.

The Government failed to produce evidence of any agreement, and any intent on Stone, Jr.'s part to further or join a conspiracy to oppose by force the authority of the United States Government.   Accordingly, the seditious conspiracy charge against him must be dismissed.

### v.      Michael Meeks

Of the many Hutaree trainings/meetings outlined in the Government's response, Meeks was present at less than ten.  Again, Stone, Sr. does most of the speaking. Meeks chimes in at times with comments such as "the Judicial system must die" and "Whack the cops who are trying to kill ya."  Stone refers to Meeks as a "heavy gunner." Meeks was present during the February 20, 2010 training where Stone makes remarks about attacking a funeral procession for the second and final time.  However, as already noted, during this training the Defendants present were tossing around ideas; no concrete agreement was reached or otherwise evidenced.  Moreover, Meeks barely spoke.

This is the extent of the Government's evidence against Meeks.  Meeks mere presence, association with the Hutaree, and off-the-cuff remarks are insufficient evidence of his intent to join a conspiracy to oppose the United States by force.

21

Further, there is no evidence of his knowledge that the conspiracy involved doing anything more than killing police officers.

### vi.    Kristopher Sickles

As Sickles' counsel pointed out at the hearing, Sickles attended only five Hutaree trainings.  Notably, almost an entire year passed between his first training in September 2008 and his second in August 2009.  During the February 20, 2010 training where the group discusses killing police officers, Sickles -- far from agreeing to an attack on a funeral procession followed by a retreat to rally points to engage in combat with federal law enforcement -- suggests sneaking into officers' homes and poisoning their milk. While this comment -- whether serious or not -- is vile, it is protected First Amendment speech.  It is also evidence that Sickles did not, in fact, agree to any plan to attack a funeral procession, retreat to rally points, and go to war with the Federal Government.

### vii.    Thomas Piatek

The Government calls Thomas Piatek a "dedicated member of the Hutaree," and a "trusted member of the core group." He attended training sessions, and was present on June 13, 2009, when certain Defendants are said to have demonstrated an explosive device.  Witnesses at trial said that Piatek expressed hatred for cops, and considered the Hutaree as family.  He traveled with other Defendants on the aborted trip to Kentucky on February 6, 2010.  The Government says he expressed approval after Stone, Sr. gave an anti-government speech in the van.  In addition, the Government says Piatek had the largest arsenal of weapons and ammunition of any member of the Hutaree, and that he possessed anti-government literature, and military and explosives

manuals.

Counsel for Piatek states that he was not present for the only two conversations the Government identified in which Stone discusses attacking the funeral procession of a law enforcement officer.  Therefore, even if some plan existed, there is no way to infer that Piatek was aware of it, or that he took the next step of agreeing to further it.  Counsel also claims that Piatek slept through Stone's speech in the van on February 6, 2010.

None of the guns or literature Piatek possessed is illegal.  Nor was it illegal for him to attend the Hutaree training sessions. There is no evidence that he was aware of any plan by Stone, Sr. to forcibly oppose the authority of the United States.  Mr Piatek was not even present on the two occasion in which Stone, Sr. discussed his "plan."  The Government has not presented nearly enough evidence for a rational trier of fact to infer that Mr. Piatek was aware of any plan, or that he agreed to further it, knowing of its objective.

### 4.    The Piling of Inferences is Insufficient to Sustain the Charge

While a defendant's participation in a conspiracy may certainly be inferred from the surrounding circumstances, *Paige*, 470 F.3d at 609, to sustain the seditious conspiracy charge fashioned by the Government, the Court would have to "pil[e] inference upon inference.*"  Ingram*, 360 U.S. at 681 (1959) (quoting *Direct Sales*, 319 U.S. at 711) (reversing two defendants' convictions for conspiracy to evade payment of federal taxes where the Court would have to pile "inference upon inference" to conclude that defendants knew of the tax liability and intended to evade that liability); *see also*

*Wexler*, 838 F.2d at 91 ("In a series of cases, this court has been obliged to overturn conspiracy convictions because the defendant was not proven to have knowledge of the illegal objective contemplated by the conspiracy. The inferences rising from 'keeping bad company' are not enough to convict a defendant for conspiracy."); *Coppin*, 1 F. App'x at 289 ("[E]vidence . . . which requires conjecture and inference upon inference, is insufficient to sustain a conviction for conspiracy.").

It is telling that in an investigation that spanned nearly two years, there were only two brief instances in which the alleged plan to kill a member of local law enforcement and attack the ensuing funeral procession was mentioned. Furthermore, the evidence of the necessary next step -- a retreat to rally points from where the larger uprising would occur -- is wholly lacking. The Government did produce some evidence of so-called rally points, but failed to produce evidence of the uprising that would follow. For example, in a conversation from August 22, 2009, Stone Sr. mentions that if the Government "start[s] backing us in with vaccinations, we have a rally point." But, this scenario concerning vaccinations is not mentioned in the Indictment. More importantly, Stone Sr. never discusses any plan about the uprising against the United States that the Government says in the Indictment would ensue after the Hutaree retreated to the rally point; it appears from the evidence that such a plan did not exist.

What the Government has shown, instead of a concrete agreement and plan to forcibly oppose the authority of the Government, is that most -- if not all -- of these Defendants held strong anti-Government sentiments. But the Court must not guess about what Defendants intended to do with their animosity. "The government is

required to present evidence of the defendant's intent, knowledge of and agreement to join a conspiracy." *Coppin*, 1 F. App'x at 291. "Absent such evidence, the government's case will not succeed merely because there is something 'fishy' about the defendant's conduct." *Id.*

The Government's case is built largely of circumstantial evidence. While this evidence could certainly lead a rational factfinder to conclude that "something fishy" was going on, it does not prove beyond a reasonable doubt that Defendants reached a concrete agreement to forcibly oppose the United States Government. "Although circumstantial evidence alone can support a conviction, there are times that it amounts to only a reasonable speculation and not to sufficient evidence." *Newman v. Metrish*, 543 F.3d 793, 796 (6th Cir. 2008) (collecting cases); *see also Wexler*, 838 F.2d at 90 ("The elements of a conspiracy may be proven entirely by circumstantial evidence, but each element of the offense must be proved beyond a reasonable doubt."). This is one of those times. The Court is limited by what inferences reason will allow it to draw. It stands to reason that most, if not all, of these Defendants had a strong dislike -- perhaps hatred -- of the Federal Government and law enforcement at every level. One could also reason that certain defendants wanted to harm or kill law enforcement agents. The evidence certainly suggests that Stone strongly believed in the idea of a need to go to war with certain enemies, including "the Brotherhood."

But, the Court would need to engage in conjecture and surmise to find sufficient evidence that Defendants "shared a 'unity of purpose', the intent to achieve a common goal, and an agreement to work together toward the goal." *Wexle*r, 838 F.2d at 90

(addressing one of the requisite elements in any conspiracy case). "In the absence of evidence of the[ ] essential [conspiracy] factors, a guilty verdict on a conspiracy charge cannot be sustained." *Id.* This is especially true here, where the specific goal contemplated by the Indictment -- a massive uprising against federal law enforcement after a funeral procession has been attacked -- is referenced (and only vaguely) by Stone, Sr. alone.

Tellingly, the testimony of Agent Huag is critical to the Government's case. Agent Huag admitted on the stand that over the course of his investigation of the Hutaree, the group never had: a date, time, target or plan for any attack. Vague anti-government hate speech simply does not amount to an agreement as a matter of law. The Court would need to infer and speculate not only that the other Defendants were aware of Stone's desire to spark a war with the federal government, but that an agreement to do so in the manner alleged in the Indictment was reached. Reason will not allow such an incredible inference on this record.

### D. Count II- Conspiracy to Use Weapons of Mass Destruction

Defendants are charged with conspiracy to use weapons of mass destruction in violation of 18 U.S.C. § 2332a(a)(2). The allegations of Count II of the Indictment specifically incorporate the factual allegations of Count I. In addition, the Indictment states that Defendants "conspired to use, without lawful authority, one or more weapons of mass destruction, specifically explosive bombs, explosive mines, and other similar explosive devices, against persons and property within the United States, that is, local, state, and federal law enforcement officers and vehicles owned and used by local, state,

and federal law enforcement agencies."  Second Superceding Indictment p. 11.

The essence of a charge of conspiracy is an agreement, as explained above. For the same reasons the Court does not find the existence of an agreement with respect to Count I, the Court cannot find that the Government proved an agreement among the Defendants to use weapons of mass destruction in the manner described in the Indictment, beyond a reasonable doubt.

### E.    Count III - Teaching and Demonstrating Use of Explosives, Destructive Devices, and Weapons of Mass Destruction

Defendants Stone, Sr. and Stone, Jr. are charged in Count III of the Indictment with teaching and demonstrating use of explosives, destructive devices, and weapons of mass destruction, in violation of 18 U.S.C. § 842(p)(2).

At the hearing on March 26, 2012, the Government conceded that Count III is derivative of Counts I and II.  Because the Court finds that Counts I and II must be dismissed, Count III is also dismissed.

### F.    Counts IV through VII - Related Weapons Offenses

Counts IV through VII charge weapons offenses related to the alleged seditious conspiracy and conspiracy to use weapons of mass destruction.  Defendants are charged with use and carrying of a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1) (Counts IV and VI), and possessing a firearm in further of a crime of violence (Counts V and VII).

These charges are dependent upon the existence of the conspiracies charged in Counts I and II.  Accordingly, they are dismissed.

## IV.    CONCLUSION

The Court **GRANTS** Defendants' motions for judgment of acquittal on Counts I through VII.  Trial will proceed with Counts VIII, IX, and XIII against Stone, Sr., and Counts X and XV against Joshua Stone.

**IT IS ORDERED.**

S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  March 27, 2012

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on March 27, 2012.

S/Linda Vertriest
Deputy Clerk